# *EXHIBIT C*

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4

5    UNITED WHOLESALE MORTGAGE,    )
     LLC,                          )
6                                  )
                    Plaintiff,     ) Case No. 2:22-cv-10395
7                                  )
         vs.                       )
8                                  )
     KEVRON INVESTMENTS, INC.,     )
9                                  )
                    Defendant.     )
10   _____)

11

12

13

14         VIDEOTAPED DEPOSITION OF KEVIN RHATIGAN

15              AS 30(b)(6) and INDIVIDUALLY

16              Westlake Village, California

17               Wednesday, April 17, 2024

18

19

20

21

22

23   REPORTED BY:
     Kathleen Siri
24   CSR No. 9726

25

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4

5    UNITED WHOLESALE MORTGAGE,    )

     LLC,                          )

6                                  )

                Plaintiff,         ) Case No. 2:22-cv-10395

7                                  )

        vs.                        )

8                                  )

     KEVRON INVESTMENTS, INC.,     )

9                                  )

                Defendant.         )

10   _____)

11

12

13

14

15

16

17       Videotaped Deposition of KEVIN RHATIGAN AS 30(b)(6)

18   and INDIVIDUALLY, taken before Kathleen Siri, a

19   Certified Shorthand Reporter for the State of

20   California, with principal office in the County of

21   Los Angeles, commencing at 12:38 p.m., Wednesday,

22   April 17, 2024, at Residence Inn, 30950 Russell Ranch

23   Road, Westlake Village, California.

24

25

Page 3

```
 1     APPEARANCES OF COUNSEL:
 2
       FOR PLAINTIFF:
 3
               BUSH SEYFERTH PLLC
 4             BY:  MAHDE Y. ABDALLAH, ESQ.
               100 West Big Beaver Road, Suite 400
 5             Troy, Michigan 48084
               Telephone:  (248) 822-7860
 6             abdallah@bsplaw.com
 7
               BUSH SEYFERTH PLLC
 8             BY:  A. LANE MORRISON, ESQ.
               5810 Wilson Road, Suite 125
 9             Humble, Texas 77397
               Telephone: (281) 930-6853
10             morrison@bsplaw.com
11
12     FOR DEFENDANT:
13             WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
               BY:  WILLIAM S. COOK, ESQ.
14             17197 North Laurel Park Drive, Suite 201
               Livonia, Michigan 48152
15             Telephone:  (313) 327-3100
               william.cook@wilsonelser.com
16
17
18     ALSO PRESENT:
19             JORDAN KYHOS, VIDEOGRAPHER
20
21
22
23
24
25
```

Page 4

```
 1                     I N D E X
 2   WITNESS                              EXAMINATION
 3   KEVIN RHATIGAN
 4   Examination by:                          PAGE
 5   MR. ABDALLAH                            7, 116
 6   MR. COOK                                   114
 7
 8
 9
10                    E X H I B I T S
11   Exhibit            Description              Page
12
13   Exhibit 4    Defendant's First Amended Answer    49
                  to Plaintiff's Complaint
14
     Exhibit 5    Defendant's Responses to            68
15                Plaintiff's Second Requests for
                  Admission
16
     Exhibit 6    Defendant's Responses to            74
17                Plaintiff's Second Requests for
                  Production
18
     Exhibit 7    Letter to Kevin Rhatigan from       78
19                William E. McDonald, 2/15/22
20   Exhibit 8    Kevron's Third Supplemental         80
                  Answers to Plaintiff's First
21                Interrogatories
22   Exhibit 9    Printout of various e-mails with    81
                  Kevin Rhatigan and Fairway
23                Wholesale Lending and Rocket
                  Mortgage
24
25   Continued...
```

Page 5

1              E X H I B I T S (CONTINUED)
2    Exhibit              Description              Page
3

4    Exhibit 10    Printout of a list of loans sent      89
                   to Rocket Mortgage by Kevron
5

     Exhibit 11    Defendant's First Amended            92
6                  Affirmative Defenses
7
8
9                  PREVIOUSLY MARKED EXHIBITS
10   Exhibit              Description              Page
11

12   Exhibit 1     Wholesale Broker Agreement,          63
                   7/22/19
13

     Exhibit 2     Printout of a Screenshot, Attest     78
14                 Loans, Acknowledgement and
                   Agreement
15

     Exhibit 3     Wholesale Broker Agreement,          54
16                 Renewal Application - Agreement
17
18
19
20
21
22
23
24
25

```
                                                      Page 6

 1                       April 17, 2024

 2                          -o0o-

 3

 4            THE VIDEOGRAPHER:  Good afternoon.  We are

 5    going on the record.  The time is 12:38 p.m.  Today is

 6    April 17th, 2024.

 7            My name is Jordan Kyhos.  I'm a video

 8    technician with Veritext Legal Solutions, located in

 9    Los Angeles, California.  My court reporter today is

10    Kathleen Siri with Veritext Legal Solutions, located in

11    Los Angeles.

12            This is the video deposition of Kevin Rhatigan

13    as an individual and PMK in the action entitled United

14    Wholesale Mortgage, LLC versus Kevron Investments, Inc.

15    This is filed in the United States District Court for

16    the Eastern District of Michigan, Southern District.

17    The case number is 2:22-cv-10395.

18            We are recording these proceedings at

19    30950 Russell Ranch Road in Westlake Village,

20    California.

21            Now, will you all please identify yourself and

22    who you represent starting with noticing attorney.

23            MR. ABDALLAH:  Mahde Abdallah on behalf of the

24    Plaintiff, United Wholesale Mortgage.

25            MR. MORRISON:  Lane Morrison on behalf of
```

Page 7

1    United Wholesale Mortgage.

2           MR. COOK:  William Cook for Defendant, Kevron

3    Investments.

4           THE VIDEOGRAPHER:  Thank you.

5           Now, will the reporter please administer the

6    oath.

7

8                        KEVIN RHATIGAN,

9    Called as a witness by and on behalf of the Plaintiff,

10   and having been first duly sworn by the Certified

11   Shorthand Reporter, was examined and testified as

12   follows:

13

14                        EXAMINATION

15   BY MR.ABDALLAH:

16     Q    I'm going to start by reading a stipulation

17   among counsel into the record.

18           Pursuant to the agreement of counsel for the

19   parties, this is the combined deposition of Kevin

20   Rhatigan, both in his individual capacity and as the

21   corporate representative of Defendant, Kevron

22   Investments, Inc., under Federal Rule of Civil Procedure

23   30(b)(6).  Mr. Rhatigan's testimony will be considered

24   the testimony of both himself and Kevron pursuant to

25   Rule 30(b)(6) unless otherwise specifically stated on

Page 8

1   the record.  To the extent, there is an objection to a

2   question being outside the scope of the matter of

3   examination noticed by United Wholesale Mortgage,

4   Kevron's counsel may state the objection on the record,

5   but Mr. Rhatigan must still answer the question.  The

6   deposition will not exceed seven hours of time on the

7   record today.  However, UWM or United Wholesale Mortgage

8   reserves the right to request to continue the deposition

9   past the seven-hour time limit on a future date in

10  accordance with Rule 30(d)(1).

11            MR. COOK:  Agreed.

12            MR. ABDALLAH:  Good afternoon.

13            THE WITNESS:  Do I have to say I agree?

14            MR. COOK:  No.  I do that for you.

15            THE WITNESS:  Okay.

16  BY MR. ABDALLAH:

17       Q    Mr. Rhatigan, my name is Mahde Abdallah.  We've

18  met earlier today.  I understand you sat through the

19  deposition of Marjam Pirouz this morning.  And the

20  deposition of Jaime Arroyo yesterday morning; is that

21  correct?

22       A    Yes.

23       Q    Mr. Rhatigan, for the record, can you please

24  state your full name and address?

25       A    Kevin Rhatigan, 2651 Country Lane, Westlake

Page 9

1    Village, California 91361.

2         Q    Have you had any other legal names?

3         A    No.

4         Q    Have you ever been deposed before?

5         A    No.

6         Q    I'm just -- you heard this probably, but --

7         A    Go ahead.

8         Q    -- I'm going to go over just some of the

9    ground -- guidelines.  I'm going to be asking you a

10   series of questions, obviously.  And you understand that

11   you've taken the oath to answer those questions

12   truthfully?

13        A    Correct.

14        Q    All right.

15             So it's important that you listen carefully to

16   the questions I ask.  I do ask that you will wait until

17   I finish asking a question before responding.  That will

18   make the transcript cleaner.  It will make the court

19   reporter's job a lot easier.  And that way there's no

20   confusion about what question you're answering.  I'll

21   likewise try to wait -- I'll likewise try to wait until

22   you're done answering your question before I start

23   asking my next question.

24             If you don't understand any questions I ask,

25   please let me know and I'll do my best to clarify or

Page 10

1    rephrase it.  If you do answer a question, I'll assume

2    you've understood it.  And when you answer my question,

3    it's important that you verbalize your answers for the

4    record.  So no head nods up and down, no "uh-huh's" or

5    "huh-uh's."  You know, we really have to go by yeses and

6    no's.

7              Your attorney may object to questions.

8    However, unless your attorney instructs you not to

9    answer, you must still answer the question.  And as we

10   stated, if you need a break at any time, please feel

11   free to let me know.  The only thing I ask is that if

12   there's a pending question at the time you need a break,

13   I just ask that you finish answering that question and

14   then break off for the record.

15             Do you have any questions?  Understand?

16        A    No, I understand.

17        Q    Have you taken any medication today that would

18   inhibit your memory or ability to testify truthfully?

19        A    No.

20        Q    And to make today's deposition proceed a little

21   more smoothly, we're going to use some abbreviations.

22   So I'll refer to Kevron Investments, Inc. as Kevron.

23   I'll refer to United Wholesale Mortgage as UWM.  I'll

24   refer to Rocket Mortgage as Rocket or Rocket Mortgage.

25   I'll refer to Fairway Independent Mortgage Corp as

Page 11

1    Fairway or, you know, Fairway Independent or something

2    similar.  And there might be other terms we use.  If you

3    don't understand any term I'm using throughout the

4    deposition, please let me know and I'll clarify that.

5            Did you prepare for this deposition in any way?

6        A    Yes.

7        Q    Okay.  How did you prepare for this deposition

8    without disclosing your communications with counsel?

9        A    Well, we had a Zoom call prior to the

10    deposition.  That's -- that was it.

11        Q    Okay.  And who was that Zoom call with?

12        A    With -- with my attorney, Bill.

13        Q    Okay.  When did that Zoom call take place?

14        A    Week ago.

15        Q    Okay.  And how long was that Zoom call?

16        A    Thirty minutes, maybe an hour.

17        Q    Did you review any documents during that Zoom

18    call?

19        A    During that Zoom call, I don't think so.

20        Q    Did you review any documents otherwise in

21    preparation for today's deposition?

22        A    Yes.

23        Q    What documents were those?

24        A    They were some documents that --

25            MR. COOK:  Do your best to describe them.  Some

Page 12

```
 1    of them were probably legal ones, but do your best on

 2    what you remember.

 3              THE WITNESS:  They were some documents that

 4    were sent the other day.

 5    BY MR. ABDALLAH:

 6         Q    Okay.  Do you know what they looked like?

 7         A    Yeah, they looked like --

 8              MR. COOK:  Do your best to describe what you

 9    think you reviewed.

10              THE WITNESS:  They were just -- frankly, I got

11    a bunch of PDF e-mails.  I didn't really look at most of

12    them.

13    BY MR. ABDALLAH:

14         Q    Okay.

15         A    Because it was -- it was -- I think it was the

16    wholesale agreement and some of the forms.

17         Q    Other than the Zoom meeting you had with your

18    counsel last week, did you have any other meetings to

19    prepare for today's deposition?

20         A    No.

21         Q    Did you discuss this deposition with anybody

22    else other than your counsel?

23         A    No.

24         Q    Okay.  Did you bring any documents with you

25    today?
```

```
                                            Page 13
 1        A    No.
 2        Q    Okay.  I'm going to go into your background
 3    little bit.
 4             Can you provide your date of birth, please?
 5        A    3/21/1959.
 6        Q    And did you --
 7             I assume you graduated high school at some
 8    point?
 9        A    I did, yeah.
10        Q    What year did you graduate high school?
11        A    1977.
12        Q    Did you receive any --
13             Did you continue your education after high
14    school?
15        A    I did.
16        Q    Where at?
17        A    I first went to Bergen Community College in
18    New Jersey.  Then I went to Mesa College in San Diego.
19    And then I finished my bachelor's degree at the
20    University of La Verne.  It was an online program.
21        Q    So did -- you didn't -- so Bergen College in
22    New Jersey, did you receive a degree from there?
23        A    No.  It's a community college.
24        Q    And then you attended a college in San Diego?
25        A    Mesa College, that's a community college as
```

Page 14

```
 1    well.  Those are two-year colleges.  I received
 2    certificate of achievement, which is a one year for
 3    accounting.  I think I got that from Mesa.  I got an
 4    associates degree in accounting.  It had been a long
 5    time.  I think that was from Mesa as well.  And I have a
 6    bachelor in science, in business administration, from
 7    University of La Verne.
 8        Q    When did you obtain your bachelor's from
 9    University of La Verne?
10        A    I would say it was 1987, because it was ten
11    years later.
12        Q    After completing your education at University
13    of La Verne, did you attend any other colleges or
14    schools?
15        A    No.
16        Q    No post graduate professional schools?
17        A    No.
18        Q    Did you -- have you ever been involved in any
19    vocational or trade schools?
20        A    No.
21        Q    Have you taken part of any other courses or
22    received any other types of certifications other than
23    the ones we've just discussed?
24        A    The Department of Real Estate, the real estate
25    certifications and the NMLS certification.
```

1      Q    Did you attend -- when did you take part of the

2    Department of Real Estate?

3      A    I got into the business in 1990.  So it must

4    have been '90.  I don't know if you need a license back

5    then, but it was around 1990.

6      Q    Did you have to take any courses as part of

7    that?

8      A    Yes.

9      Q    And did you take those courses in California?

10     A    Yes.

11     Q    Okay.  And so do you -- are you currently a

12   licensed realtor?

13     A    Yes.

14     Q    Okay.  How long have you had your license?

15     A    Since 1990.

16     Q    And you also obtained your NMLS license.  Is

17   that for the mortgage industry?

18     A    Yes.

19     Q    When did you obtain your NMLS license?

20     A    I think that was in '08 or '09, when the laws

21   changed and you had to have it.

22     Q    And did you take classes to obtain your NMLS

23   license?

24     A    Yes.

25     Q    Where were those classes or with what program?

```
                                               Page 16
1          A     Probably online.  I don't know.

2          Q     Do you recall the program name or the provider

3     for the classes?

4          A     No.  No.

5          Q     Prior to obtaining your NMLS license in 2008 or

6     2009, were you practicing in the mortgage industry at

7     all?

8          A     Yes.

9          Q     Okay.  So but you did not have your license?

10         A     No, I was licensed.

11         Q     You didn't have an NMLS license?

12         A     It wasn't required then.

13         Q     Okay.  So you could -- were you a loan officer

14    in 2008 or 2009?

15         A     Correct.

16         Q     You just didn't need a license for that?

17         A     You did not need an NMLS license.

18         Q     Okay.

19         A     That only came into play after the market crash

20    in 2008 with Dodd-Frank.

21         Q     Prior to 2008, what -- did you have to take any

22    particular steps to become a loan officer?

23         A     You had -- you had to get a real estate

24    license, which I did in 1990.

25         Q     Okay.
```

Page 17

1      A      So you had -- you had to be licensed.  Used to

2  be that you only needed a real estate license to do

3  mortgages.  And then when the market crashed in '08, the

4  government had this great idea that if we licensed you

5  through the NMLS that you would somehow be a better

6  person.  And so they created a whole division for that.

7  And we pay an annual fee for that every year for that

8  privilege.

9      Q      We understand the annual fee concept of that.

10             So in 1990, you began working both as a realtor

11 and as a loan officer?

12     A      No.  Just in -- just in loans.

13     Q      Loans.  Okay.

14     A      Yeah.

15     Q      You had the ability to practice real estate

16 with --

17     A      With the license, you have the ability, but you

18 have to join a local board.  I did not join the board,

19 because I was a lender.  You -- I -- you could do real

20 estate and loans, if you join the local board, then you

21 could be a realtor as well.

22     Q      Did you at some point also become a broker?

23     A      Yes.

24     Q      When did you become a broker?

25     A      1996 or maybe '95, somewhere in there, '95 or

Page 18

1    '96.

2        Q    Can you explain to me the steps you needed to

3    take to become a broker?

4        A    Yeah, you've got to take a test.  You've got to

5    pay a fee.  That's -- that's pretty much it.  There are

6    requirements you have to be in the business for like two

7    years and certain requirements, but I had satisfied all

8    them by that time.

9        Q    Prior to becoming a broker, where -- were you

10   employed with a certain real estate or mortgage company?

11       A    Yes.  I worked for about four different

12   mortgage companies -- four or five between 1990 and 1996

13   when I opened up the company.

14       Q    What mortgage companies were those?

15       A    I started my career at Great Western Bank,

16   which is no longer around.  I went to a work for a

17   couple of IMCO Realty Services, I-M-C-O.  They're no

18   longer in business.  I went to work for Warehouser

19   Mortgage, no longer in business.  Then I worked for a

20   company called Rancho Santa Margarita Mortgage, who is

21   no longer in business.  And then I worked for a small

22   broker called First California Capital Group.  And they

23   were no longer in business.

24       Q    Seems like -- I'll save it.

25            MR. COOK:  That's an off-the-record

Page 19

```
 1    conversation.
 2             THE WITNESS:  Want to start over?
 3    BY MR. ABDALLAH:
 4       Q    No.  That's all right.
 5             Outside of obtaining your broker certification,
 6    your real estate license and your NMLS license, do you
 7    have any other licenses or certifications?
 8       A    No.
 9       Q    And are you currently employed?
10       A    Yes.
11       Q    With whom?
12       A    Myself.
13       Q    By yourself?
14       A    Kevron Investments, Inc.
15       Q    Okay.  And how long have you been employed with
16    Kevron?
17       A    Since 1996.
18       Q    And is that when the company was founded?
19       A    The company was originally started as Westlake
20    Mortgage Group in 1996.  I incorporated in 1997 as
21    Kevron Investments, Inc. in 1997, because I had to
22    incorporate to do FHA loans.  Back then you had to be a
23    corporation to do FHA loans.
24       Q    Westlake Mortgage, was that a corporation, an
25    LLC?
```

```
                                              Page 20

 1        A     No.  That was just a sole provider.

 2        Q     Okay.

 3        A     Yeah.

 4        Q     So are you the sole founder of Kevron?

 5        A     Yeah -- well, no, sorry.  My wife is Sharon.

 6   She is the ron, Kevron, Kevin and Sharon.

 7        Q     Okay.  Did your wife ever work for the company?

 8        A     Never.

 9        Q     Okay.  Are you the sole owner of Kevron?

10        A     Legally, we're 50/50.

11        Q     Since its incorporation, has your wife had any

12   involvement in Kevron?

13        A     No.

14        Q     When you founded Kevron, what title did you

15   hold?

16        A     President.

17        Q     You hold that same title today?

18        A     Correct.

19        Q     Have you held any other titles since its

20   founding?

21        A     No.

22        Q     And what would you say your duties and

23   responsibilities are as president of the company?

24        A     Everything.

25        Q     Can you explain some of what your top duties
```

```
                                              Page 21

 1    are, like your main duties?

 2        A    So my main duties are to keep the company open,

 3    paying the bills.  I'm responsible for all the

 4    regulations, all the contracts, all the payroll, when

 5    there was payroll, basically, all the day-to-day

 6    operations, everything.

 7        Q    You say that you're responsible for contracts.

 8    Does that include contracts that Kevron enters with

 9    lenders?

10        A    Correct.

11        Q    Since its founding, has anyone else had

12    responsibility for -- for involvement in entering

13    contracts with lenders?

14        A    No.

15        Q    Just you?

16        A    Correct, yes.

17        Q    Since founding the company, have you been

18    employed elsewhere?

19        A    No.

20        Q    Do you hold any other type of membership

21    interest in a different company, other than Kevron?

22        A    No.

23        Q    I believe you testified this is your first

24    deposition; right?

25        A    Correct.
```

```
                                                    Page 22

 1        Q    Have you ever provided in-court testimony?

 2        A    Yes.

 3        Q    For what purpose?

 4        A    So there were several.  Well, there were -- I

 5    had -- I had a lawsuit against a company about 10 or 15

 6    years ago.  An older gentleman sued the company.  One of

 7    the loan officers made an agreement with him to -- to

 8    get a refund, some costs after the close.  And when the

 9    loan officer came to me with the commission check and

10    said we need to give the client back the money, I told

11    him we can't do that.  It's legal.  So he went back and

12    told the guy and then the guy sued us.

13        Q    And so you provided in-court testimony in

14    connection with that lawsuit?

15        A    Yes.

16        Q    Were you deposed in that lawsuit?

17        A    No.

18        Q    Okay.  You mentioned that you provided

19    testimony in court several times.  What were the other

20    occasions?

21        A    Well, I think one of the questions you're going

22    ask if I was ever involved in a lawsuit.  And so, yes,

23    or was that the question that's somewhere --

24        Q    Yeah.

25        A    Yeah, so I had two issues.  I had 1977, I was
```

Page 23

1    arrested in New Jersey for distribution of marijuana.

2    That was back in 1977.  And I think I got probation for

3    that.  I did my time and I was done.  And then I had a

4    car accident in 1980, that was -- I think I did -- I

5    think I was ordered like 60 days of like a halfway

6    house.  And I think I did 30 days, you know, half time.

7    And that record was expunged actually, but that was back

8    in '80.

9        Q    Any other lawsuits you've been involved in

10   other than the three we just spoke about?

11       A    Not that I can remember.

12       Q    Okay.  The lawsuit dealing with Kevron and the

13   loan officer who promised some kickback in the

14   commission, did that take place in California?

15       A    It was.

16       Q    Okay.  You said that was about 15 years ago?

17       A    I think it was 10 or 15 years ago.  It's been a

18   while.

19       Q    Do you recall where that case was pending,

20   whether it was in state court, federal court?

21       A    I think it was Ventura.  I don't know what that

22   is.  County, maybe Ventura County Court, pretty sure.

23       Q    Okay.  And then your 1997 -- sorry -- 1977

24   arrest in New Jersey, was that case pending in New

25   Jersey?

Page 24

```
 1        A    Was that -- it was in New Jersey, yes, yes.
 2   And resolved everything in New Jersey, yeah.
 3        Q    The car accident case in 19- --
 4        A    Oh, that was San Diego.
 5        Q    San Diego --
 6        A    San Diego, California.
 7             THE REPORTER:  Try to remember to let him
 8   finish.
 9             THE WITNESS:  I know.
10   BY MR. ABDALLAH:
11        Q    It's unnatural.  It's going to take some time.
12   It's a mistake we'll both make today.
13             Have you ever been convicted of a crime
14   involving theft or dishonesty?
15        A    No.
16        Q    Have you ever been a party to a class action
17   lawsuit?
18        A    I would say yes.
19        Q    Okay.  I'll give some -- I understand sometimes
20   you receive a check in the mail, you cash it.
21             I'm more interested in, have you ever been a
22   named plaintiff in a class action lawsuit, where you
23   were actually involved in a lawsuit?
24        A    No.
25        Q    Have you ever filed bankruptcy?
```

Page 25

1       A     No.

2       Q     Are you on social media personally?

3       A     Yes.

4       Q     Which platforms?

5       A     Just Facebook.

6       Q     And are you --

7             Is your identity on Facebook Kevin Rhatigan or

8    do you go by a different name?

9       A     No, no, yeah.

10      Q     Does Kevron go by any other name?

11      A     No.

12      Q     It doesn't go by Westlake Mortgage?

13      A     Kevron is the corporate name.  And the DBA

14   is -- I have three DBAs actually, Westlake Mortgage

15   Group, Westlake Realty Group and Westlake Capital Group.

16   They were made specifically for Westlake Mortgage for

17   the mortgages.  Westlake Realty for the residential real

18   estate.  And Westlake Capital Group, I took a name to

19   keep consistency for any commercial transactions, which

20   we don't really do, but I keep renewing the names every

21   time they come up.

22      Q     Commercial transactions, you mean commercial

23   lending or real --

24      A     Commercial real estate and/or lending.

25      Q     Okay.

Page 26

1     A    At one point, I had a loan officer who did

2  commercial.

3     Q    And I think you testified Kevron engages in

4  both real estate and lending -- is engaged in both the

5  real estate and lending industry.

6          Is it engaged in any other types of business?

7     A    No.

8     Q    How many people does Kevron currently employ?

9     A    Right now, there's -- there's me, Marjam, Rick,

10  Jaime and Al, five.

11     Q    So it's you, Marjam, Rick --

12     A    Me, Marjam, Rick, Jaime and Al.

13     Q    Jaime and Al?

14     A    And Al, yeah.

15     Q    Okay.  In March of -- sorry -- in 2021, was

16  anyone employed with Kevron that is not employed there

17  today?

18     A    There were.  Michelle Borsotti and Norm Sachs,

19  I am pretty sure was still around in 2021.  I don't

20  think there was anybody else.

21     Q    Does Kevron have a website?

22     A    Yes.

23     Q    What is the website address?

24     A    It's Westlakemtg.com.

25     Q    Does Kevron have any social media accounts or

Page 27

1    pages?

2         A     No.

3         Q     Other than the lawsuit we discussed relating to

4    the loan officer providing the kickback of commissions,

5    has Kevron been a party to any other lawsuit?

6         A     No.

7         Q     Okay.  And that lawsuit, did that -- that went

8    to trial?

9         A     No.  Well, the judge -- it was just -- it was

10   just the plaintiff and me and my loan officer and a

11   judge.  There wasn't a jury.

12        Q     Okay.  Sure.  That's fine.

13              Do you recall how that case resolved?

14        A     Oh, absolutely, yeah, yeah.  The client won.

15        Q     Okay.  And was there a judgment entered against

16   Kevron?

17        A     It was, yeah.

18        Q     Do you recall the amount?

19        A     I want to say it was 7,000 or $7,500.

20        Q     Okay.  I understand that case may have taken --

21   partaken somewhere in Ventura County, but was it

22   potentially a court of small claims within Ventura

23   County that the case was pending in?

24        A     I think so.  It might have been within the

25   limit of small claims.

Page 28

```
 1        Q    Okay.  Since you founded Kevron as a broker and

 2   both -- do you work as a loan officer as well, where you

 3   have your own clients and submit loans for them too?

 4        A    Yes.

 5        Q    And you've done that consistently since

 6   founding the company?

 7        A    Yes.

 8        Q    Have you done that less consistently as time

 9   went on or as you know maybe you've become semiretired?

10        A    What do you mean by that?

11        Q    Like, do you take on less clients now than you

12   previously did, because, you know, you're just, you

13   know, in the process of retiring or anything like that?

14        A    Well, no, I'm taking on less clients because

15   the market has changed.

16        Q    Okay.

17        A    I mean, I'm still available to work and do --

18   everything's remote.  So I can do business anywhere I am

19   in the country.  It's just there's -- the market tanked

20   in 2022, March of 2022, I think it was.  The rates

21   skyrocketed.  The market just died.

22        Q    So you served both as a broker but also as a

23   loan officer dealing with your own clients?

24        A    That's correct.

25        Q    Marjam Pirouz, what is her role at Kevron?
```

```
                                        Page 29

 1       A     She's a loan officer.

 2       Q     Do you recall around the time when she began?

 3       A     No, not offhand.

 4       Q     Was it over 20 years ago maybe?

 5       A     Everyone who works for me has been with me for

 6    many years.

 7       Q     Okay.  And what are the duties of a loan

 8    officer at Kevron?

 9       A     Just originate loans.

10       Q     Does Marjam have any duties outside of being a

11    loan officer?

12       A     No.

13       Q     Do you know if Marjam had access to UWM's

14    pipeline -- had access to -- let me back up a little

15    bit.

16             At some point, Kevron had an agreement with

17    United Wholesale Mortgage; correct?

18       A     Yes.

19       Q     In connection with that agreement, employees at

20    Kevron or loan officers at Kevron were provided access

21    to UWM's portal; correct?

22       A     Yes.

23       Q     Okay.  Now, was there a general portal log in

24    for Kevron itself or did each person have their own

25    individual log in?
```

Page 30

```
 1        A    Each person had their own individual log in.
 2        Q    And do you know if Marjam had her own
 3   individual log in?
 4        A    I -- yes, I believe she did.
 5        Q    Okay.  And did anyone within Kevron have -- to
 6   your knowledge, have access to anybody else's log in
 7   with UWM portal?
 8        A    No.
 9        Q    I assume you had your own log in for --
10        A    I had my own log in.
11        Q    Did anyone have access to your own log in?
12        A    No.
13        Q    What was Michelle Borsotti's role at Kevron?
14        A    She was -- she was a loan processor.
15        Q    What are the duties of a loan processor?
16        A    To process loan files.
17        Q    Did she have any other duties?
18        A    She basically ran the office.  She was my right
19   hand.
20        Q    Kind of like an office manager?
21        A    Yeah, she was with me since the day I opened up
22   the company.  So she -- she was a big part of the
23   company.
24        Q    Do you recall around the time when she -- her
25   employment with the company ended?
```

Page 31

```
 1       A     Yeah, it was March.  And I want to say it was
 2    2023.
 3       Q     What was -- what is the reason for her
 4    employment ending at the company?
 5       A     There was no business.  I -- I was paying her
 6    out of my home savings for a year.  And I just couldn't
 7    do it anymore.
 8       Q     Did her employment end on amicable terms?
 9       A     She didn't think so.
10       Q     Okay.  Did she have her own access to UWM's
11    pipeline with her own account?
12       A     Yes.
13       Q     And she did not have access to your account?
14       A     No.
15       Q     Can you explain some of the duties for a loan
16    processor, like, you know, that go along with processing
17    loan files?
18       A     Sure.  Okay.  So a loan officer's job is to
19    originate loans.  And the loan officer's job is to meet
20    with the clients, get the documentation and then turn it
21    over to the processor.  The processor's job is to
22    process the file, which is every loan transaction needs,
23    for example, 10 items, W-2s, pay stubs, bank statements,
24    credit report, appraisal, title and escrow, credit
25    report, every one.  And so the processor's job is to get
```

Page 32

1    the documents from the loan officer.  If there's

2    anything missing, go back to the loan officer and say

3    I -- you're missing these documents.  And then the loan

4    officer's job is get those documents and then give them

5    back to the processor.  And then the processor's job is

6    to go through it, make sure it's all good and then

7    submit it to the lender.

8         Q    You mentioned that Michelle also helped you run

9    the office.

10             What duties does that or what responsibilities

11   or duties did that entail?

12        A    Well, I was -- you know, as the owner of the

13   company and working, I was out a lot.  I was out trying

14   to get loans.  So she kept everything in the office

15   running.  There were times that we had, you know, more

16   employees, more loan officers.  So she was more of the

17   9:00 to 5:00 at the office, opening up, closing, taking

18   care of the day-to-day operations.  Loan officers are in

19   and out.  They're all self-employed.  People are coming

20   and going.  She's making sure that everything is just

21   handled.

22        Q    Did she ever get involved in entering contracts

23   or renewing contracts with lenders?

24        A    Never.

25        Q    I'm going to say this wrong -- I hope I'm

Page 33

```
 1    pronouncing it right.  Is it Jaime?

 2        A    Jaime.

 3        Q    Jaime Arroyo, is he another loan officer at

 4    Kevron?

 5        A    He's a loan officer.

 6        Q    Did he have any other duties outside of being a

 7    loan officer?

 8        A    He does real estate as well.

 9        Q    He does with Kevron; right?

10        A    Yes.  Yes.

11        Q    Okay.  Do any -- does anyone else currently at

12    Kevron do both real estate and loans?

13        A    Jaime and Al do both real estate and loans.  I

14    think that's it.  I don't think Rick is doing real

15    estate.

16        Q    Al, do you mean Alvaro --

17        A    Alvaro Melgoza, yeah.

18             THE REPORTER:  I'm sorry.  What was the last

19    name?

20             THE WITNESS:  Melgoza.

21             MR. COOK:  Can you spell that for her.

22             MR. ABDALLAH:  I've got it.  M-e-l-g-o-z-a.

23             THE REPORTER:  Try to make sure you wait until

24    he's done.

25    ///
```

Page 34

1    BY MR. ABDALLAH:

2         Q    Do you recall how long Jaime's been with the

3    company approximately?

4         A    Probably 20 years.

5         Q    And he has -- as a realtor with the company,

6    what do his duties entail?

7         A    Realtor, whatever a realtor does.

8         Q    Okay.  And he had his own access to UWM's

9    pipeline?

10        A    He had his own log in, yeah.

11        Q    And he did not have access to your account --

12        A    No.

13        Q    -- with UWM?

14             Alvaro Melgoza, who we'll call Al --

15        A    Al.

16        Q    -- for purposes of today, he was a loan officer

17   and realtor as well or he is a loan officer --

18        A    Yes.

19        Q    -- and realtor as well with Kevron?

20             And how long has he been the company?

21        A    He's probably the least amount of time.

22   Probably -- probably still 15 years though, 15, 18

23   years.

24        Q    Okay.  And he had access to UWM's pipeline?

25        A    He -- I'm sure he did.  He never did anything

Page 35

```
 1    with them though, so I'm guessing he did have an ID and
 2    password.  I don't know that for sure, but usually when
 3    I do a broker package, they set all the loan officers up
 4    with a log in and password, so...
 5         Q    Kevron's an independent mortgage broker;
 6    correct?
 7         A    Yes.
 8         Q    And Kevron works with many different lenders;
 9    is that true?
10         A    Yes.
11         Q    Does Kevron work with retail lenders?
12         A    Yes.
13         Q    Which ones?
14         A    Well, I think a lot of lenders do retail and
15    wholesale, a lot of them do.
16         Q    Which ones that Kevron works with do both
17    retail and wholesale?
18         A    I -- I know Rocket does.  I know Sierra Pacific
19    I'm pretty sure does wholesale and retail.  If you're
20    talking about 2011 or if you're talking about today,
21    it's two different things.
22         Q    We'll say 2021?
23         A    20 -- 2021, we had a whole bunch of different
24    lenders, way more than we have today.  I'd say most of
25    them did wholesale and retail.
```

Page 36

1      Q    Okay.  So you mentioned Rocket, Sierra Pacific.

2  Is there any others that come to mind?

3      A    There was Plaza, there was -- the thing is, so

4  many of these companies have gone out of business or

5  been purchased.  So there was a company called Fleet,

6  which became Plaza, which became -- they're the same

7  people.  They just kept changing the names.  So there

8  was first Nationwide was Cal Fed and they were bought

9  out over the years, 30 years, 35 years I've been in the

10  business.  I -- I can't remember who else was in the

11  game back then, but we were approved with a bunch of

12  different people.

13      Q    So help me understand this in the sense of, you

14  work with retail lenders through their wholesale

15  subsidiary or channel, but not necessarily directly with

16  retail lenders; is that true?

17      A    Correct.

18      Q    Okay.  And your understanding, what's the

19  difference between a retail lender and an independent

20  mortgage broker?

21      A    I mean, from a standpoint of obtaining a loan?

22      Q    Yeah.

23      A    There's -- there's -- there's no difference.

24  The -- I used to explain it this way to my clients,

25  because Bank of America had a wholesale division and

Page 37

```
 1   they were obviously a large bank.  So I would tell me
 2   clients, you could go to Bank of America or you could go
 3   to me.  I can send your loan to Bank of America.  You're
 4   going to get the same rate and you're going to get me,
 5   okay, because what I sold my whole career was me.  My
 6   reputation, my whole 30 years in the business was me.  I
 7   met with the clients.  I took care of them, you know,
 8   start to finish.  And that's what they're getting with
 9   me.  So a lot of companies do wholesale and retail,
10   they're no competition to me.  There's no difference.
11   And that's what I would tell people.  I could send you a
12   loan at Bank of America, you get the same thing.  The
13   difference is you're going to get an interest rate at a
14   fee from Bank of America.  And you're going to get the
15   same interest rate at a fee from me.  The difference is,
16   I get wholesale pricing.  So I get the commission that
17   they're charging you.
18        Q    Would you also explain to clients that you
19   could shop around for them with different lenders?
20        A    That I would shop around?
21        Q    Yes.
22        A    Yes, of course, that's what you do as a broker.
23   That's our job.
24        Q    And retail lenders don't generally do that,
25   shop around to different lenders; correct?  They only
```

Page 38

```
 1    try to get you the loan -- get a client a loan with

 2    their lending base; correct?

 3         A    Yes.

 4         Q    Okay.  How -- how does Kevron choose which

 5    lenders it works with?

 6         A    Well, again, you get a client.  You review the

 7    situation.  And then you take them to whoever fits their

 8    needs.  In most cases, it's -- in most cases, it's a

 9    rate thing.  Okay.  If you have a normal client, plain

10    vanilla, W-2, pay stubs, bank statements, who didn't

11    have a baby, who didn't leave work for three months, who

12    didn't do something, 99 percent of the lenders want that

13    loan.  Everybody wants that loan.  So if you have a

14    normal deal, you have your 30, 20, 50, 100 different

15    lenders to choose from.  And then you -- who's got the

16    best rate, best product, what do they want?  Do they

17    want an adjustable?  They want a fixed?  They want a 30

18    year?  They want a 15 year?  And you find the best

19    product for them.  That's our responsibility.  Our

20    fiduciary responsibility is to our client.  And then

21    once we do that, we submit the file to that lender.

22         Q    So there's a lot of lender options out there

23    for a client that Kevron chooses from; correct?

24         A    Yes.

25         Q    Do you know for -- how does -- you know, does
```

Page 39

1     Kevron look at every single option for every single

2     client or you know, is there certain lenders that Kevron

3     has relationships with that it generally looks to?  How

4     does Kevron narrow the list of options of lenders that

5     it works with?

6         A     Me personally or as a company?

7         Q     As a company?

8         A     The company -- me -- as -- as the company, I

9     don't tell my loan officers where to send their loans.

10    I let them -- they're all seasoned loan officers, every

11    one them.  They've been doing it for a long time.  And

12    they have different relationships.  So I might have a

13    different relationship with, for example, UWM, that

14    Marjan has.  So they -- we all have different

15    relationships.  So they would -- they would go and

16    search themselves where they wanted to be, because as I

17    mentioned, I don't tell them where to send their

18    business.  For me, personally, yes, I had -- I would

19    have my lenders that I would -- I would be a little bit

20    more comfortable with.  And I would be looking at those

21    lenders and then seeing who had the best available for

22    that client.

23        Q     Would you agree that, like, each loan officer

24    has a certain subset of lenders that they typically are

25    comfortable with and try to work with on a normal basis?

```
                                             Page 40
 1        A     Probably.
 2        Q     Which lenders did -- were you comfortable with
 3    and typically worked with in 2021?
 4        A     In 2021, I actually did a lot of business with
 5    UWM and Sierra Pacific, I mentioned before.  And then
 6    there were a few other fringe lenders, depending on what
 7    was going on, somebody needed a bank statement loan,
 8    somebody needed -- you know, there's these alternative
 9    finance loans that are available, FHA, VA, they're all
10    different.  Any given day there might be a lender buying
11    that market.
12        Q     Would you agree that retail lenders are more
13    expensive to the borrowers than working with an
14    independent mortgage broker?
15        A     No, I would not.
16        Q     Do you have any knowledge of retail lenders
17    speaking negatively about independent mortgage brokers?
18        A     No.
19        Q     Do you have any knowledge or experience of a
20    retail lender soliciting an independent mortgage
21    broker's clients?
22        A     No.
23        Q     In your opinion, are borrowers better off
24    dealing with independent mortgage brokers than retail
25    lenders?
```

Page 41

```
 1        A    Yes.

 2        Q    Why is that?

 3        A    Because as I broker, I have the ability to shop

 4    their loan with five, 10, 15, 20, 50 different lenders.

 5    If you walk into a Bank of America, they have no choice.

 6    This is today's rate.  It's on the board right there.

 7    That's what you get, take it or leave it.

 8        Q    Got me to look there.

 9             MR. COOK:  Me too.

10             THE WITNESS:  They looked there.

11    BY MR. ABDALLAH:

12        Q    Want to take five?

13        A    No.  I just want a water.  Let's go.  I'm good.

14        Q    Take a second to get you some water.

15        A    I might have to pee.

16        Q    Let me know.

17        A    No.  No.  I'm kidding.  Thanks very much.

18    Sorry about that.  Go ahead.  Sorry.

19        Q    What is your understanding of this lawsuit?

20        A    What is my understanding of this lawsuit?  Well

21    that's a good question.  I think it's nonsense.

22        Q    Do you have an understanding of the claims

23    alleged against Kevron in this lawsuit?

24        A    Yes.

25        Q    What is your understanding of that?
```

Page 42

1      A    That the -- if you send business to Rocket or

2   Fairway, that somehow United Wholesale Mortgage would be

3   hurt by that, so they're suing -- well, at the time,

4   there were three brokers.  And I think there's more now,

5   but we happen to be one of them.

6      Q    When you say there's three brokers, you mean

7   three brokers that UWM brought suit against or three

8   brokers that couldn't do business with -- I'm sorry.

9          Was that three brokers that UWM sued to your

10  knowledge?

11     A    Yes.

12     Q    Okay.  Do you recall when Kevron first began

13  doing business with UWM?

14     A    Well, I would -- I would say no, but I looked

15  it up.  It's 1999.  So, yes, 1999.

16     Q    So Kevron's been in business with UWM since

17  1999?

18     A    Wasn't it -- was it 2019?  2019, whatever the

19  broker agreement says.

20     Q    You know -- that's fine.  We'll put it in front

21  of you.

22     A    It wasn't -- it was 20- --

23     Q    I'm putting the marked exhibit --

24     A    2019.  My mistake.

25          MR. COOK:  You said 1999.

```
                                              Page 43

 1            THE WITNESS:  No, 1919 -- no.  2019.  2019.

 2    BY MR. ABDALLAH:

 3       Q    So this is what I'll represent as a Wholesale

 4    Broker Agreement between -- if you look at the first

 5    paragraph on the first page, which I'll call the

 6    preamble, it's between UWM and Kevron, entered as of

 7    July 22, 2019; correct?

 8       A    Yes.

 9       Q    Okay.  To your understanding, is that around

10    the time Kevron began doing business with UWM?

11       A    Yes.

12       Q    Why did Kevron decide to do business with UWM?

13       A    I'm sure one of my agents said we should get

14    approved with UWM.  So I said get me a broker package.

15    And I filled it out and we got approved with them.

16       Q    Do you recall what agent recommended that to

17    you?

18       A    I have no idea.

19       Q    Was it you that would have initiated contact

20    with UWM?

21       A    Usually, if a rep in my office comes to me and

22    says they want to use a new source, I tell them, if

23    you're going to do business with them, get a broker

24    package and have them send it to me.

25       Q    Would that communication or recommendation to
```

Page 44

```
 1    start working with UWM, would that had been a verbal
 2    conversation or something in writing?
 3         A    Between me and my loan officer?
 4         Q    Yes.
 5         A    Probably verbal.  I don't remember.  I filled
 6    out probably 200 broker packages or over the 35 years.
 7    And there -- you know, a loan officer would come in and
 8    say, hey, here's a new company, they're great.  They've
 9    got a product I need.  Get me the package.
10         Q    So going back to the wholesale broker agreement
11    that's before you, we have in the legal industry
12    something that's called Bates numbers, a fancy term for
13    page numbers.  You'll see here at the bottom right of
14    the page --
15         A    Uh-huh.
16         Q    -- where it says UWM-Kevron 000001, that's a
17    Bates number.  It's similar to a page number.  I'm going
18    to direct you to the last page of the document, Bates
19    No. UWM-Kevron 00008.
20         A    Uh-huh.
21         Q    At the bottom of that document, it reads
22    electronically signed 7/22/2019, 6:13 p.m. by Kevin
23    Rhatigan of Kevron Investments, Inc. from 10.10.5.244.
24              Do you recall electronically signing this
25    agreement in July of 2019?
```

Page 45

```
 1         A     I don't recall, but I'm sure I did.
 2         Q     Okay.  So you don't dispute that you -- that
 3    Kevron entered this agreement with UWM?
 4         A     That's correct.
 5         Q     And that this was the first agreement that
 6    Kevron had entered about UWM?
 7         A     Yes.  Yes.
 8         Q     And you don't dispute that Kevron agreed to the
 9    terms of this agreement with UWM?
10         A     That's correct.
11         Q     Did you work with any particular employees at
12    UWM, you know, in the loans that you were involved in?
13         A     Yes.
14         Q     Do you recall the names of those employees?
15         A     I know Jesus.  I don't how say his last name,
16    Hinajosa or something like that.  I believe we had, at
17    least, one other rep.  I know Ken Chapman was a second
18    rep -- I think a second rep.  I vaguely remember a guy
19    named Brian.  I don't remember his name.  And I don't
20    know if Brian was the first contact and then Jesus and
21    then Ken or if there was Jesus and Brian and Ken or
22    Jesus, Ken, I don't know.
23         Q     What was the nature of your relationship like
24    with Jesus?
25         A     As far as?
```

Page 46

```
 1        Q    Just you know, was -- are these -- so the three

 2   folks you mentioned, are they all account executives to

 3   your knowledge?

 4        A    Yes.

 5        Q    Okay.  And you know that Ken came after Jesus;

 6   right?

 7        A    Pretty sure, yes.

 8        Q    But you don't know where Brian fell in play

 9   with those three?

10        A    I don't even remember if there actually was a

11   Brian.  You guys would probably know better than me.

12        Q    Okay.  Did you work with any particular UWM

13   employee when entering into the wholesale broker

14   agreement with UWM?

15        A    No.

16        Q    Okay.  After Kevron entered the Wholesale

17   Broker Agreement with UWM, how often did Kevron submit

18   loans to UWM?

19        A    The company in general?

20        Q    Yes.

21        A    I don't know.

22        Q    Okay.  How about yourself?

23        A    Well, we were doing -- we were doing business

24   with UWM quite a bit.  I would imagine we were -- I

25   would imagine we were submitting one, two, three, four,
```

Page 47

1   five loans a month.  I don't know.

2       Q    For the year 2020, for example, what percentage

3   of loans closed with UWM would have been --

4            Out of the total amount of loans that Kevron

5   closed, what percentage do you think would have been

6   with UWM?

7       A    2020, I couldn't even tell you.

8       Q    How about for 2021?

9       A    I couldn't -- I couldn't tell you without

10  running reports.

11      Q    Okay.  Do you have like a ballpark estimate?

12  Would it be like 30 percent?  50 percent?

13      A    I -- I -- I don't know.  I'd be lying if I made

14  up a number.  There was a lot of business back then, so

15  I don't know.

16      Q    Do you know how many loans Kevron closed with

17  UWM during the term of its relationship?

18      A    No.

19      Q    Okay.  Do you know how many loans Kevron has

20  closed in total with every lender in the last three

21  years?

22      A    No.

23      Q    Do you keep track of those type of figures?

24      A    I -- I can run reports.  I can tell you I

25  happen to run a report.  My whole company did 19 loans

Page 48

```
 1    last year.
 2         Q     For 2023?
 3         A     With five people.  So that's how bad the market
 4    was.  Give you an idea.  I used to do 20 a month myself.
 5         Q     So bad market, you're talking about high rates
 6    and people not buying homes?
 7         A     It died.
 8         Q     Do you attribute the loss of the slow market,
 9    particularly with Kevron, at all with its termination --
10    the termination of the wholesale or broker agreement
11    with UWM?
12         A     Do I think that had any bearing on it, no.  I
13    think it was an economic thing.  The interest rates went
14    from two and a half, three to six, seven percent within
15    a three-month period.
16         Q     So you mentioned you could run a report of the
17    loans that Kevron closed.  Do you have a certain
18    software?  Does Kevron use a certain software to manage
19    its operation?
20         A     Yes.
21         Q     What software is that?
22         A     It's called Point.
23              MR. COOK:  Is that spelled out the way you
24    think it is?
25              THE WITNESS:  Point, yeah, just P-o-i-n-t.
```

Page 49

```
1    Calyx is the manufacturer, C-a-l-y-x, is the
2    manufacturer.
3    BY MR. ABDALLAH:
4        Q    They provide a software for mortgage brokers to
5    run businesses?
6        A    Yeah, it's a loan processing software.
7        Q    Does that interplay with other loan software
8    and websites that lenders have, like, UWM's portal, for
9    example or a portal that Sierra Pacific would use or are
10   they independent of each other?
11       A    They're independent.
12       Q    And how long has Kevron been using Point?
13       A    Since the day I opened the company.
14       Q    Okay.  Does Point provide Kevron employees
15   ability to communicate with other people or its clients
16   or with lenders?
17       A    No.  It's just a processing software.
18       Q    Okay.  I'm going to hand you what we'll mark as
19   Exhibit 4.
20            (Plaintiff's Exhibit 4 was marked for
21   identification by the Certified Shorthand Reporter and
22   attached hereto.)
23   BY MR. ABDALLAH:
24       Q    I'll represent to you that this is Kevron's
25   first amended answer to United Wholesale Mortgage's
```

Page 50

1    complaint.

2         I'm going to direct you to page 5, paragraph

3    13.  And I'll read it.  It states, "In July 2019, Kevron

4    elected" -- I'll back up.

5         UWM alleges in paragraph 13, "In July 2019,

6    Kevron elected to avail itself of UWM's products,

7    services and resources and entered a Wholesale Broker

8    Agreement with UWM.  See Exhibit A.  The Wholesale

9    Broker Agreement was subsequently amended and agreed to

10   by the parties in 2021, Exhibit B."

11        At first, the initial answer was, "Defendant

12   admits."  And then the amended answer is, "Defendant

13   admits it availed itself of UWM's products, services and

14   resources and entered a Wholesale Broker Agreement with

15   UWM, but denies that it agreed to any amendment of the

16   agreement."

17        Focusing on the first part of that amended

18   answer that Kevron admits that it availed itself of UWM

19   product, services and resources, what are the UWM

20   products, services and resources that Kevron availed

21   itself of?

22        A    Just being able to submit loans, do business

23   with them.

24        Q    Do you know if anyone at Kevron used UWM's

25   Brand 360 service?

Page 51

1      A    No.

2      Q    Do you know what the Brand 360 service is?

3      A    No.

4      Q    Do you know if anyone at Kevron used UWM's

5  Client Connect service, which automates communications

6  with borrowers?

7      A    I don't know.

8      Q    Do you know if anyone at Kevron used UWM's

9  Brand Builder service, which assists with customized

10  marketing materials?

11      A    No.

12      Q    Do you know if anyone at Kevron used UWM's

13  marketing calendar, which assists with social media

14  posts?

15      A    No.

16      Q    Do you know if anyone at Kevron used UWM's

17  customized video services that markets Kevron to its

18  borrowers?

19      A    No.

20      Q    Do you know if anyone at Kevron used UWM's

21  Blink service?

22      A    No.

23      Q    Did Kevron use UWM's Ease Doc service?

24      A    I don't know what that is, no.

25      Q    It's -- you know, helps -- it's -- I'll

Page 52

```
1    represent that it generates customizable document
2    packages to be sent to borrowers for e-sign.
3           Do you know if anyone at Kevron used that
4    service?
5       A    Not that I'm aware of.
6       Q    Okay.  Do you know if Kevron or anyone at
7    Kevron used UWM's Processor Assist services, which
8    handles like ordering e-mails for services like title
9    work, insurance, things like that?
10      A    Not that I'm aware of.
11      Q    Okay.  Did Kevron use UWM's Virtual E-Closing
12   service?
13      A    No.
14      Q    And do you know if Kevron used the
15   findamortgagebroker.com service?
16      A    I don't think so.  I -- I asked Jesus once for
17   a contact myself.  I didn't use any service.  My
18   daughter was buying a house in Texas, so I asked him for
19   a broker in Texas.
20      Q    I just asked you a series of questions about
21   services that UWM provides that Kevron may or may not
22   have used.
23           Is your answer to those questions that you --
24   Kevron did not use them or just you don't have knowledge
25   of anyone at Kevron using them?
```

Page 53

1          A     My understanding is I don't know anybody who

2     has used any of those services.  I -- pretty sure that I

3     never used any of those myself.

4          Q     It is possible that a loan officer or someone

5     employed with Kevron potentially used these services,

6     you just don't know about it; correct?

7          A     That's a possibility, yes.

8          Q     I think we heard Marjan testify earlier today

9     that she had used Kevron's like Facebook service for

10    some period and also used their service of sending happy

11    birthday e-mails to clients; correct?

12         A     I think you said Kevron.  I think you meant

13    UWM?

14         Q     Yes.

15         A     She said -- am I supposed to know that she said

16    that?

17         Q     Sure, yeah, you were sitting in the room.

18         A     Yeah, okay, yeah, she said it, yeah.

19         Q     So it's possible?

20         A     I don't know if that's one of those things --

21         Q     Sure.

22         A     -- you were talking about here --

23         Q     Yeah?

24         A     -- when you mentioned these names of things,

25    but anyway, sorry, go ahead.

Page 54

1      Q    No.  My question is, it's possible that these

2    services were used amongst Kevron's employees, you just

3    don't have knowledge of it one way or the other;

4    correct?

5      A    Yes.

6      Q    Are you familiar with UWM's All-In Addendum?

7      A    Yes.

8      Q    Can you explain what your understanding of the

9    All-In Addendum is?

10     A    Well, my understanding is that -- that -- that

11   UWM came out with this all-in initiative, that -- that

12   you either work with them -- you cannot work with Rocket

13   or Fairway, but you have to terminate your relationship

14   with them, if you want to work with UWM.

15     Q    Okay.

16     A    Are we done with this one, by the way?

17     Q    For now, yeah, you can just put it to the side.

18          I'm going to hand you what's been previously

19   marked as Exhibit 3.  And I'll direct you to Bates

20   number page ending in 3457 at the bottom right.  And

21   you'll see there, just above Section 3.04, there's a

22   Subsection X, which states, "Broker will not submit a

23   mortgage loan or mortgage loan application to Rocket

24   Mortgage or Fairway Independent Mortgage for review,

25   underwriting, purchase and/or funding.  This requirement

Page 55

```
 1    is limited to Rocket Mortgage, Fairway Independent

 2    Mortgage.  UWM will not add any other mortgage lender.

 3    If either Rocket Mortgage or Fairway Independent

 4    Mortgage acquire a mortgage lender, (an acquired

 5    lender), this requirement applies --

 6                THE REPORTER:  Can you read slower?

 7    BY MR. ABDALLAH:

 8         Q    Yeah, I'm sorry.  I'll back up a little bit.

 9                "If either Rocket Mortgage or Fairway

10    Independent Mortgage acquire a mortgage lender (an

11    acquired lender), this requirement applies only on a

12    going forward basis as to the acquired lender and is not

13    effective as to the acquired lender until 30 days after

14    the acquisition is closed."

15                Is this your understanding of what the All-In

16    Addendum is?

17         A    Yes.

18         Q    Okay.  Are you aware of a video streamed on

19    Facebook in March of 2021 that introduced the All-In

20    Addendum to the public?

21         A    No.

22         Q    Okay.  So you don't recall watching any type of

23    video regarding the All-In Addendum?

24         A    I don't know if I saw a video about it or not,

25    so I don't remember a video.  But I'm familiar with it.
```

Page 56

1      Q    Okay.  Do you know if anyone else at Kevron

2   watched the video relating to the All-In Addendum?

3      A    I do not know.

4      Q    When did you first learn of the All-In

5   Addendum?

6      A    Whenever it came out, shortly after it came

7   out.

8      Q    Would you say within hours, within --

9           So I'll represent to you that it was introduced

10  on March 4th, 2021.

11          Would you have learned about it within a week?

12     A    Probably -- yeah, I would say probably within a

13  week or so.

14     Q    Do you recall how you learned about the All-In

15  Addendum?

16     A    I don't.

17     Q    Would you have heard it from somebody else?

18  You read it in a newspaper, received notice about it

19  from UWM?

20     A    There was probably something that came out from

21  UWM that I saw in an e-mail or some format, but I don't

22  remember exactly.

23     Q    Okay.  So you recall receiving something from

24  UWM within a week after it was announced on March 4th,

25  2021 relating to the All-In Addendum?

```
                                            Page 57

 1        A    I would say -- I would say sometime around that

 2   time, whenever it came out, I was aware of it.  I don't

 3   know how I became aware of it specifically, but...

 4        Q    Did you inform anyone at Kevron about the

 5   All-In Addendum?

 6        A    No.

 7        Q    Do you know if anyone else within Kevron was

 8   aware of the All-In Addendum?

 9        A    I would think that they would have probably

10   sometime afterwards become aware of it.

11        Q    Did you discuss the All-In Addendum with anyone

12   at Kevron in 2021?

13        A    There were probably some discussions about it,

14   but nothing specific -- well, let me back up.

15             When this is announced or when I became aware

16   of it when it was announced, I actually reached out to

17   our rep, Jesus, at the time.  And I asked him

18   specifically -- because I said, I have not seen this

19   addendum.  I have not received this addendum.  I have

20   not been asked to sign this addendum.  What's the story?

21   And he told me, if we didn't get it, then it's either --

22   I forget the terminology.  He said, "It's either not

23   applicable to you or it doesn't apply to you, so don't

24   worry about."  That's what he told me, so I didn't make

25   a big deal out of it, because I was told by a
```

1    representative of United Wholesale Mortgage that if we

2    didn't get it, we didn't sign it and we weren't asked to

3    sign it, then it didn't apply to us.

4        Q    Was that around the time -- was that

5    conversation with Jesus around the time you learned

6    about it in March 2021?

7        A    Yes.  And I asked more than once and I also

8    asked other reps.  I believe Jesus -- I want to say it

9    went to Jesus to Ken.  And I initiated the conversation

10   about it.  And I asked about it and I was told the same

11   thing, that if I did not get it and I was wasn't asked

12   to sign it, that it didn't apply to us.

13       Q    When you spoke to Ken -- so you recall speaking

14   to Ken about --

15       A    I'm pretty sure I talked to Ken.

16       Q    Do you recall when that conversation would have

17   taken place?

18       A    No.

19       Q    Okay.  Was it in the later part of 2021?

20       A    Well, it was -- it would have been -- I mean, I

21   don't know when they switched reps --

22       Q    Uh-huh.

23       A    -- because I think, the initiative, to the best

24   of my knowledge right now, I think the initiative came

25   out and we were just doing business.  And it might have

Page 59

1  been a week or two or a month later that I said -- and

2  it might have even been more, might have been two months

3  later, where I said to Jesus, "Jesus, what's the deal

4  with this?  I never saw this.  I never got it.  Was

5  never asked to sign it."  And he told me, "Don't worry

6  about it.  Doesn't apply to you."  So I was like, "Okay,

7  great."  And then sometime in there, he was not our rep

8  anymore.  And then we got a new rep.  So when --

9  whatever that time is, you guys would probably know

10  better when these reps changed, but within -- I would

11  say within a week or a month, the most, of getting

12  switched to the new rep, I asked that same question.  I

13  was asking it.  I was initiating the conversation.  What

14  is this?  I didn't get it.  I never signed it.  I never

15  agreed to it.  And I was told by both of them, that if

16  we didn't get it, it didn't apply to us.

17      Q    Okay.  And then their representation was that

18  if you didn't get it, it didn't apply.  So it was

19  conditional on whether you received it or not; correct?

20      A    I told them, I didn't get it.  I didn't see it.

21  I wasn't asked to sign it.  No one ever reached out to

22  me to sign it.  And they said, well, if you didn't get

23  it and no one's asked you about it, then it doesn't

24  apply to you.

25      Q    I think you said you might have received an

Page 60

1   e-mail from UWM about it in March of 2021?

2       A    I don't know if I saw it in an e-mail or if it

3   came on -- you know, on the website, where it said

4   something about the initiative or -- I don't remember

5   where I learn about it officially, but I was aware of

6   it.

7       Q    Okay.  After learning of the addendum, did you

8   implement any rules or guidelines relating to the All-In

9   Addendum within Kevron?

10      A    No.

11      Q    Do you recall who within Kevron you would have

12  spoken to about the All-In Addendum?

13      A    I probably spoke to Michelle about it.  I can't

14  say for sure, but I probably did.

15      Q    Do you recall what the conversation would have

16  been?

17      A    No.  Just the same as what we're talking about

18  here.  I would have told her exactly what happened.  I

19  asked Jesus.  He said it's not applicable, so...

20      Q    Did you talk to any other loan officers or

21  employees at Kevron about the All-In Addendum?

22      A    (Inaudible response.)

23          THE REPORTER:  I'm sorry?

24          THE WITNESS:  I said -- I was waiting.  No,

25  because it -- I was told it didn't apply to us, so it

Page 61

```
 1    didn't -- it wasn't a thing.
 2    BY MR. ABDALLAH:
 3        Q    Your communications with Jesus, were those over
 4    a phone call?
 5        A    Mainly, well, he -- probably 50/50, between
 6    phone calls and e-mails.
 7        Q    I'll be more specific.  Your communications
 8    with Jesus about the All-In --
 9        A    It was definitely in a phone call.
10        Q    Did you have any communications with anyone at
11    UWM about the All-In Addendum through a form of
12    communication that's in writing, like e-mail or text or
13    some other --
14        A    Wouldn't that be great, huh?  I guess we
15    wouldn't be here today.  No.
16        Q    No.  Okay.
17            Were any communications sent internally within
18    Kevron about the All-In Addendum, like an e-mail or
19    text?
20        A    No.
21            MR. COOK:  You doing okay?
22            THE WITNESS:  Yeah, I'm good.  I don't know if
23    you need a break?
24            MR. COOK:  Well, I'm good.
25            THE WITNESS:  You drank the soda and the --
```

Page 62

1          MR. ABDALLAH:  This is a good time for a break.

2          THE WITNESS:  You want a break?

3          MR. ABDALLAH:  Yeah, let's take five.

4          THE VIDEOGRAPHER:  We are going off the record.

5    The time is 1:41 p.m.

6          (Whereupon a recess was taken.)

7          THE VIDEOGRAPHER:  This is Media 2.  We're

8    going back on the record.  The time is 1:50 p.m.

9    BY MR. ABDALLAH:

10       Q    Mr. Rhatigan, you testified earlier that you

11   were aware that -- of other brokers that UWM had brought

12   suit against; correct?

13       A    Yes.

14       Q    Have you ever communicated with anyone at those

15   brokerages?

16       A    Yes.

17       Q    Which brokerage?

18       A    The one up in northern California, Mid Valley.

19       Q    Do you recall who you spoke with over there?

20       A    The owner, I don't know his name offhand.

21       Q    Was it Charles, Charles Bachelor or something

22   to that --

23       A    Chuck.

24       Q    Chuck?

25       A    Maybe Chuck, yeah, that sounds right.

Page 63

1        Q    Do you recall what you spoke to him about?

2        A    Nothing more than the fact that we were both in

3    this lawsuit.

4        Q    Have you ever spoken to anyone at America's

5    Moneyline?

6        A    No.

7        Q    If you pull out Exhibit 1, the bottom one in

8    the document?

9        A    The bottom one?

10       Q    Over there.  I'm going to refer you to

11   paragraph 7.08, which is going to be on page ending in

12   Bates 07.

13       A    Yeah, no, I got it.  Okay.

14       Q    Second to last page.

15       A    Got it.

16       Q    I know the font is a little small.  I'm just

17   going to read it.

18       A    Which one is it, you're saying?

19       Q    7.08.  And I'll read it slowly for the court

20   reporter.  It has the heading, UWM Amendments & Website.

21   Continues, "This agreement, and UWM's policies,

22   procedures, requirements and instructions concerning

23   mortgage loan applications and mortgage loans, including

24   but not limited to those contained in the UWM guide, may

25   be amended by UWM from time to time.  And UWM will

Page 64

1   endeavor to provide broker with prompt notice thereof,

2   which may occur by posting any such amendments on UWM's

3   website, which broker is required to regularly check and

4   monitor as a condition of this agreement.  Broker agrees

5   that the submission of any mortgage loan applications or

6   mortgage loans to UWM, after such amendment shall be

7   broker's agreement to the amendment without further

8   signature or consent of any kind.  Any such amendment

9   shall apply to pending, and/or future mortgage loan

10  applications submitted by broker."

11          Is that the first time you read that provision?

12  A    Yes.

13  Q    Okay.  How often in the time that you're

14  doing --

15          In the time that Kevron was doing business with

16  UWM, how often would you or someone at Kevron check or

17  monitor UWM's website for amendments to the wholesale

18  broker agreement?

19  A    Never.

20  Q    Okay.  Do you agree, based on the paragraph we

21  read, that Kevron had the obligation to regularly

22  monitor or check UWM's website for amendments to the

23  wholesale broker agreement?

24          MR. COOK:  Let me object to the extent that

25  that calls for a legal conclusion.  So form, foundation,

Page 65

1    but go ahead and answer.

2            THE WITNESS:  Repeat the question.  Sorry.

3    BY MR. ABDALLAH:

4        Q    Would you agree that Kevron had the obligation

5    under the Wholesale Broker Agreement to regularly check

6    and monitor UWM's website for amendments to the

7    Wholesale Broker Agreement?

8        A    Yes.

9            MR. COOK:  Same objection.

10   BY MR. ABDALLAH:

11       Q    But you don't recall ever doing that; correct?

12       A    Correct.

13       Q    Okay.  And you don't know if anyone else at

14   Kevron ever did that; correct?

15       A    No one would.

16       Q    Did Kevron submit a mortgage loan application

17   or mortgage loan to UWM after March 4, 2021?

18       A    Yes.

19       Q    Do you know the first time after March 4, 2021

20   when Kevron would have submitted a mortgage loan or

21   mortgage loan application?

22       A    I'm sorry.  You said did we submit after March

23   2021 to UWM?

24       Q    Yes.

25       A    Yes, I believe we were still submitting loans

Page 66

1    to UWM.

2         Q    Do you recall the first time after March 4th of

3    2021, where Kevron would have submitted a mortgage loan

4    or loan application to UWM?

5         A    No, not offhand.

6         Q    Okay.  Was that something you could -- you

7    could learn through your point system software that

8    Kevron uses?

9         A    Yes.

10        Q    Okay.  Would you agree that Kevron's submission

11   of a mortgage loan application or mortgage loan to UWM

12   after UWM provided notice of an amendment to the

13   Wholesale Broker Agreement constitutes Kevron's

14   agreement to the amendment?

15             MR. COOK:  Objection.  Form.  Foundation.

16   Calls for a legal conclusion.

17             You can answer.

18             THE WITNESS:  No.

19   BY MR. ABDALLAH:

20        Q    Why is that?

21        A    You have to repeat it again.

22        Q    So I'll back up.

23             Do you understand that paragraph 7.08 says --

24   and it's the starting with the second to last sentence

25   in 7.08, "Broker agrees that the submission of any

Page 67

1    mortgage loan applications or mortgage loans to UWM

2    after such amendment shall be broker's agreement to the

3    amendment without further signature or consent of any

4    kind"?  Do you --

5         A    I understand what you're saying there.

6         Q    Would you agree that Kevron's submission of a

7    mortgage loan application or mortgage loan to UWM after

8    UWM provided notice of an amendment constitutes Kevron's

9    agreement to that amendment?

10             MR. COOK:  Same objections as before.

11             You can answer.

12             THE WITNESS:  I don't know how to answer that.

13   I never saw any amendments or anything.  So I don't know

14   how to answer that question.  I've never seen any other

15   amendments to the contract.

16   BY MR. ABDALLAH:

17        Q    Sure.

18        A    But based on what you're saying here, what

19   you're reading to me, if I understand it correctly, I

20   think my answer is, yes, I think so.

21        Q    Okay.  Did Kevron ever renew its Wholesale

22   Broker Agreement with UWM after it first entered into

23   the Wholesale Broker Agreement?

24        A    If they requested it, I believe I would have.

25        Q    Okay.  Do you recall on how many occasions?

Page 68

1      A     No.

2      Q     Do you recall if it happened like yearly every

3   six months?

4      A     Well, I can tell you that in -- when I started

5   in 1996, going back, we would do one broker agreement

6   and it would -- it would be good for 10, 20 years.

7   There was never any changes or anything.  It's changed

8   now.  Most lenders are doing it every year, an annual

9   recertification.  So I would imagine once a year, I

10  would imagine.

11     Q     And do you recall renewing Kevron's Wholesale

12  Broker Agreement with UWM between March 4th of 2021 and

13  February 15, 2022?

14     A     I don't recall, but I imagine if it was

15  requested of me, I would have done it.

16     Q     Okay.  I'm going to hand you what we'll mark as

17  Exhibit 5.

18           (Plaintiff's Exhibit 5 was marked for

19  identification by the Certified Shorthand Reporter and

20  attached hereto.)

21  BY MR. ABDALLAH:

22     Q     These are Kevron's responses to United

23  Wholesale Mortgage's Second Request For Admissions.

24  I'll refer you to the second page, Request for Admission

25  No. 13.  "Admit that Kevron" -- states, "Admit that

Page 69

1   Kevron renewed the Wholesale Broker Agreement between
2   March 4, 2021 and February 15, 2022."  And the response
3   is, "Admitted."
4           Do you dispute that Kevron renewed the
5   Wholesale Broker Agreement in the time frame?
6       A   I do not dispute that.  I couldn't say with 100
7   percent certainty that it was within those dates, but if
8   in fact the renewal came out during that time, then I --
9   I would say that's accurate.
10      Q   Okay.  And you would be the one that would have
11  renewed the --
12      A   That's correct.
13      Q   Do you recall what the renewal process
14  entailed?
15      A   No.  Every lender is different.
16      Q   The UWM process doesn't stick out to you?  It's
17  not something that you recall?
18      A   No.
19      Q   Okay.  I'm going to refer you back to
20  Exhibit 3, the one that looks like this.
21      A   Okay.
22      Q   So this is a Wholesale Broker Agreement.  It's
23  a screenshot of an online printout.  The preamble says
24  the Wholesale Broker Agreement is between UWM and
25  Westlake Mortgage; correct?

Page 70

1      A    Yes.

2      Q    And Westlake Mortgage Group, is that another

3    name that Kevron goes by?

4      A    That's a DBA.

5      Q    Okay.  And then it says, "With its principal

6    offices at 2659 Townsgate Road, Suite 115, Westlake

7    Village, California."

8           Is that Kevron's address?

9      A    That's correct.

10     Q    And on the last page of this document, ending

11   in Bates No. 3466, do you see at the bottom of the page,

12   you know, there's an option to submit the application.

13   And it pertains to submitting a renewal package.

14          Do you see that?

15     A    I see that.

16     Q    Do you recall ever submitting an application

17   similar to this, where you would be agreeing to a

18   Wholesale Broker Agreement as part of the renewal

19   process with UWM?

20     A    I have never seen that document before.

21     Q    Aside from seeing this document, have you ever,

22   as part of you renewing an agreement with UWM, seen

23   anything like this document or screen that would have a

24   Wholesale Broker Agreement that you would have to agree

25   to?

Page 71

1          A     Not that I can recall.

2          Q     So you just don't recall one way or the other?

3          A     I don't remember seeing -- I've never seen this

4     document before.

5          Q     Okay.  Or anything like that?

6          A     Or anything like it.

7          Q     Is it your testimony that you did not agree to

8     a document like this or you just don't recall?

9          A     I -- I don't remember seeing this document.

10    That's my testimony.

11         Q     Do you recall if you ever reviewed a Wholesale

12    Broker Agreement as part of a renewal that you submitted

13    with UWM?

14         A     No.

15         Q     Do you have any reason to dispute that you may

16    have agreed to this -- I'm sorry.  Let me strike that.

17              Do you have any reason to dispute that you

18    agreed to the Wholesale Broker Agreement as part of a

19    renewal you submitted with UWM?

20         A     I'm trying to think the way you worded that.

21    Do I have any reason to dispute --

22         Q     We can read it back.

23              (The record was read as follows:

24                   "QUESTION:  Do you have any

25                reason to dispute that you agreed to the

Page 72

1              Wholesale Broker Agreement as part of a

2              renewal you submitted with UWM?")

3         MR. COOK:  Object to form.

4         You can answer.

5         THE WITNESS:  I'm trying to -- I don't know how

6    to answer, because it seems like you -- it was -- you

7    said, do I have any reason to object to agreeing to

8    this, so that's where I'm confused.

9    BY MR. ABDALLAH:

10        Q    Sure.  I'll rephrase the question.

11        A    Can you clarify --

12        Q    Yeah, that's fine.

13        A    -- what you're asking?  Are you asking -- I'll

14   let you restate.  I don't know.

15        Q    That's fine.

16             If UWM were to say that or took the position

17   that you agreed to a Wholesale Broker Agreement that

18   contained the All-In Addendum as part of a renewal

19   process, would you disagree with that position?

20        A    If -- if -- I don't know how to answer that

21   question.  I -- I do annual renewals with brokers all

22   the time -- with wholesalers all the time.  And I

23   don't -- you can't do anything with them, so you have to

24   sign them.  So I don't remember seeing this document.

25   If I got an e-mail about a renewal, I would have

Page 73

1    renewed.  I would have never agreed with the All-In

2    Addendum, because I was told it didn't apply to us.  So

3    if they tried to stick it in the contract, like you're

4    saying they're doing here, to every broker as a way of

5    bolstering their legal position, which I believe is what

6    they're doing here, I certainly don't know anything

7    about it.  So I -- I had to sign an agreement to

8    continue to do business, so I'm sure I did, but I would

9    have never agreed to that liquidated damages clauses.

10       Q    So you agree that as part of the renewal, you

11   agreed to the current form of the Wholesale Broker

12   Agreement in effect at the time of the renewal?

13          MR. COOK:  Object to form.  You can answer.

14   Calls for legal conclusion.

15          THE WITNESS:  I would -- I would say I don't

16   have -- I would say I don't have any choice to modify

17   these forms.  I never do.  But I would -- so I -- my

18   position is the same, where I've never seen that.  And I

19   would have never agreed to the addendum, because I was

20   told it didn't apply to us.  So if it was stuck in there

21   as some way, you know, to -- I don't know.  I don't

22   know.  I would say I disagree.

23   BY MR. ABDALLAH:

24       Q    If the renewal process -- if part of the

25   renewal process included agreeing to the current form of

Page 74

```
 1    the wholesale broker agreement, you don't dispute that

 2    you completed that renewal process and, in fact, agreed

 3    to that current form of the Wholesale Broker Agreement;

 4    correct?

 5             MR. COOK:  Let me just object to form.

 6    Foundation.  Calls for legal conclusion.

 7             You can answer to the best you can.

 8             THE WITNESS:  I just don't know the answer,

 9    because -- I guess -- I guess the answer is yes.

10             MR. ABDALLAH:  Where are the e-mails regarding

11    renewal?  Did we take those out?  I could be just

12    overlooking it too?  Do you need to take a break for any

13    reason?

14             THE WITNESS:  No.  I'm good.  We can hang.

15             MR. ABDALLAH:  I found them.  Actually, no,

16    this isn't them.

17             THE WITNESS:  Do you need to take a break?

18             MR. ABDALLAH:  I know where it is.  It's the

19    way it was produced.  I remember it was produced as an

20    exhibit to the RFPs.

21        Q    Sir, I'm going to hand you what's marked as

22    Exhibit 6.

23             (Plaintiff's Exhibit 6 was marked for

24    identification by the Certified Shorthand Reporter and

25    attached hereto.)
```

Page 75

1    BY MR. ABDALLAH:

2       Q    And I'll represent to you that these are

3    Kevron's responses to plaintiff's second request for

4    production.  There are no Bates numbers to these

5    documents.  I'll refer you to Exhibit 1 of this

6    document, which --

7       A    Does it have a page number?

8       Q    Kind of halfway through the first page of the

9    exhibit, has like a big redacted block on it?

10      A    I got you, yeah.

11           MR. ABDALLAH:  Mr. Cook, I assume the redacted

12   block is simply a redaction of attorney-client

13   communication?

14           MR. COOK:  I believe that to be the case.

15           MR. ABDALLAH:  Just to simplify things, I don't

16   necessarily need a privilege log.

17      Q    Take time to review it, Mr. Rhatigan.

18      A    I'm good.  You can start at any time.

19      Q    Do you recall what this document is,

20   Mr. Rhatigan?

21      A    Never seen it, but it looks like an e-mail from

22   United Wholesale.  I guess it was sent to me on

23   November 8th of 2021.  Says I was -- the company was

24   approved for renewal.

25      Q    That's the e-mail on the first page of the

Page 76

1    document.  And if you continue through the document,

2    it's a total of four pages.  And it's an e-mail chain

3    relating to UWM -- Kevron's renewal of its Wholesale

4    Broker Agreement with UWM; correct?

5        A    Uh-huh, that's what it appears to be, yes.

6        Q    Going to page 3 at the bottom, the e-mail

7    starts there, but it continues on page 4.  It's an

8    e-mail that was sent that says the following renewal

9    application has been submitted.  Company name, Westlake

10   Mortgage Group, submitted person name, Kevron --

11   sorry -- Kevin Kevin, I assume that means probably Kevin

12   Rhatigan.  Submission time, October 20, 2021.

13            Do you recall if that's the date you may have

14   submitted a renewal application with UWM?

15       A    I don't recall, but based on this e-mail, if

16   it's accurate information, I would say this is accurate.

17       Q    This is an e-mail you provided to your counsel;

18   correct?

19       A    I don't think so.  I think you did.  I don't

20   know.

21       Q    This is something that was produced to us from

22   Kevron, so I assume -- if you don't recall, that's fine.

23       A    No, I don't remember sending it --

24       Q    It's okay.

25       A    Just -- you sure it didn't come from you guys

Page 77

```
 1    to us?  Okay.  All right.
 2         Q    It's fine.  There's a different record that
 3    establishes who produced what.
 4         A    Okay.  I don't remember sending it to him.
 5         Q    Going to page 3, October 21, 2021 e-mail
 6    requests Kevron to provide additional information in the
 7    form of a letter explanation as part of Kevron's
 8    renewal?
 9         A    Yes.
10         Q    And then if you go back to page 2, Kevron
11    provided that explanation relating to a personal loan
12    you made to the company back to 2008 --
13         A    Correct.
14         Q    -- when the economy crashed?
15         A    Sorry.
16         Q    Then in response to that on November 8th, 2021,
17    which is on the first page, the e-mail confirms that
18    Kevron completed its renewal; correct?
19         A    Yes.
20         Q    You don't dispute that Kevron renewed its
21    agreement, correct --
22         A    I do not.
23         Q    -- on November 2021?
24              MR. COOK:  You have to let --
25              THE WITNESS:  I know.  I know.
```

Page 78

```
 1   BY MR. ABDALLAH:

 2        Q    It's fine.

 3        A    Sorry.

 4        Q    We can all be guilty of that sometimes.  I'll

 5   refer you to previously marked Deposition Exhibit 2.

 6             Do you recall seeing a screen in a similar form

 7   to this as part of the renewal process you completed in

 8   October or November of 2021?

 9        A    No.  I've never seen this form before.

10        Q    Okay.  You can put that aside.

11             Does Kevron still do any type of business with

12   UWM?

13        A    No.  We were cut off.

14        Q    Do you recall how Kevron's relationship with

15   UWM ended?

16        A    Yes.

17        Q    How so?

18        A    I received an e-mail, I think first from the --

19   your attorneys.  And then -- and then a subsequent

20   letter in the mail after a phone call.

21        Q    Exhibit 7, I'll hand you what we'll mark as

22   Deposition Exhibit 7.

23             (Plaintiff's Exhibit 7 was marked for

24   identification by the Certified Shorthand Reporter and

25   attached hereto.)
```

Page 79

1    BY MR. ABDALLAH:

2        Q    To the best of your knowledge, is this the

3    letter you received?

4        A    Yes.

5        Q    In this letter, UWM notified Kevron that it

6    breached the Wholesale Broker Agreement by submitting a

7    mortgage loan or mortgage loan application to Rocket

8    Mortgage or Fairway for review, underwriting and/or

9    funding; correct?

10       A    Yes.

11       Q    In this letter, UWM terminated the Wholesale

12   Broker Agreement entered with Kevron; correct?

13       A    Yes.

14       Q    Prior to receiving this letter, Kevron did not

15   terminate its Wholesale Broker Agreement with UWM;

16   correct?

17       A    Yes.

18       Q    Do you have an understanding that Kevron was

19   free to terminate its Wholesale Broker Agreement with

20   UWM at any time with seven days notice?

21       A    Yes.

22       Q    Sorry.  I'm cleaning up a little bit.

23            Between March of 2021 and February 15, 2022,

24   did Kevron submit a mortgage loan or mortgage loan

25   application to Rocket Mortgage for review, underwriting,

Page 80

1    purchase and/or funding?

2        A    Yes.

3        Q    Do you recall how many times?

4        A    I believe, based on this information, I ran a

5    report and I believe you had said 22, but I think my

6    report showed 29.

7        Q    I'll hand you what we'll mark as Deposition

8    Exhibit No. 8.

9            (Plaintiff's Exhibit 8 was marked for

10   identification by the Certified Shorthand Reporter and

11   attached hereto.)

12   BY MR. ABDALLAH:

13       Q    And this is Kevron's Third Supplemental Answers

14   to Plaintiff's First Interrogatories.  Going to the

15   second to last page of the document.  The last page is

16   the certificate of service, which you don't have to

17   worry about.

18            There's a declaration there about the answers

19   in the interrogatories signed by, it appears to be you,

20   as the president of the company; correct?

21       A    Yes.

22       Q    And that's your signature?

23       A    Yes.

24       Q    Okay.  And going on to page 3 of the document,

25   Interrogatory No. 3 asks for the period March 1, 2021

```
                                                    Page 81

 1    through February 15, 2022, state the total number of

 2    mortgage loans and mortgage loan applications Kevron has

 3    submitted to A, Rocket Mortgage and B, Fairway

 4    Independent Mortgage.  And Kevron answers 29 for Rocket

 5    mortgage and 0 for Fairway; correct?

 6         A    Yes.

 7         Q    Okay.  And the answer's accurate to the best of

 8    your knowledge?

 9         A    Yes.

10         Q    Okay.  So prior to February 15, 2022, Kevron

11    didn't work with Fairway?

12         A    I had never heard of Fairway before this.

13         Q    Okay.  Handing you what's marked as Deposition

14    Exhibit No. 9.

15              (Plaintiff's Exhibit 9 was marked for

16    identification by the Certified Shorthand Reporter and

17    attached hereto.)

18    BY MR. ABDALLAH:

19         Q    I'll represent to you, this was produced as an

20    exhibit to discovery responses we received from Kevron.

21    And, you know, starts with cover page of Exhibit 1.  And

22    then after that, three pages of an e-mail chain between

23    you and Fairway Wholesale Lending.  Then after that,

24    there's an e-mail chain between you and someone with

25    Rocket Mortgage.  So just for your knowledge, this is
```

Page 82

1    like two different chains of communication.

2         A    Understood.

3         Q    Okay.  We'll start with the second part of that

4    dealing with your communications with Rocket.  And that

5    will be on the fifth page of this eight-page document.

6    That appears to be correct.

7              Do you recall what this document is?

8         A    Yes.

9         Q    What is it?

10        A    It's an e-mail from Paul Yatooma to me, just

11   here's my contact information.

12        Q    Okay.  And kr@westlakemtg.com is your e-mail?

13        A    That's my e-mail, that's correct.

14        Q    Who's Paul Yatooma?

15        A    Frankly, I've never heard of him before.  I

16   think he was a VP of some sort over at Rocket.

17        Q    Prior to receiving this e-mail, did you have

18   any conversations with Mr. Yatooma?

19        A    No.

20        Q    Okay.  In the e-mail, Mr. Yatooma states, "As

21   promised, here's the list of clients that have closed

22   with us since March 2021."

23              Does that refresh your recollection whether you

24   had any communications with Mr. Yatooma prior to

25   receiving this e-mail?

Page 83

1         A      Yes, I -- well, I requested from them, based on

2    the lawsuit, a list of clients that they showed that we

3    closed for them.  He sent this list.

4         Q      Okay.

5         A      Which is the -- I don't know how many are on

6    here, but he had -- this is from them to me.  And then I

7    ran my own report.  I don't know how many are on here.

8    I can count them.  There's 29 on here.  I don't know --

9    yeah, actually, I requested from him, based on the

10   lawsuit, if he could give me a list.  And that's the

11   list, there's 29.

12        Q      So did you reach out to Mr. Yatooma

13   specifically for this list?

14        A      I -- I prob- -- I'm -- I -- I'm -- I don't know

15   that I reached out.  I'm trying to remember how it

16   transpired.  I don't remember exactly how it transpired,

17   but he -- he called me as he said here, "Thanks for

18   taking the time."  He called me about the suit, you

19   know, sorry to hear about this, whatever.  And in that

20   conversation, I asked him if he would send me the list

21   of the clients, but I don't remember talking to him

22   prior to this.  I, frankly, didn't know who he was.

23        Q      So after the suit was filed, Rocket Mortgage

24   themselves reached out to you about this suit?

25        A      Yes.

Page 84

1      Q    Okay.  And -- was Mr. Yatooma the first person

2   to reach out to you with Rocket Mortgage?

3      A    I believe so.

4      Q    Do you know how -- was that by phone call?

5      A    Yes.  Pretty sure it was a phone call.

6      Q    What was discussed on that phone call?

7      A    Just sorry that you're going through this.

8   Sorry this is happening.  I'm sorry that, you know,

9   you're in this position.

10     Q    Anything else that you recall?

11     A    Not that I can recall.

12     Q    Okay.  Did you speak to anyone else at Rocket

13  other than Mr. Yatooma about this lawsuit?

14     A    Since then?

15     Q    Yes.

16     A    I did.  I believe so.  I can't remember who it

17  was.  When they came out with the Bully Shield, they

18  call it, then I reached out to them to see if they

19  wanted to take over the counsel.  And they said they

20  couldn't or whatnot, so I -- I don't remember who that

21  was with, but...

22     Q    Has or is any other entity or person paying

23  Kevron's cost or fees relating to this lawsuit?

24     A    No.

25          MR. COOK:  I was going to object.

Page 85

```
 1   Attorney-client privilege, but you answered, so...
 2   BY MR. ABDALLAH:
 3       Q    Mr. Rhatigan, I'm asking you a series of
 4   questions now, please give like a -- maybe a one
 5   Mississippi or two Mississippi before answering to give
 6   your counsel an opportunity to object and maybe instruct
 7   you not to answer.  I don't want to cross any lines.  I
 8   want to respect the boundary of the privilege for this
 9   specific -- for all questions, but this one
10   specifically.
11            You mentioned that when -- at the time the
12   Bully Shields came out, you reached out to Rocket to
13   request that they take over counsel; correct?
14            MR. COOK:  You can answer that.
15            THE WITNESS:  Only if you say so.  I don't have
16   to look at you at every question.  Yes.
17   BY MR. ABDALLAH:
18       Q    Okay.  And they declined to do so?
19       A    Yes.
20       Q    Okay.  Was that the last communication you had
21   with Rocket about them taking over counsel, providing a
22   defense?
23       A    Yes.
24       Q    Has Rocket ever provided any type -- has Rocket
25   covered any cost or fees or made any promises to cover
```

Page 86

1    any costs or fees relating to lawsuit?

2         A    No.

3         Q    Has anyone, any other entity or person, covered

4    any costs or fees or made a promise to cover any costs

5    or fees relating to this lawsuit?

6         A    No.

7         Q    Okay.  So you mentioned communication with

8    Mr. Yatooma at the time, where he reached out to you and

9    you got the e-mail.  You also mentioned communication

10   you had about Rocket, relating to the Bully Shield,

11   relating to the -- this lawsuit, the All-In Addendum,

12   have you had any other communications with Rocket that

13   you recall?

14        A    No.

15        Q    Correct me if I'm wrong, the chart on the last

16   page of this e-mail that you -- not the last page, but

17   the second to last page of this e-mail, that you

18   received from Mr. Yatooma, to your understanding, this

19   is Rocket's record of -- it's a chart essentially of the

20   mortgage loans or mortgage loan applications that Kevron

21   submitted to Rocket for review, underwriting, purchase

22   and/or funding between March 2021 through February 15,

23   2022?

24        A    Yes.  And do you want to point something out

25   here?

Page 87

1    Q    Sure.

2    A    I remember when I got this list.  And one of

3    the things was that these first three loans were in

4    March and April.  And I think that was one reason why I

5    thought maybe it wasn't 29, because there was a -- from

6    what I remember, something that said something about --

7    from UWM stating that if loans were in the pipeline

8    already, then you're not going to get charged for that

9    or something.  So I think the lawsuit was 22.  This was

10   29.  And I looked and I saw, well, there's three that

11   were in March and April, which were probably in the

12   pipeline, but I can't say for sure.  But to answer your

13   question, this document was requested by me from them

14   and this is what they sent me.

15   Q    Does Kevron still do business with Rocket?

16   A    Yes.

17   Q    How often?

18   A    Well, as mentioned previously, we're hardly

19   doing any business.  So there's -- I don't know that --

20   I don't know that we closed one loan with them this

21   year, to be quite frank with you.  I have no idea.

22   Q    The same exhibit, Exhibit 9, the first part of

23   it is an e-mail chain you have with Fairway Wholesale

24   Lending; correct?

25   A    Yes.

Page 88

```
 1        Q    And the first e-mail, it's on page 2 of the
 2   document.  The first e-mail is dated February 24th,
 3   2022; correct?
 4        A    Yes.
 5        Q    That's after UWM terminated its relationship
 6   with Kevron; correct?
 7        A    Yes.
 8        Q    Did you -- after the termination, did you seek
 9   to do business with Fairway?
10        A    No.
11        Q    Did they reach out to you to do business with
12   them?
13        A    Yes.
14        Q    Okay.  Have you done business with them?
15        A    No.
16        Q    Okay.  Did they reach out to you personally or
17   someone else at Kevron?
18        A    I'm sure they reached out to me personally.
19        Q    Can you -- was it by e-mail or phone call?
20        A    No, to the best of my recollection, it was
21   Josh, this guy here, who called me.  He was another VP
22   over there.  Very same, similar conversation to the
23   Rocket.  I'm sorry you're involved in this.  This is a
24   tragic -- what they're doing is ridiculous, blah, blah,
25   blah.  And then I said, well, you know, maybe send me a
```

Page 89

1    broker package, you know, I'll get set up with you guys,

2    because I just lost a big source in UWM.  And I said

3    I've never heard of Fairway before in the past, but I

4    mean, I guess you guys are a big company, because UWM is

5    naming you in this suit.  So maybe I ought to do

6    business with you.  They sent me the package.  I never

7    did anything with it.  The market was terrible.  We

8    weren't doing any business.  There's no reason for me to

9    bring on more wholesale lenders, when we had no business

10   to send to anybody.

11        Q    I'm going to hand you what we'll mark as

12   Deposition Exhibit No. 10.

13             (Plaintiff's Exhibit 10 was marked for

14   identification by the Certified Shorthand Reporter and

15   attached hereto.)

16   BY MR. ABDALLAH:

17        Q    I'll represent this is a document that was

18   produced to UWM by Kevron.

19             Does this document look familiar to you?

20        A    Yes.

21        Q    What is this document?

22        A    This is a report I ran on the processing

23   software of all the loans I sent to Rocket between the

24   time frame requested.

25        Q    And this is a report generated through the

Page 90

1    Point software?

2         A    Correct.

3         Q    You created this document?

4         A    I did.

5         Q    Okay.  And this is based on internal

6    information that Kevron inputs into the Point software?

7         A    Yes.

8         Q    Does this chart reflect all the mortgage loans

9    or mortgage loan applications submitted to Rocket

10   Mortgage for review, underwriting, purchase and/or

11   funding between March 2021 through February 15, 2022?

12        A    Yes.

13        Q    Are there any other loans that fall within that

14   category, not accounted for on this sheet?

15        A    No.

16        Q    So this -- your -- we previous talked about

17   interrogatory response, where you identified 29 loans.

18   That was based off this chart?

19        A    Yes.

20        Q    Is this chart part of a larger document?

21        A    No.

22        Q    I've noticed that -- you know, I see there is

23   row number starting from 52 through 80.  So I'm just

24   curious to know what are 1 through 51 and anything after

25   80?

Page 91

1       A    Clarify, yes.  This is a report that was broken

2   down by lenders.  So what's not here would have been

3   loans that went to other lenders.  This was only to

4   Rocket.

5       Q    Okay.  Is the report generated for the specific

6   time frame only?

7       A    Yes.

8       Q    Okay.  So loans that closed with UWM prior to

9   March 2021 wouldn't have been in this report; is that

10  correct?

11      A    Say again.

12      Q    Loans that closed were submitted -- I'm sorry.

13  Strike that.

14           Loans that were closed or submitted with Rocket

15  prior to March of 2021 would not have been in this

16  document that you generated; is that correct?

17      A    That's correct.  This document is only for the

18  time frame that was requested, whatever the dates were,

19  that's what this is.

20      Q    Skipping some things to save you time.

21           THE REPORTER:  Could we take a quick restroom

22  break?

23           MR. ABDALLAH:  Of course.

24           THE VIDEOGRAPHER:  We are going off the record.

25  The time is 2:31 p.m.

Page 92

```
 1              (Whereupon a recess was taken.)

 2              THE VIDEOGRAPHER:  This is -- this is Media 3.

 3    We're going back on the record.  The time is 2:43 p.m.

 4    BY MR. ABDALLAH:

 5       Q    We're back on the record.  Mr. Rhatigan, I'm

 6    going to hand you what we'll mark as Deposition Exhibit

 7    No. 11.

 8              (Plaintiff's Exhibit 11 was marked for

 9    identification by the Certified Shorthand Reporter and

10    attached hereto.)

11    BY MR. ABDALLAH:

12       Q    And I'll represent to you, these are Kevron's

13    First Amended Affirmative Defenses to United Wholesale

14    Mortgage's Complaint.

15       A    I'm sorry.  Was there a question?

16       Q    No, not yet.

17       A    Okay.  Sorry.

18       Q    So as part of your 30(b)(6) notice, we asked

19    that you be prepared to discuss the factual legal basis

20    for your affirmative defenses.  We're going to kind of

21    go through these right now.

22              Start with Affirmative Defense No. 3, where it

23    says, Plaintiff's -- you understand that plaintiff's

24    means United Wholesale Mortgage?

25       A    Okay.
```

Page 93

1        Q    "Plaintiff's claims are barred in whole or in

2    part because defendant, being Kevron, committed no

3    breach of the agreement."

4             Can you state Kevron's factual basis that it

5    did not breach the agreement?

6             MR. COOK:  Let me just place an objection to

7    the extent that calls for any kind of legal discussion,

8    but obviously go ahead and provide that factual basis as

9    you understand it.

10            THE WITNESS:  Well, because I mean, simplest

11   terms, I was told that it didn't apply to me.  The

12   All-In Addendum did not apply to me, to my company.  And

13   we never received it and never got it, never signed it.

14   And so couldn't breach a contract that I didn't agree

15   to.

16   BY MR. ABDALLAH:

17       Q    Are those the only reasons to your knowledge?

18       A    I mean, I'm sure there's other legal things,

19   but I'm not an attorney.

20       Q    Sure.  We're focusing on factual reasons that

21   you may not have committed a breach of the agreement?

22       A    Not that I know offhand.

23       Q    Sure.

24            Going on to Affirmative Defense No. 3,

25   "Plaintiff's claims are barred because there is no

Page 94

1    acceptance or meeting of the minds, which prevents

2    formation of a valid contract."

3          Do you understand what meeting of the minds

4    means?

5      A    Yes.

6      Q    What -- what is Kevron factual basis for

7    Affirmative Defense No. 3?

8      A    Well, it's my understanding that in order to

9    have a contract, you have to have an agreement with --

10   parties, that they both agree to -- both parties have to

11   agree to it.  So there is no meeting of the mind,

12   because my mind does not agree with your mind.

13     Q    So is the statement for affirmative -- your

14   statement for Affirmative Defense No. 2, that you don't

15   believe that Kevron agreed to the All-In Addendum?

16     A    That's, yes.

17     Q    Okay.  Affirmative Defense No. 4 states,

18   "Plaintiff's claims are barred because the contract it

19   seeks to enforce is substantively and procedurally

20   unconscionable."

21          Can you state what is unconscionable about the

22   contract?

23          MR. COOK:  Let me just object.  I think he's

24   asking a legal question, which I think is improper, but

25   you can answer to the extent you understand.

Page 95

1              THE WITNESS:  I think the addendum is illegal.

2      I think it's illegal, I think it's unethical.  I think

3      it's immoral.  I think it's anti-competition.  I think

4      it's steering.  I think it's numerous things.  And just

5      flat out wrong.

6      BY MR. ABDALLAH:

7         Q    Why do you think that the contract is all those

8      things?

9         A    Because what you're saying is, if you do

10     business with just these two particular companies,

11     you're -- you're limiting my ability as a broker, which

12     my job as a fiduciary, fiduciary responsibility, is to

13     my client.  So my ability is being limited.  And, again,

14     I just believe it to be based on everything that

15     transpired in 2008.  Everything that we were told in the

16     Dodd-Frank laws about steering, about illegal,

17     unethical, just it's just wrong.  The addendum is just

18     wrong.

19        Q    What about the addendum to you makes you think

20     that it partakes in steering?

21        A    Because it's -- it's saying you work with us,

22     or, basically, even though they're only naming two

23     companies, they're basically saying, you work with us,

24     nobody else.  We want you to work with us.

25        Q    So your understanding of the All-In Addendum,

Page 96

1    that it means that brokers could only work with UWM and

2    no other lender?

3        A    No, that's not my understanding.  My

4    understanding of the addendum clearly it's that they're

5    trying to limit my ability to work with two lenders, who

6    are on two -- I'm guessing Fairway is a large lender,

7    but two of the larger companies in the country, and

8    they're limiting my ability to represent my client in

9    the best possible way by not allowing me to work with

10   them.

11       Q    You do understand that the All-In Addendum is

12   limited only to Rocket and Fairway; correct?

13       A    Yes.

14       Q    Kevron is otherwise -- was otherwise free to

15   work with any other lender other than those two;

16   correct?

17       A    Yes.

18            MR. COOK:  Object to foundation.  I think that

19   assumes there was a contract in dispute, but --

20            THE WITNESS:  Yes.

21   BY MR. ABDALLAH:

22       Q    Moving on to Affirmative Defense No. 6,

23   "Plaintiff is not entitled to recover damages from

24   defendant because plaintiff has failed to mitigate its

25   damages."

Page 97

```
 1            What knowledge does Kevron have of UWM's
 2     damages relating to the All-In Addendum or breaches of
 3     the All-In Addendum?
 4            MR. COOK:  I'd just object.  I believe this is
 5     asking for a legal opinion or legal question from this
 6     witness, who is not a lawyer, but you can answer to the
 7     extent that you understand it.
 8            THE WITNESS:  Plaintiff is not entitled to
 9     recover damages -- not quite sure, plaintiff has failed
10     to mitigate its damages, what that means.
11     BY MR. ABDALLAH:
12        Q    If you don't understand what it means, we can
13     move on.
14        A    Yeah, we can move on.
15        Q    Are you unable to answer the question?
16        A    I'm unable to answer the question.
17        Q    Do you understand what the term estoppel means?
18        A    Could probably Google it.
19        Q    Sitting here today?
20        A    Sitting here today right now, not exactly.
21        Q    That's fine.
22            Do you understand what the term -- the phrase
23     lack of consideration means?
24        A    My understanding about lack of consideration
25     is -- consideration is considered anything of value,
```

Page 98

1    money or --

2        Q    So Affirmative Defense No. 8 states,

3    "Plaintiff's claims are barred for lack of

4    consideration."

5            Do you know Kevron's factual basis for

6    Affirmative Defense No. 8?

7        A    No.

8        Q    Okay.  Affirmative Defense No. 10 states,

9    "Plaintiff's claims are barred because there's an

10   impossibility."

11           Do you understand what an impossibility means

12   in this scenario?

13           MR. COOK:  Let me just object.  He's asking for

14   a legal opinion from somebody who's not a lawyer.  I

15   think the question is improper, but do the best you can

16   to answer.

17           THE WITNESS:  No, I don't know what that means.

18   BY MR. ABDALLAH:

19       Q    Okay.  Affirmative Defense No. 11 states,

20   "Plaintiff's claims are barred, because the contract is

21   ambiguous."

22           What part of the contract is or what part of

23   the contract is ambiguous to you?

24           MR. COOK:  Same objection.

25           You can answer.

Page 99

1    BY MR. ABDALLAH:

2         Q    Let me back up.

3              When it says contract, what contract do you

4    believe is being referenced?

5         A    The Wholesale Broker Agreement.

6         Q    Okay.  And when you say Wholesale Broker

7    Agreement, is that the Wholesale Broker Agreement

8    that -- the Wholesale Broker Agreement that includes the

9    All-In Addendum or does not include the All-In Addendum?

10        A    Does not does include the All-In Addendum.

11        Q    Okay.  What about the Wholesale Broker

12   Agreement that does not include the All-In Addendum?

13   For example, Exhibit 1, is ambiguous to you?

14             MR. COOK:  Same objection.

15             You can answer.

16   BY MR. ABDALLAH:

17        Q    Or to Kevron?

18        A    I don't know.

19        Q    Okay.  Is there anything about the All-In

20   Addendum, the language we read earlier today, that's

21   ambiguous to Kevron?

22             MR. COOK:  Same objection.

23             You can answer.

24             THE WITNESS:  No.

25   ///

Page 100

1    BY MR. ABDALLAH:

2        Q    Affirmative Defense No. 14 states, "Plaintiff's

3    claims are barred because it did not suffer any

4    damages."

5            Can you state Kevron's factual basis for

6    Affirmative Defense No. 14, if you know?

7            MR. COOK:  Same objections.

8            You can answer.

9            THE WITNESS:  Yes.  I don't believe they

10   suffered any damages by loans going to Rocket or Fairway

11   for that matter.

12   BY MR. ABDALLAH:

13       Q    Okay.  Do you have any knowledge for that

14   belief or is it just --

15       A    Do I have any knowledge?

16       Q    Yeah, I mean, do you base that belief off of

17   certain facts?

18       A    I've based that on my 35 years of experience in

19   the industry that you could broker loans to hundred

20   different places.  I don't know why they have damages if

21   you just send it to one of these two.

22       Q    Do you believe --

23            Would you agree that an independent mortgage

24   broker that submits and closes a loan with a lender that

25   also has a retail channel helps the retail lender's

Page 101

1    business succeed?

2              MR. COOK:  Object to form.

3              You can answer.

4              THE WITNESS:  No.

5    BY MR. ABDALLAH:

6         Q    Would you agree that UWM incurs costs to do

7    business with Kevron that it otherwise wouldn't have

8    occurred had -- had the agreement with Kevron been

9    terminated after All-In announced?

10             MR. COOK:  Object to form and foundation.

11             You can answer, if you know.

12             THE WITNESS:  I think no, if I understood the

13   question.

14   BY MR. ABDALLAH:

15        Q    Sure.  So you don't think that UWM incurs costs

16   to do business with Kevron?

17             MR. COOK:  Object to form or foundation.  You

18   can answer.

19             THE WITNESS:  I would say there may be costs to

20   have, you know, one more company added into their

21   portal, a tech guy who's on payroll and we've got to add

22   this company on, but I -- no, I don't think there's

23   any -- is there some costs?  Probably to have a tech IT

24   guy add us to the portal, but I don't think there's any

25   costs otherwise.

Page 102

1    BY MR. ABDALLAH:

2       Q    Do you know if UWM did not enforce its All-In

3    Addendum, do you believe that UWM would suffer a loss of

4    goodwill with brokers who otherwise complied with the

5    addendum?

6            MR. COOK:  Object to form.  And you can --

7            THE WITNESS:  If they -- say it again.

8    BY MR. ABDALLAH:

9       Q    If UWM did not enforce its All-In Addendum, do

10   you believe that UWM would suffer a loss of goodwill

11   with brokers who complied with the amendment?

12           MR. COOK:  Same objection.

13           You can answer.

14           THE WITNESS:  No.

15   BY MR. ABDALLAH:

16      Q    Are you aware of any public policy reasons that

17   would cause the All-In Addendum to be unenforceable?

18           MR. COOK:  Objection.  It calls for a legal

19   conclusion and form.  Foundation.

20           You can answer, if you know.

21           THE WITNESS:  No.  It's just the same thing I

22   talked about, is that the -- 2008, when the market

23   crashed and all the laws came into place, we are held to

24   a higher standard.  And we have to do what's right for

25   our client.  We have a fiduciary responsibility to our

Page 103

1   client.  And that's getting them the best we can.  So I

2   think that's a public policy thing.

3   BY MR. ABDALLAH:

4        Q    Are you familiar with the term promissory

5   estoppel?

6        A    Not exactly.

7        Q    Okay.  Affirmative Defense No. 17 states,

8   "Plaintiff's claims are barred because there was

9   improper notice of any alleged breach."

10            Can you state Kevron's factual basis for

11   believing that there was improper notice of an alleged

12   breach?

13       A    Yes.  Exactly, what I had stated previously.

14   And that was that I was never received any notice.  I

15   never received the addendum.  I never received anything

16   about -- well, I never received the addendum.  And I had

17   asked specifically numerous times and was told numerous

18   times that it didn't apply to us, if we didn't get it.

19       Q    Well, you also testified that you didn't

20   regularly check UWM website for amendments; right?

21            MR. COOK:  Objection.  Asked and answered.

22   BY MR. ABDALLAH:

23       Q    You can answer.

24            MR. COOK:  You can answer.

25            THE WITNESS:  I was waiting for him to tell me

Page 104

1    I can answer.

2                   Say it again?

3                   MR. ABDALLAH:  Can we get a read back?

4                   (The record was read as follows:

5                        "QUESTION:  Well, you also

6                   testified that you didn't regularly

7                   check UWM website for amendments;

8                   right?")

9                   THE WITNESS:  Yes.

10   BY MR. ABDALLAH:

11        Q    And you also testified -- I believe that you

12   may have received an e-mail about the amendment, but you

13   just -- you don't recall one way or the other?

14        A    No.  I never received an e-mail about the

15   addendum, All-In Addendum, specifically.

16        Q    Did you receive an e-mail potentially -- do you

17   recall receiving an e-mail about the All-In -- the

18   All-In initiative or the restriction to do business with

19   Rocket or Fairway?

20        A    I don't believe I received an e-mail

21   specifically about that.

22        Q    Okay.  You agree that Kevron provided notice of

23   breach in that termination letter that we looked at

24   earlier today; correct?

25        A    That Kevron received notice of breach?

Page 105

1        Q    In the termination letter that we looked at

2    earlier today?

3             MR. COOK:  Let me just object to form.  You can

4    answer.

5    BY MR. ABDALLAH:

6        Q    Exhibit No. 7.

7        A    Yeah, I agree to that.

8        Q    Okay.  Affirmative Defense No. 18 states,

9    "Plaintiff's claims are barred because it did not

10   perform its condition precedent."

11            Are you -- do you know what condition

12   precedents were in place that UWM had to perform?

13       A    No.

14       Q    Do you know what the term unjust enrichment

15   means?

16       A    No.

17       Q    Is Kevron still --

18            This is for you, Mr. Cook.  Is Kevron still

19   disputing venue or jurisdiction, personal jurisdiction

20   at this stage of litigation?

21            MR. COOK:  I don't think so, but I'm not going

22   to commit to it right now.

23            MR. ABDALLAH:  I'll skip over those.  You took

24   the position otherwise in writing, so...

25       Q    Affirmative Defense No. 23 states, "Plaintiff's

Page 106

1      claims are barred because its liquidated damages clause

2      is an unenforceable penalty."

3              Do you know what liquidated damages are?

4      A     Yes.

5      Q     Can you state Kevron's factual basis for

6      Affirmative Defense No. 23?

7              MR. COOK:  Just object.  I believe this calls

8      for a legal question.  Mr. Rhatigan is not a lawyer, but

9      you can answer nonetheless and provide your lay opinion.

10             THE WITNESS:  Okay.  Yes, I don't -- I don't

11     believe -- I have never seen a liquidated damages in a

12     wholesale agreement, so I don't -- I don't know how

13     anybody could validate a liquidated damages clause in a

14     mortgage wholesale contract.

15     Q     Why does Kevron believe that?  Do you

16     understand -- going back to Exhibit 3, if you could pull

17     that out.  On the last page, Section 7.30, that's Bates

18     numbers page ending in 3466.

19             So you're familiar that, along with the All-In

20     Addendum, there was a liquidated damages clause that --

21     for breaching the All-In Addendum; is that correct?

22             MR. COOK:  Object to form.

23             You can answer.

24             THE WITNESS:  Sorry.  Say it again.  I was --

25     ///

```
1    BY MR. ABDALLAH:

2         Q    Are you aware that as part of the All-In

3    Addendum, a clause was added to wholesale broker

4    agreement relating to breaches of the All-In Addendum?

5              MR. COOK:  Sorry.  Object to form and

6    foundation.

7              You can answer.

8              THE WITNESS:  No.

9    BY MR. ABDALLAH:

10        Q    Okay.  So going to the last page of the

11   document before you, Exhibit Number 3, Section 7.30, if

12   you could take time to read that and let me know if

13   that's the first time you become aware of that

14   provision?

15        A    Yes.  Other than earlier, I would question --

16   when was this document created?  I don't see a date on

17   it.

18        Q    Sure.

19             This was part of -- I'll represent that this

20   was the document you agreed to as part of the renewal.

21   So are you asking when --

22        A    Well, when was the --

23             MR. COOK:  I was going to say, you can't

24   represent that.  That's part of the foundation of the

25   lawsuit.
```

Page 108

1           MR. ABDALLAH:  Okay.  He's asking me a

2    question.

3        Q    Your testimony is evidence here.  I can

4    represent something, but if your counsel is going to

5    object, that's fine, but I'd ask that you withdraw the

6    question maybe.

7            My question to you is, if you can read the

8    liquidated damages provision in 7.30, just let me know,

9    is it the first time you become aware of this liquidated

10   damages provision?

11       A    Yes.  Can I not ask when this document was

12   created?  I don't see a date on it.

13           MR. COOK:  Unfortunately --

14           THE WITNESS:  I'm not allowed to ask?

15           MR. COOK:  Unfortunately, the questions in

16   deposition only go one way.  You do not get to ask the

17   attorneys questions.

18           THE WITNESS:  Never mind.

19   BY MR. ABDALLAH:

20       Q    I don't mean to disrespect you in any way.

21       A    No.  No.  Fine.  I've been told.  Put that one

22   away.

23       Q    So do you have a basis to state why Kevron is

24   of the position that the liquidated damages clause you

25   just read is an unenforceable penalty?

Page 109

1          MR. COOK:  Objection.  This calls for a legal

2     opinion and legal conclusion.  Mr. Rhatigan's not a

3     lawyer, but you can answer and give your lay opinion.

4          MR. ABDALLAH:  As the corporate representative

5     of the company.

6          THE WITNESS:  As I've stated numerous times, I

7     asked about the All-In Addendum.  I was told it didn't

8     apply to us.  I have never seen anything about it, these

9     documents that you're showing me today are the first

10    things I've seen about being in the contracts.  I -- I

11    don't know how you can add a liquidated damage clause in

12    this type of contract.  There are liquidated damages

13    clauses in real estate transactions and other type of

14    transactions, but I -- I -- I don't believe the addendum

15    is legal.  And if it's an illegal addendum and a legal

16    contract, they're unenforceable.

17    BY MR. ABDALLAH:

18       Q    Okay.  And is that your sole basis for

19    believing it's an unenforceable penalty?

20       A    Probably.

21          MR. COOK:  Same objection as before.

22          Go ahead.

23          THE WITNESS:  I probably have others, but I

24    think that's the basic one.

25    ///

Page 110

BY MR. ABDALLAH:

1

2     Q     What are the others that you have?

3     A     I don't know.  I'd have to think about it.

4     Q     So you can't answer that sitting here today?

5     A     Not right now.

6     Q     Okay.  We're done with that document, both

7     documents.

8           Going back to Exhibit 4, it's going to be

9     the -- Kevron's First Amended Answer to Plaintiff's

10    Complaint.  I'm going to direct you to page 7, paragraph

11    19.  The allegation reads, "In November 2021, Kevron

12    agreed to the most recent iteration of the All-In

13    Addendum, specifically paragraphs 3.03(x) and 7.30 of

14    the agreement."

15          And the answer is, "Defendant denies the

16    allegations contained in this paragraph as untrue."

17          Do you know what the basis for Kevron's denial

18    of this paragraph is?

19          MR. COOK:  Object.  This calls -- partially a

20    legal question, but you can still answer and give your

21    lay opinion, Kevin.

22          THE WITNESS:  Well, I can only go back to the

23    same thing.  I was told it didn't have any -- never

24    received it, never asked to sign it, never got it, never

25    saw it, so it didn't apply to us.  So you're saying --

Page 111

1    you're asking it, if I agreed to the most recent

2    iteration of the All-In Addendum, I never received it,

3    so I can't agree to something I never received.

4    BY MR. ABDALLAH:

5        Q    Going back to your conversations with

6    Mr. Yatooma from Rocket Mortgage, did Mr. Yatooma or

7    anyone at Rocket ever offer to help Kevron or you with

8    this lawsuit?

9        A    No.

10       Q    And you also testified about Rocket's Bully

11   Shield, how did you learn about Rocket's Bully Shield?

12       A    Through either e-mail or probably an e-mail on

13   their website.  I don't remember exactly.

14       Q    Have you spoken with anyone else, whether it be

15   someone at Rocket or any other person in the industry,

16   being independent mortgage broker or otherwise, who

17   Rocket's provided Bully Shield to?

18       A    No.

19       Q    Would you agree that the process of renewing

20   UWM broker agreement was an electronic online process?

21       A    Yes.

22       Q    And when you renew agreements, do you typically

23   read every part of the renewal or do you just kind of go

24   through the process and click submit?

25       A    Not a word.

Page 112

 1      Q    You mentioned that there are liquidated damages

 2   clauses and other contracts that you see or dealt with.

 3           What type of contracts are you referring to?

 4      A    Real estate contracts mainly.

 5      Q    Okay.  Was that, for example, like, you know,

 6   someone backs out -- a deposit that's gone hard and then

 7   someone backs out of the deal?

 8      A    Correct.

 9      Q    And that's something you see commonly in the

10   industry?

11      A    It is --

12      Q    That's the clause, not that it's actually

13   happening?

14      A    Yes.  The clause is preprinted in the contract.

15      Q    Are liquidated damages clauses also common in

16   the lending industry?

17      A    No.

18      Q    Have you communicated, other than Mid Valley,

19   who we already talked about, have you communicated with

20   any other mortgage brokers or correspondent lenders

21   regarding the All-In Addendum?

22      A    Yes.

23      Q    Who?

24      A    I don't know, but I -- specifically, but I was

25   contacted by the press, the Detroit Free Press, for a

Page 113

1   statement.  Frankly, she called me and asked me about

2   the lawsuit.  And I hadn't been served, so I didn't know

3   what she was talking about.

4        Q    Have you spoken to anyone else about the

5   lawsuit or the All-In Addendum?

6        A    There was another -- there was another press

7   person.  There were two press people.  I don't remember

8   who the second one was with.  I don't think I ever

9   talked to her.  I think she left me a voicemail and

10  wanted an opinion.

11       Q    Anybody else?

12       A    Yes.  There were a couple of people.  I don't

13  remember specifically, who had reached out to me, who --

14  who -- who were maybe concerned that they were going to

15  get dragged into the lawsuit as well.

16       Q    Do you recall who those people were?

17       A    Not offhand.  It was shortly after it happened,

18  after the lawsuit came in.

19       Q    Do you recall -- strike that.

20            Is there anything about Kevron's agreements

21  with other mortgage lenders that you believe are

22  relevant to this lawsuit?

23       A    No.

24       Q    Let's take a five-minute break.  I might be

25  done.  I just want to confirm.

Page 114

1            MR. COOK:  Okay.

2            THE WITNESS:  Sure.

3            THE VIDEOGRAPHER:  We are going off the record.

4     The time is 3:10 p.m.

5            (Whereupon a recess was taken.)

6            THE VIDEOGRAPHER:  This is Media 4.  We're

7     going back on the record.  The time is 3:14 p.m.

8     BY MR. ABDALLAH:

9       Q    I have no further questions for you today,

10    Mr. Rhatigan.

11

12

13                       EXAMINATION

14    BY MR. COOK:

15      Q    All right.  Kevin, I do have a few questions

16    for you.  I want to point you to Exhibit 1, which should

17    be the Wholesale Broker Agreement.

18            Okay.  You have that in front of you?

19      A    Yes.

20      Q    Okay.  So this is the Wholesale Broker

21    Agreement between UWM and Kevron, that's dated July

22    22nd, 2019; right?

23      A    Yes.

24      Q    Okay.  And did you electronically sign this

25    document?

Page 115

1      A    Yes.

2      Q    All right.

3           Did you negotiate this document at all?

4      A    No.

5      Q    Were you represented by counsel when you

6   negotiated this document or signed this document?

7      A    No.

8      Q    Are agreements like this that are boilerplate

9   common in the industry?

10     A    Yes.

11     Q    Are they -- is it kind of take it or leave it

12  type of situation?

13     A    Yes.

14     Q    Okay.  I'm not sure.  Can you look at

15  Exhibit 3, which is this document right here.  You see

16  Exhibit 3?

17     A    Yes.

18     Q    Okay.  You were asked about a renewal.  I

19  believe you acknowledged you did renew the Wholesale

20  Broker Agreement with United Wholesale Mortgage; is that

21  right?

22     A    Yes.

23     Q    When you renewed that agreement, did you

24  believe you were renewing it in the form of Exhibit 1 or

25  Exhibit 3?

Page 116

1      A     Exhibit 1.

2      Q     Was Exhibit 3 ever presented to you by United

3   Wholesale Mortgage based on what you remember?

4      A     No.

5      Q     Okay.  Did you ever have any discussions with

6   anyone at United Wholesale Mortgage about a liquidated

7   damages clause?

8      A     No.

9      Q     Did anyone at United Wholesale Mortgage ever

10  come to you and say they wanted to modify the original

11  Wholesale Broker Agreement in Exhibit 1?

12     A     No.

13     Q     Okay.  All right.  I think that's all the

14  questions I have.

15

16

17                  FURTHER EXAMINATION

18  BY MR. ABDALLAH:

19     Q     Just one question.

20           Exhibit 1, nobody forced you to enter into the

21  wholesale agreement in July 2019?

22     A     No, absolutely not.

23     Q     No further questions.

24           MR. COOK:  Done.

25           THE VIDEOGRAPHER:  This concludes the

Page 117

1    deposition of Kevron Rhatigan.  We're going off the

2    record.  The time is 3:16 p.m.

3

4              (Whereupon the deposition concluded at

5    3:16 p.m.)

6

7              (DECLARATION UNDER PENALTY OF PERJURY ON THE

8    FOLLOWING PAGE HEREOF.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1                    CERTIFICATION OF COURT REPORTER

2                           FEDERAL JURAT

3

4           I, the undersigned, a Certified Shorthand

5    Reporter of the State of California do hereby certify:

6           That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14          That before completion of the deposition, a

15   review of the transcript [x] was [  ] was not requested.

16          I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date subscribed

20   my name

21

22

23          Dated May 3, 2024

24

25          Certificate Number 9726

```
                                      Page 119

 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                           Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4    May 8, 2024
 5    To: William S. Cook, Esq.
 6    Case Name: United Wholesale Mortgage, LLC. v.
                  Kevron Investments, Inc.
 7
      Veritext Reference Number: 6596222
 8
      Witness:  Kevin Rhatigan, 30(b)(6) and Individually
 9    Deposition Date:  4/17/2024
10    Dear Sir/Madam:
11    The deposition transcript taken in the above-referenced
12    matter, with the reading and signing having not been
13    expressly waived, has been completed and is available
14    for review and signature.  Please call our office to
15    make arrangements for a convenient location to
16    accomplish this or if you prefer a certified transcript
17    can be purchased.
18    If the errata is not returned within thirty days of your
19    receipt of this letter, the reading and signing will be
20    deemed waived.
21
      Sincerely,
22
23    Production Department
24
25    NO NOTARY REQUIRED IN CA
```

Page 120

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 6596222
 3       CASE NAME: United Wholesale Mortgage, LLC. v.
                  Kevron Investments, Inc.
         DATE OF DEPOSITION: 4/17/2024
 4       WITNESS' NAME: Kevin Rhatigan, 30(b)(6) and Individually
 5       In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7       I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____        _____
 9   Date                    Kevin Rhatigan, 30(b)(6)
                             and Individually
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                             _____
18                           Notary Public
19                           _____
                             Commission Expiration Date
20
21
22
23
24
25
```

Page 121

```
 1                   DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
           ASSIGNMENT REFERENCE NO: 6596222
 3         CASE NAME: United Wholesale Mortgage, LLC. v.
                     Kevron Investments, Inc.
           DATE OF DEPOSITION: 4/17/2024
 4         WITNESS' NAME: Kevin Rhatigan, 30(b)(6) and Individually
 5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9         I request that these changes be entered
     as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Kevin Rhatigan, 30(b)(6)
                                  and Individually
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18              in the appended Errata Sheet;
           They signed the foregoing Sworn
19              Statement; and
           Their execution of this Statement is of
20              their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23                           _____
                             Notary Public
24
                             _____
25                           Commission Expiration Date
```

Page 122

1                          ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 6596222
3      PAGE/LINE(S) /         CHANGE         /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                    Kevin Rhatigan, 30(b)(6)
                               and Individually
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

**[& - 2:43]**                                                                 Page 1

| **&** | **12:38** 2:21 6:5 | **1:50** 62:8 | 77:23 78:8 |
|---|---|---|---|
| **&** 3:13 63:20 | **13** 50:3,5 68:25 | **2** | 79:23 80:25 |
| **0** | **14** 100:2,6 | | 82:22 86:22 |
| | **15** 22:5 23:16 | **2** 5:13 38:10 | 90:11 91:9,15 |
| **0** 81:5 | 23:17 34:22,22 | 62:7 77:10 | 110:11 |
| **000001** 44:16 | 38:18 41:4 | 78:5 88:1 | **2022** 28:20,20 |
| **00008** 44:19 | 68:13 69:2 | 94:14 | 68:13 69:2 |
| **07** 63:12 | 79:23 81:1,10 | **2/15/22** 4:19 | 79:23 81:1,10 |
| **08** 15:20 17:3 | 86:22 90:11 | **20** 29:4 34:4 | 86:23 88:3 |
| **09** 15:20 | **15055** 118:21 | 35:23 38:14 | 90:11 |
| **1** | **17** 1:17 2:22 | 41:4 42:22 | **2023** 31:2 48:2 |
| | 6:1 103:7 | 48:4 68:6 | **2024** 1:17 2:22 |
| **1** 5:12 8:10 | **17197** 3:14 | 76:12 120:16 | 6:1,6 118:23 |
| 63:7 75:5 | **17th** 6:6 | 121:22 122:22 | 119:4 |
| 80:25 81:21 | **18** 34:22 105:8 | **200** 44:6 | **21** 77:5 |
| 90:24 99:13 | **1820** 119:2 | **2008** 16:5,14,20 | **216-523-1313** |
| 114:16 115:24 | **19** 24:3 47:25 | 16:21 77:12 | 119:3 |
| 116:1,11,20 | 110:11 | 95:15 102:22 | **22** 43:7 80:5 |
| **10** 5:4 22:5 | **1919** 43:1 | **2009** 16:6,14 | 87:9 |
| 23:17 31:23 | **1977** 13:11 | **201** 3:14 | **22nd** 114:22 |
| 41:4 68:6 | 22:25 23:2,23 | **2011** 35:20 | **23** 105:25 |
| 89:12,13 98:8 | **1980** 23:4 | **2019** 42:18,18 | 106:6 |
| **10.10.5.244.** | **1987** 14:10 | 42:24 43:1,1,7 | **248** 3:5 |
| 44:23 | **1990** 15:3,5,15 | 44:25 50:3,5 | **24th** 88:2 |
| **100** 3:4 38:14 | 16:24 17:10 | 114:22 116:21 | **2651** 8:25 |
| 69:6 | 18:12 | **2020** 47:2,7 | **2659** 70:6 |
| **10395** 1:6 2:6 | **1996** 17:25 | **2021** 26:15,19 | **281** 3:9 |
| 6:17 | 18:12 19:17,20 | 35:22,23 40:3 | **29** 80:6 81:4 |
| **11** 5:5 92:7,8 | 68:5 | 40:4 47:8 | 83:8,11 87:5 |
| 98:19 | **1997** 19:20,21 | 50:10 55:19 | 87:10 90:17 |
| **1100** 119:1 | 23:23 | 56:10,25 57:12 | **2:22** 1:6 2:6 |
| **114** 4:6 | **1999** 42:15,15 | 58:6,19 60:1 | 6:17 |
| **115** 70:6 | 42:17,25 | 65:17,19,23 | **2:31** 91:25 |
| **116** 4:5 | **1:41** 62:5 | 66:3 68:12 | **2:43** 92:3 |
| **125** 3:8 | | 69:2 75:23 | |
| | | 76:12 77:5,16 | |

**2s**   31:23

**3**

**3**   5:15 54:19
  69:20 76:6
  77:5 80:24,25
  92:2,22 93:24
  94:7 106:16
  107:11 115:15
  115:16,25
  116:2 118:23
**3.03**   110:13
**3.04**   54:21
**3/21/1959**   13:5
**30**   1:15 2:17
  7:23,25 8:10
  23:6 36:9 37:6
  38:14,17 47:12
  55:13 92:18
  119:8 120:4,9
  121:4,13
  122:20
**30950**   2:22
  6:19
**313**   3:15
**327-3100**   3:15
**3457**   54:20
**3466**   70:11
  106:18
**35**   36:9 44:6
  100:18
**360**   50:25 51:2
**3:10**   114:4
**3:14**   114:7
**3:16**   117:2,5

**4**

**4**   4:13 49:19,20
  65:17,19 69:2
  76:7 94:17
  110:8 114:6
**4/17/2024**
  119:9 120:3
  121:3
**400**   3:4
**44114**   119:2
**48084**   3:5
**48152**   3:14
**49**   4:13
**4th**   56:10,24
  66:2 68:12

**5**

**5**   4:14 50:2
  68:17,18
**50**   38:14 41:4
  47:12
**50/50**   20:10
  61:5
**51**   90:24
**52**   90:23
**54**   5:15
**5810**   3:8
**5:00**   32:17

**6**

**6**   1:15 2:17
  4:16 7:23,25
  74:22,23 92:18
  96:22 119:8
  120:4,9 121:4
  121:13 122:20

**60**   23:5
**63**   5:12
**6596222**   119:7
  120:2 121:2
  122:2
**68**   4:14
**6:13**   44:22

**7**

**7**   4:5,18 78:21
  78:22,23 105:6
  110:10
**7,000**   27:19
**7,500**   27:19
**7.08**   63:11
  66:23,25
**7.08.**   63:19
**7.30**   106:17
  107:11 108:8
  110:13
**7/22/19**   5:12
**7/22/2019**
  44:22
**74**   4:16
**77397**   3:9
**78**   4:18 5:13

**8**

**8**   4:20 80:8,9
  98:2,6 119:4
**80**   4:20 23:8
  90:23,25
**81**   4:22
**822-7860**   3:5
**89**   5:4

**8th**   75:23 77:16

**9**

**9**   4:22 81:14,15
  87:22
**90**   15:4
**91361**   9:1
**92**   5:5
**930-6853**   3:9
**95**   17:25,25
**96**   18:1
**9726**   1:24
  118:25
**99**   38:12
**9:00**   32:17

**a**

**abbreviations**
  10:21
**abdallah**   3:4,6
  4:5 6:23,23
  8:12,16,17
  12:5,13 19:3
  24:10 33:22
  34:1 41:11
  43:2 49:3,23
  55:7 61:2 62:1
  62:3,9 65:3,10
  66:19 67:16
  68:21 72:9
  73:23 74:10,15
  74:18 75:1,11
  75:15 78:1
  79:1 80:12
  81:18 85:2,17
  89:16 91:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**[abdallah - agreed]**

92:4,11 93:16
95:6 96:21
97:11 98:18
99:1,16 100:1
100:12 101:5
101:14 102:1,8
102:15 103:3
103:22 104:3
104:10 105:5
105:23 107:1,9
108:1,19 109:4
109:17 110:1
111:4 114:8
116:18
**ability** 10:18
17:15,17 41:3
49:15 95:11,13
96:5,8
**able** 50:22
**above** 54:21
119:11
**absolutely**
27:14 116:22
**acceptance**
94:1
**access** 29:13,14
29:20 30:6,11
31:10,13 34:8
34:11,24
**accident** 23:4
24:3
**accomplish**
119:16
**accordance**
8:10 120:5

121:5
**account** 31:11
31:13 34:11
46:2
**accounted**
90:14
**accounting**
14:3,4
**accounts** 26:25
**accurate** 69:9
76:16,16 81:7
118:12
**achievement**
14:2
**acknowledge**
120:11 121:16
**acknowledged**
115:19
**acknowledge...**
5:14
**acquire** 55:4,10
**acquired** 55:4
55:11,12,13
**acquisition**
55:14
**act** 120:14
121:20
**action** 6:13
24:16,22
118:17
**actually** 23:7
24:23 25:14
40:4 46:10
57:16 74:15
83:9 112:12

**add** 55:2
101:21,24
109:11
**added** 101:20
107:3
**addendum**
54:6,9 55:16
55:20,23 56:2
56:5,15,25
57:5,8,11,19,19
57:20 60:7,9
60:12,21 61:11
61:18 72:18
73:2,19 86:11
93:12 94:15
95:1,17,19,25
96:4,11 97:2,3
99:9,9,10,12,20
102:3,5,9,17
103:15,16
104:15,15
106:20,21
107:3,4 109:7
109:14,15
110:13 111:2
112:21 113:5
**additional** 77:6
**address** 8:24
26:23 70:8
**adjustable**
38:17
**administer** 7:5
**administration**
14:6

**admission** 4:15
68:24
**admissions**
68:23
**admit** 68:25,25
**admits** 50:12
50:13,18
**admitted** 69:3
**affirmative** 5:6
92:13,20,22
93:24 94:7,13
94:14,17 96:22
98:2,6,8,19
100:2,6 103:7
105:8,25 106:6
**affixed** 120:15
121:21
**afternoon** 6:4
8:12
**agent** 43:16
**agents** 43:13
**ago** 11:14 22:6
23:16,17 29:4
**agree** 8:13
39:23 40:12
64:20 65:4
66:10 67:6
70:24 71:7
73:10 93:14
94:10,11,12
100:23 101:6
104:22 105:7
111:3,19
**agreed** 8:11
45:8 50:9,15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[agreed - applicable]**                                          Page 4

59:15 71:16,18
71:25 72:17
73:1,9,11,19
74:2 94:15
107:20 110:12
111:1
**agreeing**  70:17
72:7 73:25
**agreement**  5:12
5:14,15,16
7:18 12:16
22:7 29:16,19
42:19 43:4
44:10,25 45:3
45:5,9 46:14
46:17 48:10
50:8,9,14,16
63:21 64:4,7
64:18,23 65:5
65:7 66:13,14
67:2,9,22,23
68:5,12 69:1,5
69:22,24 70:18
70:22,24 71:12
71:18 72:1,17
73:7,12 74:1,3
76:4 77:21
79:6,12,15,19
93:3,5,21 94:9
99:5,7,7,8,12
101:8 106:12
107:4 110:14
111:20 114:17
114:21 115:20
115:23 116:11

116:21
**agreements**
111:22 113:20
115:8
**agrees**  64:4
66:25
**ahead**  9:7
41:18 53:25
65:1 93:8
109:22
**al**  26:10,12,13
26:14 33:13,16
34:14,15
**allegation**
110:11
**allegations**
110:16
**alleged**  41:23
103:9,11
**alleges**  50:5
**allowed**  108:14
**allowing**  96:9
**alternative**
40:8
**alvaro**  33:16,17
34:14
**ambiguous**
98:21,23 99:13
99:21
**amended**  4:13
5:5 49:25 50:9
50:12,17 63:25
92:13 110:9
**amendment**
50:15 64:6,7,8

66:12,14 67:2
67:3,8,9
102:11 104:12
**amendments**
63:20 64:2,17
64:22 65:6
67:13,15
103:20 104:7
**america**  36:25
37:2,3,12,14
41:5
**america's**  63:4
**amicable**  31:8
**amount**  27:18
34:21 47:4
**angeles**  2:21
6:9,11
**announced**
56:24 57:15,16
101:9
**annual**  17:7,9
68:8 72:21
**answer**  4:13
8:5 9:11 10:1,2
10:9,9 49:25
50:11,12,18
52:23 65:1
66:17 67:11,12
67:14,20 72:4
72:6,20 73:13
74:7,8,9 85:7
85:14 87:12
94:25 97:6,15
97:16 98:16,25
99:15,23 100:8

101:3,11,18
102:13,20
103:23,24
104:1 105:4
106:9,23 107:7
109:3 110:4,9
110:15,20
**answer's**  81:7
**answered**  85:1
103:21
**answering**  9:20
9:22 10:13
85:5
**answers**  4:20
10:3 80:13,18
81:4
**anti**  95:3
**anybody**  12:21
26:20 30:6
53:1 89:10
106:13 113:11
**anymore**  31:7
59:8
**anyway**  53:25
**appear**  120:11
121:15
**appearances**
3:1
**appears**  76:5
80:19 82:6
**appended**
121:11,18
**applicable**
57:23 60:19

application
  5:16 54:23
  65:16,21 66:4
  66:11 67:7
  70:12,16 76:9
  76:14 79:7,25
applications
  63:23 64:5,10
  67:1 81:2
  86:20 90:9
applies  55:5,11
apply  57:23
  58:3,12 59:6
  59:16,18,24
  60:25 64:9
  73:2,20 93:11
  93:12 103:18
  109:8 110:25
appraisal  31:24
approved
  36:11 43:14,15
  75:24
approximately
  34:3
april  1:17 2:22
  6:1,6 87:4,11
arrangements
  119:15
arrest  23:24
arrested  23:1
arroyo  8:20
  33:3
aside  70:21
  78:10

asked  52:16,18
  52:20 57:17,20
  58:2,7,8,10,11
  59:5,12,21,23
  60:19 83:20
  92:18 103:17
  103:21 109:7
  110:24 113:1
  115:18
asking  9:9,17
  9:23 59:13
  72:13,13 85:3
  94:24 97:5
  98:13 107:21
  108:1 111:1
asks  80:25
assignment
  120:2 121:2
  122:2
assist  52:7
assists  51:9,13
associates  14:4
assume  10:1
  13:7 30:9
  75:11 76:11,22
assumes  96:19
attached  49:22
  68:20 74:25
  78:25 80:11
  81:17 89:15
  92:10 121:7
attend  14:13
  15:1
attended  13:24

attest  5:13
attorney  6:22
  10:7,8 11:12
  75:12 85:1
  93:19 118:18
attorneys  78:19
  108:17
attribute  48:8
authorize
  121:11
automates  51:5
avail  50:6
available  28:17
  39:21 40:9
  119:13
availed  50:13
  50:18,20
ave  119:1
aware  52:5,10
  55:18 57:2,3,8
  57:10,15 60:5
  62:11 102:16
  107:2,13 108:9

**b**

b  1:15 2:17
  4:10 5:1 7:23
  7:25 50:10
  81:3 92:18
  119:8 120:4,9
  121:4,13
  122:20
baby  38:11
bachelor  14:6
  62:21

bachelor's
  13:19 14:8
back  15:4
  19:22 22:10,11
  23:2,7 29:14
  32:2,5 36:11
  44:10 47:14
  50:4 55:8
  57:14 62:8
  66:22 68:5
  69:19 71:22
  77:10,12 92:3
  92:5 99:2
  104:3 106:16
  110:8,22 111:5
  114:7
background
  13:2
backs  112:6,7
bad  48:3,5
ballpark  47:11
bank  18:15
  31:23 36:25
  37:1,2,3,12,14
  38:10 40:7
  41:5
bankruptcy
  24:25
barred  93:1,25
  94:18 98:3,9
  98:20 100:3
  103:8 105:9
  106:1
base  38:2
  100:16

**based**  64:20
67:18 76:15
80:4 83:1,9
90:5,18 95:14
100:18 116:3
**basic**  109:24
**basically**  21:5
30:18 95:22,23
**basis**  39:25
55:12 92:19
93:4,8 94:6
98:5 100:5
103:10 106:5
108:23 109:18
110:17
**bates**  44:12,17
44:18 54:19
63:12 70:11
75:4 106:17
**bearing**  48:12
**beaver**  3:4
**becoming**  18:9
**began**  17:10
29:2 42:12
43:10
**behalf**  6:23,25
7:9
**belief**  100:14
100:16
**believe**  21:23
30:4 45:16
58:8 65:25
67:24 73:5
75:14 80:4,5
84:3,16 94:15

95:14 97:4
99:4 100:9,22
102:3,10
104:11,20
106:7,11,15
109:14 113:21
115:19,24
**believing**
103:11 109:19
**bergen**  13:17
13:21
**best**  9:25 11:25
12:1,8 38:16
38:16,18 39:21
58:23 74:7
79:2 81:7
88:20 96:9
98:15 103:1
**better**  17:5
40:23 46:11
59:10
**big**  3:4 30:22
57:25 75:9
89:2,4
**bill**  11:12
**bills**  21:3
**birth**  13:4
**birthday**  53:11
**bit**  13:3 29:15
39:19 46:24
55:8 79:22
**blah**  88:24,24
88:25
**blink**  51:21

**block**  75:9,12
**board**  17:18,18
17:20 41:6
**boilerplate**
115:8
**bolstering**  73:5
**borrowers**
40:13,23 51:6
51:18 52:2
**borsotti**  26:18
**borsotti's**  30:13
**bottom**  44:13
44:21 54:20
63:7,9 70:11
76:6
**bought**  36:8
**boundary**  85:8
**brand**  50:25
51:2,9
**breach**  93:3,5
93:14,21 103:9
103:12 104:23
104:25
**breached**  79:6
**breaches**  97:2
107:4
**breaching**
106:21
**break**  10:10,12
10:14 61:23
62:1,2 74:12
74:17 91:22
113:24
**brian**  45:19,20
45:21 46:8,11

**bring**  12:24
89:9
**broken**  91:1
**broker**  5:12,15
17:22,24 18:3
18:9,22 19:5
28:1,22 35:3,5
36:20 37:22
40:14 41:3
42:19 43:4,14
43:23 44:6,10
46:13,17 48:10
50:7,9,14
52:19 54:22
64:1,3,4,10,18
64:23 65:5,7
66:13,25 67:22
67:23 68:5,12
69:1,5,22,24
70:18,24 71:12
71:18 72:1,17
73:4,11 74:1,3
76:4 79:6,12
79:15,19 89:1
95:11 99:5,6,7
99:8,11 100:19
100:24 107:3
111:16,20
114:17,20
115:20 116:11
**broker's**  40:21
64:7 67:2
**brokerage**
62:17

brokerages 62:15
brokers 40:17 40:24 42:4,6,7 42:8,9 49:4 62:11 72:21 96:1 102:4,11 112:20
brought 42:7 62:11
bsplaw.com 3:6 3:10
builder 51:9
bully 84:17 85:12 86:10 111:10,11,17
bunch 12:11 35:23 36:11
bush 3:3,7
business 14:6 15:3 18:6,18 18:19,21,23 26:6 28:18 31:5 36:4,10 37:6 39:18 40:4 42:1,8,13 42:16 43:10,12 43:23 46:23 47:14 50:22 58:25 64:15 73:8 78:11 87:15,19 88:9 88:11,14 89:6 89:8,9 95:10 101:1,7,16

104:18
businesses 49:5
buying 40:10 48:6 52:18

**c**

c 18:17 49:1
ca 119:25
cal 36:8
calendar 51:13
california 1:16 2:20,23 6:9,20 9:1 15:9 18:22 23:14 24:6 62:18 70:7 118:5
call 11:9,11,13 11:15,18,19 34:14 43:5 61:4,9 78:20 84:4,5,6,18 88:19 119:14
called 7:9 18:20 18:22 36:5 44:12 48:22 83:17,18 88:21 113:1
calls 61:6 64:25 66:16 73:14 74:6 93:7 102:18 106:7 109:1 110:19
calyx 49:1
capacity 7:20
capital 18:22 25:15,18

car 23:4 24:3
care 32:18 37:7
career 18:15 37:5
carefully 9:15
case 1:6 2:6 6:17 23:19,24 24:3 27:13,20 27:23 75:14 119:6 120:3 121:3
cases 38:8,8
cash 24:20
category 90:14
cause 102:17
certain 18:7,10 39:2,24 48:17 48:18 100:17
certainly 73:6
certainty 69:7
certificate 14:2 80:16 118:25 121:11
certification 14:25 19:5 118:1 120:1 121:1
certifications 14:22,25 19:7
certified 2:19 7:10 49:21 68:19 74:24 78:24 80:10 81:16 89:14 92:9 118:4

119:16
certify 118:5,16
chain 76:2 81:22,24 87:23
chains 82:1
change 121:8 122:3
changed 15:21 28:15 59:10 68:7
changes 68:7 120:7 121:7,9
changing 36:7
channel 36:15 100:25
chapman 45:17
charged 87:8
charging 37:17
charles 62:21 62:21
chart 86:15,19 90:8,18,20
check 22:9 24:20 64:3,16 64:22 65:5 103:20 104:7
choice 41:5 73:16
choose 38:4,15
chooses 38:23
chuck 62:23,24 62:25
civil 7:22 120:5 121:5

[claims - condition]                                                    Page 8

claims   27:22,25
   41:22 93:1,25
   94:18 98:3,9
   98:20 100:3
   103:8 105:9
   106:1
clarify   9:25
   11:4 72:11
   91:1
class   24:16,22
classes   15:22
   15:25 16:3
clause   106:1,13
   106:20 107:3
   108:24 109:11
   112:12,14
   116:7
clauses   73:9
   109:13 112:2
   112:15
cleaner   9:18
cleaning   79:22
clearly   96:4
cleveland   119:2
click   111:24
client   22:10
   27:14 38:1,6,9
   38:20,23 39:2
   39:22 51:5
   75:12 85:1
   95:13 96:8
   102:25 103:1
clients   28:3,11
   28:14,23 31:20
   36:24 37:2,7

37:18 40:21
   49:15 53:11
   82:21 83:2,21
close   22:8
closed   47:3,5
   47:16,20 48:17
   55:14 82:21
   83:3 87:20
   91:8,12,14
closes   100:24
closing   32:17
   52:11
college   13:17
   13:18,21,23,24
   13:25,25
colleges   14:1,13
combined   7:19
come   25:21
   36:2 44:7
   76:25 116:10
comes   43:21
comfortable
   39:20,25 40:2
coming   32:19
commencing
   2:21
commercial
   25:19,22,22,24
   26:2
commission
   22:9 23:14
   37:16 120:19
   121:25 122:25
commissions
   27:4

commit   105:22
committed   93:2
   93:21
common
   112:15 115:9
commonly
   112:9
communicate
   49:15
communicated
   62:14 112:18
   112:19
communication
   43:25 61:12
   75:13 82:1
   85:20 86:7,9
communicati...
   11:8 51:5 61:3
   61:7,10,17
   82:4,24 86:12
community
   13:17,23,25
companies
   18:12,14 36:4
   37:9 95:10,23
   96:7
company   18:10
   18:13,20 19:18
   19:19 20:7,23
   21:2,17,21
   22:5,6 28:6
   30:22,23,25
   31:4 32:13
   34:3,5,20 36:5
   39:6,7,8,8 44:8

46:19 47:25
   49:13 75:23
   76:9 77:12
   80:20 89:4
   93:12 101:20
   101:22 109:5
competition
   37:10 95:3
complaint   4:13
   50:1 92:14
   110:10
completed   74:2
   77:18 78:7
   119:13
completing
   14:12
completion
   118:14
complied   102:4
   102:11
concept   17:9
concerned
   113:14
concerning
   63:22
concluded
   117:4
concludes
   116:25
conclusion
   64:25 66:16
   73:14 74:6
   102:19 109:2
condition   64:4
   105:10,11

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                    www.veritext.com

**[conditional - couple]**                                    Page 9

**conditional**
59:19
**confirm** 113:25
**confirms** 77:17
**confused** 72:8
**confusion** 9:20
**connect** 51:5
**connection**
22:14 29:19
**consent** 64:8
67:3
**consideration**
97:23,24,25
98:4
**considered**
7:23 97:25
**consistency**
25:19
**consistently**
28:5,8
**constitutes**
66:13 67:8
**contact** 43:19
45:20 52:17
82:11
**contacted**
112:25
**contained**
63:24 72:18
110:16
**continue** 8:8
13:13 73:8
76:1
**continued** 4:25
5:1

**continues**
63:21 76:7
**contract** 67:15
73:3 93:14
94:2,9,18,22
95:7 96:19
98:20,22,23
99:3,3 106:14
109:12,16
112:14
**contracts** 21:4
21:7,8,13
32:22,23
109:10 112:2,3
112:4
**convenient**
119:15
**conversation**
19:1 44:2 58:5
58:9,16 59:13
60:15 83:20
88:22
**conversations**
82:18 111:5
**convicted**
24:13
**cook** 3:13 4:6
7:2,2 8:11,14
11:25 12:8
18:25 33:21
41:9 42:25
48:23 61:21,24
64:24 65:9
66:15 67:10
72:3 73:13

74:5 75:11,14
77:24 84:25
85:14 93:6
94:23 96:18
97:4 98:13,24
99:14,22 100:7
101:2,10,17
102:6,12,18
103:21,24
105:3,18,21
106:7,22 107:5
107:23 108:13
108:15 109:1
109:21 110:19
114:1,14
116:24 119:5
**corp** 10:25
**corporate** 7:21
25:13 109:4
**corporation**
19:23,24
**correct** 8:21
9:13 16:15
20:18 21:10,16
21:25 28:24
29:17,21 35:6
36:17 37:25
38:2,23 43:7
45:4,10 53:6
53:11 54:4
59:19 62:12
65:11,12,14
69:12,25 70:9
74:4 76:4,18
77:13,18,21

79:9,12,16
80:20 81:5
82:6,13 85:13
86:15 87:24
88:3,6 90:2
91:10,16,17
96:12,16
104:24 106:21
112:8
**corrections**
121:17
**correctly** 67:19
**correspondent**
112:20
**cost** 84:23
85:25
**costs** 22:8 86:1
86:4,4 101:6
101:15,19,23
101:25
**counsel** 3:1
7:17,18 8:4
11:8 12:18,22
76:17 84:19
85:6,13,21
108:4 115:5
**count** 83:8
**country** 8:25
28:19 96:7
**county** 2:20
23:22,22 27:21
27:23 120:10
121:15
**couple** 18:17
113:12

[course - difference]

course  37:22
  91:23
courses  14:21
  15:6,9
court  1:1 2:1
  6:9,15 9:18
  22:1,13,19
  23:20,20,22
  27:22 63:19
  118:1 120:7
cover  81:21
  85:25 86:4
covered  85:25
  86:3
crash  16:19
crashed  17:3
  77:14 102:23
created  17:6
  90:3 107:16
  108:12
credit  31:24,24
crime  24:13
cross  85:7
csr  1:24
curious  90:24
current  73:11
  73:25 74:3
currently  15:11
  19:9 26:8
  33:11
customizable
  52:1
customized
  51:9,17

cut  78:13
cv  1:6 2:6 6:17

**d**

d  4:1 8:10
damage  109:11
damages  73:9
  96:23,25 97:2
  97:9,10 100:4
  100:10,20
  106:1,3,11,13
  106:20 108:8
  108:10,24
  109:12 112:1
  112:15 116:7
date  8:9 13:4
  76:13 107:16
  108:12 118:19
  119:9 120:3,9
  120:19 121:3
  121:13,25
  122:20,25
dated  88:2
  114:21 118:23
dates  69:7
  91:18
daughter  52:18
day  12:4 21:5,5
  30:21 32:18,18
  40:10 49:13
  120:16 121:22
  122:22
days  23:5,6
  55:13 79:20
  119:18

dba  25:13 70:4
dbas  25:14
deal  38:14
  57:25 59:3
  112:7
dealing  23:12
  28:23 40:24
  82:4
dealt  112:2
dear  119:10
decide  43:12
declaration
  80:18 117:7
declined  85:18
deed  120:14
  121:20
deemed  119:20
defendant  1:9
  2:9 3:12 7:2,21
  50:11,12 93:2
  96:24 110:15
defendant's
  4:13,14,16 5:5
defense  85:22
  92:22 93:24
  94:7,14,17
  96:22 98:2,6,8
  98:19 100:2,6
  103:7 105:8,25
  106:6
defenses  5:6
  92:13,20
definitely  61:9
degree  13:19
  13:22 14:4

denial  110:17
denies  50:15
  110:15
department
  14:24 15:2
  119:23
depending  40:6
deposed  9:4
  22:16
deposit  112:6
deposition  1:14
  2:17 6:12 7:19
  8:6,8,19,20
  10:20 11:4,5,7
  11:10,21 12:19
  12:21 21:24
  78:5,22 80:7
  81:13 89:12
  92:6 108:16
  117:1,4 118:14
  119:9,11 120:1
  120:3 121:1,3
describe  11:25
  12:8
description
  4:11 5:2,10
detroit  112:25
dicker  3:13
died  28:21 48:7
diego  13:18,24
  24:4,5,6
difference
  36:19,23 37:10
  37:13,15

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

**different** 18:11
21:21 25:8
35:8,21,23
36:12 37:19,25
38:14 39:12,13
39:14 40:10
41:4 69:15
77:2 82:1
100:20
**direct** 44:18
50:2 54:19
110:10
**direction**
118:12
**directly** 36:15
**disagree** 72:19
73:22
**disclosing** 11:8
**discovery**
81:20
**discuss** 12:21
57:11 92:19
**discussed** 14:23
27:3 84:6
**discussion** 93:7
**discussions**
57:13 116:5
**dishonesty**
24:14
**dispute** 45:2,8
69:4,6 71:15
71:17,21,25
74:1 77:20
96:19

**disputing**
105:19
**disrespect**
108:20
**distribution**
23:1
**district** 1:1,2
2:1,2 6:15,16
6:16
**division** 1:3 2:3
17:6 36:25
**doc** 51:23
**document**
44:18,21 52:1
63:8 70:10,20
70:21,23 71:4
71:8,9 72:24
75:6,19 76:1,1
80:15,24 82:5
82:7 87:13
88:2 89:17,19
89:21 90:3,20
91:16,17
107:11,16,20
108:11 110:6
114:25 115:3,6
115:6,15
**documentation**
31:20
**documents**
11:17,20,23,24
12:3,24 32:1,3
32:4 75:5
109:9 110:7

**dodd** 16:20
95:16
**doing** 33:14
39:11 42:13
43:10 46:23,23
58:25 61:21
64:14,15 65:11
68:8 73:4,6
87:19 88:24
89:8
**dragged** 113:15
**drank** 61:25
**drive** 3:14
**duly** 7:10
**duties** 20:22,25
21:1,2 29:7,10
30:15,17 31:15
32:10,11 33:6
34:6

**e**

**e** 4:1,10,19,22
5:1 12:11
33:22 52:2,8
52:11 53:11
56:21 60:1,2
61:6,12,18
72:25 74:10
75:21,25 76:2
76:6,8,15,17
77:5,17 78:18
81:22,24 82:10
82:12,13,17,20
82:25 86:9,16
86:17 87:23
88:1,2,19

104:12,14,16
104:17,20
111:12,12
**earlier** 8:18
53:8 62:10
99:20 104:24
105:2 107:15
**ease** 51:23
**easier** 9:19
**eastern** 1:2 2:2
6:16
**economic** 48:13
**economy** 77:14
**edelman** 3:13
**education**
13:13 14:12
**effect** 73:12
**effective** 55:13
**eight** 82:5
**either** 54:12
55:3,9 57:21
57:22 111:12
**elected** 50:4,6
**electronic**
111:20
**electronically**
44:22,24
114:24
**else's** 30:6
**elser** 3:13
**employ** 26:8
**employed**
18:10 19:9,15
21:18 26:16,16
32:19 53:5

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

**employee** 46:13 118:17
**employees** 29:19 32:16 45:11,14 49:14 54:2 60:21
**employment** 30:25 31:4,8
**endeavor** 64:1
**ended** 30:25 78:15
**enforce** 94:19 102:2,9
**engaged** 26:4,6
**engages** 26:3
**enrichment** 105:14
**entail** 32:11 34:6
**entailed** 69:14
**enter** 116:20
**entered** 27:15 43:6 45:3,6 46:16 50:7,14 67:22 79:12 121:9
**entering** 21:12 32:22 46:13
**enters** 21:8
**entire** 120:5 121:5
**entitled** 6:13 96:23 97:8
**entity** 84:22 86:3

**errata** 119:18 121:7,10,18 122:1
**escrow** 31:24
**esq** 3:4,8,13 119:5
**essentially** 86:19
**establishes** 77:3
**estate** 14:24,24 15:2 16:23 17:2,15,20 18:10 19:6 25:18,24 26:4 26:5 33:8,12 33:13,15 109:13 112:4
**estimate** 47:11
**estoppel** 97:17 103:5
**everybody** 38:13
**everything's** 28:18
**evidence** 108:3
**exactly** 56:22 60:18 83:16 97:20 103:6,13 111:13
**examination** 4:2,4 7:14 8:3 114:13 116:17
**examined** 7:11

**example** 31:23 39:13 47:2 49:9 99:13 112:5
**exceed** 8:6
**executed** 121:10
**execution** 120:14 121:19
**executives** 46:2
**exhibit** 4:11,13 4:14,16,18,20 4:22 5:2,4,5,10 5:12,13,15 42:23 49:19,20 50:8,10 54:19 63:7 68:17,18 69:20 74:20,22 74:23 75:5,9 78:5,21,22,23 80:8,9 81:14 81:15,20,21 87:22,22 89:12 89:13 92:6,8 99:13 105:6 106:16 107:11 110:8 114:16 115:15,16,24 115:25 116:1,2 116:11,20
**exhibits** 5:9
**expensive** 40:13
**experience** 40:19 100:18

**expiration** 120:19 121:25 122:25
**explain** 18:2 20:25 31:15 36:24 37:18 54:8
**explanation** 77:7,11
**expressly** 119:13
**expunged** 23:7
**extent** 8:1 64:24 93:7 94:25 97:7

**f**

**facebook** 25:5 25:7 53:9 55:19
**fact** 63:2 69:8 74:2
**facts** 100:17
**factual** 92:19 93:4,8,20 94:6 98:5 100:5 103:10 106:5
**failed** 96:24 97:9
**fairway** 4:22 10:25 11:1,1 42:2 54:13,24 55:1,3,9 79:8 81:3,5,11,12,23 87:23 88:9 89:3 96:6,12

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
                                                          www.veritext.com

100:10 104:19
**fall** 90:13
**familiar** 54:6
  55:25 89:19
  103:4 106:19
**fancy** 44:12
**far** 45:25
**february** 68:13
  69:2 79:23
  81:1,10 86:22
  88:2 90:11
**fed** 36:8
**federal** 7:22
  23:20 118:2
**fee** 17:7,9 18:5
  37:14,15
**feel** 10:10
**fees** 84:23
  85:25 86:1,4,5
**fell** 46:8
**fha** 19:22,23
  40:9
**fiduciary** 38:20
  95:12,12
  102:25
**fifth** 82:5
**figures** 47:23
**file** 31:22 38:21
**filed** 6:15 24:25
  83:23
**files** 30:16
  31:17
**filled** 43:15
  44:5

**finance** 40:9
**financially**
  118:16
**find** 38:18
**findamortgag...**
  52:15
**fine** 27:12
  42:20 72:12,15
  76:22 77:2
  78:2 97:21
  108:5,21
**finish** 9:17
  10:13 24:8
  37:8
**finished** 13:19
**first** 4:13,20
  5:5 7:10 13:17
  18:22 21:23
  36:8 42:12
  43:4,5 45:5,20
  49:25 50:11,17
  56:4 64:11
  65:19 66:2
  67:22 75:8,25
  77:17 78:18
  80:14 84:1
  87:3,22 88:1,2
  92:13 107:13
  108:9 109:9
  110:9
**fits** 38:7
**five** 18:12
  26:10 41:4,12
  47:1 48:3 62:3
  113:24

**fixed** 38:17
**flat** 95:5
**fleet** 36:5
**focusing** 50:17
  93:20
**folks** 46:2
**following** 76:8
  117:8
**follows** 7:12
  71:23 104:4
**font** 63:16
**forced** 116:20
**foregoing**
  118:6,8,12
  120:13 121:18
**forget** 57:22
**form** 61:11
  64:25 66:15
  72:3 73:11,13
  73:25 74:3,5
  77:7 78:6,9
  101:2,10,17
  102:6,19 105:3
  106:22 107:5
  115:24
**format** 56:21
**formation** 94:2
**forms** 12:16
  73:17
**forth** 118:7
**forward** 55:12
**found** 74:15
**foundation**
  64:25 66:15
  74:6 96:18

101:10,17
  102:19 107:6
  107:24
**founded** 19:18
  20:14 28:1
**founder** 20:4
**founding** 20:20
  21:11,17 28:6
**four** 18:11,12
  46:25 76:2
**frame** 69:5
  89:24 91:6,18
**frank** 16:20
  87:21 95:16
**frankly** 12:10
  82:15 83:22
  113:1
**free** 10:11
  79:19 96:14
  112:25 120:14
  121:20
**fringe** 40:6
**front** 42:20
  114:18
**full** 8:24
**funding** 54:25
  79:9 80:1
  86:22 90:11
**further** 64:7
  67:3 114:9
  116:17,23
  118:12,16
**future** 8:9 64:9

**[g - home]** Page 14

| g | | | |
|---|---|---|---|
| **g** 33:22 | 40:7 43:23 | **ground** 9:9 | **happened** |
| **game** 36:11 | 44:10,17 49:18 | **group** 18:22 | 60:18 68:2 |
| **general** 29:23 | 50:2 54:18 | 19:20 25:15,15 | 113:17 |
| 46:19 | 55:12 62:4,8 | 25:15,18 70:2 | **happening** 84:8 |
| **generally** 37:24 | 63:10,11,17 | 76:10 | 112:13 |
| 39:3 | 68:5,16 69:19 | **guess** 61:14 | **happy** 53:10 |
| **generated** | 74:21 76:6 | 74:9,9 75:22 | **hard** 112:6 |
| 89:25 91:5,16 | 77:5 80:14,24 | 89:4 | **head** 10:4 |
| **generates** 52:1 | 84:7,25 87:8 | **guessing** 35:1 | **heading** 63:20 |
| **gentleman** 22:6 | 89:11 91:24 | 96:6 | **hear** 83:19 |
| **getting** 37:8 | 92:3,6,20 | **guide** 63:24 | **heard** 9:6 53:8 |
| 59:11 103:1 | 93:24 100:10 | **guidelines** 9:9 | 56:17 81:12 |
| **give** 22:10 | 105:21 106:16 | 60:8 | 82:15 89:3 |
| 24:19 32:4 | 107:10,23 | **guilty** 78:4 | **held** 20:19 |
| 48:4 83:10 | 108:4 110:8,8 | **guy** 22:12,12 | 102:23 |
| 85:4,5 109:3 | 110:10 111:5 | 45:18 88:21 | **help** 36:13 |
| 110:20 | 113:14 114:3,7 | 101:21,24 | 111:7 |
| **given** 40:10 | 117:1 | **guys** 46:11 59:9 | **helped** 32:8 |
| **go** 9:7,8 10:5 | **good** 6:4 8:12 | 76:25 89:1,4 | **helps** 51:25 |
| 13:2 25:8,10 | 32:6 41:13,21 | h | 100:25 |
| 25:12 31:16 | 61:22,24 62:1 | | **hereof** 117:8 |
| 32:2,6 37:2,2 | 68:6 74:14 | **h** 4:10 5:1 | **hereto** 49:22 |
| 39:15 41:13,18 | 75:18 | **half** 23:6 48:14 | 68:20 74:25 |
| 53:25 65:1 | **goodwill** 102:4 | **halfway** 23:5 | 78:25 80:11 |
| 77:10 92:21 | 102:10 | 75:8 | 81:17 89:15 |
| 93:8 108:16 | **google** 97:18 | **hand** 30:19 | 92:10 |
| 109:22 110:22 | **government** | 49:18 54:18 | **hey** 44:8 |
| 111:23 | 17:4 | 68:16 74:21 | **high** 13:7,10,13 |
| **goes** 70:3 | **graduate** 13:10 | 78:21 80:7 | 48:5 |
| **going** 6:5 7:16 | 14:16 | 89:11 92:6 | **higher** 102:24 |
| 9:8,9 10:21 | **graduated** 13:7 | **handing** 81:13 | **hinajosa** 45:16 |
| 13:2 22:21 | **great** 17:4 | **handled** 32:21 | **hold** 20:15,17 |
| 24:11 32:20,25 | 18:15 44:8 | **handles** 52:8 | 21:20 |
| 37:4,4,13,14 | 59:7 61:14 | **hang** 74:14 | **home** 31:6 |
| | | **happen** 42:5 | |
| | | 47:25 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                586-468-2411
www.veritext.com

homes   48:6
hope   32:25
hour   8:9 11:16
hours   8:6 56:8
house   23:6
   52:18
huh   10:5 44:15
   44:20 58:22
   61:14 76:5
huh's   10:4
humble   3:9
hundred
   100:19
hurt   42:3

**i**

idea   17:4 43:18
   48:4 87:21
identification
   49:21 68:19
   74:24 78:24
   80:10 81:16
   89:14 92:9
identified
   90:17
identify   6:21
identity   25:7
illegal   95:1,2
   95:16 109:15
imagine   46:24
   46:25 68:9,10
   68:14
imco   18:17
immoral   95:3
implement   60:8

important   9:15
   10:3
impossibility
   98:10,11
improper   94:24
   98:15 103:9,11
inaudible   60:22
include   21:8
   99:9,10,12
included   73:25
includes   99:8
including   63:23
incorporate
   19:22
incorporated
   19:20 121:12
incorporation
   20:11
incurs   101:6,15
independent
   10:25 11:1
   35:5 36:19
   40:14,17,20,24
   49:10,11 54:24
   55:1,3,10 81:4
   100:23 111:16
individual   6:13
   7:20 29:25
   30:1,3
individually
   1:15 2:18
   119:8 120:4,9
   121:4,13
   122:20

industry   15:17
   16:6 26:5
   44:11 100:19
   111:15 112:10
   112:16 115:9
inform   57:4
information
   76:16 77:6
   80:4 82:11
   90:6
inhibit   10:18
initial   50:11
initiated   43:19
   58:9
initiating   59:13
initiative   54:11
   58:23,24 60:4
   104:18
inn   2:22
inputs   90:6
instruct   85:6
instructions
   63:22
instructs   10:8
insurance   52:9
interest   21:21
   37:13,15 48:13
interested
   24:21 118:17
internal   90:5
internally
   61:17
interplay   49:7
interrogatories
   4:21 80:14,19

interrogatory
   80:25 90:17
introduced
   55:19 56:9
investments
   1:8 2:8 6:14
   7:3,22 10:22
   19:14,21 44:23
   119:6 120:3
   121:3
involved   14:18
   22:22 23:9
   24:23 32:22
   45:12 88:23
involvement
   20:12 21:12
involving   24:14
issues   22:25
items   31:23
iteration
   110:12 111:2

**j**

jaime   8:20
   26:10,12,13
   33:1,2,3,13
jaime's   34:2
jersey   13:18,22
   23:1,24,25
   24:1,2
jesus   45:15,20
   45:21,22,24
   46:5 52:16
   57:17 58:5,8,9
   59:3,3 60:19
   61:3,8

**[job - know]** Page 16

**job** 9:19 31:18
31:19,21,25
32:4,5 37:23
95:12
**join** 17:18,18
17:20
**jordan** 3:19 6:7
**josh** 88:21
**judge** 27:9,11
**judgment**
27:15
**july** 43:7 44:25
50:3,5 114:21
116:21
**jurat** 118:2
**jurisdiction**
105:19,19
**jury** 27:11

**k**

**kathleen** 1:23
2:18 6:10
**keep** 21:2 25:19
25:20 47:23
**ken** 45:17,21
45:21,22 46:5
58:9,13,14,15
**kept** 32:14 36:7
**kevin** 1:14 2:17
4:3,18,22 6:12
7:8,19 8:25
20:6 25:7
44:22 76:11,11
76:11 110:21
114:15 119:8
120:4,9 121:4

121:13 122:20
**kevron** 1:8 2:8
5:4 6:14 7:2,21
7:24 10:22,22
19:14,16,21
20:4,6,9,12,14
21:8,21 23:12
25:10,13 26:3
26:8,16,21,25
27:5,16 28:1
28:25 29:8,16
29:20,20,24
30:5,13 33:4,9
33:12 34:19
35:8,11,16
38:4,23 39:1,2
39:4 41:23
42:12 43:6,10
43:12 44:16,19
44:23 45:3,6,8
46:16,17 47:4
47:16,19 48:9
48:17,18 49:12
49:14 50:3,6
50:18,20,24
51:4,8,12,16,17
51:20,23 52:3
52:6,7,11,14,21
52:24,25 53:5
53:12 56:1
57:4,7,12 60:9
60:11,21 61:18
64:15,16,21
65:4,14,16,20
66:3,8 67:21

68:25 69:1,4
70:3 76:10,22
77:6,10,18,20
78:11 79:5,12
79:14,18,24
81:2,4,10,20
86:20 87:15
88:6,17 89:18
90:6 93:2 94:6
94:15 96:14
97:1 99:17,21
101:7,8,16
104:22,25
105:17,18
106:15 108:23
110:11 111:7
114:21 117:1
119:6 120:3
121:3
**kevron's** 4:20
8:4 35:5 42:16
49:24 53:9
54:2 66:10,13
67:6,8 68:11
68:22 70:8
75:3 76:3 77:7
78:14 80:13
84:23 92:12
93:4 98:5
100:5 103:10
106:5 110:9,17
113:20
**kickback** 23:13
27:4

**kidding** 41:17
**kind** 30:20 64:8
67:4 75:8
92:20 93:7
111:23 115:11
**know** 9:25 10:5
10:11 11:1,4
12:6 15:4 16:1
23:6,21 24:9
28:9,12,13
29:13 30:2
31:16 32:12,15
35:2,18,18
37:7 38:25,25
39:2 40:8
41:16 42:20
44:7 45:12,15
45:17,20,22
46:1,5,8,11,21
47:1,13,15,16
47:19 50:24
51:2,4,7,8,12
51:16,20,24,25
52:3,6,14 53:1
53:6,15,20
55:24 56:1,3
57:3,7 58:21
59:9 60:2,3
61:22 62:20
63:16 65:13,19
67:12,13 70:12
72:5,14,20
73:6,21,21,22
74:8,18 76:20
77:25,25 81:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

83:5,7,8,14,19
83:22 84:4,8
87:19,20 88:25
89:1 90:22,24
93:22 98:5,17
99:18 100:6,20
101:11,20
102:2,20
105:11,14
106:3,12
107:12 108:8
109:11 110:3
110:17 112:5
112:24 113:2
**knowledge**
30:6 40:16,19
42:10 46:3
52:24 54:3
58:24 79:2
81:8,25 93:17
97:1 100:13,15
**kr** 82:12
**kyhos** 3:19 6:7

**l**

**l** 33:22 49:1
**la** 13:20 14:7,9
14:13
**lack** 97:23,24
98:3
**lane** 3:8 6:25
8:25
**language** 99:20
**large** 37:1 96:6
**larger** 90:20
96:7

**laurel** 3:14
**laws** 15:20
95:16 102:23
**lawsuit** 22:5,14
22:16,22 23:12
24:17,22,23
27:3,5,7 41:19
41:20,23 63:3
83:2,10 84:13
84:23 86:1,5
86:11 87:9
107:25 111:8
113:2,5,15,18
113:22
**lawsuits** 23:9
**lawyer** 97:6
98:14 106:8
109:3
**lay** 106:9 109:3
110:21
**learn** 56:4 60:5
66:7 111:11
**learned** 56:11
56:14 58:5
**learning** 60:7
**leave** 38:11
41:7 115:11
**left** 113:9
**legal** 6:8,10 9:2
12:1 22:11
44:11 64:25
66:16 73:5,14
74:6 92:19
93:7,18 94:24
97:5,5 98:14

102:18 106:8
109:1,2,15,15
110:20 119:1
122:1
**legally** 20:10
**lender** 17:19
32:7 36:19
38:21,22 40:10
40:20 47:20
55:2,4,5,10,11
55:12,13 69:15
96:2,6,15
100:24
**lender's** 100:25
**lenders** 21:9,13
32:23 35:8,11
35:14,24 36:14
36:16 37:19,24
37:25 38:5,12
38:15 39:2,4
39:19,21,24
40:2,6,12,16,25
41:4 49:8,16
68:8 89:9 91:2
91:3 96:5
112:20 113:21
**lending** 4:23
25:23,24 26:4
26:5 38:2
81:23 87:24
112:16
**letter** 4:18 77:7
78:20 79:3,5
79:11,14
104:23 105:1

119:19
**license** 15:4,14
15:16,19,23
16:5,9,11,16,17
16:24 17:2,17
19:6,6
**licensed** 15:12
16:10 17:1,4
**licenses** 19:7
**likewise** 9:21
9:21
**limit** 8:9 27:25
96:5
**limited** 55:1
63:24 95:13
96:12
**limiting** 95:11
96:8
**line** 121:7
122:3
**lines** 85:7
**liquidated** 73:9
106:1,3,11,13
106:20 108:8,9
108:24 109:11
109:12 112:1
112:15 116:6
**list** 5:4 39:4
82:21 83:2,3
83:10,11,13,20
87:2
**listed** 121:7,17
**listen** 9:15
**listing** 121:7

[litigation - margarita]                                              Page 18

**litigation**
  105:20
**little**  10:20 13:3
  29:14 39:19
  55:8 63:16
  79:22
**livonia**  3:14
**llc**  1:5 2:5 6:14
  19:25 119:6
  120:3 121:3
**llp**  3:13
**loan**  16:13,22
  17:11 22:7,9
  23:13 26:1
  27:4,10 28:2
  28:23 29:1,7
  29:11,20 30:14
  30:15,16 31:15
  31:17,18,19,22
  32:1,2,3,16,18
  33:3,5,7 34:16
  34:17 35:3
  36:21 37:3,12
  38:1,1,13,13
  39:9,10,23
  40:7 41:4 44:3
  44:7 49:6,7
  53:4 54:23,23
  60:20 63:23
  64:5,9 65:16
  65:17,20,21
  66:3,4,11,11
  67:1,7,7 77:11
  79:7,7,24,24
  81:2 86:20

87:20 90:9
  100:24
**loans**  5:4,14
  17:12,13,20
  19:22,23 28:3
  29:9 31:19
  32:14 33:12,13
  39:9 40:9
  45:12 46:18
  47:1,3,4,16,19
  47:25 48:17
  50:22 63:23
  64:6 65:25
  67:1 81:2
  86:20 87:3,7
  89:23 90:8,13
  90:17 91:3,8
  91:12,14
  100:10,19
**local**  17:18,20
**located**  6:8,10
**location**  119:15
**log**  29:23,25
  30:1,3,6,9,10
  30:11 34:10
  35:4 75:16
**long**  11:15 14:4
  15:14 19:15
  34:2,20 39:11
  49:12
**longer**  18:16,18
  18:19,21,23
**look**  12:11 39:1
  41:8 43:4
  85:16 89:19

115:14
**looked**  12:6,7
  41:10 42:14
  87:10 104:23
  105:1
**looking**  39:20
**looks**  39:3
  69:20 75:21
**los**  2:21 6:9,11
**loss**  48:8 102:3
  102:10
**lost**  89:2
**lot**  9:19 32:13
  35:14,15 37:9
  38:22 40:4
  47:14
**lying**  47:13

**m**

**m**  18:17 33:22
**machine**
  118:10
**madam**  119:10
**made**  22:7
  25:16 47:13
  77:12 85:25
  86:4 118:10
  120:7
**mahde**  3:4 6:23
  8:17
**mail**  24:20
  56:21 60:1,2
  61:12,18 72:25
  75:21,25 76:2
  76:6,8,15,17
  77:5,17 78:18

78:20 81:22,24
  82:10,12,13,17
  82:20,25 86:9
  86:16,17 87:23
  88:1,2,19
  104:12,14,16
  104:17,20
  111:12,12
**mails**  4:22
  12:11 52:8
  53:11 61:6
  74:10
**main**  21:1,2
**make**  9:18,18
  10:20 24:12
  32:6 33:23
  57:24 119:15
**makes**  95:19
**making**  32:20
**manage**  48:18
**manager**  30:20
**manufacturer**
  49:1,2
**march**  26:15
  28:20 31:1
  55:19 56:10,24
  58:6 60:1
  65:17,19,22
  66:2 68:12
  69:2 79:23
  80:25 82:22
  86:22 87:4,11
  90:11 91:9,15
**margarita**
  18:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[marijuana - mortgage's]**                                                                        Page 19

| | | | |
|---|---|---|---|
| **marijuana** 23:1 | 100:16 108:20 | **michigan** 1:2 | **mortgage** 1:5 |
| **marjam** 8:19 | **means** 76:11 | 2:2 3:5,14 6:16 | 2:5 4:23 5:4 |
| 26:9,11,12 | 92:24 94:4 | **mid** 62:18 | 6:14,24 7:1 8:3 |
| 28:25 29:10,13 | 96:1 97:10,12 | 112:18 | 8:7 10:23,24 |
| 30:2 | 97:17,23 98:11 | **midwest** 122:1 | 10:24,25 15:17 |
| **marjan** 39:14 | 98:17 105:15 | **mind** 36:2 | 16:6 18:10,12 |
| 53:8 | **meant** 53:12 | 94:11,12,12 | 18:14,19,20 |
| **mark** 49:18 | **media** 25:2 | 108:18 | 19:20,24 25:12 |
| 68:16 78:21 | 26:25 51:13 | **minds** 94:1,3 | 25:14,16 29:17 |
| 80:7 89:11 | 62:7 92:2 | **minute** 113:24 | 35:5 36:20 |
| 92:6 | 114:6 | **minutes** 11:16 | 40:14,17,20,24 |
| **marked** 5:9 | **medication** | **missing** 32:2,3 | 42:2 49:4 |
| 42:23 49:20 | 10:17 | **mississippi** | 54:23,23,24,24 |
| 54:19 68:18 | **meet** 31:19 | 85:5,5 | 55:1,2,2,3,4,4,9 |
| 74:21,23 78:5 | **meeting** 12:17 | **mistake** 24:12 | 55:10,10 58:1 |
| 78:23 80:9 | 94:1,3,11 | 42:24 | 63:23,23 64:5 |
| 81:13,15 89:13 | **meetings** 12:18 | **mitigate** 96:24 | 64:6,9 65:16 |
| 92:8 | **melgoza** 33:17 | 97:10 | 65:17,20,21 |
| **market** 16:19 | 33:20 34:14 | **modify** 73:16 | 66:3,11,11 |
| 17:3 28:15,19 | **membership** | 116:10 | 67:1,1,7,7 |
| 28:21 40:11 | 21:20 | **money** 22:10 | 69:25 70:2 |
| 48:3,5,8 89:7 | **memory** 10:18 | 98:1 | 76:10 79:7,7,8 |
| 102:22 | **mentioned** | **moneyline** 63:5 | 79:24,24,25 |
| **marketing** | 22:18 32:8 | **monitor** 64:4 | 81:2,2,3,4,5,25 |
| 51:10,13 | 36:1 39:17 | 64:17,22 65:6 | 83:23 84:2 |
| **markets** 51:17 | 40:5 46:2 | **month** 47:1 | 86:20,20 90:8 |
| **materials** 51:10 | 48:16 53:24 | 48:4,15 59:1 | 90:9,10 92:24 |
| **matter** 8:2 | 85:11 86:7,9 | 59:11 | 100:23 106:14 |
| 100:11 119:12 | 87:18 112:1 | **months** 38:11 | 111:6,16 |
| **mcdonald** 4:19 | **mesa** 13:18,25 | 59:2 68:3 | 112:20 113:21 |
| **mean** 25:22 | 14:3,5 | **morning** 8:19 | 115:20 116:3,6 |
| 28:10,17 33:16 | **met** 8:18 37:7 | 8:20 | 116:9 119:6 |
| 36:21 42:6 | **michelle** 26:18 | **morrison** 3:8 | 120:3 121:3 |
| 58:20 89:4 | 30:13 32:8 | 3:10 6:25,25 | **mortgage's** |
| 93:10,18 | 60:13 | | 49:25 68:23 |

92:14
**mortgages** 17:3
25:17
**moskowitz**
3:13
**move** 97:13,14
**moving** 96:22
**mr.abdallah**
7:15

**n**

**n** 4:1 48:25
**name** 6:7 8:17
8:24 16:2 25:8
25:10,13,18
33:19 45:15,19
62:20 70:3
76:9,10 118:20
119:6 120:3,4
120:15 121:3,4
121:21
**named** 24:22
45:19
**names** 9:2
25:20 36:7
45:14 53:24
**naming** 89:5
95:22
**narrow** 39:4
**nationwide**
36:8
**nature** 45:23
**necessarily**
36:15 75:16
**need** 10:10,12
15:4 16:16,17

22:10 44:9
61:23 74:12,17
75:16
**needed** 17:2
18:2 40:7,8
**needs** 31:22
38:8
**negatively**
40:17
**negotiate** 115:3
**negotiated**
115:6
**neither** 118:16
**never** 20:8
32:24 34:25
53:3 59:4,4,5
59:14,14 64:19
67:13,14 68:7
70:20 71:3
73:1,9,17,18,19
75:21 78:9
81:12 82:15
89:3,6 93:13
93:13,13
103:14,15,15
103:16 104:14
106:11 108:18
109:8 110:23
110:24,24,24
111:2,3
**new** 13:18,22
23:1,24,24
24:1,2 43:22
44:8 59:8,12

**newspaper**
56:18
**nmls** 14:25
15:16,19,22
16:5,11,17
17:5 19:6
**no's** 10:6
**nods** 10:4
**nonsense** 41:21
**norm** 26:18
**normal** 38:9,14
39:25
**north** 3:14
**northern** 62:18
**notary** 119:25
120:10,18
121:15,23
122:23
**notice** 56:18
64:1 66:12
67:8 79:20
92:18 103:9,11
103:14 104:22
104:25
**noticed** 8:3
90:22
**noticing** 6:22
**notified** 79:5
**november**
75:23 77:16,23
78:8 110:11
**number** 6:17
44:17,17 47:14
54:20 75:7
81:1 90:23

107:11 118:25
119:7
**numbers** 44:12
44:13 75:4
106:18 121:7
**numerous** 95:4
103:17,17
109:6

**o**

**o** 18:17 33:22
48:25
**o0o** 6:2
**oath** 7:6 9:11
118:9
**object** 10:7
64:24 72:3,7
73:13 74:5
84:25 85:6
94:23 96:18
97:4 98:13
101:2,10,17
102:6 105:3
106:7,22 107:5
108:5 110:19
**objection** 8:1,4
65:9 66:15
93:6 98:24
99:14,22
102:12,18
103:21 109:1
109:21
**objections**
67:10 100:7
**obligation**
64:21 65:4

**[obtain - own]** Page 21

**obtain** 14:8
 15:19,22
**obtained** 15:16
**obtaining** 16:5
 19:5 36:21
**obviously** 9:10
 37:1 93:8
**occasions** 22:20
 67:25
**occur** 64:2
**occurred** 101:8
**october** 76:12
 77:5 78:8
**offer** 111:7
**offhand** 29:3
 62:20 66:5
 93:22 113:17
**office** 2:20
 30:18,20 32:9
 32:14,17 43:21
 119:14
**officer** 16:13,22
 17:11 22:9
 23:13 26:1
 27:4,10 28:2
 28:23 29:1,8
 29:11 32:1,2
 33:3,5,7 34:16
 34:17 39:23
 44:3,7 53:4
**officer's** 31:18
 31:19 32:4
**officers** 22:7
 29:20 32:16,18
 35:3 39:9,10

 60:20
**offices** 70:6
**official** 120:15
 121:21
**officially** 60:5
**oh** 24:4 27:14
**ohio** 119:2
**okay** 8:15 11:7
 11:11,13,15
 12:6,14,24
 13:2 15:11,14
 16:9,13,18,25
 17:13 19:15
 20:2,7,9 22:18
 23:12,16,23
 24:19 25:25
 26:15 27:7,12
 27:15,20 28:1
 28:16 29:7,23
 30:5 31:10,18
 33:11 34:8,24
 36:1,18 37:5
 38:4,9 42:12
 43:9 45:2 46:5
 46:12,16,22
 47:11,19 49:14
 49:18 52:6,11
 53:18 54:15
 55:18,22 56:1
 56:23 58:19
 59:6,17 60:7
 61:16,21 63:13
 64:13,20 65:13
 66:6,10 67:21
 67:25 68:16

 69:10,19,21
 70:5 71:5
 76:24 77:1,4
 78:10 80:24
 81:7,10,13
 82:3,12,20
 83:4 84:1,12
 85:18,20 86:7
 88:14,16 90:5
 91:5,8 92:17
 92:25 94:17
 98:8,19 99:6
 99:11,19
 100:13 103:7
 104:22 105:8
 106:10 107:10
 108:1 109:18
 110:6 112:5
 114:1,18,20,24
 115:14,18
 116:5,13
**older** 22:6
**once** 38:21
 52:16 58:7
 68:9
**one's** 59:23
**ones** 12:1 14:23
 35:13,16
**online** 13:20
 16:1 69:23
 111:20
**open** 21:2
**opened** 18:13
 30:21 49:13

**opening** 32:17
**operation**
 48:19
**operations** 21:6
 32:18
**opinion** 40:23
 97:5 98:14
 106:9 109:2,3
 110:21 113:10
**opportunity**
 85:6
**option** 39:1
 70:12
**options** 38:22
 39:4
**order** 94:8
**ordered** 23:5
**ordering** 52:8
**original** 116:10
**originally**
 19:19
**originate** 29:9
 31:19
**ought** 89:5
**outside** 8:2
 19:5 29:10
 33:6
**overlooking**
 74:12
**own** 28:3,23
 29:24 30:1,2,9
 30:10,11 31:10
 31:11 34:8,10
 83:7

**[owner - plaintiff's]**                                          Page 22

| | | | |
|---|---|---|---|
| **owner**  20:9 32:12 62:20 | 63:11 64:20 66:23 110:10 110:16,18 | **past**  8:9 89:3 **paul**  82:10,14 **pay**  17:7 18:5 | 113:7 **personal**  77:11 105:19 |
| **p** | **paragraphs** 110:13 | 31:23 38:10 **paying**  21:3 | **personally**  25:2 39:6,18 88:16 |
| **p**  48:25 **p.m.**  2:21 6:5 44:22 62:5,8 91:25 92:3 114:4,7 117:2 117:5 **pacific**  35:18 36:1 40:5 49:9 **package**  35:3 43:14,24 44:9 70:13 89:1,6 **packages**  44:6 52:2 **page**  4:4,11 5:2 5:10 43:5 44:13,14,17,18 50:2 54:20 63:11,14 68:24 70:10,11 75:7 75:8,25 76:6,7 77:5,10,17 80:15,15,24 81:21 82:5,5 86:16,16,17 88:1 106:17,18 107:10 110:10 117:8 121:7 122:3 **pages**  27:1 76:2 81:22 **paragraph** 43:5 50:2,5 | **park**  3:14 **part**  14:21 15:1 15:6 30:22 50:17 58:19 70:18,22 71:12 71:18 72:1,18 73:10,24 77:7 78:7 82:3 87:22 90:20 92:18 93:2 98:22,22 107:2 107:19,20,24 111:23 121:9 **partaken**  27:21 **partakes**  95:20 **partially** 110:19 **particular** 16:22 45:11 46:12 95:10 **particularly** 48:9 **parties**  7:19 50:10 94:10,10 118:18 **party**  24:16 27:5 **password**  35:2 35:4 | 31:5 84:22 **payroll**  21:4,5 101:21 **pdf**  12:11 **pee**  41:15 **penalty**  106:2 108:25 109:19 117:7 **pending**  10:12 23:19,24 27:23 64:9 **people**  26:8 32:19 36:7,12 37:11 48:3,6 49:15 113:7,12 113:16 **percent**  38:12 47:12,12 48:14 69:7 **percentage** 47:2,5 **perform**  105:10 105:12 **period**  48:15 53:10 80:25 **perjury**  117:7 **person**  17:6 29:24 30:1 76:10 84:1,22 86:3 111:15 | 88:18 120:11 121:15 **pertains**  70:13 **phone**  61:4,6,9 78:20 84:4,5,6 88:19 119:3 **phrase**  97:22 **pipeline**  29:14 31:11 34:9,24 87:7,12 **pirouz**  8:19 28:25 **place**  11:13 23:14 58:17 93:6 102:23 105:12 118:7 **placed**  118:9 **places**  100:20 **plain**  38:9 **plaintiff**  1:6 2:6 3:2 6:24 7:9 24:22 27:10 96:23,24 97:8 97:9 **plaintiff's**  4:13 4:15,17,20 49:20 68:18 74:23 75:3 78:23 80:9,14 81:15 89:13 |

92:8,23,23
93:1,25 94:18
98:3,9,20
100:2 103:8
105:9,25 110:9
**platforms**  25:4
**play**  16:19 46:8
**plaza**  36:3,6
**please**  6:21 7:5
8:23 9:25
10:10 11:4
13:4 85:4
119:14
**pllc**  3:3,7
**pmk**  6:13
**point**  13:8
17:22 26:1
29:16 48:22,25
49:12,14 66:7
86:24 90:1,6
114:16
**policies**  63:21
**policy**  102:16
103:2
**portal**  29:21,23
30:7 49:8,9
101:21,24
**position**  72:16
72:19 73:5,18
84:9 105:24
108:24
**possibility**  53:7
**possible**  53:4
53:19 54:1
96:9

**post**  14:16
**posting**  64:2
**posts**  51:14
**potentially**
27:22 53:5
104:16
**practice**  17:15
**practicing**  16:6
**preamble**  43:6
69:23
**precedent**
105:10
**precedents**
105:12
**prefer**  119:16
**preparation**
11:21
**prepare**  11:5,7
12:19
**prepared**  92:19
**preprinted**
112:14
**present**  3:18
**presented**
116:2
**president**  20:16
20:23 80:20
**press**  112:25,25
113:6,7
**pretty**  18:5
23:22 26:19
35:19 46:7
53:2 58:15
84:5

**prevents**  94:1
**previous**  90:16
**previously**  5:9
28:12 54:18
78:5 87:18
103:13
**pricing**  37:16
**principal**  2:20
70:5
**printout**  4:22
5:4,13 69:23
**prior**  11:9 16:5
16:21 18:9
79:14 81:10
82:17,24 83:22
91:8,15 118:8
**privilege**  17:8
75:16 85:1,8
**prob**  83:14
**probably**  9:6
12:1 16:1 34:4
34:21,22,22
40:1 44:5,6
46:11 56:12,12
56:20 57:9,13
59:9 60:13,14
61:5 76:11
87:11 97:18
101:23 109:20
109:23 111:12
**probation**  23:2
**procedurally**
94:19
**procedure**  7:22
120:5 121:5

**procedures**
63:22
**proceed**  10:20
**proceedings**
6:18 118:6,8
118:10
**process**  28:13
30:16 31:22
69:13,16 70:19
72:19 73:24,25
74:2 78:7
111:19,20,24
**processing**
31:16 49:6,17
89:22
**processor**
30:14,15 31:16
31:21 32:5
52:7
**processor's**
31:21,25 32:5
**produced**
74:19,19 76:21
77:3 81:19
89:18
**product**  38:16
38:19 44:9
50:19
**production**
4:17 75:4
119:23
**products**  50:6
50:13,20
**professional**
14:16

**[program - recall]**                                      Page 24

| | | | |
|---|---|---|---|
| **program** 13:20 15:25 16:2 | **pull** 63:7 106:16 | 114:9,15 116:14,23 | **real** 14:24,24 15:2 16:23 |
| **promise** 86:4 | **purchase** 54:25 | **quick** 91:21 | 17:2,15,19 |
| **promised** 23:13 82:21 | 80:1 86:21 90:10 | **quite** 46:24 87:21 97:9 | 18:10 19:6 25:17,23,24 |
| **promises** 85:25 | **purchased** 36:5 | **r** | 26:4,5 33:8,12 |
| **promissory** 103:4 | 119:17 | **ran** 30:18 80:4 | 33:13,14 109:13 112:4 |
| **prompt** 64:1 | **purpose** 22:3 | 83:7 89:22 | **really** 10:5 |
| **pronouncing** 33:1 | **purposes** 34:16 | **ranch** 2:22 6:19 | 12:11 25:20 |
| **provide** 13:4 | **pursuant** 7:18 7:24 | **rancho** 18:20 | **realtor** 15:12 |
| 49:4,14 64:1 | **put** 42:20 54:17 | **rate** 37:4,13,15 | 17:10,21 34:5 |
| 77:6 93:8 106:9 | 78:10 108:21 | 38:9,16 41:6 | 34:7,7,17,19 |
| **provided** 22:1 | **putting** 42:23 | **rates** 28:20 48:5,13 | **realty** 18:17 25:15,17 |
| 22:13,18 29:20 | **q** | **reach** 83:12 | **reason** 31:3 |
| 66:12 67:8 | **question** 8:2,5 | 84:2 88:11,16 | 71:15,17,21,25 |
| 76:17 77:11 | 9:17,20,22,23 | **reached** 57:16 | 72:7 74:13 |
| 85:24 104:22 | 10:1,2,9,12,13 | 59:21 83:15,24 | 87:4 89:8 |
| 111:17 | 22:23 41:21 | 84:18 85:12 | 121:8 122:3 |
| **provider** 16:2 20:1 | 54:1 59:12 | 86:8 88:18 | **reasons** 93:17 |
| **provides** 52:21 | 65:2 67:14 | 113:13 | 93:20 102:16 |
| **providing** 27:4 85:21 | 71:24 72:10,21 | **read** 50:3 55:6 | **recall** 16:2 |
| **provision** 64:11 | 85:16 87:13 | 56:18 63:17,19 | 23:19 27:13,18 |
| 107:14 108:8 | 92:15 94:24 | 64:11,21 71:22 | 29:2 30:24 |
| 108:10 | 97:5,15,16 | 71:23 99:20 | 34:2 42:12 |
| **public** 55:20 | 98:15 101:13 | 104:3,4 107:12 | 43:16 44:24 |
| 102:16 103:2 | 104:5 106:8 | 108:7,25 | 45:1,14 55:22 |
| 120:10,18 | 107:15 108:2,6 | 111:23 120:5,6 | 56:14,23 58:13 |
| 121:15,23 | 108:7 110:20 | 120:12 121:5,6 | 58:16 60:11,15 |
| 122:23 | 116:19 | 121:17 | 62:19 63:1 |
| | **questions** 9:10 | **reading** 7:16 | 65:11 66:2 |
| | 9:11,16,24 | 67:19 119:12 | 67:25 68:2,11 |
| | 10:7,15 22:21 | 119:19 | 68:14 69:13,17 |
| | 52:20,23 85:4 | **reads** 44:21 | 70:16 71:1,2,8 |
| | 85:9 108:15,17 | 110:11 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                      586-468-2411
www.veritext.com

71:11 75:19
76:13,15,22
78:6,14 80:3
82:7 84:10,11
86:13 104:13
104:17 113:16
113:19
**receipt** 119:19
**receive** 13:12
13:22 24:20
104:16
**received** 14:1
14:22 56:18
57:19 59:19,25
78:18 79:3
81:20 86:18
93:13 103:14
103:15,15,16
104:12,14,20
104:25 110:24
111:2,3
**receiving** 56:23
79:14 82:17,25
104:17
**recent** 110:12
111:1
**recertification**
68:9
**recess** 62:6
92:1 114:5
**recollection**
82:23 88:20
**recommendat...**
43:25

**recommended**
43:16
**record** 6:5 7:17
8:1,4,7,23 10:4
10:14 18:25
23:7 62:4,8
71:23 77:2
86:19 91:24
92:3,5 104:4
114:3,7 117:2
118:10 121:9
**recording** 6:18
**recover** 96:23
97:9
**redacted** 75:9
75:11
**redaction**
75:12
**refer** 10:22,23
10:24,25 63:10
68:24 69:19
75:5 78:5
**reference** 119:7
120:2 121:2
**referenced** 99:4
119:11 120:11
121:15
**referring** 112:3
**reflect** 90:8
**refresh** 82:23
**refund** 22:8
**regarding**
55:23 74:10
112:21

**regularly** 64:3
64:21 65:5
103:20 104:6
**regulations**
21:4
**relating** 27:3
56:2,25 60:8
76:3 77:11
84:23 86:1,5
86:10,11 97:2
107:4
**relationship**
39:13 45:23
47:17 54:13
78:14 88:5
**relationships**
39:3,12,15
**relative** 118:17
**relevant** 113:22
**remember** 12:2
23:11 24:7
36:10 44:5
45:18,19 46:10
55:25 56:22
60:4 71:3,9
72:24 74:19
76:23 77:4
83:15,16,21
84:16,20 87:2
87:6 111:13
113:7,13 116:3
**remote** 28:18
**renew** 67:21
111:22 115:19

**renewal** 5:16
69:8,13 70:13
70:18 71:12,19
72:2,18,25
73:10,12,24,25
74:2,11 75:24
76:3,8,14 77:8
77:18 78:7
107:20 111:23
115:18
**renewals** 72:21
**renewed** 69:1,4
69:11 73:1
77:20 115:23
**renewing** 25:20
32:23 68:11
70:22 111:19
115:24
**rep** 43:21 45:17
45:18,18 57:17
59:7,8,12
**repeat** 65:2
66:21
**rephrase** 10:1
72:10
**report** 31:24,25
47:25 48:16
80:5,6 83:7
89:22,25 91:1
91:5,9
**reported** 1:23
**reporter** 2:19
6:9 7:5,11 24:7
33:18,23 49:21
55:6 60:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

63:20 68:19
74:24 78:24
80:10 81:16
89:14 91:21
92:9 118:1,5
120:7
**reporter's** 9:19
**reports** 47:10
47:24
**represent** 6:22
43:3 49:24
52:1 56:9 75:2
81:19 89:17
92:12 96:8
107:19,24
108:4
**representation**
59:17
**representative**
7:21 58:1
109:4
**represented**
115:5
**reps** 58:8,21
59:10
**reputation** 37:6
**request** 8:8
68:23,24 75:3
85:13 121:9,11
**requested**
67:24 68:15
83:1,9 87:13
89:24 91:18
118:15

**requests** 4:15
4:17 77:6
**required** 16:12
64:3 119:25
**requirement**
54:25 55:5,11
**requirements**
18:6,7 63:22
**reserves** 8:8
**residence** 2:22
**residential**
25:17
**resolved** 24:2
27:13
**resources** 50:7
50:14,19,20
**respect** 85:8
**responding**
9:17
**response** 60:22
69:2 77:16
90:17
**responses** 4:14
4:16 68:22
75:3 81:20
**responsibilities**
20:23 32:10
**responsibility**
21:12 38:19,20
95:12 102:25
**responsible**
21:3,7
**restate** 72:14
**restriction**
104:18

**restroom** 91:21
**retail** 35:11,14
35:17,19,25
36:14,16,19
37:9,24 40:12
40:16,20,24
100:25,25
**retiring** 28:13
**returned**
119:18
**review** 11:17
11:20 38:6
54:24 75:17
79:8,25 86:21
90:10 118:15
119:14 120:1
121:1
**reviewed** 12:9
71:11
**rfps** 74:20
**rhatigan** 1:14
2:17 4:3,18,22
6:12 7:8,20 8:5
8:17,23,25
25:7 44:23
62:10 75:17,20
76:12 85:3
92:5 106:8
114:10 117:1
119:8 120:4,9
121:4,13
122:20
**rhatigan's** 7:23
109:2

**rick** 26:9,11,12
33:14
**ridiculous**
88:24
**right** 8:8 9:14
19:4 21:24
26:9 30:18
33:1,9 41:6
44:13 46:6
54:20 58:24
62:25 77:1
92:21 97:20
102:24 103:20
104:8 105:22
110:5 114:15
114:22 115:2
115:15,21
116:13
**road** 2:23 3:4,8
6:19 70:6
**rocket** 4:23 5:4
10:24,24,24
35:18 36:1
42:1 54:12,23
55:1,3,9 79:7
79:25 81:3,4
81:25 82:4,16
83:23 84:2,12
85:12,21,24,24
86:10,12,21
87:15 88:23
89:23 90:9
91:4,14 96:12
100:10 104:19
111:6,7,15

**rocket's** 86:19
111:10,11,17
**role** 28:25
30:13
**ron** 20:6
**room** 53:17
**row** 90:23
**rule** 7:22,25
8:10
**rules** 60:8
120:5 121:5
**run** 32:8 47:24
47:25 48:16
49:5
**running** 32:15
47:10
**russell** 2:22
6:19

**s**

**s** 3:13 4:10 5:1
119:5 121:8,8
122:3
**sachs** 26:18
**san** 13:18,24
24:4,5,6
**santa** 18:20
**sat** 8:18
**satisfied** 18:7
**save** 18:24
91:20
**savings** 31:6
**saw** 55:24
56:21 59:4
60:2 67:13
87:10 110:25

**saying** 63:18
67:5,18 73:4
95:9,21,23
110:25
**says** 42:19
43:22 44:16
66:23 69:23
70:5 75:23
76:8 92:23
99:3
**scenario** 98:12
**school** 13:7,10
13:14
**schools** 14:14
14:16,19
**science** 14:6
**scope** 8:2
**screen** 70:23
78:6
**screenshot** 5:13
69:23
**seal** 120:15
121:21
**search** 39:16
**seasoned** 39:10
**second** 4:15,17
41:14 45:17,18
63:14 66:24
68:23,24 75:3
80:15 82:3
86:17 113:8
**section** 54:21
106:17 107:11
**see** 44:13 50:8
54:21 59:20

70:11,14,15
84:18 90:22
107:16 108:12
112:2,9 115:15
**seeing** 39:21
70:21 71:3,9
72:24 78:6
**seek** 88:8
**seeks** 94:19
**seems** 18:24
72:6
**seen** 57:18
67:14 70:20,22
71:3 73:18
75:21 78:9
106:11 109:8
109:10
**self** 32:19
**semiretired**
28:9
**send** 37:3,11
39:9,17 42:1
43:24 83:20
88:25 89:10
100:21
**sending** 53:10
76:23 77:4
**sense** 36:13
**sent** 5:4 12:4
52:2 61:17
75:22 76:8
83:3 87:14
89:6,23
**sentence** 66:24

**series** 9:10
52:20 85:3
**served** 28:22
113:2
**service** 50:25
51:2,5,9,21,23
52:4,12,15,17
53:9,10 80:16
**services** 18:17
50:7,13,19,20
51:17 52:7,8
52:21 53:2,5
54:2
**set** 35:3 89:1
118:7
**seven** 8:6,9
48:14 79:20
**several** 22:4,19
**seyferth** 3:3,7
**sharon** 20:5,6
**sheet** 90:14
121:7,10,18
122:1
**shield** 84:17
86:10 111:11
111:11,17
**shields** 85:12
**shop** 37:19,20
37:25 41:3
**shorthand** 2:19
7:11 49:21
68:19 74:24
78:24 80:10
81:16 89:14
92:9 118:4,11

shortly 56:6
113:17
showed 80:6
83:2
showing 109:9
side 54:17
sierra 35:18
36:1 40:5 49:9
sign 52:2 57:20
58:2,3,12 59:5
59:21,22 72:24
73:7 110:24
114:24
signature 64:8
67:3 80:22
118:21 119:14
signed 44:22
59:14 80:19
93:13 115:6
120:13 121:18
signing 44:24
119:12,19
similar 11:2
44:17 70:17
78:6 88:22
simplest 93:10
simplify 75:15
simply 75:12
sincerely
119:21
single 39:1,1
sir 74:21
119:10
siri 1:23 2:18
6:10

sitting 53:17
97:19,20 110:4
situation 38:7
115:12
six 48:14 68:3
skip 105:23
skipping 91:20
skyrocketed
28:21
slow 48:8
slower 55:6
slowly 63:19
small 18:21
27:22,25 63:16
smoothly 10:21
social 25:2
26:25 51:13
soda 61:25
software 48:18
48:18,21 49:4
49:6,7,17 66:7
89:23 90:1,6
sold 37:5
sole 20:1,4,9
109:18
soliciting 40:20
solutions 6:8
6:10 119:1
122:1
somebody 40:7
40:8 56:17
98:14
sorry 20:5
23:23 26:15
33:18 41:18,18

42:8 53:25
55:8 60:23
65:2,22 71:16
76:11 77:15
78:3 79:22
83:19 84:7,8,8
88:23 91:12
92:15,17
106:24 107:5
sort 82:16
sounds 62:25
source 43:22
89:2
southern 1:3
2:3 6:16
speak 84:12
speaking 40:17
58:13
specific 57:14
61:7 85:9 91:5
specifically
7:25 25:16
57:3,18 83:13
85:10 103:17
104:15,21
110:13 112:24
113:13
spell 33:21
spelled 48:23
spoke 23:10
58:13 60:13
62:19 63:1
spoken 60:12
63:4 111:14
113:4

stage 105:20
standard
102:24
standpoint
36:21
start 7:16 9:22
19:2 37:8 44:1
75:18 82:3
92:22
started 18:15
19:19 68:4
starting 6:22
66:24 90:23
starts 76:7
81:21
state 2:19 8:4
8:24 23:20
81:1 93:4
94:21 100:5
103:10 106:5
108:23 118:5
120:10 121:15
stated 7:25
10:10 103:13
109:6
statement 40:7
94:13,14 113:1
120:13,14
121:19,19
statements
31:23 38:10
states 1:1 2:1
6:15 50:3
54:22 68:25
82:20 94:17

98:2,8,19
100:2 103:7
105:8,25
**stating** 87:7
**steering** 95:4
95:16,20
**steps** 16:22
18:2
**stick** 69:16 73:3
**stipulation**
7:16
**story** 57:20
**streamed** 55:18
**strike** 71:16
91:13 113:19
**stubs** 31:23
38:10
**stuck** 73:20
**submission**
64:5 66:10,25
67:6 76:12
**submit** 28:3
32:7 38:21
46:17 50:22
54:22 65:16,22
70:12 79:24
111:24
**submits** 100:24
**submitted**
64:10 65:20
66:3 71:12,19
72:2 76:9,10
76:14 81:3
86:21 90:9
91:12,14

**submitting**
46:25 65:25
70:13,16 79:6
**subscribed**
118:19 120:10
121:14 122:21
**subsection**
54:22
**subsequent**
78:19
**subsequently**
50:9
**subset** 39:24
**subsidiary**
36:15
**substantively**
94:19
**succeed** 101:1
**sued** 22:6,12
42:9
**suffer** 100:3
102:3,10
**suffered** 100:10
**suing** 42:3
**suit** 42:7 62:12
83:18,23,24
89:5
**suite** 3:4,8,14
70:6 119:2
**superior** 119:1
**supplemental**
4:20 80:13
**supposed** 53:15
**sure** 23:22
26:19 27:12

31:18 32:6,20
33:23 34:25
35:2,19 43:13
45:1 46:7 53:2
53:17,21 58:15
60:14 67:17
72:10 73:8
76:25 84:5
87:1,12 88:18
93:18,20,23
97:9 101:15
107:18 114:2
115:14
**switched** 58:21
59:12
**sworn** 7:10
120:10,13
121:14,18
122:21
**system** 66:7

**t**

**t** 4:10 5:1 48:25
**take** 11:13 15:1
15:6,9,22
16:21 18:3,4
23:14 24:11
28:11 38:7
41:7,12,14
62:3 74:11,12
74:17 75:17
84:19 85:13
91:21 107:12
113:24 115:11
**taken** 2:18 9:11
10:17 14:21

27:20 58:17
62:6 92:1
114:5 118:6
119:11
**talk** 60:20
**talked** 58:15
90:16 102:22
112:19 113:9
**talking** 35:20
35:20 48:5
53:22 60:17
83:21 113:3
**tanked** 28:19
**tech** 101:21,23
**technician** 6:8
**telephone** 3:5,9
3:15
**tell** 37:1,11
39:9,17 43:22
47:7,9,24 68:4
103:25
**ten** 14:10
**term** 11:3
44:12 47:17
97:17,22 103:4
105:14
**terminate**
54:13 79:15,19
**terminated**
79:11 88:5
101:9
**termination**
48:9,10 88:8
104:23 105:1

**[terminology - transactions]** Page 30

terminology
  57:22
terms  11:2 31:8
  45:9 93:11
terrible  89:7
test  18:4
testified  7:11
  21:23 26:3
  62:10 103:19
  104:6,11
  111:10
testify  10:18
  53:8
testifying  118:9
testimony  7:23
  7:24 22:1,13
  22:19 71:7,10
  108:3 120:6,7
  121:6,9,12
texas  3:9 52:18
  52:19
text  61:12,19
thank  7:4
thanks  41:17
  83:17
theft  24:14
thereof  64:1
  118:13
thing  10:11
  36:3 37:12
  38:9 48:13
  58:11 61:1
  102:21 103:2
  110:23

things  35:21
  52:9 53:20,24
  75:15 87:3
  91:20 93:18
  95:4,8 109:10
think  11:19
  12:9,15 14:3,5
  15:20 22:21
  23:2,4,5,6,17
  23:21 26:3,20
  27:24 28:20
  31:9 33:14,14
  35:14 41:21
  42:4 45:18
  47:5 48:12,13
  48:24 52:16
  53:8,12,12
  57:9 58:23,24
  59:25 67:20,20
  71:20 76:19,19
  78:18 80:5
  82:16 87:4,9
  94:23,24 95:1
  95:2,2,2,3,3,4,7
  95:19 96:18
  98:15 101:12
  101:15,22,24
  103:2 105:21
  109:24 110:3
  113:8,9 116:13
third  4:20
  80:13
thirty  11:16
  119:18

thought  87:5
three  23:10
  25:14 38:11
  42:4,6,7,7,9
  46:1,9,25
  47:20 48:14,15
  81:22 87:3,10
time  6:5 8:6,9
  10:10,12 14:5
  18:8 23:3,6
  24:11 25:21
  28:8 29:2
  30:24 34:21
  39:11 42:3
  43:10 57:2,17
  58:4,5 59:9
  62:1,5,8 63:25
  63:25 64:11,13
  64:15 65:19
  66:2 69:5,8
  72:22,22 73:12
  75:17,18 76:12
  79:20 83:18
  85:11 86:8
  89:24 91:6,18
  91:20,25 92:3
  107:12,13
  108:9 114:4,7
  117:2 118:7
times  22:19
  32:15 80:3
  103:17,18
  109:6
title  20:14,17
  31:24 52:8

titles  20:19
today  6:5,9 8:7
  8:18 10:17
  12:25 20:17
  24:12 26:17
  34:16 35:20,24
  53:8 61:15
  97:19,20 99:20
  104:24 105:2
  109:9 110:4
  114:9
today's  10:20
  11:21 12:19
  41:6
told  22:10,12
  57:21,24,25
  58:10 59:5,15
  59:20 60:18,25
  73:2,20 93:11
  95:15 103:17
  108:21 109:7
  110:23
took  25:18 37:7
  72:16 105:23
top  20:25
total  47:4,20
  76:2 81:1
townsgate  70:6
track  47:23
trade  14:19
tragic  88:24
transaction
  31:22
transactions
  25:19,22

[transactions - uwm]                                        Page 31

109:13,14
**transcribed**
  118:11 120:7
**transcript**  9:18
  118:15 119:11
  119:16 120:5
  120:12 121:5
  121:11,17
**transcription**
  118:13
**transpired**
  83:16,16 95:15
**trial**  27:8
**tried**  73:3
**troy**  3:5
**true**  35:9 36:16
**truthfully**  9:12
  10:18
**try**  9:21,21
  24:7 33:23
  38:1 39:25
**trying**  32:13
  71:20 72:5
  83:15 96:5
**turn**  31:20
**two**  14:1 18:6
  22:25 35:21
  46:25 48:14
  59:1,2 82:1
  85:5 95:10,22
  96:5,6,7,15
  100:21 113:7
**type**  21:20
  47:23 55:22
  78:11 85:24

109:12,13
  112:3 115:12
**types**  14:22
  26:6
**typically**  39:24
  40:3 111:22

**u**

**uh**  10:4 44:15
  44:20 58:22
  76:5
**uh's**  10:5
**unable**  97:15
  97:16
**unconsciona...**
  94:20,21
**under**  7:22
  65:5 117:7
  118:9,11
**undersigned**
  118:4
**understand**
  8:18 9:10,24
  10:15,16 11:3
  17:9 24:19
  27:20 36:13
  66:23 67:5,19
  92:23 93:9
  94:3,25 96:11
  97:7,12,17,22
  98:11 106:16
**understanding**
  36:18 41:19,20
  41:22,25 43:9
  53:1 54:8,10
  55:15 79:18

86:18 94:8
  95:25 96:3,4
  97:24
**understood**
  10:2 82:2
  101:12
**underwriting**
  54:25 79:8,25
  86:21 90:10
**unenforceable**
  102:17 106:2
  108:25 109:16
  109:19
**unethical**  95:2
  95:17
**unfortunately**
  108:13,15
**united**  1:1,5 2:1
  2:5 6:13,15,24
  7:1 8:3,7 10:23
  29:17 42:2
  49:25 58:1
  68:22 75:22
  92:13,24
  115:20 116:2,6
  116:9 119:6
  120:3 121:3
**university**
  13:20 14:7,9
  14:12
**unjust**  105:14
**unnatural**
  24:11
**untrue**  110:16

**use**  10:21 11:2
  43:22 48:18
  49:9 51:23
  52:11,17,24
**used**  17:1 36:24
  48:4 50:24
  51:4,8,12,16,20
  52:3,7,14,22
  53:2,3,5,9,10
  54:2
**uses**  66:8
**using**  11:3
  49:12 52:25
  118:10
**usually**  35:2
  43:21
**uwm**  8:7 10:23
  30:7 34:13
  39:13 40:5
  42:7,9,13,16
  43:6,10,12,14
  43:20 44:1,16
  44:19 45:3,6,9
  45:12 46:12,14
  46:17,18,24
  47:3,6,17
  48:11 50:5,8
  50:15,18,19
  52:21 53:13
  54:11,14 55:2
  56:19,21,24
  60:1 61:11
  62:11 63:20,24
  63:25,25 64:6
  64:16 65:17,23

66:1,4,11,12
67:1,7,8,22
68:12 69:16,24
70:19,22 71:13
71:19 72:2,16
76:3,4,14
78:12,15 79:5
79:11,15,20
87:7 88:5 89:2
89:4,18 91:8
96:1 101:6,15
102:2,3,9,10
103:20 104:7
105:12 111:20
114:21
**uwm's** 29:13,21
31:10 34:8,24
49:8 50:6,13
50:24 51:4,8
51:12,16,20,23
52:7,11 54:6
63:21 64:2,17
64:22 65:6
97:1

**v**

**v** 119:6 120:3
121:3
**va** 40:9
**vaguely** 45:18
**valid** 94:2
**validate** 106:13
**valley** 62:18
112:18
**value** 97:25

**vanilla** 38:10
**various** 4:22
**ventura** 23:21
23:22 27:21,22
**venue** 105:19
**verbal** 44:1,5
**verbalize** 10:3
**verbatim** 118:9
**veritext** 6:8,10
119:1,7 122:1
**verne** 13:20
14:7,9,13
**versus** 6:14
**video** 6:7,12
51:17 55:18,23
55:24,25 56:2
**videographer**
3:19 6:4 7:4
62:4,7 91:24
92:2 114:3,6
116:25
**videotaped**
1:14 2:17
**village** 1:16
2:23 6:19 9:1
70:7
**virtual** 52:11
**vocational**
14:19
**voicemail**
113:9
**vp** 82:16 88:21
**vs** 1:7 2:7

**w**

**w** 31:23 38:10
**wait** 9:16,21,21
33:23
**waiting** 60:24
103:25
**waived** 119:13
119:20
**walk** 41:5
**want** 19:2
27:19 31:1
38:12,16,17,17
38:17,18 41:12
41:13 43:22
54:14 58:8
62:2 85:7,8
86:24 95:24
113:25 114:16
**wanted** 39:16
84:19 113:10
116:10
**wants** 38:13
**warehouser**
18:18
**watched** 56:2
**watching** 55:22
**water** 41:13,14
**way** 9:19 11:5
35:24 36:24
48:23 54:3,16
71:2,20 73:4
73:21 74:19
96:9 104:13
108:16,20

**we've** 8:17
14:23 101:21
**website** 26:21
26:23 60:3
63:20 64:3,17
64:22 65:6
103:20 104:7
111:13
**websites** 49:8
**wednesday**
1:17 2:21
**week** 11:14
12:18 56:11,13
56:24 59:1,11
**went** 13:17,18
18:16,18 22:11
27:7 28:9
48:13 58:9
91:3
**west** 3:4
**western** 18:15
**westlake** 1:16
2:23 6:19 8:25
19:19,24 25:12
25:14,15,15,16
25:17,18 69:25
70:2,6 76:9
**westlakemtg....**
82:12
**westlakemtg....**
26:24
**whatnot** 84:20
**whereof** 118:19
**wholesale** 1:5
2:5 4:23 5:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

5:15 6:14,24
7:1 8:3,7 10:23
12:16 29:17
35:15,17,19,25
36:14,25 37:9
37:16 42:2
43:3 44:10
46:13,16 48:10
49:25 50:7,8
50:14 58:1
64:17,23 65:5
65:7 66:13
67:21,23 68:11
68:23 69:1,5
69:22,24 70:18
70:24 71:11,18
72:1,17 73:11
74:1,3 75:22
76:3 79:6,11
79:15,19 81:23
87:23 89:9
92:13,24 99:5
99:6,7,8,11
106:12,14
107:3 114:17
114:20 115:19
115:20 116:3,6
116:9,11,21
119:6 120:3
121:3
**wholesalers**
72:22
**wife**  20:5,7,11
**william**  3:13
4:19 7:2 119:5

**william.cook**
3:15
**wilson**  3:8,13
**wilsonelser.c...**
3:15
**withdraw**
108:5
**witness**  4:2 7:9
8:13,15 12:3
12:10 19:2
24:9 33:20
41:10 43:1
48:25 60:24
61:22,25 62:2
65:2 66:18
67:12 72:5
73:15 74:8,14
74:17 77:25
85:15 93:10
95:1 96:20
97:6,8 98:17
99:24 100:9
101:4,12,19
102:7,14,21
103:25 104:9
106:10,24
107:8 108:14
108:18 109:6
109:23 110:22
114:2 118:19
119:8 120:1,4
120:11 121:1,4
121:15
**witnesses**  118:8

**won**  27:14
**word**  111:25
**worded**  71:20
**work**  18:16,18
20:7 28:2,17
35:11 36:14
38:11 39:25
45:11 46:12
52:9 54:12,12
54:14 81:11
95:21,23,24
96:1,5,9,15
**worked**  18:11
18:19,21 40:3
**working**  17:10
32:13 40:13
44:1
**works**  29:5
35:8,16 38:5
39:5
**worry**  57:24
59:5 80:17
**writing**  44:2
61:12 105:24
**wrong**  32:25
86:15 95:5,17
95:18

| x |
| --- |

**x**  4:1,10 5:1
49:1 54:22
110:13 118:15

| y |
| --- |

**y**  3:4 49:1

**yatooma**  82:10
82:14,18,20,24
83:12 84:1,13
86:8,18 111:6
111:6
**yeah**  12:7 13:9
17:14 18:4
20:3,5 22:24
22:25 24:2
25:9 26:14
27:14,14,17
30:21 31:1
33:17 34:10
36:22 48:25
49:6 53:17,18
53:18,18,23
54:17 55:8
56:12 61:22
62:3,25 63:13
72:12 75:10
83:9 97:14
100:16 105:7
**year**  13:10 14:1
14:2 17:7 31:6
38:18,18 47:2
48:1 68:8,9
87:21
**yearly**  68:2
**years**  14:11
18:7 22:6
23:16,17 29:4
29:6 34:4,22
34:23 36:9,9,9
37:6 44:6
47:21 68:6

100:18
**yeses**  10:5
**yesterday**  8:20

| **z** |
|---|

**z**  33:22
**zoom**  11:9,11
     11:13,15,17,19
     12:17

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.