# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE,  )
LLC,                        )
                            )
            Plaintiff,      ) Case No. 2:22-cv-10395
                            )
      vs.                   )
                            )
KEVRON INVESTMENTS, INC.,   )
                            )
            Defendant.      )
_____)

VIDEOTAPED DEPOSITION OF KEVIN RHATIGAN

AS 30(b)(6) and INDIVIDUALLY

Westlake Village, California

Wednesday, April 17, 2024

REPORTED BY:

Kathleen Siri

CSR No. 9726

Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


UNITED WHOLESALE MORTGAGE,    )
LLC,                          )
                              )
            Plaintiff,        ) Case No. 2:22-cv-10395
                              )
      vs.                     )
                              )
KEVRON INVESTMENTS, INC.,     )
                              )
            Defendant.        )
_____)

     Videotaped Deposition of KEVIN RHATIGAN AS 30(b)(6) and INDIVIDUALLY, taken before Kathleen Siri, a Certified Shorthand Reporter for the State of California, with principal office in the County of Los Angeles, commencing at 12:38 p.m., Wednesday, April 17, 2024, at Residence Inn, 30950 Russell Ranch Road, Westlake Village, California.

APPEARANCES OF COUNSEL:


FOR PLAINTIFF:


      BUSH SEYFERTH PLLC
      BY:  MAHDE Y. ABDALLAH, ESQ.
      100 West Big Beaver Road, Suite 400
      Troy, Michigan 48084
      Telephone:  (248) 822-7860
      abdallah@bsplaw.com


      BUSH SEYFERTH PLLC
      BY:  A. LANE MORRISON, ESQ.
      5810 Wilson Road, Suite 125
      Humble, Texas 77397
      Telephone: (281) 930-6853
      morrison@bsplaw.com


FOR DEFENDANT:
      WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
      BY:  WILLIAM S. COOK, ESQ.
      17197 North Laurel Park Drive, Suite 201
      Livonia, Michigan 48152
      Telephone:  (313) 327-3100
      william.cook@wilsonelser.com



ALSO PRESENT:
      JORDAN KYHOS, VIDEOGRAPHER

Page 4

                            I N D E X
WITNESS                                        EXAMINATION
KEVIN RHATIGAN
Examination by:                                    PAGE
MR. ABDALLAH                                    7, 116
MR. COOK                                           114


                         E X H I B I T S
Exhibit              Description                      Page

Exhibit 4    Defendant's First Amended Answer      49
             to Plaintiff's Complaint

Exhibit 5    Defendant's Responses to              68
             Plaintiff's Second Requests for
             Admission

Exhibit 6    Defendant's Responses to              74
             Plaintiff's Second Requests for
             Production

Exhibit 7    Letter to Kevin Rhatigan from         78
             William E. McDonald, 2/15/22

Exhibit 8    Kevron's Third Supplemental           80
             Answers to Plaintiff's First
             Interrogatories

Exhibit 9    Printout of various e-mails with      81
             Kevin Rhatigan and Fairway
             Wholesale Lending and Rocket
             Mortgage

Continued...

Page 5

E X H I B I T S (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 10 | Printout of a list of loans sent to Rocket Mortgage by Kevron | 89 |
| Exhibit 11 | Defendant's First Amended Affirmative Defenses | 92 |

PREVIOUSLY MARKED EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Wholesale Broker Agreement, 7/22/19 | 63 |
| Exhibit 2 | Printout of a Screenshot, Attest Loans, Acknowledgement and Agreement | 78 |
| Exhibit 3 | Wholesale Broker Agreement, Renewal Application - Agreement | 54 |

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 6

April 17, 2024

-o0o-

THE VIDEOGRAPHER: Good afternoon. We are going on the record. The time is 12:38 p.m. Today is April 17th, 2024.

My name is Jordan Kyhos. I'm a video technician with Veritext Legal Solutions, located in Los Angeles, California. My court reporter today is Kathleen Siri with Veritext Legal Solutions, located in Los Angeles.

This is the video deposition of Kevin Rhatigan as an individual and PMK in the action entitled United Wholesale Mortgage, LLC versus Kevron Investments, Inc. This is filed in the United States District Court for the Eastern District of Michigan, Southern District. The case number is 2:22-cv-10395.

We are recording these proceedings at 30950 Russell Ranch Road in Westlake Village, California.

Now, will you all please identify yourself and who you represent starting with noticing attorney.

MR. ABDALLAH: Mahde Abdallah on behalf of the Plaintiff, United Wholesale Mortgage.

MR. MORRISON: Lane Morrison on behalf of

Page 7

United Wholesale Mortgage.

MR. COOK:  William Cook for Defendant, Kevron Investments.

THE VIDEOGRAPHER:  Thank you.

Now, will the reporter please administer the oath.

KEVIN RHATIGAN,

Called as a witness by and on behalf of the Plaintiff, and having been first duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MR.ABDALLAH:

Q    I'm going to start by reading a stipulation among counsel into the record.

Pursuant to the agreement of counsel for the parties, this is the combined deposition of Kevin Rhatigan, both in his individual capacity and as the corporate representative of Defendant, Kevron Investments, Inc., under Federal Rule of Civil Procedure 30(b)(6).  Mr. Rhatigan's testimony will be considered the testimony of both himself and Kevron pursuant to Rule 30(b)(6) unless otherwise specifically stated on

Page 8

the record.  To the extent, there is an objection to a question being outside the scope of the matter of examination noticed by United Wholesale Mortgage, Kevron's counsel may state the objection on the record, but Mr. Rhatigan must still answer the question.  The deposition will not exceed seven hours of time on the record today.  However, UWM or United Wholesale Mortgage reserves the right to request to continue the deposition past the seven-hour time limit on a future date in accordance with Rule 30(d)(1).

MR. COOK:  Agreed.

MR. ABDALLAH:  Good afternoon.

THE WITNESS:  Do I have to say I agree?

MR. COOK:  No.  I do that for you.

THE WITNESS:  Okay.

BY MR. ABDALLAH:

Q    Mr. Rhatigan, my name is Mahde Abdallah.  We've met earlier today.  I understand you sat through the deposition of Marjam Pirouz this morning.  And the deposition of Jaime Arroyo yesterday morning; is that correct?

A    Yes.

Q    Mr. Rhatigan, for the record, can you please state your full name and address?

A    Kevin Rhatigan, 2651 Country Lane, Westlake

Page 9

Village, California 91361.

Q    Have you had any other legal names?

A    No.

Q    Have you ever been deposed before?

A    No.

Q    I'm just -- you heard this probably, but --

A    Go ahead.

Q    -- I'm going to go over just some of the ground -- guidelines.  I'm going to be asking you a series of questions, obviously.  And you understand that you've taken the oath to answer those questions truthfully?

A    Correct.

Q    All right.

So it's important that you listen carefully to the questions I ask.  I do ask that you will wait until I finish asking a question before responding.  That will make the transcript cleaner.  It will make the court reporter's job a lot easier.  And that way there's no confusion about what question you're answering.  I'll likewise try to wait -- I'll likewise try to wait until you're done answering your question before I start asking my next question.

If you don't understand any questions I ask, please let me know and I'll do my best to clarify or

Page 10

rephrase it. If you do answer a question, I'll assume you've understood it. And when you answer my question, it's important that you verbalize your answers for the record. So no head nods up and down, no "uh-huh's" or "huh-uh's." You know, we really have to go by yeses and no's.

Your attorney may object to questions. However, unless your attorney instructs you not to answer, you must still answer the question. And as we stated, if you need a break at any time, please feel free to let me know. The only thing I ask is that if there's a pending question at the time you need a break, I just ask that you finish answering that question and then break off for the record.

Do you have any questions? Understand?

A     No, I understand.

Q     Have you taken any medication today that would inhibit your memory or ability to testify truthfully?

A     No.

Q     And to make today's deposition proceed a little more smoothly, we're going to use some abbreviations. So I'll refer to Kevron Investments, Inc. as Kevron. I'll refer to United Wholesale Mortgage as UWM. I'll refer to Rocket Mortgage as Rocket or Rocket Mortgage. I'll refer to Fairway Independent Mortgage Corp as

Page 11

Fairway or, you know, Fairway Independent or something similar.  And there might be other terms we use.  If you don't understand any term I'm using throughout the deposition, please let me know and I'll clarify that.

Did you prepare for this deposition in any way?

A    Yes.

Q    Okay.  How did you prepare for this deposition without disclosing your communications with counsel?

A    Well, we had a Zoom call prior to the deposition.  That's -- that was it.

Q    Okay.  And who was that Zoom call with?

A    With -- with my attorney, Bill.

Q    Okay.  When did that Zoom call take place?

A    Week ago.

Q    Okay.  And how long was that Zoom call?

A    Thirty minutes, maybe an hour.

Q    Did you review any documents during that Zoom call?

A    During that Zoom call, I don't think so.

Q    Did you review any documents otherwise in preparation for today's deposition?

A    Yes.

Q    What documents were those?

A    They were some documents that --

MR. COOK:  Do your best to describe them.  Some

Page 12

of them were probably legal ones, but do your best on what you remember.

THE WITNESS: They were some documents that were sent the other day.

BY MR. ABDALLAH:

Q Okay. Do you know what they looked like?

A Yeah, they looked like --

MR. COOK: Do your best to describe what you think you reviewed.

THE WITNESS: They were just -- frankly, I got a bunch of PDF e-mails. I didn't really look at most of them.

BY MR. ABDALLAH:

Q Okay.

A Because it was -- it was -- I think it was the wholesale agreement and some of the forms.

Q Other than the Zoom meeting you had with your counsel last week, did you have any other meetings to prepare for today's deposition?

A No.

Q Did you discuss this deposition with anybody else other than your counsel?

A No.

Q Okay. Did you bring any documents with you today?

Page 13

A    No.

Q    Okay.  I'm going to go into your background little bit.

Can you provide your date of birth, please?

A    3/21/1959.

Q    And did you --

I assume you graduated high school at some point?

A    I did, yeah.

Q    What year did you graduate high school?

A    1977.

Q    Did you receive any --

Did you continue your education after high school?

A    I did.

Q    Where at?

A    I first went to Bergen Community College in New Jersey.  Then I went to Mesa College in San Diego. And then I finished my bachelor's degree at the University of La Verne.  It was an online program.

Q    So did -- you didn't -- so Bergen College in New Jersey, did you receive a degree from there?

A    No.  It's a community college.

Q    And then you attended a college in San Diego?

A    Mesa College, that's a community college as

Page 14

well.  Those are two-year colleges.  I received certificate of achievement, which is a one year for accounting.  I think I got that from Mesa.  I got an associates degree in accounting.  It had been a long time.  I think that was from Mesa as well.  And I have a bachelor in science, in business administration, from University of La Verne.

Q   When did you obtain your bachelor's from University of La Verne?

A   I would say it was 1987, because it was ten years later.

Q   After completing your education at University of La Verne, did you attend any other colleges or schools?

A   No.

Q   No post graduate professional schools?

A   No.

Q   Did you -- have you ever been involved in any vocational or trade schools?

A   No.

Q   Have you taken part of any other courses or received any other types of certifications other than the ones we've just discussed?

A   The Department of Real Estate, the real estate certifications and the NMLS certification.

Page 15

Q   Did you attend -- when did you take part of the Department of Real Estate?

A   I got into the business in 1990.  So it must have been '90.  I don't know if you need a license back then, but it was around 1990.

Q   Did you have to take any courses as part of that?

A   Yes.

Q   And did you take those courses in California?

A   Yes.

Q   Okay.  And so do you -- are you currently a licensed realtor?

A   Yes.

Q   Okay.  How long have you had your license?

A   Since 1990.

Q   And you also obtained your NMLS license.  Is that for the mortgage industry?

A   Yes.

Q   When did you obtain your NMLS license?

A   I think that was in '08 or '09, when the laws changed and you had to have it.

Q   And did you take classes to obtain your NMLS license?

A   Yes.

Q   Where were those classes or with what program?

Page 16

A    Probably online.  I don't know.

Q    Do you recall the program name or the provider for the classes?

A    No.  No.

Q    Prior to obtaining your NMLS license in 2008 or 2009, were you practicing in the mortgage industry at all?

A    Yes.

Q    Okay.  So but you did not have your license?

A    No, I was licensed.

Q    You didn't have an NMLS license?

A    It wasn't required then.

Q    Okay.  So you could -- were you a loan officer in 2008 or 2009?

A    Correct.

Q    You just didn't need a license for that?

A    You did not need an NMLS license.

Q    Okay.

A    That only came into play after the market crash in 2008 with Dodd-Frank.

Q    Prior to 2008, what -- did you have to take any particular steps to become a loan officer?

A    You had -- you had to get a real estate license, which I did in 1990.

Q    Okay.

Page 17

A    So you had -- you had to be licensed.  Used to be that you only needed a real estate license to do mortgages.  And then when the market crashed in '08, the government had this great idea that if we licensed you through the NMLS that you would somehow be a better person.  And so they created a whole division for that.  And we pay an annual fee for that every year for that privilege.

Q    We understand the annual fee concept of that.

So in 1990, you began working both as a realtor and as a loan officer?

A    No.  Just in -- just in loans.

Q    Loans.  Okay.

A    Yeah.

Q    You had the ability to practice real estate with --

A    With the license, you have the ability, but you have to join a local board.  I did not join the board, because I was a lender.  You -- I -- you could do real estate and loans, if you join the local board, then you could be a realtor as well.

Q    Did you at some point also become a broker?

A    Yes.

Q    When did you become a broker?

A    1996 or maybe '95, somewhere in there, '95 or

Page 18

'96.

Q    Can you explain to me the steps you needed to take to become a broker?

A    Yeah, you've got to take a test.  You've got to pay a fee.  That's -- that's pretty much it.  There are requirements you have to be in the business for like two years and certain requirements, but I had satisfied all them by that time.

Q    Prior to becoming a broker, where -- were you employed with a certain real estate or mortgage company?

A    Yes.  I worked for about four different mortgage companies -- four or five between 1990 and 1996 when I opened up the company.

Q    What mortgage companies were those?

A    I started my career at Great Western Bank, which is no longer around.  I went to a work for a couple of IMCO Realty Services, I-M-C-O.  They're no longer in business.  I went to work for Warehouser Mortgage, no longer in business.  Then I worked for a company called Rancho Santa Margarita Mortgage, who is no longer in business.  And then I worked for a small broker called First California Capital Group.  And they were no longer in business.

Q    Seems like -- I'll save it.

MR. COOK:  That's an off-the-record

Page 19

conversation.

THE WITNESS:  Want to start over?

BY MR. ABDALLAH:

Q    No.  That's all right.

Outside of obtaining your broker certification, your real estate license and your NMLS license, do you have any other licenses or certifications?

A    No.

Q    And are you currently employed?

A    Yes.

Q    With whom?

A    Myself.

Q    By yourself?

A    Kevron Investments, Inc.

Q    Okay.  And how long have you been employed with Kevron?

A    Since 1996.

Q    And is that when the company was founded?

A    The company was originally started as Westlake Mortgage Group in 1996.  I incorporated in 1997 as Kevron Investments, Inc. in 1997, because I had to incorporate to do FHA loans.  Back then you had to be a corporation to do FHA loans.

Q    Westlake Mortgage, was that a corporation, an LLC?

Page 20

A    No.  That was just a sole provider.

Q    Okay.

A    Yeah.

Q    So are you the sole founder of Kevron?

A    Yeah -- well, no, sorry.  My wife is Sharon. She is the ron, Kevron, Kevin and Sharon.

Q    Okay.  Did your wife ever work for the company?

A    Never.

Q    Okay.  Are you the sole owner of Kevron?

A    Legally, we're 50/50.

Q    Since its incorporation, has your wife had any involvement in Kevron?

A    No.

Q    When you founded Kevron, what title did you hold?

A    President.

Q    You hold that same title today?

A    Correct.

Q    Have you held any other titles since its founding?

A    No.

Q    And what would you say your duties and responsibilities are as president of the company?

A    Everything.

Q    Can you explain some of what your top duties

Page 21

are, like your main duties?

A    So my main duties are to keep the company open, paying the bills.  I'm responsible for all the regulations, all the contracts, all the payroll, when there was payroll, basically, all the day-to-day operations, everything.

Q    You say that you're responsible for contracts. Does that include contracts that Kevron enters with lenders?

A    Correct.

Q    Since its founding, has anyone else had responsibility for -- for involvement in entering contracts with lenders?

A    No.

Q    Just you?

A    Correct, yes.

Q    Since founding the company, have you been employed elsewhere?

A    No.

Q    Do you hold any other type of membership interest in a different company, other than Kevron?

A    No.

Q    I believe you testified this is your first deposition; right?

A    Correct.

Page 22

Q    Have you ever provided in-court testimony?

A    Yes.

Q    For what purpose?

A    So there were several.  Well, there were -- I had -- I had a lawsuit against a company about 10 or 15 years ago.  An older gentleman sued the company.  One of the loan officers made an agreement with him to -- to get a refund, some costs after the close.  And when the loan officer came to me with the commission check and said we need to give the client back the money, I told him we can't do that.  It's legal.  So he went back and told the guy and then the guy sued us.

Q    And so you provided in-court testimony in connection with that lawsuit?

A    Yes.

Q    Were you deposed in that lawsuit?

A    No.

Q    Okay.  You mentioned that you provided testimony in court several times.  What were the other occasions?

A    Well, I think one of the questions you're going ask if I was ever involved in a lawsuit.  And so, yes, or was that the question that's somewhere --

Q    Yeah.

A    Yeah, so I had two issues.  I had 1977, I was

Page 23

arrested in New Jersey for distribution of marijuana. That was back in 1977.  And I think I got probation for that.  I did my time and I was done.  And then I had a car accident in 1980, that was -- I think I did -- I think I was ordered like 60 days of like a halfway house.  And I think I did 30 days, you know, half time. And that record was expunged actually, but that was back in '80.

Q     Any other lawsuits you've been involved in other than the three we just spoke about?

A     Not that I can remember.

Q     Okay.  The lawsuit dealing with Kevron and the loan officer who promised some kickback in the commission, did that take place in California?

A     It was.

Q     Okay.  You said that was about 15 years ago?

A     I think it was 10 or 15 years ago.  It's been a while.

Q     Do you recall where that case was pending, whether it was in state court, federal court?

A     I think it was Ventura.  I don't know what that is.  County, maybe Ventura County Court, pretty sure.

Q     Okay.  And then your 1997 -- sorry -- 1977 arrest in New Jersey, was that case pending in New Jersey?

Page 24

A    Was that -- it was in New Jersey, yes, yes. And resolved everything in New Jersey, yeah.

Q    The car accident case in 19- --

A    Oh, that was San Diego.

Q    San Diego --

A    San Diego, California.

THE REPORTER:  Try to remember to let him finish.

THE WITNESS:  I know.

BY MR. ABDALLAH:

Q    It's unnatural.  It's going to take some time. It's a mistake we'll both make today.

Have you ever been convicted of a crime involving theft or dishonesty?

A    No.

Q    Have you ever been a party to a class action lawsuit?

A    I would say yes.

Q    Okay.  I'll give some -- I understand sometimes you receive a check in the mail, you cash it.

I'm more interested in, have you ever been a named plaintiff in a class action lawsuit, where you were actually involved in a lawsuit?

A    No.

Q    Have you ever filed bankruptcy?

A    No.

Q    Are you on social media personally?

A    Yes.

Q    Which platforms?

A    Just Facebook.

Q    And are you --

Is your identity on Facebook Kevin Rhatigan or do you go by a different name?

A    No, no, yeah.

Q    Does Kevron go by any other name?

A    No.

Q    It doesn't go by Westlake Mortgage?

A    Kevron is the corporate name.  And the DBA is -- I have three DBAs actually, Westlake Mortgage Group, Westlake Realty Group and Westlake Capital Group. They were made specifically for Westlake Mortgage for the mortgages.  Westlake Realty for the residential real estate.  And Westlake Capital Group, I took a name to keep consistency for any commercial transactions, which we don't really do, but I keep renewing the names every time they come up.

Q    Commercial transactions, you mean commercial lending or real --

A    Commercial real estate and/or lending.

Q    Okay.

Page 26

A    At one point, I had a loan officer who did commercial.

Q    And I think you testified Kevron engages in both real estate and lending -- is engaged in both the real estate and lending industry.

Is it engaged in any other types of business?

A    No.

Q    How many people does Kevron currently employ?

A    Right now, there's -- there's me, Marjam, Rick, Jaime and Al, five.

Q    So it's you, Marjam, Rick --

A    Me, Marjam, Rick, Jaime and Al.

Q    Jaime and Al?

A    And Al, yeah.

Q    Okay.  In March of -- sorry -- in 2021, was anyone employed with Kevron that is not employed there today?

A    There were.  Michelle Borsotti and Norm Sachs, I am pretty sure was still around in 2021.  I don't think there was anybody else.

Q    Does Kevron have a website?

A    Yes.

Q    What is the website address?

A    It's Westlakemtg.com.

Q    Does Kevron have any social media accounts or

Page 27

pages?

A     No.

Q     Other than the lawsuit we discussed relating to the loan officer providing the kickback of commissions, has Kevron been a party to any other lawsuit?

A     No.

Q     Okay.  And that lawsuit, did that -- that went to trial?

A     No.  Well, the judge -- it was just -- it was just the plaintiff and me and my loan officer and a judge.  There wasn't a jury.

Q     Okay.  Sure.  That's fine.

Do you recall how that case resolved?

A     Oh, absolutely, yeah, yeah.  The client won.

Q     Okay.  And was there a judgment entered against Kevron?

A     It was, yeah.

Q     Do you recall the amount?

A     I want to say it was 7,000 or $7,500.

Q     Okay.  I understand that case may have taken -- partaken somewhere in Ventura County, but was it potentially a court of small claims within Ventura County that the case was pending in?

A     I think so.  It might have been within the limit of small claims.

Page 28

Q    Okay.  Since you founded Kevron as a broker and both -- do you work as a loan officer as well, where you have your own clients and submit loans for them too?

A    Yes.

Q    And you've done that consistently since founding the company?

A    Yes.

Q    Have you done that less consistently as time went on or as you know maybe you've become semiretired?

A    What do you mean by that?

Q    Like, do you take on less clients now than you previously did, because, you know, you're just, you know, in the process of retiring or anything like that?

A    Well, no, I'm taking on less clients because the market has changed.

Q    Okay.

A    I mean, I'm still available to work and do -- everything's remote.  So I can do business anywhere I am in the country.  It's just there's -- the market tanked in 2022, March of 2022, I think it was.  The rates skyrocketed.  The market just died.

Q    So you served both as a broker but also as a loan officer dealing with your own clients?

A    That's correct.

Q    Marjam Pirouz, what is her role at Kevron?

Page 29

A    She's a loan officer.

Q    Do you recall around the time when she began?

A    No, not offhand.

Q    Was it over 20 years ago maybe?

A    Everyone who works for me has been with me for many years.

Q    Okay.  And what are the duties of a loan officer at Kevron?

A    Just originate loans.

Q    Does Marjam have any duties outside of being a loan officer?

A    No.

Q    Do you know if Marjam had access to UWM's pipeline -- had access to -- let me back up a little bit.

At some point, Kevron had an agreement with United Wholesale Mortgage; correct?

A    Yes.

Q    In connection with that agreement, employees at Kevron or loan officers at Kevron were provided access to UWM's portal; correct?

A    Yes.

Q    Okay.  Now, was there a general portal log in for Kevron itself or did each person have their own individual log in?

Page 30

A    Each person had their own individual log in.

Q    And do you know if Marjam had her own individual log in?

A    I -- yes, I believe she did.

Q    Okay.  And did anyone within Kevron have -- to your knowledge, have access to anybody else's log in with UWM portal?

A    No.

Q    I assume you had your own log in for --

A    I had my own log in.

Q    Did anyone have access to your own log in?

A    No.

Q    What was Michelle Borsotti's role at Kevron?

A    She was -- she was a loan processor.

Q    What are the duties of a loan processor?

A    To process loan files.

Q    Did she have any other duties?

A    She basically ran the office.  She was my right hand.

Q    Kind of like an office manager?

A    Yeah, she was with me since the day I opened up the company.  So she -- she was a big part of the company.

Q    Do you recall around the time when she -- her employment with the company ended?

Page 31

A     Yeah, it was March.  And I want to say it was 2023.

Q     What was -- what is the reason for her employment ending at the company?

A     There was no business.  I -- I was paying her out of my home savings for a year.  And I just couldn't do it anymore.

Q     Did her employment end on amicable terms?

A     She didn't think so.

Q     Okay.  Did she have her own access to UWM's pipeline with her own account?

A     Yes.

Q     And she did not have access to your account?

A     No.

Q     Can you explain some of the duties for a loan processor, like, you know, that go along with processing loan files?

A     Sure.  Okay.  So a loan officer's job is to originate loans.  And the loan officer's job is to meet with the clients, get the documentation and then turn it over to the processor.  The processor's job is to process the file, which is every loan transaction needs, for example, 10 items, W-2s, pay stubs, bank statements, credit report, appraisal, title and escrow, credit report, every one.  And so the processor's job is to get

Page 32

the documents from the loan officer. If there's anything missing, go back to the loan officer and say I -- you're missing these documents. And then the loan officer's job is get those documents and then give them back to the processor. And then the processor's job is to go through it, make sure it's all good and then submit it to the lender.

Q You mentioned that Michelle also helped you run the office.

What duties does that or what responsibilities or duties did that entail?

A Well, I was -- you know, as the owner of the company and working, I was out a lot. I was out trying to get loans. So she kept everything in the office running. There were times that we had, you know, more employees, more loan officers. So she was more of the 9:00 to 5:00 at the office, opening up, closing, taking care of the day-to-day operations. Loan officers are in and out. They're all self-employed. People are coming and going. She's making sure that everything is just handled.

Q Did she ever get involved in entering contracts or renewing contracts with lenders?

A Never.

Q I'm going to say this wrong -- I hope I'm

Page 33

pronouncing it right.  Is it Jaime?

A    Jaime.

Q    Jaime Arroyo, is he another loan officer at Kevron?

A    He's a loan officer.

Q    Did he have any other duties outside of being a loan officer?

A    He does real estate as well.

Q    He does with Kevron; right?

A    Yes.  Yes.

Q    Okay.  Do any -- does anyone else currently at Kevron do both real estate and loans?

A    Jaime and Al do both real estate and loans.  I think that's it.  I don't think Rick is doing real estate.

Q    Al, do you mean Alvaro --

A    Alvaro Melgoza, yeah.

THE REPORTER:  I'm sorry.  What was the last name?

THE WITNESS:  Melgoza.

MR. COOK:  Can you spell that for her.

MR. ABDALLAH:  I've got it.  M-e-l-g-o-z-a.

THE REPORTER:  Try to make sure you wait until he's done.

///

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

Page 34

BY MR. ABDALLAH:

Q    Do you recall how long Jaime's been with the company approximately?

A    Probably 20 years.

Q    And he has -- as a realtor with the company, what do his duties entail?

A    Realtor, whatever a realtor does.

Q    Okay.  And he had his own access to UWM's pipeline?

A    He had his own log in, yeah.

Q    And he did not have access to your account --

A    No.

Q    -- with UWM?

Alvaro Melgoza, who we'll call Al --

A    Al.

Q    -- for purposes of today, he was a loan officer and realtor as well or he is a loan officer --

A    Yes.

Q    -- and realtor as well with Kevron?

And how long has he been the company?

A    He's probably the least amount of time. Probably -- probably still 15 years though, 15, 18 years.

Q    Okay.  And he had access to UWM's pipeline?

A    He -- I'm sure he did.  He never did anything

Page 35

with them though, so I'm guessing he did have an ID and password. I don't know that for sure, but usually when I do a broker package, they set all the loan officers up with a log in and password, so...

Q Kevron's an independent mortgage broker; correct?

A Yes.

Q And Kevron works with many different lenders; is that true?

A Yes.

Q Does Kevron work with retail lenders?

A Yes.

Q Which ones?

A Well, I think a lot of lenders do retail and wholesale, a lot of them do.

Q Which ones that Kevron works with do both retail and wholesale?

A I -- I know Rocket does. I know Sierra Pacific I'm pretty sure does wholesale and retail. If you're talking about 2011 or if you're talking about today, it's two different things.

Q We'll say 2021?

A 20 -- 2021, we had a whole bunch of different lenders, way more than we have today. I'd say most of them did wholesale and retail.

Page 36

Q    Okay.  So you mentioned Rocket, Sierra Pacific. Is there any others that come to mind?

A    There was Plaza, there was -- the thing is, so many of these companies have gone out of business or been purchased.  So there was a company called Fleet, which became Plaza, which became -- they're the same people.  They just kept changing the names.  So there was first Nationwide was Cal Fed and they were bought out over the years, 30 years, 35 years I've been in the business.  I -- I can't remember who else was in the game back then, but we were approved with a bunch of different people.

Q    So help me understand this in the sense of, you work with retail lenders through their wholesale subsidiary or channel, but not necessarily directly with retail lenders; is that true?

A    Correct.

Q    Okay.  And your understanding, what's the difference between a retail lender and an independent mortgage broker?

A    I mean, from a standpoint of obtaining a loan?

Q    Yeah.

A    There's -- there's -- there's no difference. The -- I used to explain it this way to my clients, because Bank of America had a wholesale division and

Page 37

they were obviously a large bank.  So I would tell me clients, you could go to Bank of America or you could go to me.  I can send your loan to Bank of America.  You're going to get the same rate and you're going to get me, okay, because what I sold my whole career was me.  My reputation, my whole 30 years in the business was me.  I met with the clients.  I took care of them, you know, start to finish.  And that's what they're getting with me.  So a lot of companies do wholesale and retail, they're no competition to me.  There's no difference.  And that's what I would tell people.  I could send you a loan at Bank of America, you get the same thing.  The difference is you're going to get an interest rate at a fee from Bank of America.  And you're going to get the same interest rate at a fee from me.  The difference is, I get wholesale pricing.  So I get the commission that they're charging you.

Q    Would you also explain to clients that you could shop around for them with different lenders?

A    That I would shop around?

Q    Yes.

A    Yes, of course, that's what you do as a broker. That's our job.

Q    And retail lenders don't generally do that, shop around to different lenders; correct?  They only

Page 38

try to get you the loan -- get a client a loan with their lending base; correct?

A    Yes.

Q    Okay.  How -- how does Kevron choose which lenders it works with?

A    Well, again, you get a client.  You review the situation.  And then you take them to whoever fits their needs.  In most cases, it's -- in most cases, it's a rate thing.  Okay.  If you have a normal client, plain vanilla, W-2, pay stubs, bank statements, who didn't have a baby, who didn't leave work for three months, who didn't do something, 99 percent of the lenders want that loan.  Everybody wants that loan.  So if you have a normal deal, you have your 30, 20, 50, 100 different lenders to choose from.  And then you -- who's got the best rate, best product, what do they want?  Do they want an adjustable?  They want a fixed?  They want a 30 year?  They want a 15 year?  And you find the best product for them.  That's our responsibility.  Our fiduciary responsibility is to our client.  And then once we do that, we submit the file to that lender.

Q    So there's a lot of lender options out there for a client that Kevron chooses from; correct?

A    Yes.

Q    Do you know for -- how does -- you know, does

Page 39

Kevron look at every single option for every single client or you know, is there certain lenders that Kevron has relationships with that it generally looks to?  How does Kevron narrow the list of options of lenders that it works with?

A    Me personally or as a company?

Q    As a company?

A    The company -- me -- as -- as the company, I don't tell my loan officers where to send their loans. I let them -- they're all seasoned loan officers, every one them.  They've been doing it for a long time.  And they have different relationships.  So I might have a different relationship with, for example, UWM, that Marjan has.  So they -- we all have different relationships.  So they would -- they would go and search themselves where they wanted to be, because as I mentioned, I don't tell them where to send their business.  For me, personally, yes, I had -- I would have my lenders that I would -- I would be a little bit more comfortable with.  And I would be looking at those lenders and then seeing who had the best available for that client.

Q    Would you agree that, like, each loan officer has a certain subset of lenders that they typically are comfortable with and try to work with on a normal basis?

Page 40

A    Probably.

Q    Which lenders did -- were you comfortable with and typically worked with in 2021?

A    In 2021, I actually did a lot of business with UWM and Sierra Pacific, I mentioned before.  And then there were a few other fringe lenders, depending on what was going on, somebody needed a bank statement loan, somebody needed -- you know, there's these alternative finance loans that are available, FHA, VA, they're all different.  Any given day there might be a lender buying that market.

Q    Would you agree that retail lenders are more expensive to the borrowers than working with an independent mortgage broker?

A    No, I would not.

Q    Do you have any knowledge of retail lenders speaking negatively about independent mortgage brokers?

A    No.

Q    Do you have any knowledge or experience of a retail lender soliciting an independent mortgage broker's clients?

A    No.

Q    In your opinion, are borrowers better off dealing with independent mortgage brokers than retail lenders?

Page 41

A    Yes.

Q    Why is that?

A    Because as I broker, I have the ability to shop their loan with five, 10, 15, 20, 50 different lenders. If you walk into a Bank of America, they have no choice. This is today's rate.  It's on the board right there. That's what you get, take it or leave it.

Q    Got me to look there.

MR. COOK:  Me too.

THE WITNESS:  They looked there.

BY MR. ABDALLAH:

Q    Want to take five?

A    No.  I just want a water.  Let's go.  I'm good.

Q    Take a second to get you some water.

A    I might have to pee.

Q    Let me know.

A    No.  No.  I'm kidding.  Thanks very much. Sorry about that.  Go ahead.  Sorry.

Q    What is your understanding of this lawsuit?

A    What is my understanding of this lawsuit?  Well that's a good question.  I think it's nonsense.

Q    Do you have an understanding of the claims alleged against Kevron in this lawsuit?

A    Yes.

Q    What is your understanding of that?

Page 42

A    That the -- if you send business to Rocket or Fairway, that somehow United Wholesale Mortgage would be hurt by that, so they're suing -- well, at the time, there were three brokers. And I think there's more now, but we happen to be one of them.

Q    When you say there's three brokers, you mean three brokers that UWM brought suit against or three brokers that couldn't do business with -- I'm sorry.

Was that three brokers that UWM sued to your knowledge?

A    Yes.

Q    Okay. Do you recall when Kevron first began doing business with UWM?

A    Well, I would -- I would say no, but I looked it up. It's 1999. So, yes, 1999.

Q    So Kevron's been in business with UWM since 1999?

A    Wasn't it -- was it 2019? 2019, whatever the broker agreement says.

Q    You know -- that's fine. We'll put it in front of you.

A    It wasn't -- it was 20- --

Q    I'm putting the marked exhibit --

A    2019. My mistake.

MR. COOK: You said 1999.

Page 43

THE WITNESS: No, 1919 -- no. 2019. 2019.

BY MR. ABDALLAH:

Q So this is what I'll represent as a Wholesale Broker Agreement between -- if you look at the first paragraph on the first page, which I'll call the preamble, it's between UWM and Kevron, entered as of July 22, 2019; correct?

A Yes.

Q Okay. To your understanding, is that around the time Kevron began doing business with UWM?

A Yes.

Q Why did Kevron decide to do business with UWM?

A I'm sure one of my agents said we should get approved with UWM. So I said get me a broker package. And I filled it out and we got approved with them.

Q Do you recall what agent recommended that to you?

A I have no idea.

Q Was it you that would have initiated contact with UWM?

A Usually, if a rep in my office comes to me and says they want to use a new source, I tell them, if you're going to do business with them, get a broker package and have them send it to me.

Q Would that communication or recommendation to

Page 44

start working with UWM, would that had been a verbal conversation or something in writing?

A    Between me and my loan officer?

Q    Yes.

A    Probably verbal.  I don't remember.  I filled out probably 200 broker packages or over the 35 years. And there -- you know, a loan officer would come in and say, hey, here's a new company, they're great.  They've got a product I need.  Get me the package.

Q    So going back to the wholesale broker agreement that's before you, we have in the legal industry something that's called Bates numbers, a fancy term for page numbers.  You'll see here at the bottom right of the page --

A    Uh-huh.

Q    -- where it says UWM-Kevron 000001, that's a Bates number.  It's similar to a page number.  I'm going to direct you to the last page of the document, Bates No. UWM-Kevron 00008.

A    Uh-huh.

Q    At the bottom of that document, it reads electronically signed 7/22/2019, 6:13 p.m. by Kevin Rhatigan of Kevron Investments, Inc. from 10.10.5.244.

        Do you recall electronically signing this agreement in July of 2019?

Page 45

A     I don't recall, but I'm sure I did.

Q     Okay.  So you don't dispute that you -- that Kevron entered this agreement with UWM?

A     That's correct.

Q     And that this was the first agreement that Kevron had entered about UWM?

A     Yes.  Yes.

Q     And you don't dispute that Kevron agreed to the terms of this agreement with UWM?

A     That's correct.

Q     Did you work with any particular employees at UWM, you know, in the loans that you were involved in?

A     Yes.

Q     Do you recall the names of those employees?

A     I know Jesus.  I don't how say his last name, Hinajosa or something like that.  I believe we had, at least, one other rep.  I know Ken Chapman was a second rep -- I think a second rep.  I vaguely remember a guy named Brian.  I don't remember his name.  And I don't know if Brian was the first contact and then Jesus and then Ken or if there was Jesus and Brian and Ken or Jesus, Ken, I don't know.

Q     What was the nature of your relationship like with Jesus?

A     As far as?

Page 46

Q    Just you know, was -- are these -- so the three folks you mentioned, are they all account executives to your knowledge?

A    Yes.

Q    Okay.  And you know that Ken came after Jesus; right?

A    Pretty sure, yes.

Q    But you don't know where Brian fell in play with those three?

A    I don't even remember if there actually was a Brian.  You guys would probably know better than me.

Q    Okay.  Did you work with any particular UWM employee when entering into the wholesale broker agreement with UWM?

A    No.

Q    Okay.  After Kevron entered the Wholesale Broker Agreement with UWM, how often did Kevron submit loans to UWM?

A    The company in general?

Q    Yes.

A    I don't know.

Q    Okay.  How about yourself?

A    Well, we were doing -- we were doing business with UWM quite a bit.  I would imagine we were -- I would imagine we were submitting one, two, three, four,

Page 47

five loans a month.  I don't know.

Q   For the year 2020, for example, what percentage of loans closed with UWM would have been --

Out of the total amount of loans that Kevron closed, what percentage do you think would have been with UWM?

A   2020, I couldn't even tell you.

Q   How about for 2021?

A   I couldn't -- I couldn't tell you without running reports.

Q   Okay.  Do you have like a ballpark estimate?  Would it be like 30 percent?  50 percent?

A   I -- I -- I don't know.  I'd be lying if I made up a number.  There was a lot of business back then, so I don't know.

Q   Do you know how many loans Kevron closed with UWM during the term of its relationship?

A   No.

Q   Okay.  Do you know how many loans Kevron has closed in total with every lender in the last three years?

A   No.

Q   Do you keep track of those type of figures?

A   I -- I can run reports.  I can tell you I happen to run a report.  My whole company did 19 loans

Page 48

last year.

Q    For 2023?

A    With five people.  So that's how bad the market was.  Give you an idea.  I used to do 20 a month myself.

Q    So bad market, you're talking about high rates and people not buying homes?

A    It died.

Q    Do you attribute the loss of the slow market, particularly with Kevron, at all with its termination -- the termination of the wholesale or broker agreement with UWM?

A    Do I think that had any bearing on it, no.  I think it was an economic thing.  The interest rates went from two and a half, three to six, seven percent within a three-month period.

Q    So you mentioned you could run a report of the loans that Kevron closed.  Do you have a certain software?  Does Kevron use a certain software to manage its operation?

A    Yes.

Q    What software is that?

A    It's called Point.

MR. COOK:  Is that spelled out the way you think it is?

THE WITNESS:  Point, yeah, just P-o-i-n-t.

Page 49

Calyx is the manufacturer, C-a-l-y-x, is the manufacturer.

BY MR. ABDALLAH:

Q    They provide a software for mortgage brokers to run businesses?

A    Yeah, it's a loan processing software.

Q    Does that interplay with other loan software and websites that lenders have, like, UWM's portal, for example or a portal that Sierra Pacific would use or are they independent of each other?

A    They're independent.

Q    And how long has Kevron been using Point?

A    Since the day I opened the company.

Q    Okay.  Does Point provide Kevron employees ability to communicate with other people or its clients or with lenders?

A    No.  It's just a processing software.

Q    Okay.  I'm going to hand you what we'll mark as Exhibit 4.

(Plaintiff's Exhibit 4 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. ABDALLAH:

Q    I'll represent to you that this is Kevron's first amended answer to United Wholesale Mortgage's

Page 50

complaint.

I'm going to direct you to page 5, paragraph 13. And I'll read it. It states, "In July 2019, Kevron elected" -- I'll back up.

UWM alleges in paragraph 13, "In July 2019, Kevron elected to avail itself of UWM's products, services and resources and entered a Wholesale Broker Agreement with UWM. See Exhibit A. The Wholesale Broker Agreement was subsequently amended and agreed to by the parties in 2021, Exhibit B."

At first, the initial answer was, "Defendant admits." And then the amended answer is, "Defendant admits it availed itself of UWM's products, services and resources and entered a Wholesale Broker Agreement with UWM, but denies that it agreed to any amendment of the agreement."

Focusing on the first part of that amended answer that Kevron admits that it availed itself of UWM product, services and resources, what are the UWM products, services and resources that Kevron availed itself of?

A    Just being able to submit loans, do business with them.

Q    Do you know if anyone at Kevron used UWM's Brand 360 service?

Page 51

A    No.

Q    Do you know what the Brand 360 service is?

A    No.

Q    Do you know if anyone at Kevron used UWM's Client Connect service, which automates communications with borrowers?

A    I don't know.

Q    Do you know if anyone at Kevron used UWM's Brand Builder service, which assists with customized marketing materials?

A    No.

Q    Do you know if anyone at Kevron used UWM's marketing calendar, which assists with social media posts?

A    No.

Q    Do you know if anyone at Kevron used UWM's customized video services that markets Kevron to its borrowers?

A    No.

Q    Do you know if anyone at Kevron used UWM's Blink service?

A    No.

Q    Did Kevron use UWM's Ease Doc service?

A    I don't know what that is, no.

Q    It's -- you know, helps -- it's -- I'll

Page 52

represent that it generates customizable document

packages to be sent to borrowers for e-sign.

Do you know if anyone at Kevron used that

service?

A    Not that I'm aware of.

Q    Okay.  Do you know if Kevron or anyone at

Kevron used UWM's Processor Assist services, which

handles like ordering e-mails for services like title

work, insurance, things like that?

A    Not that I'm aware of.

Q    Okay.  Did Kevron use UWM's Virtual E-Closing

service?

A    No.

Q    And do you know if Kevron used the

findamortgagebroker.com service?

A    I don't think so.  I -- I asked Jesus once for

a contact myself.  I didn't use any service.  My

daughter was buying a house in Texas, so I asked him for

a broker in Texas.

Q    I just asked you a series of questions about

services that UWM provides that Kevron may or may not

have used.

Is your answer to those questions that you --

Kevron did not use them or just you don't have knowledge

of anyone at Kevron using them?

Page 53

A    My understanding is I don't know anybody who has used any of those services.  I -- pretty sure that I never used any of those myself.

Q    It is possible that a loan officer or someone employed with Kevron potentially used these services, you just don't know about it; correct?

A    That's a possibility, yes.

Q    I think we heard Marjan testify earlier today that she had used Kevron's like Facebook service for some period and also used their service of sending happy birthday e-mails to clients; correct?

A    I think you said Kevron.  I think you meant UWM?

Q    Yes.

A    She said -- am I supposed to know that she said that?

Q    Sure, yeah, you were sitting in the room.

A    Yeah, okay, yeah, she said it, yeah.

Q    So it's possible?

A    I don't know if that's one of those things --

Q    Sure.

A    -- you were talking about here --

Q    Yeah?

A    -- when you mentioned these names of things, but anyway, sorry, go ahead.

Page 54

Q    No.  My question is, it's possible that these services were used amongst Kevron's employees, you just don't have knowledge of it one way or the other; correct?

A    Yes.

Q    Are you familiar with UWM's All-In Addendum?

A    Yes.

Q    Can you explain what your understanding of the All-In Addendum is?

A    Well, my understanding is that -- that -- that UWM came out with this all-in initiative, that -- that you either work with them -- you cannot work with Rocket or Fairway, but you have to terminate your relationship with them, if you want to work with UWM.

Q    Okay.

A    Are we done with this one, by the way?

Q    For now, yeah, you can just put it to the side.

I'm going to hand you what's been previously marked as Exhibit 3.  And I'll direct you to Bates number page ending in 3457 at the bottom right.  And you'll see there, just above Section 3.04, there's a Subsection X, which states, "Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase and/or funding.  This requirement

Page 55

is limited to Rocket Mortgage, Fairway Independent Mortgage.  UWM will not add any other mortgage lender. If either Rocket Mortgage or Fairway Independent Mortgage acquire a mortgage lender, (an acquired lender), this requirement applies --

THE REPORTER:  Can you read slower?

BY MR. ABDALLAH:

Q    Yeah, I'm sorry.  I'll back up a little bit.

"If either Rocket Mortgage or Fairway Independent Mortgage acquire a mortgage lender (an acquired lender), this requirement applies only on a going forward basis as to the acquired lender and is not effective as to the acquired lender until 30 days after the acquisition is closed."

Is this your understanding of what the All-In Addendum is?

A    Yes.

Q    Okay.  Are you aware of a video streamed on Facebook in March of 2021 that introduced the All-In Addendum to the public?

A    No.

Q    Okay.  So you don't recall watching any type of video regarding the All-In Addendum?

A    I don't know if I saw a video about it or not, so I don't remember a video.  But I'm familiar with it.

Page 56

Q    Okay.  Do you know if anyone else at Kevron watched the video relating to the All-In Addendum?

A    I do not know.

Q    When did you first learn of the All-In Addendum?

A    Whenever it came out, shortly after it came out.

Q    Would you say within hours, within --

So I'll represent to you that it was introduced on March 4th, 2021.

Would you have learned about it within a week?

A    Probably -- yeah, I would say probably within a week or so.

Q    Do you recall how you learned about the All-In Addendum?

A    I don't.

Q    Would you have heard it from somebody else? You read it in a newspaper, received notice about it from UWM?

A    There was probably something that came out from UWM that I saw in an e-mail or some format, but I don't remember exactly.

Q    Okay.  So you recall receiving something from UWM within a week after it was announced on March 4th, 2021 relating to the All-In Addendum?

Page 57

A    I would say -- I would say sometime around that time, whenever it came out, I was aware of it.  I don't know how I became aware of it specifically, but...

Q    Did you inform anyone at Kevron about the All-In Addendum?

A    No.

Q    Do you know if anyone else within Kevron was aware of the All-In Addendum?

A    I would think that they would have probably sometime afterwards become aware of it.

Q    Did you discuss the All-In Addendum with anyone at Kevron in 2021?

A    There were probably some discussions about it, but nothing specific -- well, let me back up.

When this is announced or when I became aware of it when it was announced, I actually reached out to our rep, Jesus, at the time.  And I asked him specifically -- because I said, I have not seen this addendum.  I have not received this addendum.  I have not been asked to sign this addendum.  What's the story?  And he told me, if we didn't get it, then it's either -- I forget the terminology.  He said, "It's either not applicable to you or it doesn't apply to you, so don't worry about."  That's what he told me, so I didn't make a big deal out of it, because I was told by a

representative of United Wholesale Mortgage that if we didn't get it, we didn't sign it and we weren't asked to sign it, then it didn't apply to us.

Q    Was that around the time -- was that conversation with Jesus around the time you learned about it in March 2021?

A    Yes.  And I asked more than once and I also asked other reps.  I believe Jesus -- I want to say it went to Jesus to Ken.  And I initiated the conversation about it.  And I asked about it and I was told the same thing, that if I did not get it and I was wasn't asked to sign it, that it didn't apply to us.

Q    When you spoke to Ken -- so you recall speaking to Ken about --

A    I'm pretty sure I talked to Ken.

Q    Do you recall when that conversation would have taken place?

A    No.

Q    Okay.  Was it in the later part of 2021?

A    Well, it was -- it would have been -- I mean, I don't know when they switched reps --

Q    Uh-huh.

A    -- because I think, the initiative, to the best of my knowledge right now, I think the initiative came out and we were just doing business.  And it might have

Page 59

been a week or two or a month later that I said -- and it might have even been more, might have been two months later, where I said to Jesus, "Jesus, what's the deal with this?  I never saw this.  I never got it.  Was never asked to sign it."  And he told me, "Don't worry about it.  Doesn't apply to you."  So I was like, "Okay, great."  And then sometime in there, he was not our rep anymore.  And then we got a new rep.  So when -- whatever that time is, you guys would probably know better when these reps changed, but within -- I would say within a week or a month, the most, of getting switched to the new rep, I asked that same question.  I was asking it.  I was initiating the conversation.  What is this?  I didn't get it.  I never signed it.  I never agreed to it.  And I was told by both of them, that if we didn't get it, it didn't apply to us.

Q    Okay.  And then their representation was that if you didn't get it, it didn't apply.  So it was conditional on whether you received it or not; correct?

A    I told them, I didn't get it.  I didn't see it.  I wasn't asked to sign it.  No one ever reached out to me to sign it.  And they said, well, if you didn't get it and no one's asked you about it, then it doesn't apply to you.

Q    I think you said you might have received an

Page 60

e-mail from UWM about it in March of 2021?

A    I don't know if I saw it in an e-mail or if it came on -- you know, on the website, where it said something about the initiative or -- I don't remember where I learn about it officially, but I was aware of it.

Q    Okay.  After learning of the addendum, did you implement any rules or guidelines relating to the All-In Addendum within Kevron?

A    No.

Q    Do you recall who within Kevron you would have spoken to about the All-In Addendum?

A    I probably spoke to Michelle about it.  I can't say for sure, but I probably did.

Q    Do you recall what the conversation would have been?

A    No.  Just the same as what we're talking about here.  I would have told her exactly what happened.  I asked Jesus.  He said it's not applicable, so...

Q    Did you talk to any other loan officers or employees at Kevron about the All-In Addendum?

A    (Inaudible response.)

THE REPORTER:  I'm sorry?

THE WITNESS:  I said -- I was waiting.  No, because it -- I was told it didn't apply to us, so it

Page 61

didn't -- it wasn't a thing.

BY MR. ABDALLAH:

    Q    Your communications with Jesus, were those over a phone call?

    A    Mainly, well, he -- probably 50/50, between phone calls and e-mails.

    Q    I'll be more specific.  Your communications with Jesus about the All-In --

    A    It was definitely in a phone call.

    Q    Did you have any communications with anyone at UWM about the All-In Addendum through a form of communication that's in writing, like e-mail or text or some other --

    A    Wouldn't that be great, huh?  I guess we wouldn't be here today.  No.

    Q    No.  Okay.

         Were any communications sent internally within Kevron about the All-In Addendum, like an e-mail or text?

    A    No.

         MR. COOK:  You doing okay?

         THE WITNESS:  Yeah, I'm good.  I don't know if you need a break?

         MR. COOK:  Well, I'm good.

         THE WITNESS:  You drank the soda and the --

Page 62

MR. ABDALLAH:  This is a good time for a break.

THE WITNESS:  You want a break?

MR. ABDALLAH:  Yeah, let's take five.

THE VIDEOGRAPHER:  We are going off the record.
The time is 1:41 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is Media 2.  We're
going back on the record.  The time is 1:50 p.m.

BY MR. ABDALLAH:

Q   Mr. Rhatigan, you testified earlier that you
were aware that -- of other brokers that UWM had brought
suit against; correct?

A   Yes.

Q   Have you ever communicated with anyone at those
brokerages?

A   Yes.

Q   Which brokerage?

A   The one up in northern California, Mid Valley.

Q   Do you recall who you spoke with over there?

A   The owner, I don't know his name offhand.

Q   Was it Charles, Charles Bachelor or something
to that --

A   Chuck.

Q   Chuck?

A   Maybe Chuck, yeah, that sounds right.

Page 63

Q    Do you recall what you spoke to him about?

A    Nothing more than the fact that we were both in this lawsuit.

Q    Have you ever spoken to anyone at America's Moneyline?

A    No.

Q    If you pull out Exhibit 1, the bottom one in the document?

A    The bottom one?

Q    Over there.  I'm going to refer you to paragraph 7.08, which is going to be on page ending in Bates 07.

A    Yeah, no, I got it.  Okay.

Q    Second to last page.

A    Got it.

Q    I know the font is a little small.  I'm just going to read it.

A    Which one is it, you're saying?

Q    7.08.  And I'll read it slowly for the court reporter.  It has the heading, UWM Amendments & Website. Continues, "This agreement, and UWM's policies, procedures, requirements and instructions concerning mortgage loan applications and mortgage loans, including but not limited to those contained in the UWM guide, may be amended by UWM from time to time.  And UWM will

Page 64

endeavor to provide broker with prompt notice thereof, which may occur by posting any such amendments on UWM's website, which broker is required to regularly check and monitor as a condition of this agreement. Broker agrees that the submission of any mortgage loan applications or mortgage loans to UWM, after such amendment shall be broker's agreement to the amendment without further signature or consent of any kind. Any such amendment shall apply to pending, and/or future mortgage loan applications submitted by broker."

Q Is that the first time you read that provision?

A Yes.

Q Okay. How often in the time that you're doing --

In the time that Kevron was doing business with UWM, how often would you or someone at Kevron check or monitor UWM's website for amendments to the wholesale broker agreement?

A Never.

Q Okay. Do you agree, based on the paragraph we read, that Kevron had the obligation to regularly monitor or check UWM's website for amendments to the wholesale broker agreement?

MR. COOK: Let me object to the extent that that calls for a legal conclusion. So form, foundation,

Page 65

but go ahead and answer.

THE WITNESS:  Repeat the question.  Sorry.

BY MR. ABDALLAH:

Q    Would you agree that Kevron had the obligation under the Wholesale Broker Agreement to regularly check and monitor UWM's website for amendments to the Wholesale Broker Agreement?

A    Yes.

MR. COOK:  Same objection.

BY MR. ABDALLAH:

Q    But you don't recall ever doing that; correct?

A    Correct.

Q    Okay.  And you don't know if anyone else at Kevron ever did that; correct?

A    No one would.

Q    Did Kevron submit a mortgage loan application or mortgage loan to UWM after March 4, 2021?

A    Yes.

Q    Do you know the first time after March 4, 2021 when Kevron would have submitted a mortgage loan or mortgage loan application?

A    I'm sorry.  You said did we submit after March 2021 to UWM?

Q    Yes.

A    Yes, I believe we were still submitting loans

Page 66

to UWM.

Q    Do you recall the first time after March 4th of 2021, where Kevron would have submitted a mortgage loan or loan application to UWM?

A    No, not offhand.

Q    Okay.  Was that something you could -- you could learn through your point system software that Kevron uses?

A    Yes.

Q    Okay.  Would you agree that Kevron's submission of a mortgage loan application or mortgage loan to UWM after UWM provided notice of an amendment to the Wholesale Broker Agreement constitutes Kevron's agreement to the amendment?

MR. COOK:  Objection.  Form.  Foundation. Calls for a legal conclusion.

You can answer.

THE WITNESS:  No.

BY MR. ABDALLAH:

Q    Why is that?

A    You have to repeat it again.

Q    So I'll back up.

Do you understand that paragraph 7.08 says -- and it's the starting with the second to last sentence in 7.08, "Broker agrees that the submission of any

Page 67

mortgage loan applications or mortgage loans to UWM after such amendment shall be broker's agreement to the amendment without further signature or consent of any kind"?  Do you --

A    I understand what you're saying there.

Q    Would you agree that Kevron's submission of a mortgage loan application or mortgage loan to UWM after UWM provided notice of an amendment constitutes Kevron's agreement to that amendment?

MR. COOK:  Same objections as before.

You can answer.

THE WITNESS:  I don't know how to answer that. I never saw any amendments or anything.  So I don't know how to answer that question.  I've never seen any other amendments to the contract.

BY MR. ABDALLAH:

Q    Sure.

A    But based on what you're saying here, what you're reading to me, if I understand it correctly, I think my answer is, yes, I think so.

Q    Okay.  Did Kevron ever renew its Wholesale Broker Agreement with UWM after it first entered into the Wholesale Broker Agreement?

A    If they requested it, I believe I would have.

Q    Okay.  Do you recall on how many occasions?

Page 68

A     No.

Q     Do you recall if it happened like yearly every six months?

A     Well, I can tell you that in -- when I started in 1996, going back, we would do one broker agreement and it would -- it would be good for 10, 20 years. There was never any changes or anything.  It's changed now.  Most lenders are doing it every year, an annual recertification.  So I would imagine once a year, I would imagine.

Q     And do you recall renewing Kevron's Wholesale Broker Agreement with UWM between March 4th of 2021 and February 15, 2022?

A     I don't recall, but I imagine if it was requested of me, I would have done it.

Q     Okay.  I'm going to hand you what we'll mark as Exhibit 5.

(Plaintiff's Exhibit 5 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. ABDALLAH:

Q     These are Kevron's responses to United Wholesale Mortgage's Second Request For Admissions. I'll refer you to the second page, Request for Admission No. 13.  "Admit that Kevron" -- states, "Admit that

Page 69

Kevron renewed the Wholesale Broker Agreement between March 4, 2021 and February 15, 2022."  And the response is, "Admitted."

Do you dispute that Kevron renewed the Wholesale Broker Agreement in the time frame?

A    I do not dispute that.  I couldn't say with 100 percent certainty that it was within those dates, but if in fact the renewal came out during that time, then I -- I would say that's accurate.

Q    Okay.  And you would be the one that would have renewed the --

A    That's correct.

Q    Do you recall what the renewal process entailed?

A    No.  Every lender is different.

Q    The UWM process doesn't stick out to you?  It's not something that you recall?

A    No.

Q    Okay.  I'm going to refer you back to Exhibit 3, the one that looks like this.

A    Okay.

Q    So this is a Wholesale Broker Agreement.  It's a screenshot of an online printout.  The preamble says the Wholesale Broker Agreement is between UWM and Westlake Mortgage; correct?

Page 70

A    Yes.

Q    And Westlake Mortgage Group, is that another name that Kevron goes by?

A    That's a DBA.

Q    Okay.  And then it says, "With its principal offices at 2659 Townsgate Road, Suite 115, Westlake Village, California."

Is that Kevron's address?

A    That's correct.

Q    And on the last page of this document, ending in Bates No. 3466, do you see at the bottom of the page, you know, there's an option to submit the application. And it pertains to submitting a renewal package.

Do you see that?

A    I see that.

Q    Do you recall ever submitting an application similar to this, where you would be agreeing to a Wholesale Broker Agreement as part of the renewal process with UWM?

A    I have never seen that document before.

Q    Aside from seeing this document, have you ever, as part of you renewing an agreement with UWM, seen anything like this document or screen that would have a Wholesale Broker Agreement that you would have to agree to?

Page 71

A    Not that I can recall.

Q    So you just don't recall one way or the other?

A    I don't remember seeing -- I've never seen this document before.

Q    Okay.  Or anything like that?

A    Or anything like it.

Q    Is it your testimony that you did not agree to a document like this or you just don't recall?

A    I -- I don't remember seeing this document. That's my testimony.

Q    Do you recall if you ever reviewed a Wholesale Broker Agreement as part of a renewal that you submitted with UWM?

A    No.

Q    Do you have any reason to dispute that you may have agreed to this -- I'm sorry.  Let me strike that.

Do you have any reason to dispute that you agreed to the Wholesale Broker Agreement as part of a renewal you submitted with UWM?

A    I'm trying to think the way you worded that. Do I have any reason to dispute --

Q    We can read it back.

(The record was read as follows:

"QUESTION:  Do you have any reason to dispute that you agreed to the

Page 72

Wholesale Broker Agreement as part of a renewal you submitted with UWM?")

MR. COOK: Object to form.

You can answer.

THE WITNESS: I'm trying to -- I don't know how to answer, because it seems like you -- it was -- you said, do I have any reason to object to agreeing to this, so that's where I'm confused.

BY MR. ABDALLAH:

Q    Sure. I'll rephrase the question.

A    Can you clarify --

Q    Yeah, that's fine.

A    -- what you're asking? Are you asking -- I'll let you restate. I don't know.

Q    That's fine.

If UWM were to say that or took the position that you agreed to a Wholesale Broker Agreement that contained the All-In Addendum as part of a renewal process, would you disagree with that position?

A    If -- if -- I don't know how to answer that question. I -- I do annual renewals with brokers all the time -- with wholesalers all the time. And I don't -- you can't do anything with them, so you have to sign them. So I don't remember seeing this document. If I got an e-mail about a renewal, I would have

renewed. I would have never agreed with the All-In Addendum, because I was told it didn't apply to us. So if they tried to stick it in the contract, like you're saying they're doing here, to every broker as a way of bolstering their legal position, which I believe is what they're doing here, I certainly don't know anything about it. So I -- I had to sign an agreement to continue to do business, so I'm sure I did, but I would have never agreed to that liquidated damages clauses.

Q So you agree that as part of the renewal, you agreed to the current form of the Wholesale Broker Agreement in effect at the time of the renewal?

MR. COOK: Object to form. You can answer. Calls for legal conclusion.

THE WITNESS: I would -- I would say I don't have -- I would say I don't have any choice to modify these forms. I never do. But I would -- so I -- my position is the same, where I've never seen that. And I would have never agreed to the addendum, because I was told it didn't apply to us. So if it was stuck in there as some way, you know, to -- I don't know. I don't know. I would say I disagree.

BY MR. ABDALLAH:

Q If the renewal process -- if part of the renewal process included agreeing to the current form of

Page 74

the wholesale broker agreement, you don't dispute that you completed that renewal process and, in fact, agreed to that current form of the Wholesale Broker Agreement; correct?

MR. COOK: Let me just object to form. Foundation. Calls for legal conclusion.

You can answer to the best you can.

THE WITNESS: I just don't know the answer, because -- I guess -- I guess the answer is yes.

MR. ABDALLAH: Where are the e-mails regarding renewal? Did we take those out? I could be just overlooking it too? Do you need to take a break for any reason?

THE WITNESS: No. I'm good. We can hang.

MR. ABDALLAH: I found them. Actually, no, this isn't them.

THE WITNESS: Do you need to take a break?

MR. ABDALLAH: I know where it is. It's the way it was produced. I remember it was produced as an exhibit to the RFPs.

Q Sir, I'm going to hand you what's marked as Exhibit 6.

(Plaintiff's Exhibit 6 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

Page 75

BY MR. ABDALLAH:

Q   And I'll represent to you that these are Kevron's responses to plaintiff's second request for production.  There are no Bates numbers to these documents.  I'll refer you to Exhibit 1 of this document, which --

A   Does it have a page number?

Q   Kind of halfway through the first page of the exhibit, has like a big redacted block on it?

A   I got you, yeah.

MR. ABDALLAH:  Mr. Cook, I assume the redacted block is simply a redaction of attorney-client communication?

MR. COOK:  I believe that to be the case.

MR. ABDALLAH:  Just to simplify things, I don't necessarily need a privilege log.

Q   Take time to review it, Mr. Rhatigan.

A   I'm good.  You can start at any time.

Q   Do you recall what this document is, Mr. Rhatigan?

A   Never seen it, but it looks like an e-mail from United Wholesale.  I guess it was sent to me on November 8th of 2021.  Says I was -- the company was approved for renewal.

Q   That's the e-mail on the first page of the

Page 76

document. And if you continue through the document, it's a total of four pages. And it's an e-mail chain relating to UWM -- Kevron's renewal of its Wholesale Broker Agreement with UWM; correct?

A    Uh-huh, that's what it appears to be, yes.

Q    Going to page 3 at the bottom, the e-mail starts there, but it continues on page 4. It's an e-mail that was sent that says the following renewal application has been submitted. Company name, Westlake Mortgage Group, submitted person name, Kevron -- sorry -- Kevin Kevin, I assume that means probably Kevin Rhatigan. Submission time, October 20, 2021.

Do you recall if that's the date you may have submitted a renewal application with UWM?

A    I don't recall, but based on this e-mail, if it's accurate information, I would say this is accurate.

Q    This is an e-mail you provided to your counsel; correct?

A    I don't think so. I think you did. I don't know.

Q    This is something that was produced to us from Kevron, so I assume -- if you don't recall, that's fine.

A    No, I don't remember sending it --

Q    It's okay.

A    Just -- you sure it didn't come from you guys

Page 77

to us?  Okay.  All right.

Q   It's fine.  There's a different record that establishes who produced what.

A   Okay.  I don't remember sending it to him.

Q   Going to page 3, October 21, 2021 e-mail requests Kevron to provide additional information in the form of a letter explanation as part of Kevron's renewal?

A   Yes.

Q   And then if you go back to page 2, Kevron provided that explanation relating to a personal loan you made to the company back to 2008 --

A   Correct.

Q   -- when the economy crashed?

A   Sorry.

Q   Then in response to that on November 8th, 2021, which is on the first page, the e-mail confirms that Kevron completed its renewal; correct?

A   Yes.

Q   You don't dispute that Kevron renewed its agreement, correct --

A   I do not.

Q   -- on November 2021?

MR. COOK:  You have to let --

THE WITNESS:  I know.  I know.

Page 78

BY MR. ABDALLAH:

Q    It's fine.

A    Sorry.

Q    We can all be guilty of that sometimes.  I'll refer you to previously marked Deposition Exhibit 2.

Do you recall seeing a screen in a similar form to this as part of the renewal process you completed in October or November of 2021?

A    No.  I've never seen this form before.

Q    Okay.  You can put that aside.

Does Kevron still do any type of business with UWM?

A    No.  We were cut off.

Q    Do you recall how Kevron's relationship with UWM ended?

A    Yes.

Q    How so?

A    I received an e-mail, I think first from the -- your attorneys.  And then -- and then a subsequent letter in the mail after a phone call.

Q    Exhibit 7, I'll hand you what we'll mark as Deposition Exhibit 7.

(Plaintiff's Exhibit 7 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

Page 79

BY MR. ABDALLAH:

Q    To the best of your knowledge, is this the letter you received?

A    Yes.

Q    In this letter, UWM notified Kevron that it breached the Wholesale Broker Agreement by submitting a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway for review, underwriting and/or funding; correct?

A    Yes.

Q    In this letter, UWM terminated the Wholesale Broker Agreement entered with Kevron; correct?

A    Yes.

Q    Prior to receiving this letter, Kevron did not terminate its Wholesale Broker Agreement with UWM; correct?

A    Yes.

Q    Do you have an understanding that Kevron was free to terminate its Wholesale Broker Agreement with UWM at any time with seven days notice?

A    Yes.

Q    Sorry.  I'm cleaning up a little bit.

Between March of 2021 and February 15, 2022, did Kevron submit a mortgage loan or mortgage loan application to Rocket Mortgage for review, underwriting,

Page 80

purchase and/or funding?

A    Yes.

Q    Do you recall how many times?

A    I believe, based on this information, I ran a report and I believe you had said 22, but I think my report showed 29.

Q    I'll hand you what we'll mark as Deposition Exhibit No. 8.

(Plaintiff's Exhibit 8 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. ABDALLAH:

Q    And this is Kevron's Third Supplemental Answers to Plaintiff's First Interrogatories.  Going to the second to last page of the document.  The last page is the certificate of service, which you don't have to worry about.

There's a declaration there about the answers in the interrogatories signed by, it appears to be you, as the president of the company; correct?

A    Yes.

Q    And that's your signature?

A    Yes.

Q    Okay.  And going on to page 3 of the document, Interrogatory No. 3 asks for the period March 1, 2021

Page 81

through February 15, 2022, state the total number of mortgage loans and mortgage loan applications Kevron has submitted to A, Rocket Mortgage and B, Fairway Independent Mortgage.  And Kevron answers 29 for Rocket mortgage and 0 for Fairway; correct?

A    Yes.

Q    Okay.  And the answer's accurate to the best of your knowledge?

A    Yes.

Q    Okay.  So prior to February 15, 2022, Kevron didn't work with Fairway?

A    I had never heard of Fairway before this.

Q    Okay.  Handing you what's marked as Deposition Exhibit No. 9.

(Plaintiff's Exhibit 9 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. ABDALLAH:

Q    I'll represent to you, this was produced as an exhibit to discovery responses we received from Kevron. And, you know, starts with cover page of Exhibit 1.  And then after that, three pages of an e-mail chain between you and Fairway Wholesale Lending.  Then after that, there's an e-mail chain between you and someone with Rocket Mortgage.  So just for your knowledge, this is

Page 82

like two different chains of communication.

A    Understood.

Q    Okay.  We'll start with the second part of that dealing with your communications with Rocket.  And that will be on the fifth page of this eight-page document.  That appears to be correct.

Do you recall what this document is?

A    Yes.

Q    What is it?

A    It's an e-mail from Paul Yatooma to me, just here's my contact information.

Q    Okay.  And kr@westlakemtg.com is your e-mail?

A    That's my e-mail, that's correct.

Q    Who's Paul Yatooma?

A    Frankly, I've never heard of him before.  I think he was a VP of some sort over at Rocket.

Q    Prior to receiving this e-mail, did you have any conversations with Mr. Yatooma?

A    No.

Q    Okay.  In the e-mail, Mr. Yatooma states, "As promised, here's the list of clients that have closed with us since March 2021."

Does that refresh your recollection whether you had any communications with Mr. Yatooma prior to receiving this e-mail?

Page 83

A    Yes, I -- well, I requested from them, based on the lawsuit, a list of clients that they showed that we closed for them.  He sent this list.

Q    Okay.

A    Which is the -- I don't know how many are on here, but he had -- this is from them to me.  And then I ran my own report.  I don't know how many are on here. I can count them.  There's 29 on here.  I don't know -- yeah, actually, I requested from him, based on the lawsuit, if he could give me a list.  And that's the list, there's 29.

Q    So did you reach out to Mr. Yatooma specifically for this list?

A    I -- I prob- -- I'm -- I -- I'm -- I -- I don't know that I reached out.  I'm trying to remember how it transpired.  I don't remember exactly how it transpired, but he -- he called me as he said here, "Thanks for taking the time."  He called me about the suit, you know, sorry to hear about this, whatever.  And in that conversation, I asked him if he would send me the list of the clients, but I don't remember talking to him prior to this.  I, frankly, didn't know who he was.

Q    So after the suit was filed, Rocket Mortgage themselves reached out to you about this suit?

A    Yes.

Page 84

Q    Okay.  And -- was Mr. Yatooma the first person to reach out to you with Rocket Mortgage?

A    I believe so.

Q    Do you know how -- was that by phone call?

A    Yes.  Pretty sure it was a phone call.

Q    What was discussed on that phone call?

A    Just sorry that you're going through this. Sorry this is happening.  I'm sorry that, you know, you're in this position.

Q    Anything else that you recall?

A    Not that I can recall.

Q    Okay.  Did you speak to anyone else at Rocket other than Mr. Yatooma about this lawsuit?

A    Since then?

Q    Yes.

A    I did.  I believe so.  I can't remember who it was.  When they came out with the Bully Shield, they call it, then I reached out to them to see if they wanted to take over the counsel.  And they said they couldn't or whatnot, so I -- I don't remember who that was with, but...

Q    Has or is any other entity or person paying Kevron's cost or fees relating to this lawsuit?

A    No.

MR. COOK:  I was going to object.

Page 85

Attorney-client privilege, but you answered, so...

BY MR. ABDALLAH:

Q    Mr. Rhatigan, I'm asking you a series of questions now, please give like a -- maybe a one Mississippi or two Mississippi before answering to give your counsel an opportunity to object and maybe instruct you not to answer.  I don't want to cross any lines.  I want to respect the boundary of the privilege for this specific -- for all questions, but this one specifically.

You mentioned that when -- at the time the Bully Shields came out, you reached out to Rocket to request that they take over counsel; correct?

MR. COOK:  You can answer that.

THE WITNESS:  Only if you say so.  I don't have to look at you at every question.  Yes.

BY MR. ABDALLAH:

Q    Okay.  And they declined to do so?

A    Yes.

Q    Okay.  Was that the last communication you had with Rocket about them taking over counsel, providing a defense?

A    Yes.

Q    Has Rocket ever provided any type -- has Rocket covered any cost or fees or made any promises to cover

Page 86

any costs or fees relating to lawsuit?

A    No.

Q    Has anyone, any other entity or person, covered any costs or fees or made a promise to cover any costs or fees relating to this lawsuit?

A    No.

Q    Okay.  So you mentioned communication with Mr. Yatooma at the time, where he reached out to you and you got the e-mail.  You also mentioned communication you had about Rocket, relating to the Bully Shield, relating to the -- this lawsuit, the All-In Addendum, have you had any other communications with Rocket that you recall?

A    No.

Q    Correct me if I'm wrong, the chart on the last page of this e-mail that you -- not the last page, but the second to last page of this e-mail, that you received from Mr. Yatooma, to your understanding, this is Rocket's record of -- it's a chart essentially of the mortgage loans or mortgage loan applications that Kevron submitted to Rocket for review, underwriting, purchase and/or funding between March 2021 through February 15, 2022?

A    Yes.  And do you want to point something out here?

Page 87

Q    Sure.

A    I remember when I got this list.  And one of the things was that these first three loans were in March and April.  And I think that was one reason why I thought maybe it wasn't 29, because there was a -- from what I remember, something that said something about -- from UWM stating that if loans were in the pipeline already, then you're not going to get charged for that or something.  So I think the lawsuit was 22.  This was 29.  And I looked and I saw, well, there's three that were in March and April, which were probably in the pipeline, but I can't say for sure.  But to answer your question, this document was requested by me from them and this is what they sent me.

Q    Does Kevron still do business with Rocket?

A    Yes.

Q    How often?

A    Well, as mentioned previously, we're hardly doing any business.  So there's -- I don't know that -- I don't know that we closed one loan with them this year, to be quite frank with you.  I have no idea.

Q    The same exhibit, Exhibit 9, the first part of it is an e-mail chain you have with Fairway Wholesale Lending; correct?

A    Yes.

Page 88

Q    And the first e-mail, it's on page 2 of the document.  The first e-mail is dated February 24th, 2022; correct?

A    Yes.

Q    That's after UWM terminated its relationship with Kevron; correct?

A    Yes.

Q    Did you -- after the termination, did you seek to do business with Fairway?

A    No.

Q    Did they reach out to you to do business with them?

A    Yes.

Q    Okay.  Have you done business with them?

A    No.

Q    Okay.  Did they reach out to you personally or someone else at Kevron?

A    I'm sure they reached out to me personally.

Q    Can you -- was it by e-mail or phone call?

A    No, to the best of my recollection, it was Josh, this guy here, who called me.  He was another VP over there.  Very same, similar conversation to the Rocket.  I'm sorry you're involved in this.  This is a tragic -- what they're doing is ridiculous, blah, blah, blah.  And then I said, well, you know, maybe send me a

Page 89

broker package, you know, I'll get set up with you guys,

because I just lost a big source in UWM.  And I said

I've never heard of Fairway before in the past, but I

mean, I guess you guys are a big company, because UWM is

naming you in this suit.  So maybe I ought to do

business with you.  They sent me the package.  I never

did anything with it.  The market was terrible.  We

weren't doing any business.  There's no reason for me to

bring on more wholesale lenders, when we had no business

to send to anybody.

Q    I'm going to hand you what we'll mark as

Deposition Exhibit No. 10.

(Plaintiff's Exhibit 10 was marked for

identification by the Certified Shorthand Reporter and

attached hereto.)

BY MR. ABDALLAH:

Q    I'll represent this is a document that was

produced to UWM by Kevron.

Does this document look familiar to you?

A    Yes.

Q    What is this document?

A    This is a report I ran on the processing

software of all the loans I sent to Rocket between the

time frame requested.

Q    And this is a report generated through the

Page 90

Point software?

    A    Correct.

    Q    You created this document?

    A    I did.

    Q    Okay.  And this is based on internal information that Kevron inputs into the Point software?

    A    Yes.

    Q    Does this chart reflect all the mortgage loans or mortgage loan applications submitted to Rocket Mortgage for review, underwriting, purchase and/or funding between March 2021 through February 15, 2022?

    A    Yes.

    Q    Are there any other loans that fall within that category, not accounted for on this sheet?

    A    No.

    Q    So this -- your -- we previous talked about interrogatory response, where you identified 29 loans. That was based off this chart?

    A    Yes.

    Q    Is this chart part of a larger document?

    A    No.

    Q    I've noticed that -- you know, I see there is row number starting from 52 through 80.  So I'm just curious to know what are 1 through 51 and anything after 80?

Page 91

A    Clarify, yes.  This is a report that was broken down by lenders.  So what's not here would have been loans that went to other lenders.  This was only to Rocket.

Q    Okay.  Is the report generated for the specific time frame only?

A    Yes.

Q    Okay.  So loans that closed with UWM prior to March 2021 wouldn't have been in this report; is that correct?

A    Say again.

Q    Loans that closed were submitted -- I'm sorry.  Strike that.

Loans that were closed or submitted with Rocket prior to March of 2021 would not have been in this document that you generated; is that correct?

A    That's correct.  This document is only for the time frame that was requested, whatever the dates were, that's what this is.

Q    Skipping some things to save you time.

THE REPORTER:  Could we take a quick restroom break?

MR. ABDALLAH:  Of course.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:31 p.m.

Page 92

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is -- this is Media 3. We're going back on the record. The time is 2:43 p.m.

BY MR. ABDALLAH:

Q We're back on the record. Mr. Rhatigan, I'm going to hand you what we'll mark as Deposition Exhibit No. 11.

(Plaintiff's Exhibit 11 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. ABDALLAH:

Q And I'll represent to you, these are Kevron's First Amended Affirmative Defenses to United Wholesale Mortgage's Complaint.

A I'm sorry. Was there a question?

Q No, not yet.

A Okay. Sorry.

Q So as part of your 30(b)(6) notice, we asked that you be prepared to discuss the factual legal basis for your affirmative defenses. We're going to kind of go through these right now.

Start with Affirmative Defense No. 3, where it says, Plaintiff's -- you understand that plaintiff's means United Wholesale Mortgage?

A Okay.

Page 93

Q    "Plaintiff's claims are barred in whole or in part because defendant, being Kevron, committed no breach of the agreement."

Can you state Kevron's factual basis that it did not breach the agreement?

MR. COOK:  Let me just place an objection to the extent that calls for any kind of legal discussion, but obviously go ahead and provide that factual basis as you understand it.

THE WITNESS:  Well, because I mean, simplest terms, I was told that it didn't apply to me.  The All-In Addendum did not apply to me, to my company.  And we never received it and never got it, never signed it.  And so couldn't breach a contract that I didn't agree to.

BY MR. ABDALLAH:

Q    Are those the only reasons to your knowledge?

A    I mean, I'm sure there's other legal things, but I'm not an attorney.

Q    Sure.  We're focusing on factual reasons that you may not have committed a breach of the agreement?

A    Not that I know offhand.

Q    Sure.

Going on to Affirmative Defense No. 3, "Plaintiff's claims are barred because there is no

Page 94

acceptance or meeting of the minds, which prevents formation of a valid contract."

Do you understand what meeting of the minds means?

A    Yes.

Q    What -- what is Kevron factual basis for Affirmative Defense No. 3?

A    Well, it's my understanding that in order to have a contract, you have to have an agreement with -- parties, that they both agree to -- both parties have to agree to it.  So there is no meeting of the mind, because my mind does not agree with your mind.

Q    So is the statement for affirmative -- your statement for Affirmative Defense No. 2, that you don't believe that Kevron agreed to the All-In Addendum?

A    That's, yes.

Q    Okay.  Affirmative Defense No. 4 states, "Plaintiff's claims are barred because the contract it seeks to enforce is substantively and procedurally unconscionable."

Can you state what is unconscionable about the contract?

MR. COOK:  Let me just object.  I think he's asking a legal question, which I think is improper, but you can answer to the extent you understand.

Page 95

THE WITNESS:  I think the addendum is illegal. I think it's illegal, I think it's unethical.  I think it's immoral.  I think it's anti-competition.  I think it's steering.  I think it's numerous things.  And just flat out wrong.

BY MR. ABDALLAH:

Q    Why do you think that the contract is all those things?

A    Because what you're saying is, if you do business with just these two particular companies, you're -- you're limiting my ability as a broker, which my job as a fiduciary, fiduciary responsibility, is to my client.  So my ability is being limited.  And, again, I just believe it to be based on everything that transpired in 2008.  Everything that we were told in the Dodd-Frank laws about steering, about illegal, unethical, just it's just wrong.  The addendum is just wrong.

Q    What about the addendum to you makes you think that it partakes in steering?

A    Because it's -- it's saying you work with us, or, basically, even though they're only naming two companies, they're basically saying, you work with us, nobody else.  We want you to work with us.

Q    So your understanding of the All-In Addendum,

Page 96

that it means that brokers could only work with UWM and no other lender?

A   No, that's not my understanding.  My understanding of the addendum clearly it's that they're trying to limit my ability to work with two lenders, who are on two -- I'm guessing Fairway is a large lender, but two of the larger companies in the country, and they're limiting my ability to represent my client in the best possible way by not allowing me to work with them.

Q   You do understand that the All-In Addendum is limited only to Rocket and Fairway; correct?

A   Yes.

Q   Kevron is otherwise -- was otherwise free to work with any other lender other than those two; correct?

A   Yes.

MR. COOK:  Object to foundation.  I think that assumes there was a contract in dispute, but --

THE WITNESS:  Yes.

BY MR. ABDALLAH:

Q   Moving on to Affirmative Defense No. 6, "Plaintiff is not entitled to recover damages from defendant because plaintiff has failed to mitigate its damages."

Page 97

What knowledge does Kevron have of UWM's damages relating to the All-In Addendum or breaches of the All-In Addendum?

MR. COOK:  I'd just object.  I believe this is asking for a legal opinion or legal question from this witness, who is not a lawyer, but you can answer to the extent that you understand it.

THE WITNESS:  Plaintiff is not entitled to recover damages -- not quite sure, plaintiff has failed to mitigate its damages, what that means.

BY MR. ABDALLAH:

Q    If you don't understand what it means, we can move on.

A    Yeah, we can move on.

Q    Are you unable to answer the question?

A    I'm unable to answer the question.

Q    Do you understand what the term estoppel means?

A    Could probably Google it.

Q    Sitting here today?

A    Sitting here today right now, not exactly.

Q    That's fine.

Do you understand what the term -- the phrase lack of consideration means?

A    My understanding about lack of consideration is -- consideration is considered anything of value,

Page 98

money or --

Q    So Affirmative Defense No. 8 states, "Plaintiff's claims are barred for lack of consideration."

Do you know Kevron's factual basis for Affirmative Defense No. 8?

A    No.

Q    Okay.  Affirmative Defense No. 10 states, "Plaintiff's claims are barred because there's an impossibility."

Do you understand what an impossibility means in this scenario?

MR. COOK:  Let me just object.  He's asking for a legal opinion from somebody who's not a lawyer.  I think the question is improper, but do the best you can to answer.

THE WITNESS:  No, I don't know what that means.

BY MR. ABDALLAH:

Q    Okay.  Affirmative Defense No. 11 states, "Plaintiff's claims are barred, because the contract is ambiguous."

What part of the contract is or what part of the contract is ambiguous to you?

MR. COOK:  Same objection.

You can answer.

Page 99

BY MR. ABDALLAH:

Q    Let me back up.

When it says contract, what contract do you believe is being referenced?

A    The Wholesale Broker Agreement.

Q    Okay.  And when you say Wholesale Broker Agreement, is that the Wholesale Broker Agreement that -- the Wholesale Broker Agreement that includes the All-In Addendum or does not include the All-In Addendum?

A    Does not does include the All-In Addendum.

Q    Okay.  What about the Wholesale Broker Agreement that does not include the All-In Addendum? For example, Exhibit 1, is ambiguous to you?

MR. COOK:  Same objection.

You can answer.

BY MR. ABDALLAH:

Q    Or to Kevron?

A    I don't know.

Q    Okay.  Is there anything about the All-In Addendum, the language we read earlier today, that's ambiguous to Kevron?

MR. COOK:  Same objection.

You can answer.

THE WITNESS:  No.

///

Page 100

BY MR. ABDALLAH:

Q    Affirmative Defense No. 14 states, "Plaintiff's claims are barred because it did not suffer any damages."

Can you state Kevron's factual basis for Affirmative Defense No. 14, if you know?

MR. COOK:  Same objections.

You can answer.

THE WITNESS:  Yes.  I don't believe they suffered any damages by loans going to Rocket or Fairway for that matter.

BY MR. ABDALLAH:

Q    Okay.  Do you have any knowledge for that belief or is it just --

A    Do I have any knowledge?

Q    Yeah, I mean, do you base that belief off of certain facts?

A    I've based that on my 35 years of experience in the industry that you could broker loans to hundred different places.  I don't know why they have damages if you just send it to one of these two.

Q    Do you believe --

Would you agree that an independent mortgage broker that submits and closes a loan with a lender that also has a retail channel helps the retail lender's

Page 101

business succeed?

MR. COOK:  Object to form.

You can answer.

THE WITNESS:  No.

BY MR. ABDALLAH:

Q    Would you agree that UWM incurs costs to do business with Kevron that it otherwise wouldn't have occurred had -- had the agreement with Kevron been terminated after All-In announced?

MR. COOK:  Object to form and foundation.

You can answer, if you know.

THE WITNESS:  I think no, if I understood the question.

BY MR. ABDALLAH:

Q    Sure.  So you don't think that UWM incurs costs to do business with Kevron?

MR. COOK:  Object to form or foundation.  You can answer.

THE WITNESS:  I would say there may be costs to have, you know, one more company added into their portal, a tech guy who's on payroll and we've got to add this company on, but I -- no, I don't think there's any -- is there some costs?  Probably to have a tech IT guy add us to the portal, but I don't think there's any costs otherwise.

Page 102

BY MR. ABDALLAH:

Q    Do you know if UWM did not enforce its All-In Addendum, do you believe that UWM would suffer a loss of goodwill with brokers who otherwise complied with the addendum?

MR. COOK:  Object to form.  And you can --

THE WITNESS:  If they -- say it again.

BY MR. ABDALLAH:

Q    If UWM did not enforce its All-In Addendum, do you believe that UWM would suffer a loss of goodwill with brokers who complied with the amendment?

MR. COOK:  Same objection.

You can answer.

THE WITNESS:  No.

BY MR. ABDALLAH:

Q    Are you aware of any public policy reasons that would cause the All-In Addendum to be unenforceable?

MR. COOK:  Objection.  It calls for a legal conclusion and form.  Foundation.

You can answer, if you know.

THE WITNESS:  No.  It's just the same thing I talked about, is that the -- 2008, when the market crashed and all the laws came into place, we are held to a higher standard.  And we have to do what's right for our client.  We have a fiduciary responsibility to our

client. And that's getting them the best we can. So I think that's a public policy thing.

BY MR. ABDALLAH:

Q   Are you familiar with the term promissory estoppel?

A   Not exactly.

Q   Okay. Affirmative Defense No. 17 states, "Plaintiff's claims are barred because there was improper notice of any alleged breach."

Can you state Kevron's factual basis for believing that there was improper notice of an alleged breach?

A   Yes. Exactly, what I had stated previously. And that was that I was never received any notice. I never received the addendum. I never received anything about -- well, I never received the addendum. And I had asked specifically numerous times and was told numerous times that it didn't apply to us, if we didn't get it.

Q   Well, you also testified that you didn't regularly check UWM website for amendments; right?

MR. COOK: Objection. Asked and answered.

BY MR. ABDALLAH:

Q   You can answer.

MR. COOK: You can answer.

THE WITNESS: I was waiting for him to tell me

Page 104

I can answer.

Say it again?

MR. ABDALLAH:  Can we get a read back?

(The record was read as follows:

"QUESTION:  Well, you also testified that you didn't regularly check UWM website for amendments; right?")

THE WITNESS:  Yes.

BY MR. ABDALLAH:

Q    And you also testified -- I believe that you may have received an e-mail about the amendment, but you just -- you don't recall one way or the other?

A    No.  I never received an e-mail about the addendum, All-In Addendum, specifically.

Q    Did you receive an e-mail potentially -- do you recall receiving an e-mail about the All-In -- the All-In initiative or the restriction to do business with Rocket or Fairway?

A    I don't believe I received an e-mail specifically about that.

Q    Okay.  You agree that Kevron provided notice of breach in that termination letter that we looked at earlier today; correct?

A    That Kevron received notice of breach?

Q    In the termination letter that we looked at earlier today?

MR. COOK:  Let me just object to form.  You can answer.

BY MR. ABDALLAH:

Q    Exhibit No. 7.

A    Yeah, I agree to that.

Q    Okay.  Affirmative Defense No. 18 states, "Plaintiff's claims are barred because it did not perform its condition precedent."

Are you -- do you know what condition precedents were in place that UWM had to perform?

A    No.

Q    Do you know what the term unjust enrichment means?

A    No.

Q    Is Kevron still --

This is for you, Mr. Cook.  Is Kevron still disputing venue or jurisdiction, personal jurisdiction at this stage of litigation?

MR. COOK:  I don't think so, but I'm not going to commit to it right now.

MR. ABDALLAH:  I'll skip over those.  You took the position otherwise in writing, so...

Q    Affirmative Defense No. 23 states, "Plaintiff's

Page 106

claims are barred because its liquidated damages clause is an unenforceable penalty."

Do you know what liquidated damages are?

A    Yes.

Q    Can you state Kevron's factual basis for Affirmative Defense No. 23?

MR. COOK:  Just object.  I believe this calls for a legal question.  Mr. Rhatigan is not a lawyer, but you can answer nonetheless and provide your lay opinion.

THE WITNESS:  Okay.  Yes, I don't -- I don't believe -- I have never seen a liquidated damages in a wholesale agreement, so I don't -- I don't know how anybody could validate a liquidated damages clause in a mortgage wholesale contract.

Q    Why does Kevron believe that?  Do you understand -- going back to Exhibit 3, if you could pull that out.  On the last page, Section 7.30, that's Bates numbers page ending in 3466.

So you're familiar that, along with the All-In Addendum, there was a liquidated damages clause that -- for breaching the All-In Addendum; is that correct?

MR. COOK:  Object to form.

You can answer.

THE WITNESS:  Sorry.  Say it again.  I was --

///

Page 107

BY MR. ABDALLAH:

Q    Are you aware that as part of the All-In Addendum, a clause was added to wholesale broker agreement relating to breaches of the All-In Addendum?

MR. COOK:  Sorry.  Object to form and foundation.

You can answer.

THE WITNESS:  No.

BY MR. ABDALLAH:

Q    Okay.  So going to the last page of the document before you, Exhibit Number 3, Section 7.30, if you could take time to read that and let me know if that's the first time you become aware of that provision?

A    Yes.  Other than earlier, I would question -- when was this document created?  I don't see a date on it.

Q    Sure.

This was part of -- I'll represent that this was the document you agreed to as part of the renewal. So are you asking when --

A    Well, when was the --

MR. COOK:  I was going to say, you can't represent that.  That's part of the foundation of the lawsuit.

Page 108

MR. ABDALLAH:  Okay.  He's asking me a question.

Q    Your testimony is evidence here.  I can represent something, but if your counsel is going to object, that's fine, but I'd ask that you withdraw the question maybe.

My question to you is, if you can read the liquidated damages provision in 7.30, just let me know, is it the first time you become aware of this liquidated damages provision?

A    Yes.  Can I not ask when this document was created?  I don't see a date on it.

MR. COOK:  Unfortunately --

THE WITNESS:  I'm not allowed to ask?

MR. COOK:  Unfortunately, the questions in deposition only go one way.  You do not get to ask the attorneys questions.

THE WITNESS:  Never mind.

BY MR. ABDALLAH:

Q    I don't mean to disrespect you in any way.

A    No.  No.  Fine.  I've been told.  Put that one away.

Q    So do you have a basis to state why Kevron is of the position that the liquidated damages clause you just read is an unenforceable penalty?

Page 109

MR. COOK: Objection. This calls for a legal opinion and legal conclusion. Mr. Rhatigan's not a lawyer, but you can answer and give your lay opinion.

MR. ABDALLAH: As the corporate representative of the company.

THE WITNESS: As I've stated numerous times, I asked about the All-In Addendum. I was told it didn't apply to us. I have never seen anything about it, these documents that you're showing me today are the first things I've seen about being in the contracts. I -- I don't know how you can add a liquidated damage clause in this type of contract. There are liquidated damages clauses in real estate transactions and other type of transactions, but I -- I -- I don't believe the addendum is legal. And if it's an illegal addendum and a legal contract, they're unenforceable.

BY MR. ABDALLAH:

Q    Okay. And is that your sole basis for believing it's an unenforceable penalty?

A    Probably.

MR. COOK: Same objection as before.

Go ahead.

THE WITNESS: I probably have others, but I think that's the basic one.

///

Page 110

BY MR. ABDALLAH:

Q    What are the others that you have?

A    I don't know.  I'd have to think about it.

Q    So you can't answer that sitting here today?

A    Not right now.

Q    Okay.  We're done with that document, both documents.

Going back to Exhibit 4, it's going to be the -- Kevron's First Amended Answer to Plaintiff's Complaint.  I'm going to direct you to page 7, paragraph 19.  The allegation reads, "In November 2021, Kevron agreed to the most recent iteration of the All-In Addendum, specifically paragraphs 3.03(x) and 7.30 of the agreement."

And the answer is, "Defendant denies the allegations contained in this paragraph as untrue."

Do you know what the basis for Kevron's denial of this paragraph is?

MR. COOK:  Object.  This calls -- partially a legal question, but you can still answer and give your lay opinion, Kevin.

THE WITNESS:  Well, I can only go back to the same thing.  I was told it didn't have any -- never received it, never asked to sign it, never got it, never saw it, so it didn't apply to us.  So you're saying --

Page 111

you're asking it, if I agreed to the most recent iteration of the All-In Addendum, I never received it, so I can't agree to something I never received.

BY MR. ABDALLAH:

Q    Going back to your conversations with Mr. Yatooma from Rocket Mortgage, did Mr. Yatooma or anyone at Rocket ever offer to help Kevron or you with this lawsuit?

A    No.

Q    And you also testified about Rocket's Bully Shield, how did you learn about Rocket's Bully Shield?

A    Through either e-mail or probably an e-mail on their website.  I don't remember exactly.

Q    Have you spoken with anyone else, whether it be someone at Rocket or any other person in the industry, being independent mortgage broker or otherwise, who Rocket's provided Bully Shield to?

A    No.

Q    Would you agree that the process of renewing UWM broker agreement was an electronic online process?

A    Yes.

Q    And when you renew agreements, do you typically read every part of the renewal or do you just kind of go through the process and click submit?

A    Not a word.

Page 112

Q    You mentioned that there are liquidated damages clauses and other contracts that you see or dealt with.

What type of contracts are you referring to?

A    Real estate contracts mainly.

Q    Okay.  Was that, for example, like, you know, someone backs out -- a deposit that's gone hard and then someone backs out of the deal?

A    Correct.

Q    And that's something you see commonly in the industry?

A    It is --

Q    That's the clause, not that it's actually happening?

A    Yes.  The clause is preprinted in the contract.

Q    Are liquidated damages clauses also common in the lending industry?

A    No.

Q    Have you communicated, other than Mid Valley, who we already talked about, have you communicated with any other mortgage brokers or correspondent lenders regarding the All-In Addendum?

A    Yes.

Q    Who?

A    I don't know, but I -- specifically, but I was contacted by the press, the Detroit Free Press, for a

Page 113

statement.  Frankly, she called me and asked me about the lawsuit.  And I hadn't been served, so I didn't know what she was talking about.

Q    Have you spoken to anyone else about the lawsuit or the All-In Addendum?

A    There was another -- there was another press person.  There were two press people.  I don't remember who the second one was with.  I don't think I ever talked to her.  I think she left me a voicemail and wanted an opinion.

Q    Anybody else?

A    Yes.  There were a couple of people.  I don't remember specifically, who had reached out to me, who -- who -- who were maybe concerned that they were going to get dragged into the lawsuit as well.

Q    Do you recall who those people were?

A    Not offhand.  It was shortly after it happened, after the lawsuit came in.

Q    Do you recall -- strike that.

Is there anything about Kevron's agreements with other mortgage lenders that you believe are relevant to this lawsuit?

A    No.

Q    Let's take a five-minute break.  I might be done.  I just want to confirm.

Page 114

MR. COOK:  Okay.

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are going off the record. The time is 3:10 p.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  This is Media 4.  We're going back on the record.  The time is 3:14 p.m.

BY MR. ABDALLAH:

Q   I have no further questions for you today, Mr. Rhatigan.


EXAMINATION

BY MR. COOK:

Q   All right.  Kevin, I do have a few questions for you.  I want to point you to Exhibit 1, which should be the Wholesale Broker Agreement.

Okay.  You have that in front of you?

A   Yes.

Q   Okay.  So this is the Wholesale Broker Agreement between UWM and Kevron, that's dated July 22nd, 2019; right?

A   Yes.

Q   Okay.  And did you electronically sign this document?

Page 115

A    Yes.

Q    All right.

Did you negotiate this document at all?

A    No.

Q    Were you represented by counsel when you negotiated this document or signed this document?

A    No.

Q    Are agreements like this that are boilerplate common in the industry?

A    Yes.

Q    Are they -- is it kind of take it or leave it type of situation?

A    Yes.

Q    Okay.  I'm not sure.  Can you look at Exhibit 3, which is this document right here.  You see Exhibit 3?

A    Yes.

Q    Okay.  You were asked about a renewal.  I believe you acknowledged you did renew the Wholesale Broker Agreement with United Wholesale Mortgage; is that right?

A    Yes.

Q    When you renewed that agreement, did you believe you were renewing it in the form of Exhibit 1 or Exhibit 3?

Page 116

A    Exhibit 1.

Q    Was Exhibit 3 ever presented to you by United Wholesale Mortgage based on what you remember?

A    No.

Q    Okay.  Did you ever have any discussions with anyone at United Wholesale Mortgage about a liquidated damages clause?

A    No.

Q    Did anyone at United Wholesale Mortgage ever come to you and say they wanted to modify the original Wholesale Broker Agreement in Exhibit 1?

A    No.

Q    Okay.  All right.  I think that's all the questions I have.


                    FURTHER EXAMINATION

BY MR. ABDALLAH:

Q    Just one question.

     Exhibit 1, nobody forced you to enter into the wholesale agreement in July 2019?

A    No, absolutely not.

Q    No further questions.

     MR. COOK:  Done.

     THE VIDEOGRAPHER:  This concludes the

Page 117

deposition of Kevron Rhatigan.  We're going off the record.  The time is 3:16 p.m.

(Whereupon the deposition concluded at 3:16 p.m.)

(DECLARATION UNDER PENALTY OF PERJURY ON THE FOLLOWING PAGE HEREOF.)

Page 118

CERTIFICATION OF COURT REPORTER

FEDERAL JURAT

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

That before completion of the deposition, a review of the transcript [x] was [  ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name

Dated May 3, 2024

Certificate Number 9726

Page 119

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 8, 2024

To: William S. Cook, Esq.

Case Name: United Wholesale Mortgage, LLC. v. Kevron Investments, Inc.

Veritext Reference Number: 6596222

Witness:  Kevin Rhatigan, 30(b)(6) and Individually

Deposition Date:  4/17/2024

Dear Sir/Madam:

The deposition transcript taken in the above-referenced matter, with the reading and signing having not been expressly waived, has been completed and is available for review and signature.  Please call our office to make arrangements for a convenient location to accomplish this or if you prefer a certified transcript can be purchased.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 120

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6596222
CASE NAME: United Wholesale Mortgage, LLC. v.
Kevron Investments, Inc.
DATE OF DEPOSITION: 4/17/2024
WITNESS' NAME: Kevin Rhatigan, 30(b)(6) and Individually
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.


_____          _____
Date                      Kevin Rhatigan, 30(b)(6)
                          and Individually
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.


_____
Notary Public
_____
Commission Expiration Date

Page 121

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 6596222
        CASE NAME: United Wholesale Mortgage, LLC. v.
                   Kevron Investments, Inc.
        DATE OF DEPOSITION: 4/17/2024
        WITNESS' NAME: Kevin Rhatigan, 30(b)(6) and Individually
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
        I request that these changes be entered
as part of the record of my testimony.

        I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____          _____
Date                       Kevin Rhatigan, 30(b)(6)
                           and Individually

        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
            in the appended Errata Sheet;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.
        I have affixed my name and official seal
this _____ day of_____, 20_____.
                 _____
                 Notary Public

                 _____
                 Commission Expiration Date

Page 122

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 6596222

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____          _____

Date                     Kevin Rhatigan, 30(b)(6)

                         and Individually

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

              _____

              Notary Public

              _____

              Commission Expiration Date

**[& - 2:43]**

**&**

**&**  3:13 63:20

**0**

**0**  81:5
**000001**  44:16
**00008**  44:19
**07**  63:12
**08**  15:20 17:3
**09**  15:20

**1**

**1**  5:12 8:10
63:7 75:5
80:25 81:21
90:24 99:13
114:16 115:24
116:1,11,20
**10**  5:4 22:5
23:17 31:23
41:4 68:6
89:12,13 98:8
**10.10.5.244.**
44:23
**100**  3:4 38:14
69:6
**10395**  1:6 2:6
6:17
**11**  5:5 92:7,8
98:19
**1100**  119:1
**114**  4:6
**115**  70:6
**116**  4:5
**125**  3:8

**12:38**  2:21 6:5
**13**  50:3,5 68:25
**14**  100:2,6
**15**  22:5 23:16
23:17 34:22,22
38:18 41:4
68:13 69:2
79:23 81:1,10
86:22 90:11
**15055**  118:21
**17**  1:17 2:22
6:1 103:7
**17197**  3:14
**17th**  6:6
**18**  34:22 105:8
**1820**  119:2
**19**  24:3 47:25
110:11
**1919**  43:1
**1977**  13:11
22:25 23:2,23
**1980**  23:4
**1987**  14:10
**1990**  15:3,5,15
16:24 17:10
18:12
**1996**  17:25
18:12 19:17,20
68:5
**1997**  19:20,21
23:23
**1999**  42:15,15
42:17,25
**1:41**  62:5

**1:50**  62:8

**2**

**2**  5:13 38:10
62:7 77:10
78:5 88:1
94:14
**2/15/22**  4:19
**20**  29:4 34:4
35:23 38:14
41:4 42:22
48:4 68:6
76:12 120:16
121:22 122:22
**200**  44:6
**2008**  16:5,14,20
16:21 77:12
95:15 102:22
**2009**  16:6,14
**201**  3:14
**2011**  35:20
**2019**  42:18,18
42:24 43:1,1,7
44:25 50:3,5
114:22 116:21
**2020**  47:2,7
**2021**  26:15,19
35:22,23 40:3
40:4 47:8
50:10 55:19
56:10,25 57:12
58:6,19 60:1
65:17,19,23
66:3 68:12
69:2 75:23
76:12 77:5,16

77:23 78:8
79:23 80:25
82:22 86:22
90:11 91:9,15
110:11
**2022**  28:20,20
68:13 69:2
79:23 81:1,10
86:23 88:3
90:11
**2023**  31:2 48:2
**2024**  1:17 2:22
6:1,6 118:23
119:4
**21**  77:5
**216-523-1313**
119:3
**22**  43:7 80:5
87:9
**22nd**  114:22
**23**  105:25
106:6
**248**  3:5
**24th**  88:2
**2651**  8:25
**2659**  70:6
**281**  3:9
**29**  80:6 81:4
83:8,11 87:5
87:10 90:17
**2:22**  1:6 2:6
6:17
**2:31**  91:25
**2:43**  92:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[2s - abdallah]**                                                                                 Page 2

**2s**  31:23

**3**

**3**  5:15 54:19
69:20 76:6
77:5 80:24,25
92:2,22 93:24
94:7 106:16
107:11 115:15
115:16,25
116:2 118:23
**3.03**  110:13
**3.04**  54:21
**3/21/1959**  13:5
**30**  1:15 2:17
7:23,25 8:10
23:6 36:9 37:6
38:14,17 47:12
55:13 92:18
119:8 120:4,9
121:4,13
122:20
**30950**  2:22
6:19
**313**  3:15
**327-3100**  3:15
**3457**  54:20
**3466**  70:11
106:18
**35**  36:9 44:6
100:18
**360**  50:25 51:2
**3:10**  114:4
**3:14**  114:7
**3:16**  117:2,5

**4**

**4**  4:13 49:19,20
65:17,19 69:2
76:7 94:17
110:8 114:6
**4/17/2024**
119:9 120:3
121:3
**400**  3:4
**44114**  119:2
**48084**  3:5
**48152**  3:14
**49**  4:13
**4th**  56:10,24
66:2 68:12

**5**

**5**  4:14 50:2
68:17,18
**50**  38:14 41:4
47:12
**50/50**  20:10
61:5
**51**  90:24
**52**  90:23
**54**  5:15
**5810**  3:8
**5:00**  32:17

**6**

**6**  1:15 2:17
4:16 7:23,25
74:22,23 92:18
96:22 119:8
120:4,9 121:4
121:13 122:20

**60**  23:5
**63**  5:12
**6596222**  119:7
120:2 121:2
122:2
**68**  4:14
**6:13**  44:22

**7**

**7**  4:5,18 78:21
78:22,23 105:6
110:10
**7,000**  27:19
**7,500**  27:19
**7.08**  63:11
66:23,25
**7.08.**  63:19
**7.30**  106:17
107:11 108:8
110:13
**7/22/19**  5:12
**7/22/2019**
44:22
**74**  4:16
**77397**  3:9
**78**  4:18 5:13

**8**

**8**  4:20 80:8,9
98:2,6 119:4
**80**  4:20 23:8
90:23,25
**81**  4:22
**822-7860**  3:5
**89**  5:4

**8th**  75:23 77:16

**9**

**9**  4:22 81:14,15
87:22
**90**  15:4
**91361**  9:1
**92**  5:5
**930-6853**  3:9
**95**  17:25,25
**96**  18:1
**9726**  1:24
118:25
**99**  38:12
**9:00**  32:17

**a**

**abbreviations**
10:21
**abdallah**  3:4,6
4:5 6:23,23
8:12,16,17
12:5,13 19:3
24:10 33:22
34:1 41:11
43:2 49:3,23
55:7 61:2 62:1
62:3,9 65:3,10
66:19 67:16
68:21 72:9
73:23 74:10,15
74:18 75:1,11
75:15 78:1
79:1 80:12
81:18 85:2,17
89:16 91:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
www.veritext.com

92:4,11 93:16
95:6 96:21
97:11 98:18
99:1,16 100:1
100:12 101:5
101:14 102:1,8
102:15 103:3
103:22 104:3
104:10 105:5
105:23 107:1,9
108:1,19 109:4
109:17 110:1
111:4 114:8
116:18
**ability** 10:18
17:15,17 41:3
49:15 95:11,13
96:5,8
**able** 50:22
**above** 54:21
119:11
**absolutely**
27:14 116:22
**acceptance**
94:1
**access** 29:13,14
29:20 30:6,11
31:10,13 34:8
34:11,24
**accident** 23:4
24:3
**accomplish**
119:16
**accordance**
8:10 120:5

121:5
**account** 31:11
31:13 34:11
46:2
**accounted**
90:14
**accounting**
14:3,4
**accounts** 26:25
**accurate** 69:9
76:16,16 81:7
118:12
**achievement**
14:2
**acknowledge**
120:11 121:16
**acknowledged**
115:19
**acknowledge...**
5:14
**acquire** 55:4,10
**acquired** 55:4
55:11,12,13
**acquisition**
55:14
**act** 120:14
121:20
**action** 6:13
24:16,22
118:17
**actually** 23:7
24:23 25:14
40:4 46:10
57:16 74:15
83:9 112:12

**add** 55:2
101:21,24
109:11
**added** 101:20
107:3
**addendum**
54:6,9 55:16
55:20,23 56:2
56:5,15,25
57:5,8,11,19,19
57:20 60:7,9
60:12,21 61:11
61:18 72:18
73:2,19 86:11
93:12 94:15
95:1,17,19,25
96:4,11 97:2,3
99:9,9,10,12,20
102:3,5,9,17
103:15,16
104:15,15
106:20,21
107:3,4 109:7
109:14,15
110:13 111:2
112:21 113:5
**additional** 77:6
**address** 8:24
26:23 70:8
**adjustable**
38:17
**administer** 7:5
**administration**
14:6

**admission** 4:15
68:24
**admissions**
68:23
**admit** 68:25,25
**admits** 50:12
50:13,18
**admitted** 69:3
**affirmative** 5:6
92:13,20,22
93:24 94:7,13
94:14,17 96:22
98:2,6,8,19
100:2,6 103:7
105:8,25 106:6
**affixed** 120:15
121:21
**afternoon** 6:4
8:12
**agent** 43:16
**agents** 43:13
**ago** 11:14 22:6
23:16,17 29:4
**agree** 8:13
39:23 40:12
64:20 65:4
66:10 67:6
70:24 71:7
73:10 93:14
94:10,11,12
100:23 101:6
104:22 105:7
111:3,19
**agreed** 8:11
45:8 50:9,15

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                    www.veritext.com

**[agreed - applicable]**                                    Page 4

59:15 71:16,18
71:25 72:17
73:1,9,11,19
74:2 94:15
107:20 110:12
111:1

**agreeing** 70:17
72:7 73:25

**agreement** 5:12
5:14,15,16
7:18 12:16
22:7 29:16,19
42:19 43:4
44:10,25 45:3
45:5,9 46:14
46:17 48:10
50:8,9,14,16
63:21 64:4,7
64:18,23 65:5
65:7 66:13,14
67:2,9,22,23
68:5,12 69:1,5
69:22,24 70:18
70:22,24 71:12
71:18 72:1,17
73:7,12 74:1,3
76:4 77:21
79:6,12,15,19
93:3,5,21 94:9
99:5,7,7,8,12
101:8 106:12
107:4 110:14
111:20 114:17
114:21 115:20
115:23 116:11

116:21

**agreements**
111:22 113:20
115:8

**agrees** 64:4
66:25

**ahead** 9:7
41:18 53:25
65:1 93:8
109:22

**al** 26:10,12,13
26:14 33:13,16
34:14,15

**allegation**
110:11

**allegations**
110:16

**alleged** 41:23
103:9,11

**alleges** 50:5

**allowed** 108:14

**allowing** 96:9

**alternative**
40:8

**alvaro** 33:16,17
34:14

**ambiguous**
98:21,23 99:13
99:21

**amended** 4:13
5:5 49:25 50:9
50:12,17 63:25
92:13 110:9

**amendment**
50:15 64:6,7,8

66:12,14 67:2
67:3,8,9
102:11 104:12

**amendments**
63:20 64:2,17
64:22 65:6
67:13,15
103:20 104:7

**america** 36:25
37:2,3,12,14
41:5

**america's** 63:4

**amicable** 31:8

**amount** 27:18
34:21 47:4

**angeles** 2:21
6:9,11

**announced**
56:24 57:15,16
101:9

**annual** 17:7,9
68:8 72:21

**answer** 4:13
8:5 9:11 10:1,2
10:9,9 49:25
50:11,12,18
52:23 65:1
66:17 67:11,12
67:14,20 72:4
72:6,20 73:13
74:7,8,9 85:7
85:14 87:12
94:25 97:6,15
97:16 98:16,25
99:15,23 100:8

101:3,11,18
102:13,20
103:23,24
104:1 105:4
106:9,23 107:7
109:3 110:4,9
110:15,20

**answer's** 81:7

**answered** 85:1
103:21

**answering** 9:20
9:22 10:13
85:5

**answers** 4:20
10:3 80:13,18
81:4

**anti** 95:3

**anybody** 12:21
26:20 30:6
53:1 89:10
106:13 113:11

**anymore** 31:7
59:8

**anyway** 53:25

**appear** 120:11
121:15

**appearances**
3:1

**appears** 76:5
80:19 82:6

**appended**
121:11,18

**applicable**
57:23 60:19

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**[application - base]** Page 5

**application** 5:16 54:23 65:16,21 66:4 66:11 67:7 70:12,16 76:9 76:14 79:7,25

**applications** 63:23 64:5,10 67:1 81:2 86:20 90:9

**applies** 55:5,11

**apply** 57:23 58:3,12 59:6 59:16,18,24 60:25 64:9 73:2,20 93:11 93:12 103:18 109:8 110:25

**appraisal** 31:24

**approved** 36:11 43:14,15 75:24

**approximately** 34:3

**april** 1:17 2:22 6:1,6 87:4,11

**arrangements** 119:15

**arrest** 23:24

**arrested** 23:1

**arroyo** 8:20 33:3

**aside** 70:21 78:10

**asked** 52:16,18 52:20 57:17,20 58:2,7,8,10,11 59:5,12,21,23 60:19 83:20 92:18 103:17 103:21 109:7 110:24 113:1 115:18

**asking** 9:9,17 9:23 59:13 72:13,13 85:3 94:24 97:5 98:13 107:21 108:1 111:1

**asks** 80:25

**assignment** 120:2 121:2 122:2

**assist** 52:7

**assists** 51:9,13

**associates** 14:4

**assume** 10:1 13:7 30:9 75:11 76:11,22

**assumes** 96:19

**attached** 49:22 68:20 74:25 78:25 80:11 81:17 89:15 92:10 121:7

**attend** 14:13 15:1

**attended** 13:24

**attest** 5:13

**attorney** 6:22 10:7,8 11:12 75:12 85:1 93:19 118:18

**attorneys** 78:19 108:17

**attribute** 48:8

**authorize** 121:11

**automates** 51:5

**avail** 50:6

**available** 28:17 39:21 40:9 119:13

**availed** 50:13 50:18,20

**ave** 119:1

**aware** 52:5,10 55:18 57:2,3,8 57:10,15 60:5 62:11 102:16 107:2,13 108:9

**b**

**b** 1:15 2:17 4:10 5:1 7:23 7:25 50:10 81:3 92:18 119:8 120:4,9 121:4,13 122:20

**baby** 38:11

**bachelor** 14:6 62:21

**bachelor's** 13:19 14:8

**back** 15:4 19:22 22:10,11 23:2,7 29:14 32:2,5 36:11 44:10 47:14 50:4 55:8 57:14 62:8 66:22 68:5 69:19 71:22 77:10,12 92:3 92:5 99:2 104:3 106:16 110:8,22 111:5 114:7

**background** 13:2

**backs** 112:6,7

**bad** 48:3,5

**ballpark** 47:11

**bank** 18:15 31:23 36:25 37:1,2,3,12,14 38:10 40:7 41:5

**bankruptcy** 24:25

**barred** 93:1,25 94:18 98:3,9 98:20 100:3 103:8 105:9 106:1

**base** 38:2 100:16

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[based - brokerage]**                                                    Page 6

**based**  64:20
  67:18 76:15
  80:4 83:1,9
  90:5,18 95:14
  100:18 116:3
**basic**  109:24
**basically**  21:5
  30:18 95:22,23
**basis**  39:25
  55:12 92:19
  93:4,8 94:6
  98:5 100:5
  103:10 106:5
  108:23 109:18
  110:17
**bates**  44:12,17
  44:18 54:19
  63:12 70:11
  75:4 106:17
**bearing**  48:12
**beaver**  3:4
**becoming**  18:9
**began**  17:10
  29:2 42:12
  43:10
**behalf**  6:23,25
  7:9
**belief**  100:14
  100:16
**believe**  21:23
  30:4 45:16
  58:8 65:25
  67:24 73:5
  75:14 80:4,5
  84:3,16 94:15

95:14 97:4
  99:4 100:9,22
  102:3,10
  104:11,20
  106:7,11,15
  109:14 113:21
  115:19,24
**believing**
  103:11 109:19
**bergen**  13:17
  13:21
**best**  9:25 11:25
  12:1,8 38:16
  38:16,18 39:21
  58:23 74:7
  79:2 81:7
  88:20 96:9
  98:15 103:1
**better**  17:5
  40:23 46:11
  59:10
**big**  3:4 30:22
  57:25 75:9
  89:2,4
**bill**  11:12
**bills**  21:3
**birth**  13:4
**birthday**  53:11
**bit**  13:3 29:15
  39:19 46:24
  55:8 79:22
**blah**  88:24,24
  88:25
**blink**  51:21

**block**  75:9,12
**board**  17:18,18
  17:20 41:6
**boilerplate**
  115:8
**bolstering**  73:5
**borrowers**
  40:13,23 51:6
  51:18 52:2
**borsotti**  26:18
**borsotti's**  30:13
**bottom**  44:13
  44:21 54:20
  63:7,9 70:11
  76:6
**bought**  36:8
**boundary**  85:8
**brand**  50:25
  51:2,9
**breach**  93:3,5
  93:14,21 103:9
  103:12 104:23
  104:25
**breached**  79:6
**breaches**  97:2
  107:4
**breaching**
  106:21
**break**  10:10,12
  10:14 61:23
  62:1,2 74:12
  74:17 91:22
  113:24
**brian**  45:19,20
  45:21 46:8,11

**bring**  12:24
  89:9
**broken**  91:1
**broker**  5:12,15
  17:22,24 18:3
  18:9,22 19:5
  28:1,22 35:3,5
  36:20 37:22
  40:14 41:3
  42:19 43:4,14
  43:23 44:6,10
  46:13,17 48:10
  50:7,9,14
  52:19 54:22
  64:1,3,4,10,18
  64:23 65:5,7
  66:13,25 67:22
  67:23 68:5,12
  69:1,5,22,24
  70:18,24 71:12
  71:18 72:1,17
  73:4,11 74:1,3
  76:4 79:6,12
  79:15,19 89:1
  95:11 99:5,6,7
  99:8,11 100:19
  100:24 107:3
  111:16,20
  114:17,20
  115:20 116:11
**broker's**  40:21
  64:7 67:2
**brokerage**
  62:17

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
                                                                    www.veritext.com

**[brokerages - civil]**

**brokerages**
62:15
**brokers** 40:17
40:24 42:4,6,7
42:8,9 49:4
62:11 72:21
96:1 102:4,11
112:20
**brought** 42:7
62:11
**bsplaw.com** 3:6
3:10
**builder** 51:9
**bully** 84:17
85:12 86:10
111:10,11,17
**bunch** 12:11
35:23 36:11
**bush** 3:3,7
**business** 14:6
15:3 18:6,18
18:19,21,23
26:6 28:18
31:5 36:4,10
37:6 39:18
40:4 42:1,8,13
42:16 43:10,12
43:23 46:23
47:14 50:22
58:25 64:15
73:8 78:11
87:15,19 88:9
88:11,14 89:6
89:8,9 95:10
101:1,7,16

104:18
**businesses** 49:5
**buying** 40:10
48:6 52:18

**c**

**c** 18:17 49:1
**ca** 119:25
**cal** 36:8
**calendar** 51:13
**california** 1:16
2:20,23 6:9,20
9:1 15:9 18:22
23:14 24:6
62:18 70:7
118:5
**call** 11:9,11,13
11:15,18,19
34:14 43:5
61:4,9 78:20
84:4,5,6,18
88:19 119:14
**called** 7:9 18:20
18:22 36:5
44:12 48:22
83:17,18 88:21
113:1
**calls** 61:6 64:25
66:16 73:14
74:6 93:7
102:18 106:7
109:1 110:19
**calyx** 49:1
**capacity** 7:20
**capital** 18:22
25:15,18

**car** 23:4 24:3
**care** 32:18 37:7
**career** 18:15
37:5
**carefully** 9:15
**case** 1:6 2:6
6:17 23:19,24
24:3 27:13,20
27:23 75:14
119:6 120:3
121:3
**cases** 38:8,8
**cash** 24:20
**category** 90:14
**cause** 102:17
**certain** 18:7,10
39:2,24 48:17
48:18 100:17
**certainly** 73:6
**certainty** 69:7
**certificate** 14:2
80:16 118:25
121:11
**certification**
14:25 19:5
118:1 120:1
121:1
**certifications**
14:22,25 19:7
**certified** 2:19
7:10 49:21
68:19 74:24
78:24 80:10
81:16 89:14
92:9 118:4

119:16
**certify** 118:5,16
**chain** 76:2
81:22,24 87:23
**chains** 82:1
**change** 121:8
122:3
**changed** 15:21
28:15 59:10
68:7
**changes** 68:7
120:7 121:7,9
**changing** 36:7
**channel** 36:15
100:25
**chapman** 45:17
**charged** 87:8
**charging** 37:17
**charles** 62:21
62:21
**chart** 86:15,19
90:8,18,20
**check** 22:9
24:20 64:3,16
64:22 65:5
103:20 104:7
**choice** 41:5
73:16
**choose** 38:4,15
**chooses** 38:23
**chuck** 62:23,24
62:25
**civil** 7:22 120:5
121:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com                586-468-2411
                                www.veritext.com

**[claims - condition]**                                      Page 8

| | | | |
|---|---|---|---|
| **claims** 27:22,25 | 37:18 40:21 | **commit** 105:22 | 46:19 47:25 |
| 41:22 93:1,25 | 49:15 53:11 | **committed** 93:2 | 49:13 75:23 |
| 94:18 98:3,9 | 82:21 83:2,21 | 93:21 | 76:9 77:12 |
| 98:20 100:3 | **close** 22:8 | **common** | 80:20 89:4 |
| 103:8 105:9 | **closed** 47:3,5 | 112:15 115:9 | 93:12 101:20 |
| 106:1 | 47:16,20 48:17 | **commonly** | 101:22 109:5 |
| **clarify** 9:25 | 55:14 82:21 | 112:9 | **competition** |
| 11:4 72:11 | 83:3 87:20 | **communicate** | 37:10 95:3 |
| 91:1 | 91:8,12,14 | 49:15 | **complaint** 4:13 |
| **class** 24:16,22 | **closes** 100:24 | **communicated** | 50:1 92:14 |
| **classes** 15:22 | **closing** 32:17 | 62:14 112:18 | 110:10 |
| 15:25 16:3 | 52:11 | 112:19 | **completed** 74:2 |
| **clause** 106:1,13 | **college** 13:17 | **communication** | 77:18 78:7 |
| 106:20 107:3 | 13:18,21,23,24 | 43:25 61:12 | 119:13 |
| 108:24 109:11 | 13:25,25 | 75:13 82:1 | **completing** |
| 112:12,14 | **colleges** 14:1,13 | 85:20 86:7,9 | 14:12 |
| 116:7 | **combined** 7:19 | **communicati...** | **completion** |
| **clauses** 73:9 | **come** 25:21 | 11:8 51:5 61:3 | 118:14 |
| 109:13 112:2 | 36:2 44:7 | 61:7,10,17 | **complied** 102:4 |
| 112:15 | 76:25 116:10 | 82:4,24 86:12 | 102:11 |
| **cleaner** 9:18 | **comes** 43:21 | **community** | **concept** 17:9 |
| **cleaning** 79:22 | **comfortable** | 13:17,23,25 | **concerned** |
| **clearly** 96:4 | 39:20,25 40:2 | **companies** | 113:14 |
| **cleveland** 119:2 | **coming** 32:19 | 18:12,14 36:4 | **concerning** |
| **click** 111:24 | **commencing** | 37:9 95:10,23 | 63:22 |
| **client** 22:10 | 2:21 | 96:7 | **concluded** |
| 27:14 38:1,6,9 | **commercial** | **company** 18:10 | 117:4 |
| 38:20,23 39:2 | 25:19,22,22,24 | 18:13,20 19:18 | **concludes** |
| 39:22 51:5 | 26:2 | 19:19 20:7,23 | 116:25 |
| 75:12 85:1 | **commission** | 21:2,17,21 | **conclusion** |
| 95:13 96:8 | 22:9 23:14 | 22:5,6 28:6 | 64:25 66:16 |
| 102:25 103:1 | 37:16 120:19 | 30:22,23,25 | 73:14 74:6 |
| **clients** 28:3,11 | 121:25 122:25 | 31:4 32:13 | 102:19 109:2 |
| 28:14,23 31:20 | **commissions** | 34:3,5,20 36:5 | **condition** 64:4 |
| 36:24 37:2,7 | 27:4 | 39:6,7,8,8 44:8 | 105:10,11 |

**[conditional - couple]**

**conditional**
59:19
**confirm**  113:25
**confirms**  77:17
**confused**  72:8
**confusion**  9:20
**connect**  51:5
**connection**
22:14 29:19
**consent**  64:8
67:3
**consideration**
97:23,24,25
98:4
**considered**
7:23 97:25
**consistency**
25:19
**consistently**
28:5,8
**constitutes**
66:13 67:8
**contact**  43:19
45:20 52:17
82:11
**contacted**
112:25
**contained**
63:24 72:18
110:16
**continue**  8:8
13:13 73:8
76:1
**continued**  4:25
5:1

**continues**
63:21 76:7
**contract**  67:15
73:3 93:14
94:2,9,18,22
95:7 96:19
98:20,22,23
99:3,3 106:14
109:12,16
112:14
**contracts**  21:4
21:7,8,13
32:22,23
109:10 112:2,3
112:4
**convenient**
119:15
**conversation**
19:1 44:2 58:5
58:9,16 59:13
60:15 83:20
88:22
**conversations**
82:18 111:5
**convicted**
24:13
**cook**  3:13 4:6
7:2,2 8:11,14
11:25 12:8
18:25 33:21
41:9 42:25
48:23 61:21,24
64:24 65:9
66:15 67:10
72:3 73:13

74:5 75:11,14
77:24 84:25
85:14 93:6
94:23 96:18
97:4 98:13,24
99:14,22 100:7
101:2,10,17
102:6,12,18
103:21,24
105:3,18,21
106:7,22 107:5
107:23 108:13
108:15 109:1
109:21 110:19
114:1,14
116:24 119:5
**corp**  10:25
**corporate**  7:21
25:13 109:4
**corporation**
19:23,24
**correct**  8:21
9:13 16:15
20:18 21:10,16
21:25 28:24
29:17,21 35:6
36:17 37:25
38:2,23 43:7
45:4,10 53:6
53:11 54:4
59:19 62:12
65:11,12,14
69:12,25 70:9
74:4 76:4,18
77:13,18,21

79:9,12,16
80:20 81:5
82:6,13 85:13
86:15 87:24
88:3,6 90:2
91:10,16,17
96:12,16
104:24 106:21
112:8
**corrections**
121:17
**correctly**  67:19
**correspondent**
112:20
**cost**  84:23
85:25
**costs**  22:8 86:1
86:4,4 101:6
101:15,19,23
101:25
**counsel**  3:1
7:17,18 8:4
11:8 12:18,22
76:17 84:19
85:6,13,21
108:4 115:5
**count**  83:8
**country**  8:25
28:19 96:7
**county**  2:20
23:22,22 27:21
27:23 120:10
121:15
**couple**  18:17
113:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[course - difference]**

**course** 37:22 91:23

**courses** 14:21 15:6,9

**court** 1:1 2:1 6:9,15 9:18 22:1,13,19 23:20,20,22 27:22 63:19 118:1 120:7

**cover** 81:21 85:25 86:4

**covered** 85:25 86:3

**crash** 16:19

**crashed** 17:3 77:14 102:23

**created** 17:6 90:3 107:16 108:12

**credit** 31:24,24

**crime** 24:13

**cross** 85:7

**csr** 1:24

**curious** 90:24

**current** 73:11 73:25 74:3

**currently** 15:11 19:9 26:8 33:11

**customizable** 52:1

**customized** 51:9,17

**cut** 78:13

**cv** 1:6 2:6 6:17

**d**

**d** 4:1 8:10

**damage** 109:11

**damages** 73:9 96:23,25 97:2 97:9,10 100:4 100:10,20 106:1,3,11,13 106:20 108:8 108:10,24 109:12 112:1 112:15 116:7

**date** 8:9 13:4 76:13 107:16 108:12 118:19 119:9 120:3,9 120:19 121:3 121:13,25 122:20,25

**dated** 88:2 114:21 118:23

**dates** 69:7 91:18

**daughter** 52:18

**day** 12:4 21:5,5 30:21 32:18,18 40:10 49:13 120:16 121:22 122:22

**days** 23:5,6 55:13 79:20 119:18

**dba** 25:13 70:4

**dbas** 25:14

**deal** 38:14 57:25 59:3 112:7

**dealing** 23:12 28:23 40:24 82:4

**dealt** 112:2

**dear** 119:10

**decide** 43:12

**declaration** 80:18 117:7

**declined** 85:18

**deed** 120:14 121:20

**deemed** 119:20

**defendant** 1:9 2:9 3:12 7:2,21 50:11,12 93:2 96:24 110:15

**defendant's** 4:13,14,16 5:5

**defense** 85:22 92:22 93:24 94:7,14,17 96:22 98:2,6,8 98:19 100:2,6 103:7 105:8,25 106:6

**defenses** 5:6 92:13,20

**definitely** 61:9

**degree** 13:19 13:22 14:4

**denial** 110:17

**denies** 50:15 110:15

**department** 14:24 15:2 119:23

**depending** 40:6

**deposed** 9:4 22:16

**deposit** 112:6

**deposition** 1:14 2:17 6:12 7:19 8:6,8,19,20 10:20 11:4,5,7 11:10,21 12:19 12:21 21:24 78:5,22 80:7 81:13 89:12 92:6 108:16 117:1,4 118:14 119:9,11 120:1 120:3 121:1,3

**describe** 11:25 12:8

**description** 4:11 5:2,10

**detroit** 112:25

**dicker** 3:13

**died** 28:21 48:7

**diego** 13:18,24 24:4,5,6

**difference** 36:19,23 37:10 37:13,15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[different - employed]** Page 11

**different** 18:11 21:21 25:8 35:8,21,23 36:12 37:19,25 38:14 39:12,13 39:14 40:10 41:4 69:15 77:2 82:1 100:20
**direct** 44:18 50:2 54:19 110:10
**direction** 118:12
**directly** 36:15
**disagree** 72:19 73:22
**disclosing** 11:8
**discovery** 81:20
**discuss** 12:21 57:11 92:19
**discussed** 14:23 27:3 84:6
**discussion** 93:7
**discussions** 57:13 116:5
**dishonesty** 24:14
**dispute** 45:2,8 69:4,6 71:15 71:17,21,25 74:1 77:20 96:19

**disputing** 105:19
**disrespect** 108:20
**distribution** 23:1
**district** 1:1,2 2:1,2 6:15,16 6:16
**division** 1:3 2:3 17:6 36:25
**doc** 51:23
**document** 44:18,21 52:1 63:8 70:10,20 70:21,23 71:4 71:8,9 72:24 75:6,19 76:1,1 80:15,24 82:5 82:7 87:13 88:2 89:17,19 89:21 90:3,20 91:16,17 107:11,16,20 108:11 110:6 114:25 115:3,6 115:6,15
**documentation** 31:20
**documents** 11:17,20,23,24 12:3,24 32:1,3 32:4 75:5 109:9 110:7

**dodd** 16:20 95:16
**doing** 33:14 39:11 42:13 43:10 46:23,23 58:25 61:21 64:14,15 65:11 68:8 73:4,6 87:19 88:24 89:8
**dragged** 113:15
**drank** 61:25
**drive** 3:14
**duly** 7:10
**duties** 20:22,25 21:1,2 29:7,10 30:15,17 31:15 32:10,11 33:6 34:6

**e**

**e** 4:1,10,19,22 5:1 12:11 33:22 52:2,8 52:11 53:11 56:21 60:1,2 61:6,12,18 72:25 74:10 75:21,25 76:2 76:6,8,15,17 77:5,17 78:18 81:22,24 82:10 82:12,13,17,20 82:25 86:9,16 86:17 87:23 88:1,2,19

104:12,14,16 104:17,20 111:12,12
**earlier** 8:18 53:8 62:10 99:20 104:24 105:2 107:15
**ease** 51:23
**easier** 9:19
**eastern** 1:2 2:2 6:16
**economic** 48:13
**economy** 77:14
**edelman** 3:13
**education** 13:13 14:12
**effect** 73:12
**effective** 55:13
**eight** 82:5
**either** 54:12 55:3,9 57:21 57:22 111:12
**elected** 50:4,6
**electronic** 111:20
**electronically** 44:22,24 114:24
**else's** 30:6
**elser** 3:13
**employ** 26:8
**employed** 18:10 19:9,15 21:18 26:16,16 32:19 53:5

**[employee - fairway]**

| | | | |
|---|---|---|---|
| **employee**  46:13 118:17 | **errata**  119:18 121:7,10,18 122:1 | **example**  31:23 39:13 47:2 49:9 99:13 112:5 | **expiration** 120:19 121:25 122:25 |
| **employees** 29:19 32:16 45:11,14 49:14 54:2 60:21 | **escrow**  31:24 | **exceed**  8:6 | **explain**  18:2 20:25 31:15 36:24 37:18 54:8 |
| **employment** 30:25 31:4,8 | **esq**  3:4,8,13 119:5 | **executed** 121:10 | **explanation** 77:7,11 |
| **endeavor**  64:1 | **essentially** 86:19 | **execution** 120:14 121:19 | **expressly** 119:13 |
| **ended**  30:25 78:15 | **establishes** 77:3 | **executives**  46:2 | **expunged**  23:7 |
| **enforce**  94:19 102:2,9 | **estate**  14:24,24 15:2 16:23 17:2,15,20 18:10 19:6 25:18,24 26:4 26:5 33:8,12 33:13,15 109:13 112:4 | **exhibit**  4:11,13 4:14,16,18,20 4:22 5:2,4,5,10 5:12,13,15 42:23 49:19,20 50:8,10 54:19 63:7 68:17,18 69:20 74:20,22 74:23 75:5,9 78:5,21,22,23 80:8,9 81:14 81:15,20,21 87:22,22 89:12 89:13 92:6,8 99:13 105:6 106:16 107:11 110:8 114:16 115:15,16,24 115:25 116:1,2 116:11,20 | **extent**  8:1 64:24 93:7 94:25 97:7 |
| **engaged**  26:4,6 | | | **f** |
| **engages**  26:3 | | | **facebook**  25:5 25:7 53:9 55:19 |
| **enrichment** 105:14 | | | **fact**  63:2 69:8 74:2 |
| **entail**  32:11 34:6 | **estimate**  47:11 | | **facts**  100:17 |
| **entailed**  69:14 | **estoppel**  97:17 103:5 | | **factual**  92:19 93:4,8,20 94:6 98:5 100:5 103:10 106:5 |
| **enter**  116:20 | **everybody** 38:13 | | |
| **entered**  27:15 43:6 45:3,6 46:16 50:7,14 67:22 79:12 121:9 | **everything's** 28:18 | | **failed**  96:24 97:9 |
| | **evidence**  108:3 | | |
| **entering**  21:12 32:22 46:13 | **exactly**  56:22 60:18 83:16 97:20 103:6,13 111:13 | **exhibits**  5:9 | **fairway**  4:22 10:25 11:1,1 42:2 54:13,24 55:1,3,9 79:8 81:3,5,11,12,23 87:23 88:9 89:3 96:6,12 |
| **enters**  21:8 | | **expensive** 40:13 | |
| **entire**  120:5 121:5 | **examination** 4:2,4 7:14 8:3 114:13 116:17 | **experience** 40:19 100:18 | |
| **entitled**  6:13 96:23 97:8 | | | |
| **entity**  84:22 86:3 | **examined**  7:11 | | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                        www.veritext.com

**[fairway - future]**

100:10 104:19
**fall** 90:13
**familiar** 54:6
  55:25 89:19
  103:4 106:19
**fancy** 44:12
**far** 45:25
**february** 68:13
  69:2 79:23
  81:1,10 86:22
  88:2 90:11
**fed** 36:8
**federal** 7:22
  23:20 118:2
**fee** 17:7,9 18:5
  37:14,15
**feel** 10:10
**fees** 84:23
  85:25 86:1,4,5
**fell** 46:8
**fha** 19:22,23
  40:9
**fiduciary** 38:20
  95:12,12
  102:25
**fifth** 82:5
**figures** 47:23
**file** 31:22 38:21
**filed** 6:15 24:25
  83:23
**files** 30:16
  31:17
**filled** 43:15
  44:5

**finance** 40:9
**financially**
  118:16
**find** 38:18
**findamortgag...**
  52:15
**fine** 27:12
  42:20 72:12,15
  76:22 77:2
  78:2 97:21
  108:5,21
**finish** 9:17
  10:13 24:8
  37:8
**finished** 13:19
**first** 4:13,20
  5:5 7:10 13:17
  18:22 21:23
  36:8 42:12
  43:4,5 45:5,20
  49:25 50:11,17
  56:4 64:11
  65:19 66:2
  67:22 75:8,25
  77:17 78:18
  80:14 84:1
  87:3,22 88:1,2
  92:13 107:13
  108:9 109:9
  110:9
**fits** 38:7
**five** 18:12
  26:10 41:4,12
  47:1 48:3 62:3
  113:24

**fixed** 38:17
**flat** 95:5
**fleet** 36:5
**focusing** 50:17
  93:20
**folks** 46:2
**following** 76:8
  117:8
**follows** 7:12
  71:23 104:4
**font** 63:16
**forced** 116:20
**foregoing**
  118:6,8,12
  120:13 121:18
**forget** 57:22
**form** 61:11
  64:25 66:15
  72:3 73:11,13
  73:25 74:3,5
  77:7 78:6,9
  101:2,10,17
  102:6,19 105:3
  106:22 107:5
  115:24
**format** 56:21
**formation** 94:2
**forms** 12:16
  73:17
**forth** 118:7
**forward** 55:12
**found** 74:15
**foundation**
  64:25 66:15
  74:6 96:18

101:10,17
  102:19 107:6
  107:24
**founded** 19:18
  20:14 28:1
**founder** 20:4
**founding** 20:20
  21:11,17 28:6
**four** 18:11,12
  46:25 76:2
**frame** 69:5
  89:24 91:6,18
**frank** 16:20
  87:21 95:16
**frankly** 12:10
  82:15 83:22
  113:1
**free** 10:11
  79:19 96:14
  112:25 120:14
  121:20
**fringe** 40:6
**front** 42:20
  114:18
**full** 8:24
**funding** 54:25
  79:9 80:1
  86:22 90:11
**further** 64:7
  67:3 114:9
  116:17,23
  118:12,16
**future** 8:9 64:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
www.veritext.com

**[g - home]**

| g | | | |
| --- | --- | --- | --- |

**g** 33:22
**game** 36:11
**general** 29:23
  46:19
**generally** 37:24
  39:3
**generated**
  89:25 91:5,16
**generates** 52:1
**gentleman** 22:6
**getting** 37:8
  59:11 103:1
**give** 22:10
  24:19 32:4
  48:4 83:10
  85:4,5 109:3
  110:20
**given** 40:10
**go** 9:7,8 10:5
  13:2 25:8,10
  25:12 31:16
  32:2,6 37:2,2
  39:15 41:13,18
  53:25 65:1
  77:10 92:21
  93:8 108:16
  109:22 110:22
  111:23
**goes** 70:3
**going** 6:5 7:16
  9:8,9 10:21
  13:2 22:21
  24:11 32:20,25
  37:4,4,13,14

40:7 43:23
44:10,17 49:18
50:2 54:18
55:12 62:4,8
63:10,11,17
68:5,16 69:19
74:21 76:6
77:5 80:14,24
84:7,25 87:8
89:11 91:24
92:3,6,20
93:24 100:10
105:21 106:16
107:10,23
108:4 110:8,8
110:10 111:5
113:14 114:3,7
117:1
**good** 6:4 8:12
  32:6 41:13,21
  61:22,24 62:1
  68:6 74:14
  75:18
**goodwill** 102:4
  102:10
**google** 97:18
**government**
  17:4
**graduate** 13:10
  14:16
**graduated** 13:7
**great** 17:4
  18:15 44:8
  59:7 61:14

**ground** 9:9
**group** 18:22
  19:20 25:15,15
  25:15,18 70:2
  76:10
**guess** 61:14
  74:9,9 75:22
  89:4
**guessing** 35:1
  96:6
**guide** 63:24
**guidelines** 9:9
  60:8
**guilty** 78:4
**guy** 22:12,12
  45:18 88:21
  101:21,24
**guys** 46:11 59:9
  76:25 89:1,4

| h | | | |
| --- | --- | --- | --- |

**h** 4:10 5:1
**half** 23:6 48:14
**halfway** 23:5
  75:8
**hand** 30:19
  49:18 54:18
  68:16 74:21
  78:21 80:7
  89:11 92:6
**handing** 81:13
**handled** 32:21
**handles** 52:8
**hang** 74:14
**happen** 42:5
  47:25

**happened**
  60:18 68:2
  113:17
**happening** 84:8
  112:13
**happy** 53:10
**hard** 112:6
**head** 10:4
**heading** 63:20
**hear** 83:19
**heard** 9:6 53:8
  56:17 81:12
  82:15 89:3
**held** 20:19
  102:23
**help** 36:13
  111:7
**helped** 32:8
**helps** 51:25
  100:25
**hereof** 117:8
**hereto** 49:22
  68:20 74:25
  78:25 80:11
  81:17 89:15
  92:10
**hey** 44:8
**high** 13:7,10,13
  48:5
**higher** 102:24
**hinajosa** 45:16
**hold** 20:15,17
  21:20
**home** 31:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[homes - jesus]**

**homes** 48:6
**hope** 32:25
**hour** 8:9 11:16
**hours** 8:6 56:8
**house** 23:6
  52:18
**huh** 10:5 44:15
  44:20 58:22
  61:14 76:5
**huh's** 10:4
**humble** 3:9
**hundred**
  100:19
**hurt** 42:3

**i**

**idea** 17:4 43:18
  48:4 87:21
**identification**
  49:21 68:19
  74:24 78:24
  80:10 81:16
  89:14 92:9
**identified**
  90:17
**identify** 6:21
**identity** 25:7
**illegal** 95:1,2
  95:16 109:15
**imagine** 46:24
  46:25 68:9,10
  68:14
**imco** 18:17
**immoral** 95:3
**implement** 60:8

**important** 9:15
  10:3
**impossibility**
  98:10,11
**improper** 94:24
  98:15 103:9,11
**inaudible** 60:22
**include** 21:8
  99:9,10,12
**included** 73:25
**includes** 99:8
**including** 63:23
**incorporate**
  19:22
**incorporated**
  19:20 121:12
**incorporation**
  20:11
**incurs** 101:6,15
**independent**
  10:25 11:1
  35:5 36:19
  40:14,17,20,24
  49:10,11 54:24
  55:1,3,10 81:4
  100:23 111:16
**individual** 6:13
  7:20 29:25
  30:1,3
**individually**
  1:15 2:18
  119:8 120:4,9
  121:4,13
  122:20

**industry** 15:17
  16:6 26:5
  44:11 100:19
  111:15 112:10
  112:16 115:9
**inform** 57:4
**information**
  76:16 77:6
  80:4 82:11
  90:6
**inhibit** 10:18
**initial** 50:11
**initiated** 43:19
  58:9
**initiating** 59:13
**initiative** 54:11
  58:23,24 60:4
  104:18
**inn** 2:22
**inputs** 90:6
**instruct** 85:6
**instructions**
  63:22
**instructs** 10:8
**insurance** 52:9
**interest** 21:21
  37:13,15 48:13
**interested**
  24:21 118:17
**internal** 90:5
**internally**
  61:17
**interplay** 49:7
**interrogatories**
  4:21 80:14,19

**interrogatory**
  80:25 90:17
**introduced**
  55:19 56:9
**investments**
  1:8 2:8 6:14
  7:3,22 10:22
  19:14,21 44:23
  119:6 120:3
  121:3
**involved** 14:18
  22:22 23:9
  24:23 32:22
  45:12 88:23
**involvement**
  20:12 21:12
**involving** 24:14
**issues** 22:25
**items** 31:23
**iteration**
  110:12 111:2

**j**

**jaime** 8:20
  26:10,12,13
  33:1,2,3,13
**jaime's** 34:2
**jersey** 13:18,22
  23:1,24,25
  24:1,2
**jesus** 45:15,20
  45:21,22,24
  46:5 52:16
  57:17 58:5,8,9
  59:3,3 60:19
  61:3,8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[job - know]** Page 16

| | | | |
|---|---|---|---|
| **job** 9:19 31:18 31:19,21,25 32:4,5 37:23 95:12 | 121:13 122:20 | 68:25 69:1,4 70:3 76:10,22 | **kidding** 41:17 |
| **join** 17:18,18 17:20 | **kevron** 1:8 2:8 5:4 6:14 7:2,21 | 77:6,10,18,20 78:11 79:5,12 | **kind** 30:20 64:8 67:4 75:8 |
| **jordan** 3:19 6:7 | 7:24 10:22,22 | 79:14,18,24 | 92:20 93:7 |
| **josh** 88:21 | 19:14,16,21 | 81:2,4,10,20 | 111:23 115:11 |
| **judge** 27:9,11 | 20:4,6,9,12,14 | 86:20 87:15 | **know** 9:25 10:5 |
| **judgment** 27:15 | 21:8,21 23:12 | 88:6,17 89:18 | 10:11 11:1,4 |
| **july** 43:7 44:25 50:3,5 114:21 116:21 | 25:10,13 26:3 26:8,16,21,25 27:5,16 28:1 | 90:6 93:2 94:6 94:15 96:14 97:1 99:17,21 | 12:6 15:4 16:1 23:6,21 24:9 28:9,12,13 |
| **jurat** 118:2 | 28:25 29:8,16 | 101:7,8,16 | 29:13 30:2 |
| **jurisdiction** 105:19,19 | 29:20,20,24 30:5,13 33:4,9 | 104:22,25 105:17,18 | 31:16 32:12,15 35:2,18,18 |
| **jury** 27:11 | 33:12 34:19 | 106:15 108:23 | 37:7 38:25,25 |
| **k** | 35:8,11,16 38:4,23 39:1,2 | 110:11 111:7 114:21 117:1 | 39:2 40:8 41:16 42:20 |
| **kathleen** 1:23 2:18 6:10 | 39:4 41:23 42:12 43:6,10 | 119:6 120:3 121:3 | 44:7 45:12,15 45:17,20,22 |
| **keep** 21:2 25:19 25:20 47:23 | 43:12 44:16,19 44:23 45:3,6,8 | **kevron's** 4:20 8:4 35:5 42:16 | 46:1,5,8,11,21 47:1,13,15,16 |
| **ken** 45:17,21 45:21,22 46:5 58:9,13,14,15 | 46:16,17 47:4 47:16,19 48:9 48:17,18 49:12 | 49:24 53:9 54:2 66:10,13 67:6,8 68:11 | 47:19 50:24 51:2,4,7,8,12 51:16,20,24,25 |
| **kept** 32:14 36:7 | 49:14 50:3,6 | 68:22 70:8 | 52:3,6,14 53:1 |
| **kevin** 1:14 2:17 4:3,18,22 6:12 | 50:18,20,24 51:4,8,12,16,17 | 75:3 76:3 77:7 78:14 80:13 | 53:6,15,20 55:24 56:1,3 |
| 7:8,19 8:25 20:6 25:7 | 51:20,23 52:3 52:6,7,11,14,21 | 84:23 92:12 93:4 98:5 | 57:3,7 58:21 59:9 60:2,3 |
| 44:22 76:11,11 76:11 110:21 | 52:24,25 53:5 53:12 56:1 | 100:5 103:10 106:5 110:9,17 | 61:22 62:20 63:16 65:13,19 |
| 114:15 119:8 120:4,9 121:4 | 57:4,7,12 60:9 60:11,21 61:18 | 113:20 | 67:12,13 70:12 72:5,14,20 |
| | 64:15,16,21 | **kickback** 23:13 27:4 | 73:6,21,21,22 |
| | 65:4,14,16,20 | | 74:8,18 76:20 |
| | 66:3,8 67:21 | | 77:25,25 81:21 |

Carroll Reporting & Video
A Veritext Company

www.veritext.com
586-468-2411
www.veritext.com

**[know - listing]** Page 17

83:5,7,8,14,19
83:22 84:4,8
87:19,20 88:25
89:1 90:22,24
93:22 98:5,17
99:18 100:6,20
101:11,20
102:2,20
105:11,14
106:3,12
107:12 108:8
109:11 110:3
110:17 112:5
112:24 113:2
**knowledge**
30:6 40:16,19
42:10 46:3
52:24 54:3
58:24 79:2
81:8,25 93:17
97:1 100:13,15
**kr** 82:12
**kyhos** 3:19 6:7

**l**

**l** 33:22 49:1
**la** 13:20 14:7,9
14:13
**lack** 97:23,24
98:3
**lane** 3:8 6:25
8:25
**language** 99:20
**large** 37:1 96:6
**larger** 90:20
96:7

**laurel** 3:14
**laws** 15:20
95:16 102:23
**lawsuit** 22:5,14
22:16,22 23:12
24:17,22,23
27:3,5,7 41:19
41:20,23 63:3
83:2,10 84:13
84:23 86:1,5
86:11 87:9
107:25 111:8
113:2,5,15,18
113:22
**lawsuits** 23:9
**lawyer** 97:6
98:14 106:8
109:3
**lay** 106:9 109:3
110:21
**learn** 56:4 60:5
66:7 111:11
**learned** 56:11
56:14 58:5
**learning** 60:7
**leave** 38:11
41:7 115:11
**left** 113:9
**legal** 6:8,10 9:2
12:1 22:11
44:11 64:25
66:16 73:5,14
74:6 92:19
93:7,18 94:24
97:5,5 98:14

102:18 106:8
109:1,2,15,15
110:20 119:1
122:1
**legally** 20:10
**lender** 17:19
32:7 36:19
38:21,22 40:10
40:20 47:20
55:2,4,5,10,11
55:12,13 69:15
96:2,6,15
100:24
**lender's** 100:25
**lenders** 21:9,13
32:23 35:8,11
35:14,24 36:14
36:16 37:19,24
37:25 38:5,12
38:15 39:2,4
39:19,21,24
40:2,6,12,16,25
41:4 49:8,16
68:8 89:9 91:2
91:3 96:5
112:20 113:21
**lending** 4:23
25:23,24 26:4
26:5 38:2
81:23 87:24
112:16
**letter** 4:18 77:7
78:20 79:3,5
79:11,14
104:23 105:1

119:19
**license** 15:4,14
15:16,19,23
16:5,9,11,16,17
16:24 17:2,17
19:6,6
**licensed** 15:12
16:10 17:1,4
**licenses** 19:7
**likewise** 9:21
9:21
**limit** 8:9 27:25
96:5
**limited** 55:1
63:24 95:13
96:12
**limiting** 95:11
96:8
**line** 121:7
122:3
**lines** 85:7
**liquidated** 73:9
106:1,3,11,13
106:20 108:8,9
108:24 109:11
109:12 112:1
112:15 116:6
**list** 5:4 39:4
82:21 83:2,3
83:10,11,13,20
87:2
**listed** 121:7,17
**listen** 9:15
**listing** 121:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[litigation - margarita]**

**litigation**
  105:20
**little**  10:20 13:3
  29:14 39:19
  55:8 63:16
  79:22
**livonia**  3:14
**llc**  1:5 2:5 6:14
  19:25 119:6
  120:3 121:3
**llp**  3:13
**loan**  16:13,22
  17:11 22:7,9
  23:13 26:1
  27:4,10 28:2
  28:23 29:1,7
  29:11,20 30:14
  30:15,16 31:15
  31:17,18,19,22
  32:1,2,3,16,18
  33:3,5,7 34:16
  34:17 35:3
  36:21 37:3,12
  38:1,1,13,13
  39:9,10,23
  40:7 41:4 44:3
  44:7 49:6,7
  53:4 54:23,23
  60:20 63:23
  64:5,9 65:16
  65:17,20,21
  66:3,4,11,11
  67:1,7,7 77:11
  79:7,7,24,24
  81:2 86:20

  87:20 90:9
  100:24
**loans**  5:4,14
  17:12,13,20
  19:22,23 28:3
  29:9 31:19
  32:14 33:12,13
  39:9 40:9
  45:12 46:18
  47:1,3,4,16,19
  47:25 48:17
  50:22 63:23
  64:6 65:25
  67:1 81:2
  86:20 87:3,7
  89:23 90:8,13
  90:17 91:3,8
  91:12,14
  100:10,19
**local**  17:18,20
**located**  6:8,10
**location**  119:15
**log**  29:23,25
  30:1,3,6,9,10
  30:11 34:10
  35:4 75:16
**long**  11:15 14:4
  15:14 19:15
  34:2,20 39:11
  49:12
**longer**  18:16,18
  18:19,21,23
**look**  12:11 39:1
  41:8 43:4
  85:16 89:19

  115:14
**looked**  12:6,7
  41:10 42:14
  87:10 104:23
  105:1
**looking**  39:20
**looks**  39:3
  69:20 75:21
**los**  2:21 6:9,11
**loss**  48:8 102:3
  102:10
**lost**  89:2
**lot**  9:19 32:13
  35:14,15 37:9
  38:22 40:4
  47:14
**lying**  47:13

**m**

**m**  18:17 33:22
**machine**
  118:10
**madam**  119:10
**made**  22:7
  25:16 47:13
  77:12 85:25
  86:4 118:10
  120:7
**mahde**  3:4 6:23
  8:17
**mail**  24:20
  56:21 60:1,2
  61:12,18 72:25
  75:21,25 76:2
  76:6,8,15,17
  77:5,17 78:18

  78:20 81:22,24
  82:10,12,13,17
  82:20,25 86:9
  86:16,17 87:23
  88:1,2,19
  104:12,14,16
  104:17,20
  111:12,12
**mails**  4:22
  12:11 52:8
  53:11 61:6
  74:10
**main**  21:1,2
**make**  9:18,18
  10:20 24:12
  32:6 33:23
  57:24 119:15
**makes**  95:19
**making**  32:20
**manage**  48:18
**manager**  30:20
**manufacturer**
  49:1,2
**march**  26:15
  28:20 31:1
  55:19 56:10,24
  58:6 60:1
  65:17,19,22
  66:2 68:12
  69:2 79:23
  80:25 82:22
  86:22 87:4,11
  90:11 91:9,15
**margarita**
  18:20

**marijuana** 23:1
**marjam** 8:19
  26:9,11,12
  28:25 29:10,13
  30:2
**marjan** 39:14
  53:8
**mark** 49:18
  68:16 78:21
  80:7 89:11
  92:6
**marked** 5:9
  42:23 49:20
  54:19 68:18
  74:21,23 78:5
  78:23 80:9
  81:13,15 89:13
  92:8
**market** 16:19
  17:3 28:15,19
  28:21 40:11
  48:3,5,8 89:7
  102:22
**marketing**
  51:10,13
**markets** 51:17
**materials** 51:10
**matter** 8:2
  100:11 119:12
**mcdonald** 4:19
**mean** 25:22
  28:10,17 33:16
  36:21 42:6
  58:20 89:4
  93:10,18

100:16 108:20
**means** 76:11
  92:24 94:4
  96:1 97:10,12
  97:17,23 98:11
  98:17 105:15
**meant** 53:12
**media** 25:2
  26:25 51:13
  62:7 92:2
  114:6
**medication**
  10:17
**meet** 31:19
**meeting** 12:17
  94:1,3,11
**meetings** 12:18
**melgoza** 33:17
  33:20 34:14
**membership**
  21:20
**memory** 10:18
**mentioned**
  22:18 32:8
  36:1 39:17
  40:5 46:2
  48:16 53:24
  85:11 86:7,9
  87:18 112:1
**mesa** 13:18,25
  14:3,5
**met** 8:18 37:7
**michelle** 26:18
  30:13 32:8
  60:13

**michigan** 1:2
  2:2 3:5,14 6:16
**mid** 62:18
  112:18
**midwest** 122:1
**mind** 36:2
  94:11,12,12
  108:18
**minds** 94:1,3
**minute** 113:24
**minutes** 11:16
**missing** 32:2,3
**mississippi**
  85:5,5
**mistake** 24:12
  42:24
**mitigate** 96:24
  97:10
**modify** 73:16
  116:10
**money** 22:10
  98:1
**moneyline** 63:5
**monitor** 64:4
  64:17,22 65:6
**month** 47:1
  48:4,15 59:1
  59:11
**months** 38:11
  59:2 68:3
**morning** 8:19
  8:20
**morrison** 3:8
  3:10 6:25,25

**mortgage** 1:5
  2:5 4:23 5:4
  6:14,24 7:1 8:3
  8:7 10:23,24
  10:24,25 15:17
  16:6 18:10,12
  18:14,19,20
  19:20,24 25:12
  25:14,16 29:17
  35:5 36:20
  40:14,17,20,24
  42:2 49:4
  54:23,23,24,24
  55:1,2,2,3,4,4,9
  55:10,10 58:1
  63:23,23 64:5
  64:6,9 65:16
  65:17,20,21
  66:3,11,11
  67:1,1,7,7
  69:25 70:2
  76:10 79:7,7,8
  79:24,24,25
  81:2,2,3,4,5,25
  83:23 84:2
  86:20,20 90:8
  90:9,10 92:24
  100:23 106:14
  111:6,16
  112:20 113:21
  115:20 116:3,6
  116:9 119:6
  120:3 121:3
**mortgage's**
  49:25 68:23

**[mortgage's - obligation]**                    Page 20

92:14

**mortgages** 17:3
25:17

**moskowitz**
3:13

**move** 97:13,14

**moving** 96:22

**mr.abdallah**
7:15

**n**

**n** 4:1 48:25

**name** 6:7 8:17
8:24 16:2 25:8
25:10,13,18
33:19 45:15,19
62:20 70:3
76:9,10 118:20
119:6 120:3,4
120:15 121:3,4
121:21

**named** 24:22
45:19

**names** 9:2
25:20 36:7
45:14 53:24

**naming** 89:5
95:22

**narrow** 39:4

**nationwide**
36:8

**nature** 45:23

**necessarily**
36:15 75:16

**need** 10:10,12
15:4 16:16,17

22:10 44:9
61:23 74:12,17
75:16

**needed** 17:2
18:2 40:7,8

**needs** 31:22
38:8

**negatively**
40:17

**negotiate** 115:3

**negotiated**
115:6

**neither** 118:16

**never** 20:8
32:24 34:25
53:3 59:4,4,5
59:14,14 64:19
67:13,14 68:7
70:20 71:3
73:1,9,17,18,19
75:21 78:9
81:12 82:15
89:3,6 93:13
93:13,13
103:14,15,15
103:16 104:14
106:11 108:18
109:8 110:23
110:24,24,24
111:2,3

**new** 13:18,22
23:1,24,24
24:1,2 43:22
44:8 59:8,12

**newspaper**
56:18

**nmls** 14:25
15:16,19,22
16:5,11,17
17:5 19:6

**no's** 10:6

**nods** 10:4

**nonsense** 41:21

**norm** 26:18

**normal** 38:9,14
39:25

**north** 3:14

**northern** 62:18

**notary** 119:25
120:10,18
121:15,23
122:23

**notice** 56:18
64:1 66:12
67:8 79:20
92:18 103:9,11
103:14 104:22
104:25

**noticed** 8:3
90:22

**noticing** 6:22

**notified** 79:5

**november**
75:23 77:16,23
78:8 110:11

**number** 6:17
44:17,17 47:14
54:20 75:7
81:1 90:23

107:11 118:25
119:7

**numbers** 44:12
44:13 75:4
106:18 121:7

**numerous** 95:4
103:17,17
109:6

**o**

**o** 18:17 33:22
48:25

**o0o** 6:2

**oath** 7:6 9:11
118:9

**object** 10:7
64:24 72:3,7
73:13 74:5
84:25 85:6
94:23 96:18
97:4 98:13
101:2,10,17
102:6 105:3
106:7,22 107:5
108:5 110:19

**objection** 8:1,4
65:9 66:15
93:6 98:24
99:14,22
102:12,18
103:21 109:1
109:21

**objections**
67:10 100:7

**obligation**
64:21 65:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**[obtain - own]**                                                    Page 21

| | | | |
|---|---|---|---|
| **obtain** 14:8 | 60:20 | 69:10,19,21 | **opening** 32:17 |
| 15:19,22 | **offices** 70:6 | 70:5 71:5 | **operation** |
| **obtained** 15:16 | **official** 120:15 | 76:24 77:1,4 | 48:19 |
| **obtaining** 16:5 | 121:21 | 78:10 80:24 | **operations** 21:6 |
| 19:5 36:21 | **officially** 60:5 | 81:7,10,13 | 32:18 |
| **obviously** 9:10 | **oh** 24:4 27:14 | 82:3,12,20 | **opinion** 40:23 |
| 37:1 93:8 | **ohio** 119:2 | 83:4 84:1,12 | 97:5 98:14 |
| **occasions** 22:20 | **okay** 8:15 11:7 | 85:18,20 86:7 | 106:9 109:2,3 |
| 67:25 | 11:11,13,15 | 88:14,16 90:5 | 110:21 113:10 |
| **occur** 64:2 | 12:6,14,24 | 91:5,8 92:17 | **opportunity** |
| **occurred** 101:8 | 13:2 15:11,14 | 92:25 94:17 | 85:6 |
| **october** 76:12 | 16:9,13,18,25 | 98:8,19 99:6 | **option** 39:1 |
| 77:5 78:8 | 17:13 19:15 | 99:11,19 | 70:12 |
| **offer** 111:7 | 20:2,7,9 22:18 | 100:13 103:7 | **options** 38:22 |
| **offhand** 29:3 | 23:12,16,23 | 104:22 105:8 | 39:4 |
| 62:20 66:5 | 24:19 25:25 | 106:10 107:10 | **order** 94:8 |
| 93:22 113:17 | 26:15 27:7,12 | 108:1 109:18 | **ordered** 23:5 |
| **office** 2:20 | 27:15,20 28:1 | 110:6 112:5 | **ordering** 52:8 |
| 30:18,20 32:9 | 28:16 29:7,23 | 114:1,18,20,24 | **original** 116:10 |
| 32:14,17 43:21 | 30:5 31:10,18 | 115:14,18 | **originally** |
| 119:14 | 33:11 34:8,24 | 116:5,13 | 19:19 |
| **officer** 16:13,22 | 36:1,18 37:5 | **older** 22:6 | **originate** 29:9 |
| 17:11 22:9 | 38:4,9 42:12 | **once** 38:21 | 31:19 |
| 23:13 26:1 | 43:9 45:2 46:5 | 52:16 58:7 | **ought** 89:5 |
| 27:4,10 28:2 | 46:12,16,22 | 68:9 | **outside** 8:2 |
| 28:23 29:1,8 | 47:11,19 49:14 | **one's** 59:23 | 19:5 29:10 |
| 29:11 32:1,2 | 49:18 52:6,11 | **ones** 12:1 14:23 | 33:6 |
| 33:3,5,7 34:16 | 53:18 54:15 | 35:13,16 | **overlooking** |
| 34:17 39:23 | 55:18,22 56:1 | **online** 13:20 | 74:12 |
| 44:3,7 53:4 | 56:23 58:19 | 16:1 69:23 | **own** 28:3,23 |
| **officer's** 31:18 | 59:6,17 60:7 | 111:20 | 29:24 30:1,2,9 |
| 31:19 32:4 | 61:16,21 63:13 | **open** 21:2 | 30:10,11 31:10 |
| **officers** 22:7 | 64:13,20 65:13 | **opened** 18:13 | 31:11 34:8,10 |
| 29:20 32:16,18 | 66:6,10 67:21 | 30:21 49:13 | 83:7 |
| 35:3 39:9,10 | 67:25 68:16 | | |

**owner** 20:9 32:12 62:20

**p**

**p** 48:25

**p.m.** 2:21 6:5 44:22 62:5,8 91:25 92:3 114:4,7 117:2 117:5

**pacific** 35:18 36:1 40:5 49:9

**package** 35:3 43:14,24 44:9 70:13 89:1,6

**packages** 44:6 52:2

**page** 4:4,11 5:2 5:10 43:5 44:13,14,17,18 50:2 54:20 63:11,14 68:24 70:10,11 75:7 75:8,25 76:6,7 77:5,10,17 80:15,15,24 81:21 82:5,5 86:16,16,17 88:1 106:17,18 107:10 110:10 117:8 121:7 122:3

**pages** 27:1 76:2 81:22

**paragraph** 43:5 50:2,5

63:11 64:20 66:23 110:10 110:16,18

**paragraphs** 110:13

**park** 3:14

**part** 14:21 15:1 15:6 30:22 50:17 58:19 70:18,22 71:12 71:18 72:1,18 73:10,24 77:7 78:7 82:3 87:22 90:20 92:18 93:2 98:22,22 107:2 107:19,20,24 111:23 121:9

**partaken** 27:21

**partakes** 95:20

**partially** 110:19

**particular** 16:22 45:11 46:12 95:10

**particularly** 48:9

**parties** 7:19 50:10 94:10,10 118:18

**party** 24:16 27:5

**password** 35:2 35:4

**past** 8:9 89:3

**paul** 82:10,14

**pay** 17:7 18:5 31:23 38:10

**paying** 21:3 31:5 84:22

**payroll** 21:4,5 101:21

**pdf** 12:11

**pee** 41:15

**penalty** 106:2 108:25 109:19 117:7

**pending** 10:12 23:19,24 27:23 64:9

**people** 26:8 32:19 36:7,12 37:11 48:3,6 49:15 113:7,12 113:16

**percent** 38:12 47:12,12 48:14 69:7

**percentage** 47:2,5

**perform** 105:10 105:12

**period** 48:15 53:10 80:25

**perjury** 117:7

**person** 17:6 29:24 30:1 76:10 84:1,22 86:3 111:15

113:7

**personal** 77:11 105:19

**personally** 25:2 39:6,18 88:16 88:18 120:11 121:15

**pertains** 70:13

**phone** 61:4,6,9 78:20 84:4,5,6 88:19 119:3

**phrase** 97:22

**pipeline** 29:14 31:11 34:9,24 87:7,12

**pirouz** 8:19 28:25

**place** 11:13 23:14 58:17 93:6 102:23 105:12 118:7

**placed** 118:9

**places** 100:20

**plain** 38:9

**plaintiff** 1:6 2:6 3:2 6:24 7:9 24:22 27:10 96:23,24 97:8 97:9

**plaintiff's** 4:13 4:15,17,20 49:20 68:18 74:23 75:3 78:23 80:9,14 81:15 89:13

**[plaintiff's - professional]**                                      Page 23

92:8,23,23
93:1,25 94:18
98:3,9,20
100:2 103:8
105:9,25 110:9
**platforms** 25:4
**play** 16:19 46:8
**plaza** 36:3,6
**please** 6:21 7:5
8:23 9:25
10:10 11:4
13:4 85:4
119:14
**pllc** 3:3,7
**pmk** 6:13
**point** 13:8
17:22 26:1
29:16 48:22,25
49:12,14 66:7
86:24 90:1,6
114:16
**policies** 63:21
**policy** 102:16
103:2
**portal** 29:21,23
30:7 49:8,9
101:21,24
**position** 72:16
72:19 73:5,18
84:9 105:24
108:24
**possibility** 53:7
**possible** 53:4
53:19 54:1
96:9

**post** 14:16
**posting** 64:2
**posts** 51:14
**potentially**
27:22 53:5
104:16
**practice** 17:15
**practicing** 16:6
**preamble** 43:6
69:23
**precedent**
105:10
**precedents**
105:12
**prefer** 119:16
**preparation**
11:21
**prepare** 11:5,7
12:19
**prepared** 92:19
**preprinted**
112:14
**present** 3:18
**presented**
116:2
**president** 20:16
20:23 80:20
**press** 112:25,25
113:6,7
**pretty** 18:5
23:22 26:19
35:19 46:7
53:2 58:15
84:5

**prevents** 94:1
**previous** 90:16
**previously** 5:9
28:12 54:18
78:5 87:18
103:13
**pricing** 37:16
**principal** 2:20
70:5
**printout** 4:22
5:4,13 69:23
**prior** 11:9 16:5
16:21 18:9
79:14 81:10
82:17,24 83:22
91:8,15 118:8
**privilege** 17:8
75:16 85:1,8
**prob** 83:14
**probably** 9:6
12:1 16:1 34:4
34:21,22,22
40:1 44:5,6
46:11 56:12,12
56:20 57:9,13
59:9 60:13,14
61:5 76:11
87:11 97:18
101:23 109:20
109:23 111:12
**probation** 23:2
**procedurally**
94:19
**procedure** 7:22
120:5 121:5

**procedures**
63:22
**proceed** 10:20
**proceedings**
6:18 118:6,8
118:10
**process** 28:13
30:16 31:22
69:13,16 70:19
72:19 73:24,25
74:2 78:7
111:19,20,24
**processing**
31:16 49:6,17
89:22
**processor**
30:14,15 31:16
31:21 32:5
52:7
**processor's**
31:21,25 32:5
**produced**
74:19,19 76:21
77:3 81:19
89:18
**product** 38:16
38:19 44:9
50:19
**production**
4:17 75:4
119:23
**products** 50:6
50:13,20
**professional**
14:16

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
www.veritext.com

**[program - recall]**

**program** 13:20 15:25 16:2
**promise** 86:4
**promised** 23:13 82:21
**promises** 85:25
**promissory** 103:4
**prompt** 64:1
**pronouncing** 33:1
**provide** 13:4 49:4,14 64:1 77:6 93:8 106:9
**provided** 22:1 22:13,18 29:20 66:12 67:8 76:17 77:11 85:24 104:22 111:17
**provider** 16:2 20:1
**provides** 52:21
**providing** 27:4 85:21
**provision** 64:11 107:14 108:8 108:10
**public** 55:20 102:16 103:2 120:10,18 121:15,23 122:23

**pull** 63:7 106:16
**purchase** 54:25 80:1 86:21 90:10
**purchased** 36:5 119:17
**purpose** 22:3
**purposes** 34:16
**pursuant** 7:18 7:24
**put** 42:20 54:17 78:10 108:21
**putting** 42:23

**q**

**question** 8:2,5 9:17,20,22,23 10:1,2,9,12,13 22:23 41:21 54:1 59:12 65:2 67:14 71:24 72:10,21 85:16 87:13 92:15 94:24 97:5,15,16 98:15 101:13 104:5 106:8 107:15 108:2,6 108:7 110:20 116:19
**questions** 9:10 9:11,16,24 10:7,15 22:21 52:20,23 85:4 85:9 108:15,17

114:9,15 116:14,23
**quick** 91:21
**quite** 46:24 87:21 97:9

**r**

**ran** 30:18 80:4 83:7 89:22
**ranch** 2:22 6:19
**rancho** 18:20
**rate** 37:4,13,15 38:9,16 41:6
**rates** 28:20 48:5,13
**reach** 83:12 84:2 88:11,16
**reached** 57:16 59:21 83:15,24 84:18 85:12 86:8 88:18 113:13
**read** 50:3 55:6 56:18 63:17,19 64:11,21 71:22 71:23 99:20 104:3,4 107:12 108:7,25 111:23 120:5,6 120:12 121:5,6 121:17
**reading** 7:16 67:19 119:12 119:19
**reads** 44:21 110:11

**real** 14:24,24 15:2 16:23 17:2,15,19 18:10 19:6 25:17,23,24 26:4,5 33:8,12 33:13,14 109:13 112:4
**really** 10:5 12:11 25:20
**realtor** 15:12 17:10,21 34:5 34:7,7,17,19
**realty** 18:17 25:15,17
**reason** 31:3 71:15,17,21,25 72:7 74:13 87:4 89:8 121:8 122:3
**reasons** 93:17 93:20 102:16
**recall** 16:2 23:19 27:13,18 29:2 30:24 34:2 42:12 43:16 44:24 45:1,14 55:22 56:14,23 58:13 58:16 60:11,15 62:19 63:1 65:11 66:2 67:25 68:2,11 68:14 69:13,17 70:16 71:1,2,8

**[recall - reporter]**

71:11 75:19
76:13,15,22
78:6,14 80:3
82:7 84:10,11
86:13 104:13
104:17 113:16
113:19
**receipt** 119:19
**receive** 13:12
13:22 24:20
104:16
**received** 14:1
14:22 56:18
57:19 59:19,25
78:18 79:3
81:20 86:18
93:13 103:14
103:15,15,16
104:12,14,20
104:25 110:24
111:2,3
**receiving** 56:23
79:14 82:17,25
104:17
**recent** 110:12
111:1
**recertification**
68:9
**recess** 62:6
92:1 114:5
**recollection**
82:23 88:20
**recommendat...**
43:25

**recommended**
43:16
**record** 6:5 7:17
8:1,4,7,23 10:4
10:14 18:25
23:7 62:4,8
71:23 77:2
86:19 91:24
92:3,5 104:4
114:3,7 117:2
118:10 121:9
**recording** 6:18
**recover** 96:23
97:9
**redacted** 75:9
75:11
**redaction**
75:12
**refer** 10:22,23
10:24,25 63:10
68:24 69:19
75:5 78:5
**reference** 119:7
120:2 121:2
**referenced** 99:4
119:11 120:11
121:15
**referring** 112:3
**reflect** 90:8
**refresh** 82:23
**refund** 22:8
**regarding**
55:23 74:10
112:21

**regularly** 64:3
64:21 65:5
103:20 104:6
**regulations**
21:4
**relating** 27:3
56:2,25 60:8
76:3 77:11
84:23 86:1,5
86:10,11 97:2
107:4
**relationship**
39:13 45:23
47:17 54:13
78:14 88:5
**relationships**
39:3,12,15
**relative** 118:17
**relevant** 113:22
**remember** 12:2
23:11 24:7
36:10 44:5
45:18,19 46:10
55:25 56:22
60:4 71:3,9
72:24 74:19
76:23 77:4
83:15,16,21
84:16,20 87:2
87:6 111:13
113:7,13 116:3
**remote** 28:18
**renew** 67:21
111:22 115:19

**renewal** 5:16
69:8,13 70:13
70:18 71:12,19
72:2,18,25
73:10,12,24,25
74:2,11 75:24
76:3,8,14 77:8
77:18 78:7
107:20 111:23
115:18
**renewals** 72:21
**renewed** 69:1,4
69:11 73:1
77:20 115:23
**renewing** 25:20
32:23 68:11
70:22 111:19
115:24
**rep** 43:21 45:17
45:18,18 57:17
59:7,8,12
**repeat** 65:2
66:21
**rephrase** 10:1
72:10
**report** 31:24,25
47:25 48:16
80:5,6 83:7
89:22,25 91:1
91:5,9
**reported** 1:23
**reporter** 2:19
6:9 7:5,11 24:7
33:18,23 49:21
55:6 60:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[reporter - rocket]**

63:20 68:19
74:24 78:24
80:10 81:16
89:14 91:21
92:9 118:1,5
120:7
**reporter's** 9:19
**reports** 47:10
47:24
**represent** 6:22
43:3 49:24
52:1 56:9 75:2
81:19 89:17
92:12 96:8
107:19,24
108:4
**representation**
59:17
**representative**
7:21 58:1
109:4
**represented**
115:5
**reps** 58:8,21
59:10
**reputation** 37:6
**request** 8:8
68:23,24 75:3
85:13 121:9,11
**requested**
67:24 68:15
83:1,9 87:13
89:24 91:18
118:15

**requests** 4:15
4:17 77:6
**required** 16:12
64:3 119:25
**requirement**
54:25 55:5,11
**requirements**
18:6,7 63:22
**reserves** 8:8
**residence** 2:22
**residential**
25:17
**resolved** 24:2
27:13
**resources** 50:7
50:14,19,20
**respect** 85:8
**responding**
9:17
**response** 60:22
69:2 77:16
90:17
**responses** 4:14
4:16 68:22
75:3 81:20
**responsibilities**
20:23 32:10
**responsibility**
21:12 38:19,20
95:12 102:25
**responsible**
21:3,7
**restate** 72:14
**restriction**
104:18

**restroom** 91:21
**retail** 35:11,14
35:17,19,25
36:14,16,19
37:9,24 40:12
40:16,20,24
100:25,25
**retiring** 28:13
**returned**
119:18
**review** 11:17
11:20 38:6
54:24 75:17
79:8,25 86:21
90:10 118:15
119:14 120:1
121:1
**reviewed** 12:9
71:11
**rfps** 74:20
**rhatigan** 1:14
2:17 4:3,18,22
6:12 7:8,20 8:5
8:17,23,25
25:7 44:23
62:10 75:17,20
76:12 85:3
92:5 106:8
114:10 117:1
119:8 120:4,9
121:4,13
122:20
**rhatigan's** 7:23
109:2

**rick** 26:9,11,12
33:14
**ridiculous**
88:24
**right** 8:8 9:14
19:4 21:24
26:9 30:18
33:1,9 41:6
44:13 46:6
54:20 58:24
62:25 77:1
92:21 97:20
102:24 103:20
104:8 105:22
110:5 114:15
114:22 115:2
115:15,21
116:13
**road** 2:23 3:4,8
6:19 70:6
**rocket** 4:23 5:4
10:24,24,24
35:18 36:1
42:1 54:12,23
55:1,3,9 79:7
79:25 81:3,4
81:25 82:4,16
83:23 84:2,12
85:12,21,24,24
86:10,12,21
87:15 88:23
89:23 90:9
91:4,14 96:12
100:10 104:19
111:6,7,15

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

**[rocket's - shorthand]**

| | | | |
|---|---|---|---|
| **rocket's** 86:19 111:10,11,17 | **saying** 63:18 67:5,18 73:4 95:9,21,23 110:25 | 70:11,14,15 84:18 90:22 107:16 108:12 112:2,9 115:15 | **series** 9:10 52:20 85:3 |
| **role** 28:25 30:13 | **says** 42:19 43:22 44:16 66:23 69:23 70:5 75:23 76:8 92:23 99:3 | **seeing** 39:21 70:21 71:3,9 72:24 78:6 | **served** 28:22 113:2 |
| **ron** 20:6 | | **seek** 88:8 | **service** 50:25 51:2,5,9,21,23 52:4,12,15,17 53:9,10 80:16 |
| **room** 53:17 | | **seeks** 94:19 | |
| **row** 90:23 | | **seems** 18:24 72:6 | |
| **rule** 7:22,25 8:10 | **scenario** 98:12 | **seen** 57:18 67:14 70:20,22 71:3 73:18 75:21 78:9 106:11 109:8 109:10 | **services** 18:17 50:7,13,19,20 51:17 52:7,8 52:21 53:2,5 54:2 |
| **rules** 60:8 120:5 121:5 | **school** 13:7,10 13:14 | | |
| **run** 32:8 47:24 47:25 48:16 49:5 | **schools** 14:14 14:16,19 | | **set** 35:3 89:1 118:7 |
| | **science** 14:6 | | |
| **running** 32:15 47:10 | **scope** 8:2 | **self** 32:19 | **seven** 8:6,9 48:14 79:20 |
| **russell** 2:22 6:19 | **screen** 70:23 78:6 | **semiretired** 28:9 | **several** 22:4,19 |
| | | **send** 37:3,11 39:9,17 42:1 43:24 83:20 88:25 89:10 100:21 | **seyferth** 3:3,7 |
| **s** | **screenshot** 5:13 69:23 | | **sharon** 20:5,6 |
| **s** 3:13 4:10 5:1 119:5 121:8,8 122:3 | **seal** 120:15 121:21 | | **sheet** 90:14 121:7,10,18 122:1 |
| **sachs** 26:18 | **search** 39:16 | **sending** 53:10 76:23 77:4 | **shield** 84:17 86:10 111:11 111:11,17 |
| **san** 13:18,24 24:4,5,6 | **seasoned** 39:10 | | |
| **santa** 18:20 | **second** 4:15,17 41:14 45:17,18 63:14 66:24 68:23,24 75:3 80:15 82:3 86:17 113:8 | **sense** 36:13 | **shields** 85:12 |
| **sat** 8:18 | | **sent** 5:4 12:4 52:2 61:17 75:22 76:8 83:3 87:14 89:6,23 | **shop** 37:19,20 37:25 41:3 |
| **satisfied** 18:7 | | | **shorthand** 2:19 7:11 49:21 68:19 74:24 78:24 80:10 81:16 89:14 92:9 118:4,11 |
| **save** 18:24 91:20 | | | |
| **savings** 31:6 | **section** 54:21 106:17 107:11 | | |
| **saw** 55:24 56:21 59:4 60:2 67:13 87:10 110:25 | **see** 44:13 50:8 54:21 59:20 | **sentence** 66:24 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**shortly** 56:6
  113:17
**showed** 80:6
  83:2
**showing** 109:9
**side** 54:17
**sierra** 35:18
  36:1 40:5 49:9
**sign** 52:2 57:20
  58:2,3,12 59:5
  59:21,22 72:24
  73:7 110:24
  114:24
**signature** 64:8
  67:3 80:22
  118:21 119:14
**signed** 44:22
  59:14 80:19
  93:13 115:6
  120:13 121:18
**signing** 44:24
  119:12,19
**similar** 11:2
  44:17 70:17
  78:6 88:22
**simplest** 93:10
**simplify** 75:15
**simply** 75:12
**sincerely**
  119:21
**single** 39:1,1
**sir** 74:21
  119:10
**siri** 1:23 2:18
  6:10

**sitting** 53:17
  97:19,20 110:4
**situation** 38:7
  115:12
**six** 48:14 68:3
**skip** 105:23
**skipping** 91:20
**skyrocketed**
  28:21
**slow** 48:8
**slower** 55:6
**slowly** 63:19
**small** 18:21
  27:22,25 63:16
**smoothly** 10:21
**social** 25:2
  26:25 51:13
**soda** 61:25
**software** 48:18
  48:18,21 49:4
  49:6,7,17 66:7
  89:23 90:1,6
**sold** 37:5
**sole** 20:1,4,9
  109:18
**soliciting** 40:20
**solutions** 6:8
  6:10 119:1
  122:1
**somebody** 40:7
  40:8 56:17
  98:14
**sorry** 20:5
  23:23 26:15
  33:18 41:18,18

42:8 53:25
  55:8 60:23
  65:2,22 71:16
  76:11 77:15
  78:3 79:22
  83:19 84:7,8,8
  88:23 91:12
  92:15,17
  106:24 107:5
**sort** 82:16
**sounds** 62:25
**source** 43:22
  89:2
**southern** 1:3
  2:3 6:16
**speak** 84:12
**speaking** 40:17
  58:13
**specific** 57:14
  61:7 85:9 91:5
**specifically**
  7:25 25:16
  57:3,18 83:13
  85:10 103:17
  104:15,21
  110:13 112:24
  113:13
**spell** 33:21
**spelled** 48:23
**spoke** 23:10
  58:13 60:13
  62:19 63:1
**spoken** 60:12
  63:4 111:14
  113:4

**stage** 105:20
**standard**
  102:24
**standpoint**
  36:21
**start** 7:16 9:22
  19:2 37:8 44:1
  75:18 82:3
  92:22
**started** 18:15
  19:19 68:4
**starting** 6:22
  66:24 90:23
**starts** 76:7
  81:21
**state** 2:19 8:4
  8:24 23:20
  81:1 93:4
  94:21 100:5
  103:10 106:5
  108:23 118:5
  120:10 121:15
**stated** 7:25
  10:10 103:13
  109:6
**statement** 40:7
  94:13,14 113:1
  120:13,14
  121:19,19
**statements**
  31:23 38:10
**states** 1:1 2:1
  6:15 50:3
  54:22 68:25
  82:20 94:17

98:2,8,19 100:2 103:7 105:8,25

**stating** 87:7

**steering** 95:4 95:16,20

**steps** 16:22 18:2

**stick** 69:16 73:3

**stipulation** 7:16

**story** 57:20

**streamed** 55:18

**strike** 71:16 91:13 113:19

**stubs** 31:23 38:10

**stuck** 73:20

**submission** 64:5 66:10,25 67:6 76:12

**submit** 28:3 32:7 38:21 46:17 50:22 54:22 65:16,22 70:12 79:24 111:24

**submits** 100:24

**submitted** 64:10 65:20 66:3 71:12,19 72:2 76:9,10 76:14 81:3 86:21 90:9 91:12,14

**submitting** 46:25 65:25 70:13,16 79:6

**subscribed** 118:19 120:10 121:14 122:21

**subsection** 54:22

**subsequent** 78:19

**subsequently** 50:9

**subset** 39:24

**subsidiary** 36:15

**substantively** 94:19

**succeed** 101:1

**sued** 22:6,12 42:9

**suffer** 100:3 102:3,10

**suffered** 100:10

**suing** 42:3

**suit** 42:7 62:12 83:18,23,24 89:5

**suite** 3:4,8,14 70:6 119:2

**superior** 119:1

**supplemental** 4:20 80:13

**supposed** 53:15

**sure** 23:22 26:19 27:12

31:18 32:6,20 33:23 34:25 35:2,19 43:13 45:1 46:7 53:2 53:17,21 58:15 60:14 67:17 72:10 73:8 76:25 84:5 87:1,12 88:18 93:18,20,23 97:9 101:15 107:18 114:2 115:14

**switched** 58:21 59:12

**sworn** 7:10 120:10,13 121:14,18 122:21

**system** 66:7

**t**

**t** 4:10 5:1 48:25

**take** 11:13 15:1 15:6,9,22 16:21 18:3,4 23:14 24:11 28:11 38:7 41:7,12,14 62:3 74:11,12 74:17 75:17 84:19 85:13 91:21 107:12 113:24 115:11

**taken** 2:18 9:11 10:17 14:21

27:20 58:17 62:6 92:1 114:5 118:6 119:11

**talk** 60:20

**talked** 58:15 90:16 102:22 112:19 113:9

**talking** 35:20 35:20 48:5 53:22 60:17 83:21 113:3

**tanked** 28:19

**tech** 101:21,23

**technician** 6:8

**telephone** 3:5,9 3:15

**tell** 37:1,11 39:9,17 43:22 47:7,9,24 68:4 103:25

**ten** 14:10

**term** 11:3 44:12 47:17 97:17,22 103:4 105:14

**terminate** 54:13 79:15,19

**terminated** 79:11 88:5 101:9

**termination** 48:9,10 88:8 104:23 105:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[terminology - transactions]** Page 30

| | | | |
|---|---|---|---|
| **terminology** 57:22 | **things** 35:21 52:9 53:20,24 75:15 87:3 91:20 93:18 95:4,8 109:10 | **thought** 87:5 | **titles** 20:19 |
| **terms** 11:2 31:8 45:9 93:11 | | **three** 23:10 25:14 38:11 42:4,6,7,7,9 46:1,9,25 47:20 48:14,15 81:22 87:3,10 | **today** 6:5,9 8:7 8:18 10:17 12:25 20:17 24:12 26:17 34:16 35:20,24 53:8 61:15 97:19,20 99:20 104:24 105:2 109:9 110:4 114:9 |
| **terrible** 89:7 | | | |
| **test** 18:4 | **think** 11:19 12:9,15 14:3,5 15:20 22:21 23:2,4,5,6,17 23:21 26:3,20 27:24 28:20 31:9 33:14,14 35:14 41:21 42:4 45:18 47:5 48:12,13 48:24 52:16 53:8,12,12 57:9 58:23,24 59:25 67:20,20 71:20 76:19,19 78:18 80:5 82:16 87:4,9 94:23,24 95:1 95:2,2,2,3,3,4,7 95:19 96:18 98:15 101:12 101:15,22,24 103:2 105:21 109:24 110:3 113:8,9 116:13 | | |
| **testified** 7:11 21:23 26:3 62:10 103:19 104:6,11 111:10 | | **time** 6:5 8:6,9 10:10,12 14:5 18:8 23:3,6 24:11 25:21 28:8 29:2 30:24 34:21 39:11 42:3 43:10 57:2,17 58:4,5 59:9 62:1,5,8 63:25 63:25 64:11,13 64:15 65:19 66:2 69:5,8 72:22,22 73:12 75:17,18 76:12 79:20 83:18 85:11 86:8 89:24 91:6,18 91:20,25 92:3 107:12,13 108:9 114:4,7 117:2 118:7 | **today's** 10:20 11:21 12:19 41:6 |
| **testify** 10:18 53:8 | | | **told** 22:10,12 57:21,24,25 58:10 59:5,15 59:20 60:18,25 73:2,20 93:11 95:15 103:17 108:21 109:7 110:23 |
| **testifying** 118:9 | | | |
| **testimony** 7:23 7:24 22:1,13 22:19 71:7,10 108:3 120:6,7 121:6,9,12 | | | |
| | | | |
| **texas** 3:9 52:18 52:19 | | | |
| **text** 61:12,19 | | | **took** 25:18 37:7 72:16 105:23 |
| **thank** 7:4 | | | **top** 20:25 |
| **thanks** 41:17 83:17 | | | **total** 47:4,20 76:2 81:1 |
| **theft** 24:14 | | **times** 22:19 32:15 80:3 103:17,18 109:6 | **townsgate** 70:6 |
| **thereof** 64:1 118:13 | | | **track** 47:23 |
| **thing** 10:11 36:3 37:12 38:9 48:13 58:11 61:1 102:21 103:2 110:23 | | | **trade** 14:19 |
| | **third** 4:20 80:13 | | **tragic** 88:24 |
| | | | **transaction** 31:22 |
| | **thirty** 11:16 119:18 | **title** 20:14,17 31:24 52:8 | **transactions** 25:19,22 |

109:13,14
**transcribed**
  118:11 120:7
**transcript** 9:18
  118:15 119:11
  119:16 120:5
  120:12 121:5
  121:11,17
**transcription**
  118:13
**transpired**
  83:16,16 95:15
**trial** 27:8
**tried** 73:3
**troy** 3:5
**true** 35:9 36:16
**truthfully** 9:12
  10:18
**try** 9:21,21
  24:7 33:23
  38:1 39:25
**trying** 32:13
  71:20 72:5
  83:15 96:5
**turn** 31:20
**two** 14:1 18:6
  22:25 35:21
  46:25 48:14
  59:1,2 82:1
  85:5 95:10,22
  96:5,6,7,15
  100:21 113:7
**type** 21:20
  47:23 55:22
  78:11 85:24

109:12,13
112:3 115:12
**types** 14:22
  26:6
**typically** 39:24
  40:3 111:22

**u**

**uh** 10:4 44:15
  44:20 58:22
  76:5
**uh's** 10:5
**unable** 97:15
  97:16
**unconsciona...**
  94:20,21
**under** 7:22
  65:5 117:7
  118:9,11
**undersigned**
  118:4
**understand**
  8:18 9:10,24
  10:15,16 11:3
  17:9 24:19
  27:20 36:13
  66:23 67:5,19
  92:23 93:9
  94:3,25 96:11
  97:7,12,17,22
  98:11 106:16
**understanding**
  36:18 41:19,20
  41:22,25 43:9
  53:1 54:8,10
  55:15 79:18

86:18 94:8
95:25 96:3,4
97:24
**understood**
  10:2 82:2
  101:12
**underwriting**
  54:25 79:8,25
  86:21 90:10
**unenforceable**
  102:17 106:2
  108:25 109:16
  109:19
**unethical** 95:2
  95:17
**unfortunately**
  108:13,15
**united** 1:1,5 2:1
  2:5 6:13,15,24
  7:1 8:3,7 10:23
  29:17 42:2
  49:25 58:1
  68:22 75:22
  92:13,24
  115:20 116:2,6
  116:9 119:6
  120:3 121:3
**university**
  13:20 14:7,9
  14:12
**unjust** 105:14
**unnatural**
  24:11
**untrue** 110:16

**use** 10:21 11:2
  43:22 48:18
  49:9 51:23
  52:11,17,24
**used** 17:1 36:24
  48:4 50:24
  51:4,8,12,16,20
  52:3,7,14,22
  53:2,3,5,9,10
  54:2
**uses** 66:8
**using** 11:3
  49:12 52:25
  118:10
**usually** 35:2
  43:21
**uwm** 8:7 10:23
  30:7 34:13
  39:13 40:5
  42:7,9,13,16
  43:6,10,12,14
  43:20 44:1,16
  44:19 45:3,6,9
  45:12 46:12,14
  46:17,18,24
  47:3,6,17
  48:11 50:5,8
  50:15,18,19
  52:21 53:13
  54:11,14 55:2
  56:19,21,24
  60:1 61:11
  62:11 63:20,24
  63:25,25 64:6
  64:16 65:17,23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                          586-468-2411
                                          www.veritext.com

**[uwm - wholesale]**

66:1,4,11,12
67:1,7,8,22
68:12 69:16,24
70:19,22 71:13
71:19 72:2,16
76:3,4,14
78:12,15 79:5
79:11,15,20
87:7 88:5 89:2
89:4,18 91:8
96:1 101:6,15
102:2,3,9,10
103:20 104:7
105:12 111:20
114:21
**uwm's** 29:13,21
31:10 34:8,24
49:8 50:6,13
50:24 51:4,8
51:12,16,20,23
52:7,11 54:6
63:21 64:2,17
64:22 65:6
97:1

**v**

**v** 119:6 120:3
121:3
**va** 40:9
**vaguely** 45:18
**valid** 94:2
**validate** 106:13
**valley** 62:18
112:18
**value** 97:25

**vanilla** 38:10
**various** 4:22
**ventura** 23:21
23:22 27:21,22
**venue** 105:19
**verbal** 44:1,5
**verbalize** 10:3
**verbatim** 118:9
**veritext** 6:8,10
119:1,7 122:1
**verne** 13:20
14:7,9,13
**versus** 6:14
**video** 6:7,12
51:17 55:18,23
55:24,25 56:2
**videographer**
3:19 6:4 7:4
62:4,7 91:24
92:2 114:3,6
116:25
**videotaped**
1:14 2:17
**village** 1:16
2:23 6:19 9:1
70:7
**virtual** 52:11
**vocational**
14:19
**voicemail**
113:9
**vp** 82:16 88:21
**vs** 1:7 2:7

**w**

**w** 31:23 38:10
**wait** 9:16,21,21
33:23
**waiting** 60:24
103:25
**waived** 119:13
119:20
**walk** 41:5
**want** 19:2
27:19 31:1
38:12,16,17,17
38:17,18 41:12
41:13 43:22
54:14 58:8
62:2 85:7,8
86:24 95:24
113:25 114:16
**wanted** 39:16
84:19 113:10
116:10
**wants** 38:13
**warehouser**
18:18
**watched** 56:2
**watching** 55:22
**water** 41:13,14
**way** 9:19 11:5
35:24 36:24
48:23 54:3,16
71:2,20 73:4
73:21 74:19
96:9 104:13
108:16,20

**we've** 8:17
14:23 101:21
**website** 26:21
26:23 60:3
63:20 64:3,17
64:22 65:6
103:20 104:7
111:13
**websites** 49:8
**wednesday**
1:17 2:21
**week** 11:14
12:18 56:11,13
56:24 59:1,11
**went** 13:17,18
18:16,18 22:11
27:7 28:9
48:13 58:9
91:3
**west** 3:4
**western** 18:15
**westlake** 1:16
2:23 6:19 8:25
19:19,24 25:12
25:14,15,15,16
25:17,18 69:25
70:2,6 76:9
**westlakemtg....**
82:12
**westlakemtg....**
26:24
**whatnot** 84:20
**whereof** 118:19
**wholesale** 1:5
2:5 4:23 5:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                  586-468-2411
                                                  www.veritext.com

5:15 6:14,24
7:1 8:3,7 10:23
12:16 29:17
35:15,17,19,25
36:14,25 37:9
37:16 42:2
43:3 44:10
46:13,16 48:10
49:25 50:7,8
50:14 58:1
64:17,23 65:5
65:7 66:13
67:21,23 68:11
68:23 69:1,5
69:22,24 70:18
70:24 71:11,18
72:1,17 73:11
74:1,3 75:22
76:3 79:6,11
79:15,19 81:23
87:23 89:9
92:13,24 99:5
99:6,7,8,11
106:12,14
107:3 114:17
114:20 115:19
115:20 116:3,6
116:9,11,21
119:6 120:3
121:3
**wholesalers**
72:22
**wife** 20:5,7,11
**william** 3:13
4:19 7:2 119:5

**william.cook**
3:15
**wilson** 3:8,13
**wilsonelser.c...**
3:15
**withdraw**
108:5
**witness** 4:2 7:9
8:13,15 12:3
12:10 19:2
24:9 33:20
41:10 43:1
48:25 60:24
61:22,25 62:2
65:2 66:18
67:12 72:5
73:15 74:8,14
74:17 77:25
85:15 93:10
95:1 96:20
97:6,8 98:17
99:24 100:9
101:4,12,19
102:7,14,21
103:25 104:9
106:10,24
107:8 108:14
108:18 109:6
109:23 110:22
114:2 118:19
119:8 120:1,4
120:11 121:1,4
121:15
**witnesses** 118:8

**won** 27:14
**word** 111:25
**worded** 71:20
**work** 18:16,18
20:7 28:2,17
35:11 36:14
38:11 39:25
45:11 46:12
52:9 54:12,12
54:14 81:11
95:21,23,24
96:1,5,9,15
**worked** 18:11
18:19,21 40:3
**working** 17:10
32:13 40:13
44:1
**works** 29:5
35:8,16 38:5
39:5
**worry** 57:24
59:5 80:17
**writing** 44:2
61:12 105:24
**wrong** 32:25
86:15 95:5,17
95:18

| x |
| --- |
| **x** 4:1,10 5:1 |
| 49:1 54:22 |
| 110:13 118:15 |

| y |
| --- |
| **y** 3:4 49:1 |

**won** 27:14
**yatooma** 82:10
82:14,18,20,24
83:12 84:1,13
86:8,18 111:6
111:6
**yeah** 12:7 13:9
17:14 18:4
20:3,5 22:24
22:25 24:2
25:9 26:14
27:14,14,17
30:21 31:1
33:17 34:10
36:22 48:25
49:6 53:17,18
53:18,18,23
54:17 55:8
56:12 61:22
62:3,25 63:13
72:12 75:10
83:9 97:14
100:16 105:7
**year** 13:10 14:1
14:2 17:7 31:6
38:18,18 47:2
48:1 68:8,9
87:21
**yearly** 68:2
**years** 14:11
18:7 22:6
23:16,17 29:4
29:6 34:4,22
34:23 36:9,9,9
37:6 44:6
47:21 68:6

**[years - zoom]**                                                    Page 34

| |
|---|
| 100:18 |
| **yeses**   10:5 |
| **yesterday**   8:20 |

| **z** |
|---|

| |
|---|
| **z**   33:22 |
| **zoom**   11:9,11 |
|   11:13,15,17,19 |
|   12:17 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.