# EXHIBIT 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC,

Plaintiff,

vs

Case No. 22-10395
Hon. Laurie J. Michelson

KEVRON INVESTMENTS, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF SARAH DECIANTIS, taken on Wednesday, May 1, 2024, at 100 West Big Beaver Road, Suite 400, Troy, Michigan, at 1:00 p.m., pursuant to Notice.

Reported by DEBORAH LINEHAN, CER 7251

FORTZ Legal

Fortz Legal Support

www.FortzLegal.com

844.730.4066

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC,

Plaintiff,

Case No. 22-10395
Hon. Laurie J. Michelson

vs

KEVRON INVESTMENTS, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF SARAH DECIANTIS, taken on Wednesday, May 1, 2024, at 100 West Big Beaver Road, Suite 400, Troy, Michigan, at 1:00 p.m., pursuant to Notice.

Reported by DEBORAH LINEHAN, CER 7251
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

A P P E A R A N C E S

Appearing for Plaintiff:
MOHEEM H. MURRAY P63893
BUSH SEYFERTH, PLLC
100 West Big Beaver Road
Suite 400
Troy, Michigan 48084
Telephone: 248.822.7800
murray@bsplaw.com

Appearing for Plaintiff:
RYAN J. BYRD P75906
IN-HOUSE COUNSEL UNITED WHOLESALE MORTGAGE
585 South Boulevard E
Pontiac, Michigan 48341
Telephone: 800.981.8898
Rbyrd2@uwm.com

Appearing for Defendant:
MATTHEW J. HIGH P82783
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
17197 North Laurel Park Drive
Suite 201
Livonia, Michigan 48152
Telephone: 313.327.3100
matthew.high@wilsonelser.com

VIDEO TECHNICIAN: Rob Jacques

ALSO PRESENT REMOTELY: Kevin Rhatigan

W I T N E S S   I N D E X

Witness Page

Examination by Mr. High ..........................7
Examination by Mr. Murray ......................164
Re-examination by Mr. High .....................174
Re-examination by Mr. Murray ...................193
Re-examination by Mr. High .....................194

E X H I B I T I N D E X

(Exhibits attached)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 1 | Deposition Notice | 7 |
| Exhibit 2 | Wholesale Broker Agreement | 20 |
| Exhibit 3 | Wholesale Broker Agreement | 27 |
| Exhibit 4 | Facebook Live Transcript | 37 |
| Exhibit 5 | Requests to Admit | 86 |
| Exhibit 6 | Wholesale Broker Agreement | 164 |
| Exhibit 7 | Screenshot | 164 |

Troy, Michigan
Wednesday, May 1, 2024
Approximately 1:05 p.m.

** ** **

THE VIDEOGRAPHER: Good afternoon. We are now on the record. The time is 1:05 on May 1, 2024. This begins the videotaped deposition of Sarah DeCiantis taken in the matter of United Wholesale Mortgage, LLC versus Kevron Investment, Incorporated. It is case number 2 -- 22-cv-10395.

We are taking this deposition at the offices of Bush Seyferth, PLLC in Troy, Michigan. My name is Rob Jacques. I'm your videographer for today representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. MURRAY: Moheem Murray for Plaintiff United Wholesale Mortgage.

MR. HIGH: Matt High for the defendant, Kevron Investments, Inc.

THE COURT REPORTER: Could you raise your right hand please. Do you swear to tell the truth, the whole truth, and nothing but the truth so help you God?

MS. DECIANTIS: Yes.

MR. HIGH: Ms. DeCiantis, my name is Matthew High. You just heard who I represent. Could you state your full name for the record, please.

THE WITNESS: Sure. Sarah DeCiantis.

MR. HIGH: Let the record reflect this is the deposition of Sarah DeCiantis taken pursuant to Notice for all purposes under the Federal Court Rules and Federal Rules of Evidence.

Ms. DeCiantis, have you ever had your deposition taken before?

THE WITNESS: No.

MR. HIGH: Okay. I'm going to go over a couple of ground rules for you. The court reporter next to you is taking down everything you say so it's very important that you give all verbal answers. In common conversation we sometimes say uh-uh and uh-huh, and that doesn't read well in a transcript. So can you give me all verbal answers?

THE WITNESS: Yes.

MR. HIGH: I do want to remind you that you are testifying under oath so you do have an obligation to testify truthfully; is that understood?

THE WITNESS: Understood.

MR. HIGH: As you'll see with dep -- this deposition, there may be objections from your attorney,

but do you understand that as long as your attorney instructs you not to answer, you do have to answer my questions after the objection?

THE WITNESS: Yes.

MR. HIGH: A lot of times I may ask you a question and you may know where I'm going with the answer, but I just ask that you let me finish my question so that we have a clear record; is that okay?

THE WITNESS: That's okay.

MR. HIGH: And also I may ask you questions, and you might not know the answer. So it's perfectly acceptable for you to say I don't know. Okay?

THE WITNESS: Okay.

** ** ** ** **

E X A M I N A T I O N

BY MR. HIGH:

Q Where do you live?

A Rochester Hills.

Q And how old are you?

A 41.

Q When is your date of birth?

A 7/5/82.

MR. HIGH: I'm going to mark this as Defendant's Exhibit 1, the dep notice for today.

(Exhibit 1 marked for identification)

BY MR. HIGH:
Q Ms. DeCiantis, that is the dep notice for UWM's corporate representative deposition. Have you seen that before?
A Yes.
Q When have you seen it?
A Last week.
Q Was last week the first time?
A Yes.
Q And are you here today on behalf of the corporation, and not yourself as an individual?
A Yes.
Q And during this deposition I will say UWM, and I'm just referring to United Wholesale Mortgage. Okay?
A Okay.
Q And when I say Kevron I'm referring to Kevron Investments.
A Okay.
Q And when I say Rocket I'm referring to Rocket Mortgage, and when I say Fairway I'm referring to Fairway Mortgage; is that understood?
A Understood.
Q Now are you the person with the most knowledge concerning those topics listed on that Notice?
A Yes.

MR. MURRAY: I would just note for the record, Matt, that we did serve objections to some of the topics. So --

MR. HIGH: Yes.

MR. MURRAY: -- subject to those objections.

MR. HIGH: Yes, of course.

BY MR. HIGH:

Q Mr. DeCiantis, what is your current employment?

A Who am I employed with?

Q Yes.

A United Wholesale Mortgage.

Q And what's your position?

A Chief marketing officer.

Q And what is -- what do you do in that role?

A I oversee all marketing, advertising, PR.

Q Do you have any direct reports?

A Yes.

Q How many?

A Seven.

Q Who do you report to?

A Desmond Smith.

Q And what is Desmond Smith's role?

A Chief growth officer.

Q And did you talk to Mr. Smith to prepare for your deposition today?

A Did not.
Q Now I want you to turn to I believe maybe the third page of that Notice where it starts listing the topics. Can you do that for me?
A Sure.
Q I want to go through the topics one by one here just so we're all clear.
Are you the person who has been designated by UWM to speak on its behalf with respect to knowledge of UWM's decision to insert the liquidated damages provision in its all-in addendum?
A Yes.
Q Are you the person designated by UWM to speak about the knowledge of how the liquidated -- liquidated damages provision and the all-in addendum works?
A Yes.
Q Knowledge of how UWM generates income from mortgage loans?
A Yes.
Q Knowledge of contractual negotiations between Kevron and UWM?
A Yes.
Q Knowledge of how UWM's liquidated damages were calculated at $5,000 per loan?
A Yes.

Q Knowledge of why Rocket and Fairway were selected to be a part of UWM's all-in addendum?
A Yes.
Q Knowledge of UWM's relationship with competitors Rocket and Fairway?
A Yes.
Q Knowledge of UWM's consequential damages as a result of loan submissions to Rocket and Fairway?
A Yes.
Q Knowledge of UWM's loss of goodwill as a result of loan submissions to Rocket and Fairway?
A Yes.
Q Knowledge of any and all correspondence in UWM's possession regarding its decision to implement the all-in addendum?
A Yes.
Q Knowledge of research that shows UWM is damaged when Kevron submits loans to Rocket and Fairway?
A Yes.
Q Or Fairway, I'm sorry.
Knowledge of the factual basis for UWM's alleged damages?
A Yes.
Q Knowledge of the typical revenue UWM receives for a closed loan with Kevron?

A Yes.
Q Knowledge of UWM's cost to develop and maintain the services and benefits it provides independent mortgage brokers?
A Yes.
Q Knowledge of UWM's attempt to approximate its actual damages in case Kevron breached the agreement?
A Yes.
Q Knowledge of why UWM asked mortgage brokers to sign the all-in addendum?
A Yes.
Q Knowledge of UWM's responsibility under its wholesale broker agreement with Kevron?
A Yes.
Q Knowledge of UWM's standing in the wholesale mortgage industry?
A Yes.
Q Who designated you to speak on behalf of UWM?
A Legal counsel.
Q Why you?
A I was one of the participants in the room when the decisions were made.
Q And how many people were in that room?
A There were five. Six including myself.
Q And what were the roles of the people in the room?

A Our CEO was in the room. There was a VP of sales, our chief risk officer, chief operating officer, and chief legal counsel.
Q Out of those topics I just listed is there anyone else who has more knowledge about those topics than you?
MR. MURRAY: Object to the form and foundation of the question.
She's been designated as the representative to speak on behalf of the company, and is up to speed on those topics subject to our objections.
But you can answer the question if you know.
THE WITNESS: To the best of my ability.
BY MR. HIGH:
Q Do you have full authority to speak on behalf of UWM with respect to those topics?
A Yes.
Q Do you understand the answers that you give to my questions will be on behalf of UWM?
A Yes.
Q Do you understand that all the answers you give to my questions will represent all of the information available to UWM?
A Yes.
Q And are you aware that your answers will be binding upon UWM?

A Yes.
Q And you're fully prepared to speak about these topics?
A Yes.
Q What did you do to prepare for your deposition?
A Spoke with legal counsel.
Q How many hours did you spend?
A Three to four.
Q Outside of legal counsel, did anyone else from UWM help you prepare for your deposition?
A No.
Q Did you review any documents to prepare for your deposition?
A Yes.
Q What did you review?
A I would need to get the names of each of them, but this is a document I've definitely seen.
Q How many documents did you review?
A Probably six to seven.
Q Can you recall any of the other documents that you reviewed, contracts, discovery answers?
A Contracts, discovery answers, yes.
Q And was there any discussion about your testimony today outside of anybody else from legal counsel?
A No.
Q When did you first learn about the contract dispute

that's the subject of this lawsuit?
A Dispute?
Q Yeah.
A I'm sorry. Can you --
Q Yeah. When did you first learn about this lawsuit?
A Within the last couple months.
Q And who told you about it?
A Legal counsel.
Q And what's your knowledge of the lawsuit?

MR. MURRAY: I'm just going to caution the witness not to talk about any discussions you've had with legal counsel. That's privileged.

THE WITNESS: Sure.

MR. MURRAY: But anything outside of that you can testify to, but just no discussions with either my office or anybody in-house legal at UWM.

THE WITNESS: Understood.

Would you mind asking your question one more time?

MR. HIGH: Court Reporter, could you repeat my question?

(Indicated question read back by reporter.)

THE WITNESS: Why the lawsuit was filed?

BY MR. HIGH:
Q Yeah. What do you know about the lawsuit?

A I know that we -- it is about the all-in addendum.

MR. HIGH: Can we go off the record for a quick second? My client can't hear what we're saying.

THE VIDEOGRAPHER: Okay. We're going off the record at 1:17 p.m.

(Break in proceeding taken from 1:17 p.m. to 1:19 p.m.)

THE VIDEOGRAPHER: Okay. We are back on the record at 1:19 p.m.

BY MR. HIGH:

Q Ms. DeCiantis, I believe you were telling me that the lawsuit is about the all-in addendum?

A Correct.

Q Okay. In terms of the people that were in that meeting with you, I know you said there were about six people. Could you give me the names? Who's the CEO of UWM?

A Mat Ishbia.

Q Okay. And how about the chief growth officer?

A That individual was not in the room.

Q Okay. What other officers? Chief risk officer?

A The chief risk officer was in the room, yes.

Q Okay. And what's the name of that individual?

A Katie Foster.

Q And then what's the name of the chief legal counsel?

A Adam Wolfe.

Q And who else did you say was in the room?
A Our chief operating officer.
Q Okay. And what's the name of that person?
A Melinda Wilner.
Q And who else?
A Danny Margoy who's -- was representing sales.
Q And that is all the people that were present?
A That is who I recall, yes.
Q Okay. And was this a group to -- group discussion about the all-in addendum?
A It was.
Q And was this a unilateral decision made by the CEO or is this a vote, based on a vote? How was this done?
MR. MURRAY: Object to form. Foundation.
THE WITNESS: It was just a discussion. It wasn't put up for vote.
BY MR. HIGH:
Q And who ultimately made the decision?
A Legal counsel.
Q Now I understand UWM is a wholesale mortgage lender; is that correct?
A That is correct.
Q Could you explain to me what that is?
A We work directly with mortgage brokers across the country.

 Q Okay. And that's different from retail mortgage lenders?
A It is.
Q And could you tell me what a retail mortgage lender is?
A They go direct to consumer.
Q Okay. Now with wholesale mortgage lenders, is it all inclusive like, let's say, for a company like UWM, do you work directly with borrowers at all or just exclusively brokers?
A Exclusively with brokers through UWM, yep.
Q Okay. And is UWM the largest wholesale mortgage lender?
A We are.
Q And what role do mortgage brokers pay -- play? What's their role?
A They are the direct to consumer face.
Q And if you know in terms of UWM being the largest wholesale mortgage lender, is it a gap between UWM and the second largest, or is it close? Like where does it stand in, I guess, the industry overall?
A There is -- there is a gap, yes.
Q Okay. So if a mortgage broker can't work with UWM would you say that they're damaged by not being able to do that?
A No.

Q Why not?
A Because there's roughly 65 wholesale lenders in the space to choose from.
Q So you'd still say that even though UWM is the largest in the industry, a broker isn't damaged if they're able to -- if they're not able to work with the largest lender?
A If they choose not to work with any lender, they're not damaged.
Q I'm just talking about UWM, not anyone. Just the largest lender.
A No.
Q What do you know about any contractual discussions between UWM and Kevron?
A Can you ask more specifically?
Q Sure. Like what do you know -- so I assume before a broker and a lender like UWM do business together, is there a contract prior to that?
A There is, yes.
Q Prior to the contract, are there any discussions about that contract?
A If the client has questions, yes, but it is an online agreement that is signed digitally.
Q And is that like a standardized agreement for UWM?
A It is.

Q And does UWM use that same agreement for all of its mortgage brokers?
A We do.
Q In this particular case, did anybody from Kevron negotiate the standardized agreement with UWM?
A No.
Q And when these agreements are discussed who represents UWM?
MR. MURRAY: Object to foundation and form.
THE WITNESS: I believe it's legal counsel.
BY MR. HIGH:
Q Okay. And I guess what I mean is I know generally for the broker there may be an owner of the mortgage broker, and on UWM's side who was the contact person with the broker, if that makes sense?
A I believe it is legal counsel --
Q Okay.
A -- yeah.
MR. HIGH: I'm going to mark this as Exhibit 2. Wholesale Broker Agreement.
(Exhibit 2 marked for identification)
MR. MURRAY: And I know this is the way that this is produced to you, but it's really small print. I don't know if you need glasses but...
BY MR. HIGH:

Q Now Ms. DeCiantis, is that a standard agreement that UWM uses with all its mortgage brokers?
A It is.
Q Do mortgage brokers have the ability to insert their own language in those contracts?
A They definitely have the ability to request something to be added.
Q And is those suggestions likely to be added to the agreement?
A I suppose legal counsel. It would depend on how reasonable the requests were.
Q Now you testified this is a standard agreement for all brokers, correct?
A Uh-huh.
Q So if that's the case then isn't it unlikely that any changes would be made to that agreement based on what a broker wants?
MR. MURRAY: Object to form.
THE WITNESS: I don't know that there has been many changes made, but we do take into consideration changes. Then it's a -- it's a living document, and so if there are changes that we deem need to be made at a grand scale, those would be done at the next iteration.
BY MR. HIGH:

Q Right. But I guess my question is, if that standardized agreement is used for brokers across the country, how is, for example, Kevron's suggestions to that contract ever inserted if everybody uses the standard agreement?

A If Kevron wanted to redline an agreement, we would take that into consideration. If we had similar requests from other clients that we deemed was a more broad change to be made, we would update the agreement.

Q Can you tell me of a situation where a mortgage broker suggested a change to the agreement, and UWM accepted that change?

A I'm not aware of any.

Q At the time of that agreement did UWM anticipate any actual damages if Kevron breached the agreement?

A Can you ask the question again?

Q Yeah. So at the time that that agreement was executed --

A Uh-huh.

Q -- did UWM anticipate any damages if Kevron breached the agreement?

MR. MURRAY: Object to form.

THE WITNESS: There, of course, are damages to breaching an agreement.

BY MR. HIGH:

Q So what damages did UWM anticipate?
A We anticipated that this is an opportunity for Kevron or any other mortgage broker that were to sign the agreement, if they were to go and do business with Rocket or Fairway, there would be damages to UWM and the wholesale channel.
Q So the agreement I'm talking about does not have the all-in addendum change. So this is the first agreement --
A This -- right from 2019.
Q -- so I guess what does Rocket and Fairway have to do with that agreement?
A That -- not this specific one.
Q Okay. So with that one, what damages did UWM anticipate when that contract was executed?
A I would have to go through and look at every single line to determine that.
Q Are you aware of any damages, as you sit here today?
A I am not aware of specific damages, no.
Q Okay. And is that one of the documents you reviewed to prepare for your deposition today?
A Yes.
Q And when you reviewed that document did you see anywhere in there any reference to any damages that UWM anticipated?

MR. MURRAY: Object to form and foundation.

THE WITNESS: No.

BY MR. HIGH:

Q Okay. What services and benefits does UWM provide to mortgage brokers?

A Technology, 0if that's the direction of your question. Technology, marketing, training, we have a partner services team that offers support from a recruiting standpoint, the setup of technology. There's a variety of different ways in which we support the -- the whole channel, not just one specific broker.

Q Okay. And I'll admit I'm a novice to the mortgage industry. So what type of technology?

A A good example is probably our online application. We call it Blink+, but it is something that's white labeled for the broker. So if you, as a consumer, go to a broker's website you might find an online application to insert some initial information to get your loan application started. That's something that is one example of something we -- traditionally, a loan officer or a broker would need to pay for that if they were to go to a vendor. It's something that we offer as part of being a partner of UWM's.

MR. MURRAY: Matt, I just want to -- on the record, anything that's going to be, like, proprietary

to UWM, I'm going to say now that we'll state it's subject to the protective order. I just want to make sure we're clear about that.

MR. HIGH: No problem with that at all.

BY MR. HIGH:

Q What -- if you know, what are the -- what's the cost of those services?

A I would have to get further clarification for you on the cost.

Q Okay. And generally speaking, I guess I'm trying to understand. Does UWM charge the broker for those services, or is it just these are the services we provide for you, and then in return you may send us loan applications? Is it kind of like that?

A It is, but the key word there is may. There is no requirement or --

Q Okay.

A -- we do not -- what we provide to our clients is not based on what loan volume they send to us. If you are a partner of UWM, you have access.

Q Got it. What does UWM expect in return for those services that you just mentioned?

A There isn't an expectation. There is a hope that what we provide is enough value that they would consider sending us business, but they don't have to.

Q Is it a quid pro quo type of situation in your -- in your view?
A No.
Q Now how does a lender generate income from a mortgage broker? Could you explain like the process how that would work?
A Sure. So there are -- its margin or profit basis points is typically how we look at it. It's a -- translated into a percentage. It changes on a daily basis based on the market. So there is a day flat fee per se that no matter what you send, this is -- this is what it is. Sometimes it changes during the day.
Q Okay. And just -- just so I can understand with an example. So let's say I'm using a mortgage broker.
A Yep.
Q I buy a house for $300,000. The application is submitted to UWM. It's accepted. It all goes through. How does UWM generate income from that loan?
A There's a margin that is tied to that loan in the form of basis points.
Q Okay. So is it like a calculation? I know you said it's not a percentage.
A No, it --
Q Oh, I'm sorry.
A -- a basis point can -- a basis point translates into a

percentage.
Q Okay. So is that typically like 5 percent or 10 or --
A Like one basis point is 1/10 of a percent.
Q Okay. Now does UWM track the income it generates from brokers?
A On a -- on what level?
Q Right. Like at all. Whether its yearly? Monthly?
A At an aggregate level, yes.
Q And I guess, for example, would UWM notice if it was getting less loans from a specific broker?
A Not based on revenue. We would know based on number of loans that come in.
Q Got it. Okay. So if UWM received 100 loans from a broker last year, you guys pay attention and say, oh, this year we only received 10?
A Yes.
MR. HIGH: Mark this as Exhibit 3, the wholesale agreement with the all-in addendum.
(Exhibit 3 marked for identification)
BY MR. HIGH:
Q Ms. DeCiantis, another question. The service that you told me about that UWM provides to brokers is -- are those unique services or do most lenders provide the same type of service?
MR. MURRAY: Object to form and foundation.

You can answer.

THE WITNESS: That, I don't know.

BY MR. HIGH:

Q Okay. Now I think you spoke -- we spoke briefly about the all-in addendum. So that's the contract in front of you, and I understand -- was this prompted by all-in initiative?

A Yes.

Q Okay. Could you explain to me what that is?

A It was a initiative that we launched that communicated to brokers they could work with UWM or they could work with Rocket and Fairway, but they could not work with UWM and Rocket and Fairway. I should clarify and say "or."

Q Okay.

A It was not --

Q No, understood. Thank you.

So I understand the previous agreement I just showed you was changed to include what you just stated, correct?

A Correct.

MR. MURRAY: Just to be clear for the record --

MR. HIGH: Yeah.

MR. MURRAY: -- you're saying Exhibit 2 was

changed to include all-in in Exhibit 3?

MR. HIGH: Yes.

MR. MURRAY: Okay.

MR. HIGH: Yep.

BY MR. HIGH:

Q And outside of those changes that we just talked about, were there any other changes made to the new agreement?

A Not that I'm aware of.

Q Okay. When was the new agreement changed?

A March of '21.

Q And who changed it?

A Legal counsel.

Q Now how was this done?

MR. MURRAY: Object to foundation.

BY MR. HIGH:

Q So was it changed -- was it a situation where they just sent that new agreement out to brokers, and that was the change or how was that changed or circulated?

A So the --

MR. MURRAY: Object to form.

Go ahead.

THE WITNESS: -- the change was modified and then was communicated to brokers, yes.

BY MR. HIGH:

Q And so you said UWM changed the terms of the agreement.

Legal counsel changed the terms, correct?
A Correct.
Q And then after they changed the terms those were -- that was the new agreement that controlled the contractual relationship between the brokers and UWM, correct?
A Correct.
Q Now before implementing this all-in addendum you said that there were discussions, right, with those individuals you mentioned in the room?
A That's correct.
Q Now was that a situation where there was a discussion, and the all-in addendum was promulgated a month or so later, or was it continuous meetings whether monthly, weekly before that was done?
A It was not. It was a very quick turnaround. We had a discussion and within probably two to five days it was -- it was implemented.
Q Okay. And just -- and just so I understand, just so we're clear, so there was the discussion about it that you mentioned. Was that the first time it was discussed?
A That is the first time I was involved in the conversation, yes.
Q Was it discussed prior to you being involved?

A I do not know.
Q So you're not sure if there was a situation where people were, like, hey, Sarah, we've been talking about this. We want to bring you in. It wasn't that type of situation?
A No. The first group discussion was when we all discussed it together.
Q Okay. And after that discussion were there any emails, memos exchanged before the change was actually formalized?
A No.
Q So there was just a talk about it and then the change was made, correct?
A Yes.
Q Why Rocket and Fairway specifically?
A Those are two individuals that were doing things to cause harm to the broker channel through various business decisions that they made to go after loans that were done on the wholesale side, and transferring those over to the retail side as well as Rocket in particular had an initiative around real estate agents, and turning them into LOs, which was also taking away from the broker channel.
Q What does that have to do with Kevron?
MR. MURRAY: Object to form.

BY MR. HIGH:
Q What you just mentioned, what does that have to do with Kevron?
A It doesn't have to do with Kevron.
Q Okay. So who -- who decided to pick these two lenders?
A It was a group discussion over what we just went through.
Q And prior to selecting these two lenders were other lenders discussed?
A No.
Q Are these two lenders competitors of UWM?
A Yes.
Q Did that factor into why they were chosen?
MR. MURRAY: Object to form.
THE WITNESS: No.
BY MR. HIGH:
Q Are you aware of -- and I'm sorry, strike that.
Who's the owner of Fairway mortgage?
MR. MURRAY: Object to foundation.
THE WITNESS: I believe his name is Steve Jacobson, but I would have to verify.
BY MR. HIGH:
Q And who's the owner of Rocket?
MR. MURRAY: Object to form and foundation.
THE WITNESS: Dan Gilbert.

BY MR. HIGH:
Q Are you aware of any vendetta between Mat Ishbia and Dan Gilbert?
A No.
Q You're not aware of any rivalry between the two?
A No.
Q You've never seen any articles about them talking about each other?
A I have seen articles, yes.
Q Okay. So you are aware of the rivalry between the two?
MR. MURRAY: Object to form. Asked and answered.
THE WITNESS: I am --
MR. MURRAY: Foundation.
THE WITNESS: -- I am aware of what the media tries to portray as a rivalry.
BY MR. HIGH:
Q Are you aware of Mat Ishbia's comments about Dan Gilbert?
A Yes.
Q Did that factor into why Rocket was chosen?
A No.
Q And you talked earlier about some of the reasons Rocket and Fairway were chosen. Let's just talk about Rocket first. What specifically factored into Rocket being

chosen, could you tell me?
A    Yes.  As I said, the two programs that they had going, which one is they had a realtor program that was active.  They were recruiting realtors to become LOs which was taking business away from mortgage brokers. In addition to that they -- because of the structure of their business model, wholesale loans that go to their wholesale side oftentimes end up on their retail side.
Q    And does what Rocket is doing in terms of this business, did that have anything to do with Kevron?
          MR. MURRAY:  Object to form and foundation.
          THE WITNESS:  No.
BY MR. HIGH:
Q    How many lenders are in the wholesale mortgage industry?
A    I would say between 65 and 70.
Q    Is UWM damaged when a loan is sent to one of those other lenders, not Rocket or Fairway?
A    Are we damaged?
Q    Yes.
A    No.
Q    Why not?
A    I don't understand why we'd be damaged.
Q    It was just a question.  So you don't know if UWM is damaged or not?

A UWM is not damaged, no.
Q Okay. So is UWM damaged when a loan is sent to Rocket or Fairway?
A Yes.
Q So is -- so I guess my question is, is UWM also damaged if a loan is sent to another lender, not Rocket or Fairway?
A No.
Q Why not?
A Different business models.
Q Are you aware of any other lenders engaging in the business models that you discussed about Rocket and Fairway?
A No.
Q If there were other lenders engaged in those business practices, would UWM still be damaged?
A Can you restate the question?
Q Yeah. If there were other lenders involved in those business practices that you just stated, would UWM be damaged if a loan went to those lenders?
A Potentially.
Q So does UWM lose any money if a loan is closed with Rocket or Fairway?

MR. MURRAY: Object to form and foundation.

THE WITNESS: It is not necessarily a direct

connection, but the -- when a loan is closed through Rocket's wholesale, oftentimes that goes to their retail for a refinance or whatever the next transaction might be.

Retail has very aggressive business practices. So once a loan ends up in retail, it oftentimes is out of wholesale forever.

BY MR. HIGH:

Q Got it. And let me just make sure I understand because you know this better than me. So are you saying that Rocket and Fairway do not use mortgage brokers so when loans are closed with these two lenders that damages the industry as a whole?

A They do both have wholesale -- well, Fairway no longer has wholesale, but Rocket does still have wholesale. Because of the way that their business model is set up they make a majority of their profit in the retail space. So they do use mortgage brokers on their wholesale side. They will close a loan, but then beyond that it ends up in retail.

Q Got it. And that's the damage, that it's becoming a retail loan?

A Correct.

Q Isn't that just competition?

A You could call it competition, yes. But also at the

same time there's a damage to the wholesale industry, which is a very needed part of what is offered to borrowers.

Q And so is there anything that you could point me to in UWM's, I guess, financial documents that shows, hey, this is how we're damaged when this loan closes with Rocket? Is there anything you can point to?

A No.

MR. HIGH: I think we're on Exhibit 4.

(Exhibit 4 marked for identification)

BY MR. HIGH:

Q It's a transcript of Mat Ishbia's Facebook Live video.

MR. MURRAY: For the record, I would just say it's -- it says it's a transcript, and I'm not disputing that it's accurate or inaccurate. I'm just saying --

MR. HIGH: No, I understand.

MR. MURRAY: -- it purports to be a transcript.

MR. HIGH: Understood.

BY MR. HIGH:

Q Hey, can we go back to Exhibit 3 for a second?

Could you go to the second to last page, Section 7.30.

MR. MURRAY: You said 7.30, Matt?

MR. HIGH: Yes.

BY MR. HIGH:

Q Now, Ms. DeCiantis, I know we talked about the all-in addendum --

A Yes.

Q -- but I understand one of the other changes was this liquidated damages provision here on 7.3; is that correct?

A That is correct.

Q And that provision was not in the initial wholesale broker agreement, correct?

A Correct.

Q Okay. So could you turn to page 12 of Exhibit 4, the transcript.

A It's at the top.

MR. MURRAY: You don't have extra copies, do you, Matt?

MR. HIGH: I don't. I'm sorry.

MR. MURRAY: Okay. I'm going to lean over --

MR. HIGH: No, no, I'm sorry. It wasn't intentional.

MR. MURRAY: Okay. And ultimately, if you need to read the whole document, you can take the time to read the whole thing if you need to.

THE WITNESS: Okay.

MR. MURRAY: But -- but I think his question is just about page 12.

THE WITNESS: Okay.

BY MR. HIGH:

Q Now, Ms. DeCiantis, I understand that Mat Ishbia announced the changes to the Wholesale Broker Agreement via Facebook Live video?

A That was one avenue, yes.

Q Okay. Did this happen a couple of days after that discussion that you told me about, a few days after?

A Within a week, yes.

Q Okay. Are you aware of that video? Have you watched it?

A Yes.

Q Could you read starting on, "well, let me talk about something"?

A Uh-huh.

Q Could you read that out all the way to the bottom of the page, and the top of the -- top paragraph to the next page. Could you read that for me?

A Sure.

MR. MURRAY: You want her to read it out loud --

MR. HIGH: Yes.

MR. MURRAY: -- or to yourself?

 BY MR. HIGH:

Q Yes, out loud. I'm sorry.

A Sure.

Let me talk about something. There's two companies out there that are hurting the wholesale channel. Right? At UWM we only grow if you go -- if you grow. We -- I've got no chance. I've got 800 -- oh, sorry. I got 8500 plus people here. We win when you win, and all of us win together. But there's two companies out there hurting the wholesale channel. Specifically, Fairway Independent. They have a wholesale company called Fairway Independent Wholesale. They're out there soliciting loan officers, and talking negatively about brokers right now. They're calling, trying to steal your loan officers, they're soliciting them, they're aggressively going after -- they're -- they're -- they are aggressive, and they're not doing what is right for broker channel. But some of our brokers are still referring them loans, sending them loans. That's not good. Loan officers, we don't want them to leave. We want them to come to us, not leaving. Fairway Independent is out there trying to hurt the wholesale channel.

Q In terms of what we test to -- I'm sorry.

In terms of what you testified about earlier, this

is -- does this encapsulate what you were saying earlier about why Fairway was selected?

A Yes.

Q And could you read the next section starting with "the other companies Rocket Mortgage," and the last sentence ends on the next page.

A Sure.

The other company is Rocket Mortgage. They're going after real estate agents. They're trying to cut loan officers out. They're paying real estate agents to get licensed, and then paying them 50 basis points. I don't know what this is. It's not my job to figure that out. Paying them 50 basis points and cut the loss, just refer them back to Rocket's partnership team. Cut the brokers out. Cut the loan officers out. That's not good. That's not good for us. That's not what we want.

The same thing this at -- the same thing with, you know, all know Rocket Mortgage solicits your past clients and solicits -- they're -- once again, these are their business models. Fairway Independent and Rocket Mortgage, whenever they're -- whenever they want to do they can do. As long as they play by the rules, it's their rules, their world. But that's not my business model. My business model is helping you win,

helping the family grow, being all in for brokers, and I can't stop other people's business models. But what I can do is control my business model.

Q I think I asked you how this relates to Kevron. I guess my next question is, what does Rocket and Fairway's business practices have to do with UWM?

A UWM -- it has to do with the wholesale channel, which UWM is only wholesale.

Q So -- so indirectly it has something to do with UWM?

A Absolutely.

MR. MURRAY: Object to form.

BY MR. HIGH:

Q But directly does it have any impact on UWM at all?

A It does have impact on UWM because our entire model is wholesale.

Q Right. So I guess if two lenders out of the industry -- out of this mortgage industry, with all these lenders around, I guess if two specifically change how they do business, how does that affect UWM if it's only two?

MR. MURRAY: Object to form.

THE WITNESS: If there are more wholesale loans that are not staying within wholesale, that ultimately harms UWM and the wholesale channel.

BY MR. HIGH:

Q So if it's -- but if it's better for, let's say, a prospective borrower to go through the -- I'm sorry, strike that.

Isn't it possible that there are situations where it's more advantageous for a borrower to go the retail route?

MR. MURRAY: Object --

(Indiscernible crosstalk.)

MR. MURRAY: -- to foundation.

MR. HIGH: Retail route.

THE WITNESS: I suppose there are certain situations, sure.

BY MR. HIGH:

Q So if a mortgage broker is unable to send a loan -- if a mortgage breaker -- if a mortgage broker is unable to send an application to a lender who gives better rates, doesn't that end up hurting the borrower?

MR. MURRAY: Object to form and foundation. Incomplete hypothetical.

THE WITNESS: The broker has the choice on what they want to do.

BY MR. HIGH:

Q And I guess my question is different. So, like, for example, if UWM offers a 5 percent interest rate, and rocket offers a 2 percent interest rate, and a broker

can't send a loan to Rocket because of this agreement, isn't the borrower the one that's hurt in the end?

MR. MURRAY: Object to foundation.

THE WITNESS: No. Because the broker can choose to go and leave UWM and go to Rocket.

BY MR. HIGH:

Q But would the borrower be hurt by not being able to send the loan to Rocket? Would they be hurt?

A No.

Q Okay. Now I asked you about Exhibit 3 in terms of 7.3 with the liquidated damages provision. Why was that put in the all-in addendum?

A That is the all-in addendum.

Q Yeah. I guess why was that put in there? I know part of the agreement is not to send loans to Rocket or Fairway. I believe that's -- I'm sorry, strike that.

Could you go to Section 3.03(x)?

MR. MURRAY: And this is Exhibit?

MR. HIGH: Three.

MR. MURRAY: Three, all right.

THE WITNESS: I'm not sure I have the right one. 3.03(x) you said?

MR. HIGH: Yes.

THE WITNESS: That's it?

MR. MURRAY: I think that's -- let me just

 make sure you're in the right place.

Yeah, I think that's the right one.

BY MR. HIGH:

Q So I understand that's one of the changes, is not to send loans to Rocket or Fairway, correct?

A That is correct.

Q Okay. And then the other change is 7.30, correct, with the liquidated damages provision?

A Yes. Those are both tied to all-in addendum.

Q Okay. So why was the liquidated damages provision, the 7.3, inserted into this new agreement?

A That is -- that is part of the all-in addendum.

Q So I guess my question is, I understand the reason for not sending loans to Rocket or Fairway --

A Yes.

Q -- but why was the liquidated damages portion included?

A Because that was our best and honest estimate or assessment of the damages to UWM and the wholesale channel.

Q And I'm not asking about any amount. I'm just asking about the provision itself. Why was the liquidated damages provision placed there?

MR. MURRAY: Object. Asked and answered.

You can answer again.

THE WITNESS: Because there are damages to

UWM and the wholesale channel if this agreement was breached.

BY MR. HIGH:

Q Was that -- was that put there to deter mortgage brokers for sending loans to Rocket or Fairway?

A If they agreed to this addendum, they agreed to not send loans to Rocket and Fairway.

Q And I guess my question is different. So was that provision placed in there to deter mortgage brokers for sending loans to Rocket and Fairway?

A It was placed in there as a part of agreeing to be all-in with UWM.

MR. HIGH: Court Reporter, could you repeat my question again? I don't think I got an answer.

(Indicated question played back by reporter.)

BY MR. HIGH:

Q So I guess my question is a yes or no. Was it not placed in there to deter, or was it -- was it a deterrence?

MR. MURRAY: Object to form. Asked and answered.

THE WITNESS: It was placed in there as part of the all-in agreement.

BY MR. HIGH:

Q So I guess to my question -- I guess let me give you

example. So you'd agree with me that if you get a ticket for parking over a meter too long, the purpose of the ticket is to prevent people from parking there too long, correct?

A Correct.

Q Okay. So taking that to this situation, if there's an amount that brokers have to pay if they close loans with Rocket or Fairway, isn't the purpose of that to penalize brokers for sending loans?

A It is absolutely not a penalty.

Q I guess that's -- that's not my question. So my question --

MR. MURRAY: No, I think that was your question.

BY MR. HIGH:

Q -- no. My question is, is that the purpose. That's a yes or no question.

A No.

Q It's not the purpose?

A No.

Q Okay. So what is the purpose?

A The purpose is that if you are going to send -- sign this agreement --

Q Uh-huh.

A -- breach the agreement --

Q Uh-huh.
A -- then there will be damages to UWM and the wholesale channel.
Q And where in this agreement does it say that there will be damages to UWM and the wholesale channel?
A Well, I believe it says liquidated damages.
Q Yeah. Where in the agreement does it say UWM -- if you send loans to Rocket or Fairway, the wholesale channel is damaged? Is that anywhere in the agreement?
A I don't believe those specific words are in the agreement. No.
Q Why not?
A Because I believe the --
MR. MURRAY: Object to foundation.
THE WITNESS: -- 7.3 covers that.
BY MR. HIGH:
Q Yeah. I guess my question is, why isn't that in the agreement, though?
MR. MURRAY: Object to foundation.
THE WITNESS: Can you ask your question differently?
BY MR. HIGH:
Q Yeah. So don't you think it would be important for brokers to know, hey, if you send the loan to Rocket or Fairway, this is damaging the wholesale channel? Don't

you think that'd be important for brokers to know that?

MR. MURRAY: Object to foundation. Form.

THE WITNESS: I think that that was answered in the Facebook Live and other communications that went out.

BY MR. HIGH:

Q Okay. I guess my question is different. My question is, don't you think it would be important for brokers to know that in the agreement?

MR. MURRAY: Object to foundation and form.

THE WITNESS: I -- I believe, though, it's clearly stated in here what the purpose of 7.3 is.

BY MR. HIGH:

Q Okay. So could you show me what section the agreement says the wholesale channel is damaged when loans are sent to Rocket and Fairway? Could you point me to that section?

A 7.3.

Q Okay. And --

MR. MURRAY: Just to be clear, when you say 7.3, you mean 7.30?

THE WITNESS: Sorry, 7.30.

BY MR. HIGH:

Q And could you show me in that section where it says the wholesale channel is damaged?

A It says that there's -- this is the measure of damages in the event of a breach of the broker agreement.
Q And I guess my question is different. So my question is, where in 7.3 does it say the wholesale channel is damaged when loans are sent to Rocket and Fairway? Where is that?
A It does not specifically state wholesale channel.
Q Okay. When Mat Ishbia did an announcement on Facebook Live, was there any mention of the liquidated damages provision?
A I would need to go back and read through the transcripts.
Q It -- take a moment.
MR. MURRAY: Matt, when you're done with this line of questioning, could we take a break?
MR. HIGH: Oh, sure. Sure.
THE WITNESS: It does not appear that that specific amount was in there. No.
BY MR. HIGH:
Q And just so I understand your testimony, so the agreement doesn't state that -- I'm sorry, strike that.
So in that transcript there was no mention of the liquidated damages provision, correct?
A Correct.
Q Why not?

MR. MURRAY: Object to form and foundation. Beyond the scope of the categories the witness is designated to talk about.

THE WITNESS: I can't answer that.

MR. HIGH: Just so the record is clear, I'd like to say -- I believe it's related to the topic of liquidated damages topics but, you know, that's subject to motion practice.

BY MR. HIGH:

Q So my question is, don't you think it'd be important for brokers to know on that Facebook Live, hey, if you send loans to Rocket or Fairway you owe us $5,000? Don't you think that'd be important to know?

MR. MURRAY: Object to foundation.

THE WITNESS: No.

BY MR. HIGH:

Q You don't think brokers would want to know that they have to pay $5,000 if they send loans to Rocket or Fairway?

A That is something that was communicated in the agreement and through other channels.

Q And I guess my question is different. I'm just wanting to focus on the Facebook Live. Don't you think it would be important to note on that live that if you send loans to Rocket or Fairway, you would have to pay

$5,000 if the loan was closed?
A No.
Q You don't think that would be important to know?
A No, not in that form.
Q Okay. How many brokers were present on that forum?
A How many -- sorry, can you --
Q Brokers were present on the Facebook Live platform?
A I would have to go back and get that information.
Q It was a lot, wasn't it?
A I would have to go back and get those numbers.
Q Do you think it was a lot?
A Depends on what you consider a lot.
Q Okay. More than 50?
A More than 50.
Q More than 200?
A I would have guessed so.
Q Okay. More than 300?
A I really would have to go back and look.
Q No, understand. So you don't think it would be important to -- to -- to tell over possibly 200 brokers that if you send these loans to these two companies you owe us $5,000?

MR. MURRAY: Object. Asked and answered.

THE WITNESS: Is it important for them to know? It was not important for that to be communicated

in the Facebook Live.

BY MR. HIGH:

Q Okay. So it wasn't important for it to be communicated during that Facebook Live?

A Correct.

Q Was it important for it to be communicated during that Facebook Live that brokers would owe a minimum of $50,000 or $5,000 per loan?

A No.

Q You don't think that would be important?

A No.

Q Okay. Now in terms of the liquidated damages provision, I understand 3.3 says that brokers are not to send loans to Rocket or Fairway, correct?

A Let me check.

Q Okay, yep.

A 3.3 you said?

Q Yep, 3.3(x). Yep.

A Can you ask your question one more time?

Q Sure. So for 3.3(x), this basically says brokers would not submit loans to Rocket or Fairway, correct?

A Correct.

Q Okay. So if brokers are not to submit loans to Rocket or Fairway why is the liquidated damages provision even needed if they can't send loans there anyway?

A Because there is harm to the wholesale channel if that is done.

Q Right. But I guess my question is, if you can't send loans to Rocket or Fairway, why do we even need the liquidated damages provision?

MR. MURRAY: Object to form and foundation.

THE WITNESS: That was what we had agreed to as damages.

BY MR. HIGH:

Q Okay. Before the change was made in March of 2021, are you aware of any discussions with the representative of Kevron about the changes around that time period?

A No.

Q Before that change was made did you ask a representative from Kevron for their input on that change?

A No.

Q Did you ask a representative of Kevron about what would be a -- I'm sorry, strike that.

Did you have a discussion with a representative of Kevron about how the mortgage channel is damaged as a whole when these loans are submitted? Was that -- did that ever occur?

A No.

Q Did you have a discussion with Kevron on what UWM

actual damages would be if Kevron breached the agreement?

A The liquidated damages is what we have in the agreement, yes.

Q No. And I'm just asking about actual damages. So unrelated to that provision, was there a discussion with a representative of Kevron about what -- what UWM's actual damages would be if Kevron breached the agreement?

MR. MURRAY: Object to the form. To the extent it seeks a legal conclusion.

But you can answer.

THE WITNESS: We're looking at actual as liquidated damages in this case.

BY MR. HIGH:

Q Right, and I understand that. So I want to know about actual specifically. So unrelated to the liquidated damages provision. If there wasn't that provision -- this is a better way to phrase it -- if that provision didn't exist, right, was there a discussion with the representative of Kevron on what the damages would be if Kevron breached the agreement?

A You're saying prior to all-in?

Q Yes.

A No.

 Q Okay. And then once that was executed was there any discussion with Kevron about what their damages would be -- what UWM's damage would be if Kevron breached their agreement?

MR. MURRAY: Just to be clear, after the all-in addendum was --

MR. HIGH: Yep, after it was --

MR. MURRAY: -- executed?

MR. HIGH: -- executed.

THE WITNESS: I mean, there was communication with all clients.

BY MR. HIGH:

Q And I'm just asking about Kevron specifically.

A Yes, they would have had --

Q Okay.

A -- communication.

Q And so they're -- so you're testifying under oath that there was a discussion with the representative of Kevron about what UWM's actual damages would be if Kevron breached the agreement?

MR. MURRAY: Object to form and foundation. Mischaracterizes the testimony.

THE WITNESS: I'm saying that there was communication sent to all clients. Kevron would have been included in those communications.

BY MR. HIGH:
Q And there was -- okay. I just want to know about Kevron specifically because all clients can get a little confusing. So just focusing on Kevron, was there a discussion about UWM's actual damages if Kevron breached the agreement? Was that discussion had?
A I don't know if there was a discussion.
Q Okay. Do you know if Kevron accept -- accepted those March 2021 changes, when those changes were made? Did Kevron accept those?
A They did.
Q And how?
A Electronically.
Q And how did they accept those changes electronically?
A They signed the agreement.
Q So they signed the Exhibit 3 that I showed you?
A Yes, they did.
Q Okay. I want to represent to you on the record that that Exhibit 3 is the agreement that was attached to UWM's complaint and it is unsigned. So do you have a different document of that contract that's signed?
A We have the signed version, yes.
Q So you do have a signed version of Exhibit 3?
MR. MURRAY: You mean like an ink signature or electronic signature?

BY MR. HIGH:
Q So just so we're clear, Exhibit 3 has a signature block on it for Kevron. You have a signed version of that document with Kevron's signature on it?
MR. MURRAY: Do you mean a written signature or do you mean a version that is electronically signed?
(Crosstalk.)
BY MR. HIGH:
Q I mean a version of that agreement because that was attached to the complaint. So I'm saying is there a version of that, that's signed?
MR. MURRAY: Well, I'm not going to -- I can't answer the question so --
THE WITNESS: It is my understanding that we have a signed agreement from Kevron. Yes.
BY MR. HIGH:
Q Okay. And is it your understanding that you have a -- that there's a signed agreement of that agreement, that Exhibit 3 right there?
A That is my understanding, yes.
Q Okay. Any reason why I didn't receive that agreement in discovery?
A That, I can't answer.
Q Okay.
MR. MURRAY: I guess I'd say, Matt, is if we

have it and you didn't get it, we'd produce it. I think you do have it, but I'll double check.

MR. HIGH: Okay.

BY MR. HIGH:

Q And just so we're clear for the record, so your testimony is that the agreement was changed on March 2021, and that Kevron signed an amended agreement, and that was acceptance of those changes?

A That is my understanding, yes.

Q When did Kevron sign that agreement?

A I believe it was September of '21.

Q So before that liquidated damages provision was inserted into the new agreement, what steps did UWM take to calculate its actual damages?

A It was our best assessment of the damages to UWM and the wholesale channel, based on the different technology, marketing, different support that we offer, as well as the damage to the channel as a whole.

Q And did you discuss that with Kevron saying, hey, here's our best assessment of our damages? Was that ever had?

A The direct conversation?

Q Yes.

A I don't know there was a direct conversation, but that's what's represented in the agreement.

Q Did Kevron have any input on the liquidated damages provision?
A No, other than to not sign it.
Q I'm sorry?
A Other than to not sign it.
Q Okay. I'm sorry.
MR. MURRAY: Ask your next question, but then we'll take a break.
MR. HIGH: Yeah, sure.
BY MR. HIGH:
Q And you said -- I guess, could you, I guess, repeat? You said to not sign it?
A Sure. They had the choice to not sign the agreement.
Q Okay --
A They did --
Q -- that's what you're saying.
A -- not have input into what the liquidated damages would be.
MR. HIGH: Okay. No, we can take a break.
THE VIDEOGRAPHER: Okay. We're going off the record at 2:12 p.m.
(Break in proceeding from 2:12 p.m. to 2:27 p.m.)
THE VIDEOGRAPHER: And we're back on the record at 2:27 p.m.

BY MR. HIGH:
Q All right. Ms. DeCiantis, are you aware of any research that shows when Kevron sends a loan to Rocket or Fairway that that causes UWM damage?
A Not specific to Kevron.
Q Do you have any knowledge of anything like that specific to other brokers?
A It damages the wholesale channel.
Q Do you have any research of that? Like any research?
A We have done research in the past, yes.
Q Okay. What type of research?
A Just the volume of loans. That if they leave the wholesale channel to go to retail, what that means for wholesale which essentially means it doesn't come back.
Q So you have research that shows if a loan goes to a competitor of UWM, you guys lose money?
A Not necessarily in that direct regard, but if -- it's more so about the wholesale channel in and of itself. The loans just end up in retail. They have very aggressive tactics, and it doesn't come back to wholesale.
Q How long have you been with UWM?
A Ten years.
Q And in what roles?
A I started as VP of marketing, and then was moved into

chief marketing officer.
Q And what's your educational background?
A I have a bachelor's degree in marketing and advertising.
Q From where?
A I graduated from Wayne State.
Q Any other education?
A No.
Q What about prior employment before working at UWM?
A I worked for Palace Sports Entertainment, and then before that ad agencies. Several.
Q What did you do at Palace Sports and Entertainment?
A I was the director of corporate partnerships.
Q And then when you came to UWM it was as the VP of marketing?
A Correct.
Q I know we had some back and forth in terms of why was the liquidated damages provision needed. So why -- if Kevron sends a loan to Rocket or Fairway, right, which it says you're not supposed to do in that agreement, correct?
A Correct.
MR. MURRAY: Object to form.
BY MR. HIGH:
Q Why wouldn't UWM just reject Kevron's business at that

point and just terminate the contract?
A That -- it would be Kevron's responsibility to terminate the contract if they choose to do business with Rocket or Fairway.
Q Could UWM terminate the contract?
A We would have the ability to terminate the contract.
Q And why didn't they do that in this case?
A We are -- it's not something that we're trolling to see who's sending loans where until it becomes egregious.
Q And you say until it becomes egregious, could you explain what you mean by that?
A We are definitely monitoring where loans are sent. That's public record. It's not something proprietary. And if loans are being sent to Rocket or Fairway we address it with the client.
Q Okay. Can I direct you back to Exhibit 4, the transcript for Mat Ishbia. Could you turn to page 14 for me?
And could you read that paragraph where it says "so you can't work with UWM"? Could you read that for me?
A Sure. Out loud?
Q Yes.
A So you can't work with UWM if you work with those guys. Because, you know what, I can't stop you, but I'm not

going to help you -- I'm not going to help you help the people that are hurting the broker channel.
Q So I understand that to mean, hey, if you work with -- if you work with Rocket or Fairway, I can't stop you from doing that, correct?
A Correct.
Q So if that's done why not just terminate the relationship with the broker, and reject any business for the broker? Why not just do that?
A The broker does have the ability to reject the UWM contract, and choose to work with U -- direct with Rocket and Fairway.
Q I -- I understand what the broker has the ability to do, but you're here to testify on behalf of UWM. So I want to know why didn't UWM just terminate the relationship at that point?
A Well, we did once we found out that they were sending business to Rocket and Fairway.
Q Right. So I understand Kevron sent 22 loans; is that correct?
A I believe it was more than that.
Q Okay. Well, that's -- that's what's in the complaint. So after Kevron sent the first one why didn't UWM say no, you're sending loans to Rocket and Fairway. We don't want to do business with you. Terminate the

contract. Why didn't that happen?
A I do not know.
Q Don't you think that would make more sense than letting loans accumulate?
MR. MURRAY: Object to form and foundation.
THE WITNESS: I am not aware of how often it is being reviewed, which loans are going where.
BY MR. HIGH:
Q Okay. I guess -- that's not my question, how often would it be reviewed. My question is, doesn't it make more sense if you guys are tracking where loans are sent, correct? You testified to that, right?
A Correct.
Q So if you see one loan go to Rocket or Fairway why not just terminate the agreement?
A It's not that cut and dry. Based on when loans are actually recorded with counties, you may not know for many months that a loan was sent somewhere.
Q Would you say it's more advantageous if the loans accumulate for UWM? If it's 50 loans sent into Rocket and Fairway, that's more advantageous to UWM, right?
MR. MURRAY: Object to form and foundation.
THE WITNESS: No. I would say it's actually more harmful to UWM and the wholesale channel.
BY MR. HIGH:

Q And how's it more harmful if UWM is getting $5,000 per loan according to that agreement?
A Because it's not about the damages. It's about the loans leaving the wholesale channel.
Q So if it's not about the damages why is the liquidated damages provision even there?
A Because that is our best assessment of how the damage between what we offer as a wholesale lender, and the damage to the wholesale channel.
Q And I get that, but you just testified it's not about the damage, correct?
A It -- it --
MR. MURRAY: Object to form. Foundation.
THE WITNESS: -- it is about the damages. It's -- but it is not specific to what Kevron is or how much they're sending. That it -- the damage to the wholesale channel and ultimately to UWM, as we've talked about, is when loans leave the wholesale channel and go to Rocket. We don't get them back. That doesn't come back to the wholesale channel. That's the damage.
There is also damage when it comes to the amount that has been invested by UWM and technology and marketing and training, and so collectively between both we've decided that was our honest assessment of

liquidated damages.

BY MR. HIGH:

Q And I guess let me rephrase this another way. So UWM is damaged when loans go to Rocket or Fairway, right?

A Yes.

Q Okay. So you also testified, hey, if a bunch of loans are going to Rocket and Fairway, that's continued damage to the -- the wholesale mortgage channel, correct?

A That is correct.

Q So wouldn't it make more sense for UWM to terminate the relationship with Kevron as soon as one loan is sent so it doesn't cause additional damage to the channel?

MR. MURRAY: Object to foundation.

THE WITNESS: Like I said, the -- the lag time and when loans are recorded is -- is very erratic throughout the country.

BY MR. HIGH:

Q And I understand that. I guess my question is, doesn't it make more sense to just terminate the contract at the sight of one loan being -- does that make more sense?

MR. MURRAY: Object to foundation.

THE WITNESS: I would say that one loan could also be a mistake.

BY MR. HIGH:
Q Okay. And I guess my question is different. So my question is, does that make more sense? So that's yes or no. Yes, it does make sense to do that or, no, it doesn't make sense to do --
A No.
MR. MURRAY: Object to form.
BY MR. HIGH:
Q Does it make sense to do that at five loans?
A It makes sense to do it as soon as we are made aware.
Q And I guess you're made aware because you are tracking this, correct?
A We do track it, yes.
Q Okay. So wouldn't it make sense for UWM to terminate a relationship with the broker at five loans?
MR. MURRAY: Object to foundation. Incomplete hypothetical.
THE WITNESS: Again, I am not aware of exactly how often that is tracked. It's not as if there is a notification that comes through to UWM as something -- data has to be pulled.
BY MR. HIGH:
Q No, and I understand that. But I guess my question is, after five loans doesn't it make more sense for UWM to just terminate the contract at that point? Does that

make more sense?
A If we are aware, yes.
Q Okay. And why does that make more sense if you are aware?
A If we are aware then there's a breach of contract.
Q Right. So you're saying it makes more sense if you're aware because UWM would terminate the agreement at that point? I guess I'm trying to understand.
A Yes. When we are made aware that there are loans going -- when there's a breach of contract, at that point is when the termination would happen.
Q Are there other retail lenders besides Fairway and Rocket?
A In total?
Q Yes.
A Yes. Yes.
Q If loans go to those lenders, does that hurt the wholesale channel?
A Yes.
Q Why aren't those lenders in the agreement?
A Because not all of them have wholesale.
Q So the ones that -- so I guess my question is, so if there are other lenders that have retail, that do retail loans, right --
A Uh-huh.

Q -- why aren't those lenders in the agreement?
A First of all, not all of them have wholesale. Some lenders are only retail, and also not all lenders that have wholesale and retail are engaging in the same practices that Rocket and Fairway were.
Q And you know that for a fact?
A To the best of our knowledge.
Q Can we go back to Exhibit 3? And could you read section 7.30 out loud for me, please?
A Sure.

7.30 Liquidated Damages. Broker and UWM agree that the measure of damages in the event of a breach of Broker's representation and warrant [sic] under Section 3.03(x) may be difficult, if not impossible, to ascertain. Accordingly, in the event of a violation of Section 3.03(x), Broker shall immediately pay UWM the greater of $5,000 per loan -- per closed loan with Rocket and Fairway -- sorry -- Rocket, Fairway Independent or subject to Section 3.03(x), an acquired lender, or $50,000 as liquidated damages for such breach without the need or proof of damages by UWM. UWM's right to liquidate damages are in addition to, not in lieu of, any other monetary or other remedies UWM may have under this agreement and/or applicable law.

Q So the first part of that says: Broker and UWM agree that the measures of damages in the event of a breach of Broker's representation and warranty under Section 3.03(x) may be difficult, if not impossible, to ascertain.

How do we know that?

A How do we --

Q How do we know --

A -- can you rephrase?

Q -- that the measure of damages may be difficult, if not impossible, to ascertain?

MR. MURRAY: Object to foundation. To the extent it calls for a legal conclusion.

THE WITNESS: I'm sorry, can you state your question --

BY MR. HIGH:

Q Yeah, how --

A -- one more time?

Q -- no, that's okay. No, that's okay.

How do we know the damages --

A Yeah.

Q -- may be difficult, if not impossible, to ascertain? How do we know that?

A Because the way we were able to reach the -- our best assessment of liquidated damages is based on what we

offer as well as goodwill to the wholesale channel and UWM.
Q And I guess my question is, like, what work was done that shows that these damages were difficult, if not impossible, to ascertain? What did UWM do?
A We made our best assessment.
Q How did you do that?
A Just based on the technology, the marketing, the training, as well as the goodwill to UWM and the channel.
Q Okay. So that'll take me to my next question. So I see here that it mentions $5,000 per loan closed. What does that represent?
A The $5,000 --
Q Yeah.
A -- represents the amount that would be owed by a broker or $50,000, whichever is greater. Per closed loan, sorry.
Q Okay. And you're saying the $50,000 represents the same thing?
A It is whichever is greater. So it's $50,000 or $5,000 per closed loan.
Q Right. And I understand that, but I guess what -- what -- what does it represent? Like, what is that 5,000 a representation of?

A Liquidated damages.
Q Yeah, but I mean, is that loss of loans? Like, what -- what is the basis for that $5,000 amount?
A It was our best assessment.
Q Yeah, but what's the basis? Like, what's the support? How was that number decided?
A Based on the technology, the marketing, the training, the growth tools that we offer clients, as well as goodwill to the channel.
Q Okay. And how much was the training?
A That is not something I have off the top of my head.
Q How about the technology?
A We would have to get those exact numbers.
Q Growth tools?
A We would have to get those.
Q Now -- and you say that the 5,000 is based on the technology, the growth, some of the services that you initially told me UWM provides the broker, correct?
A Correct.
Q And the 50,000 is the representation of the same thing, right?
A Whichever is greater, yes.
Q Right. Now how is those -- how are those numbers related to a breach of the agreement by Kevron? Like, what's the relationship between the two?

A There is -- it's -- it's the number of closed loans. It's based on the number of closed loans that Kevron did.
Q Right. But what does the number of closed loans have to do with UWM's technology? Like, what's the relationship between that?
A That was our best assessment of the value that we provide to clients, as well as the goodwill to the channel. You know, as it -- as it states here, it's -- it's not potentially -- it's a difficult thing to get to, and that was our best assessment.
Q And I guess I understand that, but the breach is related to sending loans to Rocket and Fairway, correct?
A That is correct.
Q What does that have to do with the tools UWM provides?
A The -- that's how we reached the liquidated damages amount.
Q Right. But I'm saying what's the -- what is the connection between the services UWM provides to a broker, and a broker sending loans to Rocket or Fairway? What do those things have to do with each other?
A I'm not sure I understand what --
Q Yeah. What -- so you're telling me these -- so I guess

let me just take a step back.

If Kevron breaches their agreement --

A Yep.

Q -- they would owe 5,000 or 50,000; correct?

A Per closed loan, yes.

Q And you told me that these numbers represent the services that UWM provides, correct?

MR. MURRAY: Object to form.

THE WITNESS: As -- as well as our best assessment of the goodwill to the channel as well.

BY MR. HIGH:

Q Correct. And that's U -- and just to clarify. That's UWM's best assessment, correct; not Kevron's, right?

A That is correct.

Q Now what do those numbers have to do with sending a loan to Rocket or Fairway? Those seem like two different things to me.

MR. MURRAY: Object to form.

THE WITNESS: They are -- that -- this is what the liquidated damages are if you send or if you close loans with one of these two. I'm not sure how to better answer --

BY MR. HIGH:

Q Yeah. So, I guess, what does sending a loan to a different lender have to do with UWM services? Like,

what's the connection between those things?
A It's a breach of contract.
Q Right. And I get that, but I don't think that answers my question. My question is what's the connection, and your answer was it's a breach of contract. I don't think that answers the question.
So what's the connection between the services that UWM provides for these amounts, and sending loans to Rocket and Fairway?
A The services that we provide are in -- are built in to help support and grow the broker channel, their business, offer the proper training that they need to grow. If they're going to decide to -- which they can decide to work with Fairway or Rocket, they can do that, but those -- I don't think I'm answering your question, but I'm not sure I understand exactly what you're asking.
Q Yeah. I guess a better way to phrase it is if -- if -- if a broker sends a loan to Rocket and Fairway, UWM is still able to provide the services, correct?
A Not under the terms of this agreement.
Q Right. But they're still able to provide the services, correct?
A We are still --
MR. MURRAY: Object to form.

THE WITNESS: -- we still have the capability, yes.

BY MR. HIGH:

Q Right. Just like I think we talked about earlier that, in terms of the agreement, technically, Kevron isn't supposed to -- according to this agreement, they're not supposed to send loans to Rocket and Fairway, correct?

A Correct.

Q But that can still happen, right?

A If they breach the agreement, yes.

Q Right. So, similarly, that -- the breach of the agreement, that doesn't stop UWM providing services that they provide to brokers, right?

MR. MURRAY: Object to form. Foundation.

THE WITNESS: No.

BY MR. HIGH:

Q Okay. So let's take Rocket, for example. So if UWM closes a loan with Rocket Mortgage in breach of the agreement, how is the $5,000 related to that? So one single loan closed with Rocket, how does that become $5,000?

MR. MURRAY: Object to form because UWM. I don't know if you meant Kevron.

MR. HIGH: Oh, yeah, Kevron. I'm sorry, yep.

THE WITNESS: Okay. Sorry. Can you ask the

question one more time?
BY MR. HIGH:
Q Yeah, sure. So if Kevron closed the loan --
A Okay.
Q -- with Rocket --
A Okay.
Q -- how does the $5,000 relate to that? Just one loan, how do we get $5,000 from that?
A Our best assessment of the liquidated damages was based on what we've discussed. I -- that -- that is -- that is the amount for -- based on our best assessment, that were the liquidated damages for closing a loan.
Q Okay. And -- and that $5,000 is the same if a loan is closed with Fairway?
A It is.
Q Okay. But do you have a -- the formula of how that $5,000 was calculated?
MR. MURRAY: Object to foundation.
THE WITNESS: It was our best assessment.
BY MR. HIGH:
Q Right. But I guess my question is, do you have a formula for how that was calculated?
A It was just our best assessment.
Q Okay. Nope, I understand that. So was that 5,000 -- was it pulled out of a hat?

MR. MURRAY: Object to form.

THE WITNESS: It was our best assessment.

BY MR. HIGH:

Q But how did you arrive at your best assessment?

A Based on the technology, the marketing, the training, the growth tools, and just the overall goodwill to the channel.

Q And I get that, but I guess I want to know the formula. Like did you guys actually do a formula to say, hey, it's $1,000 for the technology, $2,000 for the loss of goodwill, is that how you're saying it was done?

A It was our best assessment.

Q No. I guess my question is, was it done like that, like I just stated?

A There -- it was -- it was truly our honest assessment for the value.

Q And I get that, but my question is -- I need an answer to my question. So when you guys are arriving at your best assessment, did you ascertain value to the different services that UWM provides?

MR. MURRAY: Object to form.

THE WITNESS: I would definitely need to go through and see if we had an actual formula, but it was -- the conversation was our best assessment.

BY MR. HIGH:

Q But you're the most knowledgeable person to testify about these --
A Uh-huh.
Q -- topics, correct?
A Yep.
Q So if there is a formula for this calculation you would know about it, right?
A I would think so.
Q Okay. And do you know about any formula for the basis of that 5,000?
A Not down to a perfect science.
Q Okay. What about any science?
A There is definitely value in what is provided to our clients, and we calculated that best -- on our best assessment.
Q No, and I understand the value. But I want to know what math was done to arrive at $5,000. Can you show me how that that number was determined?
MR. MURRAY: Object to form and foundation.
THE WITNESS: There is not a specific formula I can show you.
BY MR. HIGH:
Q Okay. Same question for the 50,000. Can you show me a formula of how that 50,000 was determined?
A No, it's the same thing.

Q Okay. And you said -- and I don't want to misquote you -- that this calculation is based on the services that UWM provides to brokers, correct?
A Correct.
Q Why isn't that in the agreement?
MR. MURRAY: Object to form. Foundation.
THE WITNESS: Can you ask the question again?
BY MR. HIGH:
Q Right. Why doesn't the agreement say, hey, this $5,000 is based on the services that UWM provides to brokers?
A That is what is summarized in liquidated damages. That's how we got to the $5,000.
Q Right. But I want to know why that specific -- if you're telling me it's based on the services that UWM provides, why isn't that in the contract?
A There are services that UWM provides in the contract. I mean, 7.28 specifically talks about the Blink application system.
Q No, I understand there are services they provide. I want to know specifically to 7.30, why doesn't that section say this $5,000 is based on the services that UWM provides to its brokers, and here's how we arrived there. Why isn't that there?
MR. MURRAY: I'm going to object to foundation, to the extent it calls for legal

conclusion, and I also think it's beyond the scope of the -- the dep notice.

But you can answer if you know.

THE WITNESS: This -- based on the comprehensiveness of the agreement, it is in there.

BY MR. HIGH:

Q Okay. Can you show me where in the agreement that it says the $5,000 is based on the services that UWM provides its brokers? Can you show me where that is?

A That specific language is not in there.

Q Okay. Is there any language that you can point me to in this agreement that shows that the $50,000 is based on the services that UWM provides to its brokers?

A Not that direct line, no.

Q Don't you think that would be important for brokers to know what the basis of those numbers are?

MR. MURRAY: Object to foundation.

THE WITNESS: I think the brokers are reading the full agreement. It's all encapsulated in there.

BY MR. HIGH:

Q No, I understand that, but I guess my question is a bit different. My question is, don't you think it would be important for brokers to know the basis of the liquidated damages provision? Would that be important for brokers to know?

MR. MURRAY: Object to form and foundation, and to the extent it calls for a legal conclusion.

THE WITNESS: If the broker had a question on it, I'm sure it would have been answered.

BY MR. HIGH:

Q Okay. And I guess that's not my question. My question is about the contract. Why isn't that in the contract? Can you explain to me why it isn't in the contract how these -- or what these numbers are based off of? Why isn't that there?

MR. MURRAY: Same objection.

THE WITNESS: I think that it is encapsulated in the comprehensiveness of the agreement. It is not specifically stated in the way that you were asking, but I believe it is in there.

BY MR. HIGH:

Q Don't you think it would be important to specifically state what is the basis of this liquidated damage provision?

MR. MURRAY: Object to form. Foundation. To the extent it calls for a legal conclusion.

THE WITNESS: I don't.

BY MR. HIGH:

Q You don't think that'd be important to have in the agreement?

A It is in the agreement. It's not specifically in the language that you're asking for.

Q Okay. So I guess my question is, don't you think it would be important to specifically state the basis for the amounts in this liquidated damages provision?

MR. MURRAY: Same objection.

THE WITNESS: Same response.

BY MR. HIGH:

Q Yeah, I guess I'm not getting an answer, though. So my question is, don't you think it would be important to have this contract here that governs the relationship between broker and lender, don't you think it would be important to have the basis of the $5,000 and the 50,000?

MR. MURRAY: Object to the extent it calls for legal conclusion.

THE WITNESS: It is in here. It is just not in the way that you're specifically asking for it.

BY MR. HIGH:

Q But don't you think it would be important -- everybody doesn't have the opportunity to depose you and ask these questions. So in this agreement don't you think it would be important for a broker to have it specifically as I stated in the agreement?

A I don't.

Q So you don't think in this agreement brokers should know the basis of the liquidated damages provision?

MR. MURRAY: Object to form and foundation.

THE WITNESS: It is comprehended in the overall agreement.

BY MR. HIGH:

Q Right. But why isn't it in this section for the liquidated damages provision?

MR. MURRAY: Object. Asked and answered.

THE WITNESS: You would have to ask legal counsel.

BY MR. HIGH:

Q Okay. Now I think we talked about -- so before this liquidated damages provision was inserted into the all-in addendum, was it ever discussed with Kevron?

A Prior to, no.

Q Correct.

So UWM didn't discuss the liquidated damages provision before amending the agreement?

A Correct.

MR. MURRAY: Just because she answered before I could object to form but...

BY MR. HIGH:

Q Did UWM discuss the all-in addendum with Kevron before amending the agreement?

A No.
Q It was only discussed with the five to six people in that room, right?
MR. MURRAY: Object to form and foundation.
THE WITNESS: Yes.
MR. HIGH: Okay. I'm going to mark this as Exhibit 5, request to admit. UWM's answers to Kevron's request to admit.
(Exhibit 5 marked for identification)
BY MR. HIGH:
Q Have you seen that document before --
A Yes.
Q -- Ms. DeCiantis?
A Yep.
Q Okay. When did you see that document?
A Last week.
Q Was last week the first time?
A Yes.
Q Okay. I want to direct you to the second question.
It says: Please admit that UWM did not discuss the all-in addendum with Kevron before amending the Wholesale Broker Agreement.
I see the response is denied. Do you see that?
A Uh-huh.
Q Do you know why that is?

A Saying because it's irrelevant.
Q Yeah, I'm just asking you about the denied. Do you know why it was denied?
A I do not.
MR. MURRAY: You can -- well, you can read the whole response, though, if you want.
THE WITNESS: UWM otherwise objects to this request on the ground that it is irrelevant, and not proportional to the needs in this case. UWM further objects to this request on the ground that is vague and ambiguous because Kevron was presented with the all-in addendum, and had an opportunity to review the all-in addendum before voluntarily agreeing to its terms.
BY MR. HIGH:
Q That's fine. The objection's fine. But the request to admit still answered. So you see it says denied, right?
A Yes.
Q Do you know why it was denied?
A Because it's irrelevant.
Q Right. But didn't you just tell me that it was never discussed with Kevron?
A I -- I don't believe that it was.
Q Right. So shouldn't it just be denied if you're the corporate representative testifying that it wasn't

discussed?

MR. MURRAY: Object to form, foundation, to the extent it calls for a legal conclusion. We have our objection into the response as to why we think it's vague and ambiguous as written, and it also provides other information about -- to the extent that Kevron was presented with the agreement before they agreed to it.

So she can answer the question, but we've got our legal objections in there that qualify the answer in that response.

MR. HIGH: Could you repeat my question?

(Indicated question played back by reporter.)

BY MR. HIGH:

Q So that's my question. You testified it wasn't discussed with Kevron, correct?

A I do not have knowledge of it being discussed, no.

Q So if you -- so you're -- you're the corporate representative, correct?

A Yes.

Q So if you said it wasn't discussed then it wasn't discussed, right?

A It is my understanding that it was not discussed.

Q So shouldn't that say admitted?

MR. MURRAY: Object. Based on -- oh, I'm sorry. Did I interrupt --

MR. HIGH: Oh, no. No. You go.

MR. MURRAY: I just wanted to object. We had our -- our objections to the -- the response and why we thought it was vague and ambiguous.

But you can answer to the best of your knowledge.

BY MR. HIGH:

Q So my question is shouldn't that say admitted if the corporate representative for UWM is saying it wasn't discussed?

A I -- I'm speaking to the best of my knowledge.

Q Right. So I guess my question is, shouldn't that say admitted if you're the corporate representative, and you're saying it wasn't discussed?

MR. MURRAY: Object, again, for the same reasons that are stated in the response.

BY MR. HIGH:

Q Same question.

A I have the same response.

Q Yeah, so I guess I didn't get an answer to my question. So I guess my question is, shouldn't that say admitted if you, as the corporate representative, are saying it was not discussed?

A I am speaking to the best of my knowledge.
Q Right. So should that say admitted or no?
A No.
Q It should not say admitted?
A No.
Q So when you testified earlier and you said it wasn't discussed, was that correct?
A It is -- I'm speaking to the best of my knowledge.
Q Right. So if the best of your knowledge, it was never discussed, shouldn't that reflect this document here?
A This document is saying that it was irrelevant.
Q Right. I'm talking about it being denied. So if you're saying to the best of your knowledge it was not discussed, shouldn't this document line up with the testimony of UWM's corporate representative?
A I would need to speak with legal counsel.
Q Okay. Next question says: Please admit that UWM did not discuss liquidated damages with Kevron before amending the Wholesale Broker Agreement.
Do you see that?
A Yes.
Q And you testified that -- that it was not discussed, correct?
A To the best of my knowledge, yes.
Q Right. And you're the most knowledgeable person,

right?
A Uh-huh. Yes.
Q Okay. So why does this also say denied?
A I would need to speak with legal counsel.
Q You're unable to answer the question?
A Correct.
Q Okay. Now, let's go back to Exhibit 3.
My understanding of the liquidated damages provision is -- is it's either 5,000 per loan or a minimum of 50,000; correct?
A That is correct.
Q So if Kevron sends one loan to Rocket or Fairway it would owe 50,000; correct?
A That would be correct.
Q How much would it owe if it sent two loans?
A 50,000.
Q How about three loans?
A 50,000.
Q Four loans?
A Same.
Q Five loans?
A Same.
Q Six loans?
A Uh-huh.
Q Six loans?

A Yes.
Q Seven loans?
A Yes.
Q Eight loans?
A Yep.
Q Nine loans?
A Yes.
Q Ten loans?
A Yes.
Q So if it sends one loan or if it sends ten loans, it owes $50,000 regardless --
A That is correct.
Q -- correct?
A That is correct.
Q Does that make any sense to you?
MR. MURRAY: Object to form and foundation.
THE WITNESS: It does.
BY MR. HIGH:
Q How?
A Because that was our best assessment for liquidated damages for a certain number of loans that were sent.
Q And I understand that, but why is it $50,000 for one loan, and also $50,000 for ten loans?
A Because that was our best assessment of damages.
Q But why is it the same number?

 A Why is it the same number?
Q Correct. So are you damaged the same way if there's one loan sent to Rocket versus ten went -- ten loans sent to Fairway? You're damaged the exact same way?
A There's a difference between breach of the agreement, which, as we've discussed, there is a lag time in when we would know when -- how many loans were sent versus something being egregious and complete disregard for the agreement that was signed.
Q So I guess my question, though, is, if -- if a broker sends one loan -- like you called it almost even a mistake -- if they send one loan to Fairway, they would owe a minimum of $50,000; correct?
A That is correct.
Q And then they would send -- if they send ten loans to Rocket, a completely different lender, they would still owe $50,000; correct?
A Yes.
Q That makes sense to you?
A Yes.
Q So it makes sense to you that UWM is damaged exactly the same if they were to send five loans to Rocket or ten loans to Fairway, they're still damaged $50,000?
MR. MURRAY: Object to form. Foundation.
THE WITNESS: Yes. And it's more than just

UWM. It's the wholesale channel.

BY MR. HIGH:

Q Right. But UWM -- it's in UWM's contract, correct?

A It is.

Q It is not in a wholesale contract, right?

A Correct.

Q Okay. So -- and then you testified earlier that the 5,000 was a best estimate of UWM for the services it provides, correct?

A Plus the goodwill to the channel, yes.

Q So why isn't it just $5,000 if you send one loan?

A The -- the number works out to be the same.

Q Right. But I guess my question is, if your best estimate was $5,000, why is it a minimum of $50,000 if you send one loan? Why isn't it just $5,000?

A That was our determination in our discussions.

Q Right. And I understand it was a determination in discussions, but I guess my question is why is it the same? Right? Could you give me a explanation as to why it's the same?

MR. MURRAY: Object to form.

THE WITNESS: Can you clarify what --

BY MR. HIGH:

Q Yeah. Could you explain to me why the damage is $50,000 for ten loans to Rocket --

A Yep.
Q -- and also $50,000 for one loan to Fairway? Can you explain that to me?

MR. MURRAY: And I guess just to clarify. Maybe I'm splitting hairs here --

MR. HIGH: Yeah.

MR. MURRAY: -- and I don't mean to, is -- are you talking about ten loans total or are you talking about eleven loans? Because you're -- are you saying ten to Rocket, one to Fairway, or are you saying --

MR. HIGH: Yeah, I'm giving two different scenarios.

MR. MURRAY: Different scenarios --

MR. HIGH: Yep.

MR. MURRAY: -- so it's like either ten to --

MR. HIGH: Yep.

MR. MURRAY: -- got it. Okay.

MR. HIGH: Yep.

THE WITNESS: So it is -- it is my understanding that it did not matter whether the loans went to Rocket or Fairway. It was the total number. So it was not -- if I'm understanding your question properly, if they send one loan to Fairway and five loans to Rocket, it's not $100,000.

BY MR. HIGH:
Q Right. But I guess my question is, as opposed to it -- why is it a minimum of $50,000?
A That was our determination.
Q Who determined that?
A We determined that and through discussions.
Q Who is we?
A The people that were in that room.
Q Is there any formula that you can show me that shows why it's $50,000?
A I cannot point to a formula.
Q Now I understand this agreement is standard. This was a standardized agreement, the initial wholesale agreement and the new agreement, correct?
A It is, yes.
Q Okay. So there are other brokers outside of Kevron that are parties to the amended agreement with the all-in addendum, correct?
A As far as them signing it?
Q Yes.
A Yes.
Q So if another broker, not named Kevron, sends loans -- sends two loans to Rocket, UWM is still damaged $50,000?
A That was our best assessment, yes.

Q So the contract doesn't account for if a smaller broker sends loans to Rocket or Fairway versus a larger broker?
A It does not.
Q And was this number arbitrarily selected by UWM?
MR. MURRAY: Object to form and foundation.
THE WITNESS: It was our best assessment.
BY MR. HIGH:
Q Right. It was arbitrarily selected by UWM?
A It was --
MR. MURRAY: Object to form.
THE WITNESS: -- it was based on what we offer to our clients as well as the goodwill.
BY MR. HIGH:
Q Right, and I understand that. I just want an answer to my question. Was it arbitrarily selected by UWM?
A It was --
MR. MURRAY: Object. Asked and answered.
You can answer.
BY MR. HIGH:
Q Yeah.
A It was based on what we've already discussed.
Q Right. So that's a yes?
MR. MURRAY: Object to form.
THE WITNESS: No. It was based on the

services, the technology, the marketing, the goodwill, the partner recruiting services that we collectively offer.

BY MR. HIGH:

Q Right. But I guess my question is UWM arbitrarily determined this number? Kevron didn't have any input on it, right?

MR. MURRAY: Object to form. Because I guess I'm just getting caught up by what do you mean by arbitrarily --

THE WITNESS: Yeah.

BY MR. HIGH:

Q Right, that --

MR. MURRAY: -- Matt?

BY MR. HIGH:

Q -- they determine the number themselves. UWM, by itself, without the input of a broker said, hey, it's 5,000 and it's 50,000; right?

A That is correct.

Q Are you aware of any -- at the time that it was decided that this liquidated damages provision was going to be part of the contract, are you aware of any contemporaneous documentation when this was done?

MR. MURRAY: Object to form.

THE WITNESS: Can you restate your question?

BY MR. HIGH:
Q Yeah. So at the time it was decided that this provision was going to be in the new agreement, are you aware of any contemporaneous documentation around that same time?
MR. MURRAY: Object to form.
THE WITNESS: I am not aware.
BY MR. HIGH:
Q Okay. And by contemporaneous documentation, I mean, are you aware of any documentation that shows somebody doing the math to arrive at 5,000 and 50,000. Are you aware of that?
A A document, no.
Q Are you aware of any documentation showing the formula for the $50,000 and the $5,000?
MR. MURRAY: Object to foundation.
THE WITNESS: A document, no.
BY MR. HIGH:
Q Okay. Is there any evidence that you could hand me, any documentation that you could show me that says, hey, here's how we arrived at 50,000; here's how we arrived at 5,000; any documents like that?
A There was nothing documented.
Q Why not?
A It was based on the discussion of those in that room

with legal counsel.
Q And in that room with legal counsel and everybody else that was involved, it was just determined that it will be 50,000 and 5,000?
A Yes.
Q And I understand -- back to Exhibit 3, the con -- the contract says that the damages may be difficult, if not impossible, to ascertain, right?
A Yes, it does.
Q Why doesn't it -- why doesn't the contract explain why that is the case?
MR. MURRAY: Object to form and foundation, and to the extent it calls for a legal conclusion.
THE WITNESS: That is what legal determined to put in there.
BY MR. HIGH:
Q Yeah, I understand that. But I guess why in the contract doesn't it say here's why UWM's damages are different difficult to calculate? Why isn't that in the agreement?
MR. MURRAY: Object to the extent it calls for a legal conclusion, and I think that's beyond the scope of the dep notice.
THE WITNESS: I can't answer that.
BY MR. HIGH:

Q Okay. Do you think the $5,000 was a just amount?
A I'm sorry?
Q Do you think the $5,000 was a just amount?
A Yes.
Q Do you think the $50,000 was a just amount?
A Yes.
Q Do you have any evidence of that?
MR. MURRAY: Object to form. Foundation rather.
THE WITNESS: Just what we've discussed already.
BY MR. HIGH:
Q Do you have any evidence? Is there anything --
A The technology --
Q -- any documentation that you could show me that supports what you're saying?
MR. MURRAY: Object to form.
THE WITNESS: We -- showing you the technology and showing you the --
BY MR. HIGH:
Q No. So any documentation showing that these amounts were just. Is there anything you could provide me that supports what you're testifying to?
MR. MURRAY: Object to form.
THE WITNESS: There is no documented formula

if that's what you're asking.

BY MR. HIGH:

Q So I guess you're saying the amount -- the 5,000 and 50,000 was -- those were just amounts, correct?

A Yes.

Q Okay. And you're saying you guys did a fair estimate, right?

A That was our best assessment, yes.

Q Right. Is there any documentation of that -- of that estimate or assessment?

A There's no documentation, no.

Q Do you think UWM suffers actual damages when loans are submitted to Rocket and Fairway?

A If it goes to their wholesale channel and then goes to retail, yes.

Q How does UWM suffer actual damages? So unrelated to liquidated damages, how does UWM suffer actual damages when loans are sent to Rocket and Fairway?

MR. MURRAY: Object to the extent it calls for a legal conclusion, and to the extent it's making a distinction that liquidated damages is not a fair estimate of what actual damages -- or does not include an estimate of what actual damages would be.

I kinda think that's a legal question, but if you can answer that.

THE WITNESS: That is how -- we included everything in liquidated damages.

BY MR. HIGH:

Q Yeah, I understand. I'm not asking about liquidated -- liquidated damages right now. I'm asking about actual damages.

A We encapsulated it all in one.

Q Right. So are you aware of any actual damages?

A That's encapsulated in liquidated damages.

Q So they're two different things. So I don't want to confuse liquidated damage with the actual damage. Liquidated damages is the amount that UWM determined --

A Yeah.

Q -- correct?

A Uh-huh.

Q Actual damage is the actual loss, do you understand that?

A Uh-huh.

Q Okay. So what actual damages does UWM have? Are you aware of any?

A We included all that in liquidated damages.

Q But I'm saying are you aware of any actual damages?

MR. MURRAY: Objection. Again, to the extent it calls for a legal conclusion.

But go ahead.

THE WITNESS: We did not separate them.

BY MR. HIGH:

Q So is it fair to say you don't have any actual damages; you just have liquidated damages?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

You can answer if you don't...

THE WITNESS: It's all in liquidated damages.

BY MR. HIGH:

Q Yeah, I want an answer to my question, though. Is it fair to say that UWM does not have actual damages, it only has liquidated damages which you're referring to?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

THE WITNESS: I would -- we would -- if you want a further answer, we would need legal counsel.

BY MR. HIGH:

Q Right. But you're the person -- there was a topic on that dep notice about the actual damages that UWM suffers. You don't understand that, right?

A Yes.

Q And you were that person identified to testify about those topics, correct?

A Correct.

Q Legal counsel was not identified to testify about those

topics, correct?
A Correct.
Q So I need an answer from you on whether UWM suffers actual damages or whether -- are you saying UWM has only suffered liquidated damages?
MR. MURRAY: Object. Asked and answered and calls for a legal conclusion.
You can answer to the best of your knowledge.
THE WITNESS: The liquidated damages, we looked at it all holistically. It was not broken out.
BY MR. HIGH:
Q Right, and I understand that. I just want an answer to my question. Can you tell me under oath that UWM did, in fact, suffer actual damages, or did it only suffer the liquidated damages that you mentioned in the agreement?
A The liquidated damages are all inclusive.
Q Right. So there are no actual damages that you can point me to, correct?
MR. MURRAY: Object to form, foundation, to the extent it calls for a legal conclusion, and we also did object to this category in our dep notice -- in response to the dep notice.
THE WITNESS: I'm not sure how to better answer your question. It was determined to be all

inclusive under liquidated.

BY MR. HIGH:

Q Okay. So I think I'm getting a response. I'm not getting an answer.

MR. HIGH: Can you repeat that question for -- for -- court reporter?

(Indicated question played back by reporter.)

BY MR. HIGH:

Q So are there any actual damages that you can point me to?

A We did an all encompassing damage -- liquidated -- under -- under liquidated damages.

Q No, I understand -- I understand the script, but I want to answer to my question. So my question --

MR. MURRAY: Object. Argumentative.

BY MR. HIGH:

Q -- my question is, can you point me to any actual damages? Can you point me to that information? I don't want to hear about the liquidated damages, just the actual damages.

MR. MURRAY: Object to the extent it calls for a legal conclusion.

THE WITNESS: It's all encompassing.

BY MR. HIGH:

Q Can you answer my question, ma'am?
A I'm answering your question to the best of my ability.
Q Yeah. So if you're the person that was identified to textual -- to testify about actual damages --
A Yep.
Q -- then -- and I'm asking you about actual damages, don't you think I have a right to that answer?
A We did not break out actual damages. That's why I'm saying it's all under liquidated damages.
Q Right. So if you didn't break it out, it's fair to say you don't have any actual damages, correct?

MR. MURRAY: Object to form and foundation.

THE WITNESS: It's all under liquidated.

BY MR. HIGH:
Q Right. So I guess -- I don't want to -- I guess I don't want to ask about liquidated damages. I just want to know about actual damages.
A I know, but that's all under liquidated damages. You're trying -- we're trying to break out something that's not broken out.
Q So if it's not broken out, there are no actual damages that you could point me to, correct?
A It is under the liquidated damages.
Q So outside -- so where in the liquidated damages provision -- you're talking about 7.30, correct?

A Yes, correct.
Q Okay. And where in that provision does it say what UWM's actual damages are?
A That word is not in there.
Q Actual damages is not in that provision?
A No.
Q Why not?
A Because it -- we rolled it all up under liquidated damages.
Q Are you aware of any actual damages?
A To the best of my knowledge, this is all what we believe is our all-inclusive damages.
Q Right, I understand that. But my question is, are you, the corporate representative, aware of any actual damages?

MR. MURRAY: I'm just going to place another objection. I mean, I think -- to the extent you're drawing this distinction between actual damages and liquidated damages such that liquidated damages doesn't include actual damages that are hard to calculate, I think it's -- it doesn't have a proper foundation as a question.

But to the extent you can answer, Ms. DeCiantis, you can answer.

THE WITNESS: I'm not sure how to better

answer your question.
BY MR. HIGH:
Q Okay. And let me try to better phrase -- your attorney is much smarter than me. So let me try to -- let me try to ask it a different way.
So you've testified -- I think I've explained that -- you understand liquidated damages and actual damages are different, correct?
MR. MURRAY: Object to foundation. I don't think we've established that.
MR. HIGH: Well, but she testified to it.
MR. MURRAY: I don't -- I don't believe she did, but fine. The record is what it is, but she's not a lawyer so...
BY MR. HIGH:
Q So you understand that liquidated damages is the amount of damages that UWM determined it suffered if Kevron breached the agreement. Do you understand that?
A That is correct.
Q And you understand that if that provision was not there, that there would still be damages that UWM suffers if Kevron breached the agreement, correct?
A There would still be damages, yes.
Q Correct. And that's what actual damages would be. So if we don't have that liquidated damage provision,

actual damage would be the damages that UWM suffers if Kevron breached the agreement. Do you understand that?

A Yes. But what I'm saying is we didn't break them out. We rolled them all up into liquidated damages.

Q Right. And I guess I understand that, but you understand they're two different things, right?

MR. MURRAY: Object to foundation.

THE WITNESS: Rolled up into one. That is how we did the agreement.

BY MR. HIGH:

Q Okay. So can you point to any documentation or evidence that shows what UWM's actual damages are?

A There is not a document, no.

Q Can you point to any evidence outside of just referring back to the liquidated damages clause? Can you refer -- can you show me any evidence what the actual damages are?

A No, it's all in liquidated damages.

Q No, I'm saying outside of that. So if we take that out can you point to any evidence that shows what the actual damages are?

A Outside of where it's been rolled up into liquidated, no.

Q Okay. So you -- so just so I understand -- so what the actual damages -- how much in actual damages does UWM

suffer if Kevron sends loans to Rocket or Fairway? How much?

A We did not --

MR. MURRAY: Object to form and foundation.

THE WITNESS: -- we did not break that out separately from liquidated damages. It's all in one.

BY MR. HIGH:

Q So do you know?

A It is all rolled up into liquidated damages.

Q No. So I'm saying, do you know?

A Do I know -- it's $5,000 per loan.

Q And you're saying that that's the actual damages?

A We've rolled it all up into one.

Q Okay. And I get the rolled up into one, and I don't want to split hairs here, but I don't want to discuss the liquidated damages. I just want to discuss actual damages. And if you're saying, hey, I can't discuss actual damages. I can just refer to liquidated damages, that's fine, but I just need to know that. So is there anything that you could show me that shows how much actual damages UWM suffers when loans are sent to Rocket and Fairway?

A There is not a breakout of actual separate from liquidated.

Q So UWM only has liquidated damages?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

THE WITNESS: The liquidated damages that are referenced include all damages.

BY MR. HIGH:

Q Right. So you just testified earlier actual damages is not in that section, correct?

A It is -- it is not broken out.

Q Well, where is it -- where would it be?

A It is rolled up into liquidated damages.

Q So I guess when you say rolled up, what do you mean by that?

A It's an all-inclusive damages.

Q Where -- where does it say that in the agreement?

A It does not specifically state that in the agreement.

Q Then what are you basing your testimony off of?

A Based on the conversations that we had.

Q Why isn't that in the agreement?

A Because we rolled it all up into one liquidated damage amount.

Q Right. But why isn't what you just testified to in this contract?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

THE WITNESS: That I would have to --

MR. MURRAY: And foundation.

THE WITNESS: -- consult legal counsel.

BY MR. HIGH:

Q So just so I understand clearly. So is it your testimony today that based on this agreement UWM only suffers liquidated damages when loans are sent to Rocket and Fairway, based on this agreement?

A Based on this agreement, it's not when they're sent. It's when they're closed.

Q When they're closed. I'm sorry.

A Yes.

Q Okay. Now do you think UWM suffers consequential damages when loans are closed with Rocket or Fairway?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

THE WITNESS: Once again, all damages were rolled up into liquidated.

BY MR. HIGH:

Q Right. I just want to -- I guess I don't want to do all. I just want to focus on consequential damages because it's easier when we read the transcript.

So for consequential damages, is it your testimony, as the corporate representative, that UWM suffers consequential damages when loans are closed with Rocket and Fairway?

A We rolled it all up into one.
Q You rolled consequential damages all into one?
A Correct.
Q How would anybody else know that outside of the people in the room that made the decision?
A That is not broken out separately.
Q Right, that's not my question. My question is, you say it's rolled up in this agreement, correct?
A Liquidated damages, yes.
Q If you weren't in the room to make that decision, how would anybody else know that?
A You would not.
Q Okay. But your testimony is that UWM suffers consequential damages when loans are closed to -- with Kevron and Rocket?
A Yes, it's all in liquidated.
Q Do you know how --
MR. BYRD: Closed with Kevron.
MR. MURRAY: Yeah, I think you --
MR. HIGH: Oh, I'm sorry, Rocket and Fairway.
THE WITNESS: Yes.
BY MR. HIGH:
Q Do you know how the consequential damages are calculated?
A I don't have a formula for that.

Q Okay. Do you know how much in consequential damages UWM suffers?
A I don't have the formula.
Q Can you give me an estimate of how much in damages?
A We rolled everything up into one. I don't have the breakout.
Q So you don't know?
A I don't have the breakout.
Q But you're the corporate representative, right?
A Uh-huh.
Q Shouldn't you have that breakdown?
MR. MURRAY: Object to foundation. She didn't say there was a breakdown.
MR. HIGH: She said I don't have it.
BY MR. HIGH:
Q So who has it?
A I don't know that anyone has a full breakdown. There was nothing documented.
Q So if there's -- so if you don't have the breakdown, are you saying nobody has a breakdown?
A I don't believe there is one.
Q So if there's no breakdown, how do you know that UWM suffers consequential damages? What is that based off of?
A I was part of the discussions.

Q Okay. Did the discussions discuss a breakdown?
A We talked through different breakdowns, yes.
Q Okay. Could you walk me through the formula that was discussed for the consequential damages?
MR. MURRAY: Object to foundation.
THE WITNESS: We did not document a formula.
BY MR. HIGH:
Q No, I'm not asking about a document. Could you walk me through the discussions? What formula was discussed for the consequential damages?
MR. MURRAY: Object to foundation.
THE WITNESS: We were going through all of the various offerings that we provide to clients, the goodwill to UWM to the channel, and came up with the liquidated damages total amount.
BY MR. HIGH:
Q Okay. And out of the things that you discussed could you at least give me one formula of how UWM suffers consequential damages? Can you give me an example of what was discussed?
A I cannot give you the formula, no.
Q You don't know it?
A I cannot give you the formula, no.
Q Why not?
A Because there was not a specific formula.

Q So you just determined that UWM suffers consequential damages?
A We rolled everything up into one.
Q What does that mean?
A So all damages were rolled up into liquidated damages.
Q Okay. But that's not in the agreement, right?
MR. MURRAY: Object to form.
THE WITNESS: It is not called out specifically as consequential damages.
BY MR. HIGH:
Q Okay. Do you think it would be important to have in the agreement that UWM suffers consequential damages when loans are cloned -- closed -- I'm sorry -- when loans are closed with Rocket or Fairway? Do you think that would be important to have in the agreement?
MR. MURRAY: Object to foundation. To the extent it calls for a legal conclusion.
THE WITNESS: I think the liquidated damages encompasses it.
BY MR. HIGH:
Q So you don't think it would be important to have consequential damages in the agreement?
A No.
MR. MURRAY: Same objection.
BY MR. HIGH:

Q Now we talked about Exhibit 3, 3.3(x) that basically says brokers are not supposed to send loans to Rocket or Fairway. Do you remember that?

A Yes.

Q Does UWM assume that the loans that went to Rocket or Fairway would have otherwise went to UWM?

A No.

Q So those loans could have gone to some nonexclusive lender?

A Ask your question one more time.

Q Yeah. So -- so those same loans could have gone to a non-excluded lender, so a different lender, and UWM wouldn't have had a problem with that?

A Yes.

MR. MURRAY: Object to form.

THE WITNESS: Yes.

BY MR. HIGH:

Q For the loans that went to Rocket and Fairway, did UWM do anything to confirm that it was offering the best rate and terms for those particular loans?

MR. MURRAY: Object to form and foundation, and beyond the scope of the dep notice.

If you know.

THE WITNESS: We did not.

BY MR. HIGH:

Q So I guess, for example, if Fairway offers a better deal for a prospective borrower than UWM, shouldn't that loan go to Fairway for the good of the borrower?
A It --
MR. MURRAY: Object to foundation.
THE WITNESS: -- it could. They would just have to terminate their relationship with UWM.
BY MR. HIGH:
Q Well, UWM could terminate it, right?
MR. MURRAY: Object to foundation.
THE WITNESS: UWM has the ability to terminate, yes.
BY MR. HIGH:
Q Okay. Now does UWM experience the loss of goodwill if loans are closed with Rocket or Fairway?
MR. MURRAY: Object to form and foundation.
I guess, do you mean in violation of the agreement, or do you mean generally?
MR. HIGH: Either way. I'm just going off the discovery said that they -- there's a loss of goodwill when these loans are closed with Rocket or Fairway.
THE WITNESS: There is a loss of goodwill for UWM and for the channel. Yes.
BY MR. HIGH:

Q Okay. Could you explain to me what that means, loss of goodwill? Could you explain that?
A So UWM and -- as a larger portion of the wholesale channel loses goodwill when loans go into the wholesale channel at Rocket because ultimately they end up leaving the wholesale channel and going into retail.
Q So that loss of goodwill, I guess, how -- how is that calculated?
A There's not a calculation for goodwill.
Q So how do you know you lost it?
A That is our best assessment.
Q Yeah, but I guess I understand that. But how do you know you lost it if there's no calculation to determine it?
A It is our best assessment that it is being lost by the loans going out of the channel.
Q But how do you know you lost it? Like how does UWM know it lost goodwill if one loan goes to Fairway? How is that determined?
A That was our best assessment.
Q Do you know how it was determined?
A It was just our best assessment.
Q Right. But I guess my question is, do you know how it was determined that UWM suffered loss of goodwill? Do you know that?

A There's not a formula to determine loss of goodwill.
Q But how do you know it was -- that UWM experienced the loss of goodwill?
A We believe we do when loans leave the channel.
Q And just based on that?
A Yes.
Q So you believe that -- I'm sorry. You're testifying that under oath that when loans go to Rocket or Fairway, UWM loses goodwill?
A Yes.
MR. MURRAY: Object to form.
BY MR. HIGH:
Q Are there any other lenders that can cause UWM to lose goodwill?
A Those are the two we've identified.
Q Right. I understand you identified though -- those. Are there any others?
A I don't believe so.
Q Is there anywhere in the agreement that you could point to that shows that UWM suffers a loss of goodwill when loans are closed with Rocket or Fairway?
A There is not a goodwill section, no.
Q So there is nothing in there that tells the broker, hey, UWM is experiencing a loss of goodwill when you do this?

A That it's not stated explicitly, no.
Q Why not?
A Because it's rolled up into liquidated damages.
Q But the broker wouldn't know that, right?
A That is --
MR. MURRAY: Object to foundation.
THE WITNESS: -- that is not specifically called out, no.
BY MR. HIGH:
Q Right. So there is no way a broker would know if UWM loses goodwill if it's not in the agreement, right?
A They --
MR. MURRAY: Object to foundation.
THE WITNESS: -- they could ask, but it's not specifically stated.
BY MR. HIGH:
Q Well, how would they know to ask that?
A They're signing an agreement.
Q That --
A They can question anything.
Q -- right. But if it's not in the agreement, how would they know to ask that?
A Just like anything, when you have questions about a contract that you're signing, they have the ability to ask questions.

Q Right. But isn't that usually -- aren't your questions usually about what's in the contract?

MR. MURRAY: Object to foundation.

THE WITNESS: It -- well, clarification.

BY MR. HIGH:

Q Right. So if it's -- if there's no mention of a loss of goodwill in the contract, how would they know to ask that?

MR. MURRAY: Object to foundation.

THE WITNESS: I can't say how they would know.

BY MR. HIGH:

Q You're just -- are you just guessing?

A No. I'm just saying that they have the ability to question anything that's in the agreement, liquidated damages included.

Q Right. Keyword, anything that's in the agreement.

So if it's not in the agreement, they have no basis to question it, right?

MR. MURRAY: Object to foundation. Form.

THE WITNESS: But there's liquidated damages in the agreement. If they needed clarification around those, they would be welcome to ask.

BY MR. HIGH:

Q Right. I'm not asking about liquidated damages. I'm

 just asking about loss of goodwill. So how would they know to ask about that, if it's not in the agreement?
A They would -- the goodwill piece is not specifically stated in the agreement, but if there was questions around how -- anything in the agreement we were -- how it was reached, they can ask those questions.
Q Right, I get that. But if UWM experiences a loss of goodwill, and the agreement does not say that, how does the broker know to ask questions about that?
MR. MURRAY: Object to foundation.
THE WITNESS: I can't -- I can't say how they would know, but there's a lot of questions that go into a contract that gets signed of -- of any kind.
BY MR. HIGH:
Q Right. But if it's not in the contract, isn't it true that there wouldn't be a question about it?
MR. MURRAY: Object to foundation and form.
THE WITNESS: There could be questions around anything. I -- I can't say specifically how a broker would know or what questions a broker might ask, but anything is open to question or clarification.
BY MR. HIGH:
Q If it's in the contract, right?
A Sure.
Q Thank you.

So I want to take you back to Exhibit 4.

Could you turn to page 14? The bottom of that -- so it says, "so you have until." Could you read that paragraph, and then the second paragraph on the next page, please?

A Sorry, through the second paragraph or just the -- what's on the bottom here in the second paragraph?

Q Yep, the last paragraph on page 14. "So you" -- "so you have until" --

A Yep.

Q -- and then the next paragraph on page 15.

A Okay, sure. Sorry.

So you have until -- so, owners, you have until March 15th to sign an addendum saying you're not working with those two lenders. There's other lenders, by the way. 75 great lenders. Those lenders, I don't agree with their business practices, but these two are going after the broker channel and we're not helping them anymore. You have until March 15th to sign the addendum, and if you don't sign the addendum -- I'm sorry -- and if you don't sign the addendum, but, hey, I'm not working with them, that's no problem. Then you and nobody in your company will have to work with UWM anymore.

Is that as far as you want me to go?

Q Yes. Yes. Thank you so much.
Are you aware of Kevron -- any representative of Kevron signing that addendum?
A Yes.
Q Okay. And that's consistent with your testimony earlier where you said you think there was a signed agreement?
A Yes.
Q Okay. Could you --
A If I could clarify it --
Q -- yeah, sure.
A -- it is an acknowledgement. I'm not sure if you're -- if we're trying to split between a actual pen to paper signature, but is -- the agreement is acknowledged in the way all of our broker agreements are acknowledged.
Q Okay. And I guess it doesn't have to be a pen and paper. I just want to know -- so, yeah, we can go back to that real quick.
So for Exhibit 3, this is the amended Wholesale Broker Agreement, and what I want to know -- this specific agreement, whether this was physically signed and turned in or electrically -- electronically signed.
MR. MURRAY: And just to clarify, you mean the one -- Exhibit 3 that was the one dated as of that revision date? You don't mean did Kevron ever sign

one? You mean that one at that particular time?

BY MR. HIGH:

Q Yeah, this agreement. Has Kevron signed a similar agreement?

A They have acknowledged, yes, acceptance of the agreement.

Q That looks like this?

A Yes.

Q And the full agreement, you're aware of Kevron affixing their signature to an agreement like this?

A It is a -- it is an acknowledgement. So it is not -- again, I want to make sure --

Q Yeah.

A -- it's not an actual signature, but it is the way that our electronic system works. It is an electronic acknowledgment from Kevron, yes --

Q Okay.

A -- of this current agreement.

Q No, and just to clarify. So you're saying online there is an agreement like this, and it will be similar to clicking to accept terms and conditions? Something like that?

A It is more than a checkbox, but, yes.

Q Yeah, okay. Okay.

Could you turn to page 17? Could you read that

paragraph?
A From the top? Or which one?
Q Yeah, I'm sorry. "But here's the reality," just that first paragraph.
A Sure.

But here's the reality. Today, after our rate sheet, or maybe tomorrow, Rocket Mortgage and Fairway Independent, you know they're -- what they're going to do? Sharpen the price to another 100 basis points, make it so that if they -- they just lost 80 percent of their business potentially, right? Because the only thing 80 to 90 percent of brokers are going to say is, hey, we're sticking with UWM and the other 73 lenders that are out there trying to help us grow, not with people that are trying to put us out of business.
Q Okay. So let -- I want to focus on make it so that if they just lost 80 percent of their business. I know this is referring to Rocket and Fairway. Do you disagree with that?
A That it is referring to Rocket and Fairway?
Q Yeah.
A No, I don't disagree.
Q Okay. Could you explain what's meant by saying make it so if they -- they just lost 80 percent of their business potentially? Could you explain what that

means?

A My understanding would be that if people who were working with both Rocket and UWM before the addendum, if they chose to go with UWM that would be a portion of Rocket's business.

Q Right. So -- and just correct me if I'm wrong, so my understanding is that if these brokers stick with UWM, in turn it would hurt -- I don't want to use hurt because I'm not trying to miss your testimony, but essentially Rocket and Fairway would lose 80 percent of their business if these brokers sign -- stick with UWM?

MR. MURRAY: Object to form and foundation, and I think that the line of questioning regarding this Facebook Live post is beyond the scope of the dep notice.

But you can answer if you know.

THE WITNESS: I know what is stated there, and I would say the interpretation is correct.

BY MR. HIGH:

Q Okay. Could you -- I guess could you answer my question.

Court Reporter, could you repeat the question, please?

(Indicated question played back by reporter.)

BY MR. HIGH:
Q Is that -- is that a correct interpretation?
A Potentially.
Q Okay. So the correct interpretation potentially is that, hey, if these brokers side with UWM instead of Rocket and Fairway, in turn, it could cause Rocket and Fairway to lose 80 percent of their business, correct?
MR. MURRAY: Object to form and foundation, but --
THE WITNESS: Potentially that much, yes.
BY MR. HIGH:
Q Yeah, potentially. Yep.
Okay. And this is a Facebook Live from the CEO of UWM, right?
A Uh-huh. Yes.
Q But doesn't this mean the purpose of the addendum is to cause Rocket and Fairway to lose business?
A That is not the purpose of it, no.
Q But -- but you just told me that's what the CEO of UWM is saying, correct?
MR. MURRAY: Object to form and foundation.
THE WITNESS: He is saying that potentially that just happened.
BY MR. HIGH:
Q Right. And the CEO was a part of the meetings that

determined the all-in addendum, correct?
A That is correct.
Q So wasn't the purpose of the all-in addendum to potentially cause business loss to Rocket and Fairway?
A That was not the purpose.
Q Then why did the CEO say that?
A I -- I don't believe it says that this is the purpose of it. He's saying this is -- they are going to sharpen their pricing to earn more business because they potentially just lost business.
Q Right. But isn't he announcing in his Facebook Live -- isn't he announcing the all-in addendum?
A He is, yes.
Q And during this Facebook Live isn't he explaining the problems with Rocket and Fairway?
A That is explained, yes.
Q And isn't he also explaining that if you choose UWM instead of Rocket and Fairway, it could cause Rocket and Fairway to lose business?
MR. MURRAY: Object to form and foundation.
THE WITNESS: That is being stated, yes.
BY MR. HIGH:
Q Okay. And isn't it also in the contract, Exhibit 3, that brokers are not to send loans to Rocket and Fairway?

A That is correct.

MR. MURRAY: Object to foundation.

BY MR. HIGH:

Q And it's also stated in Exhibit 3 that if brokers send loans to Rocket and Fairway and close those loans, they would owe a minimum of $50,000; correct?

A That is correct.

Q Okay. So with all that being said, if the CEO says that this could potentially happen, and these are our competitors, didn't that play a part in the all-in addendum? Didn't that at least play a part?

MR. MURRAY: Object to form and foundation.

THE WITNESS: What I can tell you is it was not the premise or the reason for the all-in addendum.

BY MR. HIGH:

Q Right, and I understand that. I'm saying didn't it play a part, right? Wasn't part of the all-in addendum to cause competitors to lose business? Isn't that at least part of it?

MR. MURRAY: Object to form and foundation.

THE WITNESS: It was not a reason to do it. It was potential fallout from it, but that was not the reason.

BY MR. HIGH:

Q Okay. That was potential fall out, but you're

saying -- you're testifying under oath that that was not the reason?
A That was not the reason.
Q So UWM -- does UWM benefit if Rocket and Fairway lose business?
A Not necessarily, no.
Q But UWM is damaged if loans are sent to Rocket and Fairway?
A Correct.
Q Does that make sense to you?
A It does.
MR. HIGH: I'll just take a moment and review my notes, and then I might be done.
MR. MURRAY: Okay. I'll probably have a few questions so -- if you're done. I don't know if you want to take a break?
MR. HIGH: Yeah, I'm going to go to the bathroom.
MR. MURRAY: Okay.
THE VIDEOGRAPHER: Okay. We're going to go off the record at 3:41 p.m.
(Break in proceeding taken from 3:41 p.m. to 3:55 p.m.)
THE VIDEOGRAPHER: We are back on the record at 3:55 p.m.

BY MR. HIGH:

Q Okay. Ms. Deciantis, just going back to the initial meeting you told me about where the decision was made about the all-in addendum. How long was that meeting?

A An hour.

Q And when was -- when was that meeting?

A Within a week before we actually rolled out. Probably less than that.

Q Okay. And just so I understand, your testimony is that within an hour you guys had a discussion about the all-in addendum; is that correct?

A We did, yes.

Q And within that same hour you -- you determined that it would be Rocket and Fairway that are going to be a part of this all-in addendum, correct?

A Yes.

Q And you also determined within that same hour that the cost of the services UWM provides to its brokers should be 5,000 and 50,000; that was also determined at that meeting?

MR. MURRAY: Object to foundation. Form.

THE WITNESS: Yes, that was discussed in the meeting. Yes.

BY MR. HIGH:

Q So was there any research done prior to that meeting to

determine how it would be Fairway and Rocket?
A There were many conversations that were had regarding what Rocket and Fairway were doing in the marketplace.
Q Were you a part of those discussions?
A Yes.
Q When were those discussions had?
A They had been had throughout a series of a couple of years.
Q Okay. And those discussions were strictly about Rocket and Fairway?
A Yes.
Q How many brokers does UWM do business with?
A Today?
Q Yes.
A We have about 45-, 50,000 loan originators that is separate from broker shops.
Q Okay. And I guess how many independent mortgage brokers does UWM do business with?
A Are you asking for -- are you asking for individuals or shops?
Q Could you explain the difference for me?
A Sure. So an individual -- so a broker shop can have 10, 50 loan originators. So we have about 45- to 50,000 loan originators that are signed up with UWM and able to do business with us.

Q Okay. And just so I understand for my identification, would you mean like 45- to 50,000 different companies?
A No, different people.
Q Okay. And would these people -- would they have their own company or how does that work?
A So there's about 11- to 12,000 broker shops. So companies --
Q Got it.
A -- that are signed up with UWM. Within those shops there's obviously multiple individuals. Some are smaller; some are larger.
Q Okay. So UWM does business with 11- to 12,000 broker shops?
A That's how many we have signed up that are able to do business.
Q Got it. And so when you had this meeting you guys knew that this meeting would affect these 11- to 12,000 brokers, correct.
MR. MURRAY: Object to form and foundation.
THE WITNESS: We were placing a decision in front of them, yes.
BY MR. HIGH:
Q Okay. And UWM is a billion dollar company?
A Yes.
Q So are you testifying under oath that a billion dollar

company made the decision within an hour to effect 11- to 12,000 brokers?

MR. MURRAY: Object to form.

You can answer.

THE WITNESS: That was -- that was the conversation we had in that meeting, yes.

BY MR. HIGH:

Q Right. So that was -- all of that was determined in a one hour meeting for a billion dollar company?

A Yes.

Q And there are no other meetings determined before this plan was rolled out?

A That is the conversation that I was a part of.

Q Got it. So I'm not asking if you were a part of it or not. I'm saying were there any other meetings had, or are you testifying under oath that there was one meeting had and UWM rolled out this all-in addendum?

A The conversation that I was part of where we were discussing the liquidated damages was one hour.

Q Right. I guess my question is, it was only one meeting that was had at a billion dollar company, and then they announced the all-in addendum?

A To the best of my knowledge, there was -- that is the conversation we had, yes.

Q Okay. And you're not aware of any other conversations

that took place?

MR. MURRAY: Object to form and foundation.

Do you mean like group discussion or do you mean -- because I think she testified there had been talk about Fairway and Rocket practices before that. I just want to clarify what you mean --

BY MR. HIGH:

Q No, I understand. I guess my question is -- I think you testified initially one hour meeting, two to five days later the initiative was rolled out.

A Uh-huh.

Q And I want to know were there any other meetings, or there was a one hour meeting and that was it, you rolled out the initiative?

A Legal counsel had presented liquidated damages in that conversation. That -- there could have been other conversations that legal counsel had or determinations prior to, but in the meeting is when we discussed it.

Q And during that meeting did you ever discuss changing the agreement without the liquidated damages provision?

MR. MURRAY: I'm just going to caution the witness not to talk about anything that was discussed specifically with legal counsel. If there were discussions not directed at legal counsel as part of that meeting, you can answer that. But if it's

discussions with legal counsel, don't answer that part of --

THE WITNESS: That -- all those conversations were with legal counsel.

BY MR. HIGH:

Q Okay. So you're not aware -- are you aware of any other discussions about the agreement?

A What specifically are you asking?

Q Yeah. So you're saying that legal counsel determined the liquidated damages provision, correct?

A Yes.

Q And this was determined within an hour, correct?

A I am saying that that conversation -- that was discussed -- that was brought up in that conversation. Legal counsel could have had other thoughts or conversations in how they got to that which -- which was presented in the conversation.

Q Got it. Now -- so I guess I want to know is before the liquidated damages provision was offered as a suggestion were there ever discussions about changing the agreement, and not including that provision?

MR. MURRAY: Again, just to caution you not to talk about any discussions with legal counsel. If there were discussions among others in the group besides legal counsel, you can answer that.

THE WITNESS: It was all discussed with legal counsel.

BY MR. HIGH:

Q But I said -- I mean, are you aware of the discussions? I'm not asking for the content. I'm asking if they occurred.

A Yes.

Q Okay. Now I think earlier you testified -- you'll probably have to refresh my memory, but I think you were explaining to me how to broker channel works, and I think you mentioned a comment about -- and correct me because I know I'll have this wrong. If a loan goes in the wholesale channel, that it was lost forever or something like that. Do you remember that? Could you explain what that was again --

A Yes.

Q -- you were saying?

A Yep. So the wholesale channel -- I think you're specifically referring to my comment about Rocket and how --

Q Yes.

A -- yes. So because Rocket has their business model, the way they are structured, they have wholesale and retail. When they have a loan in their wholesale side that is closed, the next time that that borrower is

eligible for a refi, it will be done by their retail team. The retail practices are very aggressive. So the chances of a broker shop, which does not have the call center infrastructure or ability to make calls out on what is called in the industry as trigger lead, that loan is really lost to the retail channel. It's very, very difficult for a loan to come back into wholesale once retail's got hold of it.

Q Got it. Okay. And just so I understand, you're saying, hey, if you send a loan to Rocket -- if somebody sends a loan to Rocket and it goes through their wholesale side there's a chance, if somebody refinances or uses that lender again, it will end up on the retail side, not the wholesale side again?

A Correct.

Q What evidence do you have in support of that?

A The -- where loans go is public knowledge.

Q Okay. What evidence do you have? Do you have any evidence that you could point me to that supports what you just testified to?

A We have done research in the past to come to the conclusion that if a loan -- once a loan goes into -- from wholesale into the retail channel, the chances of it coming back are very low.

Q Where is that research located?

A I would have to point you to it.

Q Could you -- could you tell me how to get that research?

A It's all based on public -- publicly available databases. It's not -- there is not a study per se that says this is exactly how this works. We've done research in the past, based on the publicly available data that we have, not just us, that other people have available to them as well.

Q Right. But is that -- I guess is that dispositive or is that research just show, hey, the chances of somebody going back to a wholesale lender are slim? Are you saying it's deposit -- dispositive that it goes to the resale -- retail side?

A I'm saying that it's highly likely that it never comes back into wholesale after it's gone to retail.

Q Are you aware of any other lenders with liquidated damages provision in their wholesale broker agreements?

MR. MURRAY: Object to foundation.

THE WITNESS: I have not reviewed other broker agreements with other lenders.

BY MR. HIGH:

Q Is there ever a situation when a loan goes from the retail side to the wholesale side? Does that happen?

A I'm sure it does. Not -- not once it's in -- at

Rocket, but there are definitely opportunities and times when brokers would get the opportunity from -- that maybe it closed at a bank, somebody closed at a bank or whatever it is, so it's not unheard of that a consumer would work with a bank for one loan, and then broker for another.

Q Are you aware of that situation happening with Rocket where somebody uses the retail side, and then they go back and use the wholesale side?

A I'm sure it has happened. I'm not aware of specifics.

Q And I think -- I think earlier you might have testified I think when I was asking you interpreting -- how you interpreted the agreement, and I talked to you about the 22 loans that were mentioned in the complaint that was filed that were either sent to Rocket or Fairway. Do you remember that testimony?

A Yeah.

Q And I think you may have said, or may not have said, that that amount of loans was egregious?

A I don't believe I said -- I think I said I think it was more than 22.

Q Okay. Do you think that was a lot of loans?

A That is a lot of loans.

Q Are you aware of any mortgage brokers that do business with UWM and Rocket and Fairway?

A All at the same time?

MR. MURRAY: Object to form.

BY MR. HIGH:

Q Yes.

A No.

Q How about just UWM and Rocket?

A No. I mean, not -- none that we would not be having a conversation with.

Q Got it. So is your testimony that all the brokers that UWM does business with today, do not do business with Rocket?

A Unless they are in violation of the agreement, that is correct.

Q Right. So I -- I -- I get that would be a violation of agreement, but I guess my question is, are you aware of any brokers that are allowed to continue to doing business with UWM and Rocket?

A No.

Q So if there are brokers that are doing business with UWM and Rocket would UWM terminate that relationship?

A Yes.

Q Why didn't it do that with Kevron?

A I believe that's why we're here.

Q Yeah, I guess why didn't they initially terminate the relationship, right?

MR. MURRAY: Object to form.

THE WITNESS: Can you clarify --

BY MR. HIGH:

Q Yeah. So when -- so when initially -- because I'm assuming with the 22 loans or more they weren't all submitted at the same time. It would have had to have been individually submitted, correct?

A They -- they are individually submitted, yes.

Q Right. So after the first loan is sent why didn't UWM just terminate the relationship and say, hey, this is our agreement. You did this, end the relationship.

A That is what we did.

Q So you did it after one loan?

A No, we did not do that for one loan.

Q Okay. So my question is, why didn't UWM do that after one loan?

A So there is -- there is not a -- an alert or a trigger that notifies UWM of a closed loan with a different lender. It is data that we have to manually pull from databases and records. It is not something that we are looking at on a daily or weekly basis. So we -- we entrust that our brokers are upholding the agreement that they have signed. We do double check to make sure that that agreement is being upheld. If we find that it is not being upheld, we take action. It could be

one loan. It could be 50. It could be 15. It just depends on when we are pulling the data which, again, we don't get a notification to say X broker is doing this. We have to go out and actually pull that.

Q And what -- I guess what system does UWM use to check this information?

A It is a system called CoreLogic.

Q Okay. And could you explain to me how that works? Like how does UWM know that, hey, broker X is closing a loan with Rocket or Fairway?

MR. MURRAY: I guess I just want to -- and I know this -- is this a proprietary system?

THE WITNESS: It is not.

MR. MURRAY: Okay.

THE WITNESS: No. No. It is a -- a -- I want to careful and say a public database. It is a -- it is a database of information that gathers publicly available data based on county records of closed mortgage loans. Based on those county records, it states who the lender was that the loan was closed with. But, again, there are delays in county records. Some counties are still manual. Some are electronic. And, again, we don't pull it on a daily or weekly or, frankly, I don't believe on a monthly basis. It is a random, you know, selection as to when we pull that

data because we believe in and entrust that our brokers are pulling the agreement.

BY MR. HIGH:

Q And when that information is pulled, can you recall a situation where that -- that documentation was pulled, and it showed that a broker had submitted one loan to Rocket or Fairway and closed that loan --

A Uh-huh.

Q -- has that situation ever happened?

A I am not aware of it being pulled when there's only one loan. No.

Q Now I know we talked about this before, but I just want to get just a little clarification.

A Sure.

Q So I know 3.03(x) talks about how the broker will not submit a mortgage loan or mortgage application or Rocket or Fairway mortgage, correct?

(Indiscernible crosstalk.)

A I believe that is what it says.

Sorry. Can you state your question one more time?

Q Yeah. So I -- I'm sorry, Court Reporter, could you repeat it how I asked it, please?

(Indicated question played back by reporter.)

THE WITNESS: Yes, that is what it says.

BY MR. HIGH:
Q Okay. And just so I understand. Do you think that that clause just by itself -- does UWM think that clause by itself would assist in preventing brokers from closing loans with Rocket and Fairway?
MR. MURRAY: Object to form and foundation.
THE WITNESS: Yes. The way it is written they are agreeing to not submit loans to them, yes.
BY MR. HIGH:
Q Right. So I guess my question is, UWM implemented this clause because they -- they thought that this would prevent brokers from sending and closing loans with Rocket and Fairway, right?
MR. MURRAY: Object to form and foundation.
THE WITNESS: This clause, as well as 7.30, I believe were added at the same time. They were not separate.
BY MR. HIGH:
Q Right. Nope, I get that. I just want to ask about 3.03. So my question is only about this clause.
A Okay.
Q So same question. UWM implemented this clause because UWM thought it would help prevent brokers from sending loans to Rocket and Fairway, correct?
MR. MURRAY: Object to form and foundation.

THE WITNESS: That is how it's stated, correct.

BY MR. HIGH:

Q So wouldn't this clause be just as effective without the liquidated damages provision in the contract?

MR. MURRAY: Object to foundation. Form.

THE WITNESS: No.

BY MR. HIGH:

Q Why not?

A Because there are -- there are damages that we've discussed.

Q Okay. So don't you think if brokers have to pay UWM 5,000 per loan if they send loans to these other lenders, don't you think that that hurts the broker channel?

MR. MURRAY: Object to foundation.

THE WITNESS: No. Because they don't have to pay it if they abide by the agreement.

BY MR. HIGH:

Q Right. But I guess my question is, if they are sending loans to a lender who provides the best available deal for their client, right, if they're doing that --

A Uh-huh.

Q -- so, for example, if Fairway offers 2 percent and UWM offers 5 percent --

A Uh-huh.
Q -- if they're doing that and they're trying -- you would agree with me if they send the loan to Fairway who offers 2 percent and UWM who offers a 5 percent interest rate, if the loan is sent to Fairway, the broker is doing what's best for their client, correct?
MR. MURRAY: Object to foundation. Incomplete hypothetical.
THE WITNESS: All the broker has to do is terminate the agreement with UWM, and they can send the loan to Fairway.
BY MR. HIGH:
Q I get that, but I just want to go under the question that I asked. So my question is, if a broker is submitting a loan to a lender who offers a lower interest rate --
A Uh-huh.
Q -- isn't the broker doing the best that they can for their client?
MR. MURRAY: Object to foundation. Incomplete hypothetical.
THE WITNESS: They do have the ability to do that.
BY MR. HIGH:
Q Right. So you would agree in that scenario, if they're

sending a loan to the lender who provides the lower interest rate, they're doing what's best for their client, right?

MR. MURRAY: Same objection.

THE WITNESS: The -- the -- I think the focus on -- you're focus -- you're focusing on rate, and I want to be very careful is that there is a -- there's more than rate that goes into the decision oftentimes that a -- that a broker makes. But, again, if they choose to send to Fairway based on a 2 percent rate, they can do that. They just can't continue to send UWM loans.

BY MR. HIGH:

Q Right. And I guess if they are making the decision off of the rate, and any other indicia that helps determine who the best lender is -- because you would agree with me that when it comes -- when there's a decision between UWM and Rocket or Fairway or any other lender, UWM doesn't always have the best deal; you would agree with me, right?

A Well, are you saying deal or rate?

Q Right, deal. So everything that's included with a potential mortgage, UWM doesn't always have the best offer for a potential borrower, correct.

A 100 percent of the time that's not going to be the

case; that's correct.
Q Right. Correct. So if there is a situation where a different lender, for example, Fairway offers more favorable terms to a borrower, they're doing the best that they can for that borrower, correct?
A And they can do that.
Q Right. But I guess under my question you would agree with me that they're doing the best that they can, correct?
A If they believe that they're doing -- if they believe that is the best option for their borrower, they have the opportunity to do that.
Q Do you think mortgage brokers have a fiduciary duty to borrowers to help them find the best deal for them?
A They --
MR. MURRAY: Object to foundation. Legal conclusion. To the extent you know.
THE WITNESS: Yeah, they do.
BY MR. HIGH:
Q Okay. So wouldn't they be violating that fiduciary duty if they send a loan to UWM who does not have as favorable rates as Rocket or Fairway? Wouldn't that be a disservice to the borrower?
MR. MURRAY: Object to the extent it calls -- it calls for a legal conclusion. It's beyond the scope

of the deposition notice.

THE WITNESS: What I would say is that the fiduciary responsibility is not just based on rate. So when we say rate is one thing. Deal is also a different thing. And, again, the broker has the ability to send the loan wherever they determine is the best all-in offer or package or opportunity for their borrower.

They just don't continue sending business to UWM if they choose to send that business to Rocket or Fairway.

BY MR. HIGH:

Q Right. But I think my question is a bit different than -- than that. My question is, if -- if a broker sees that there is one deal for UWM and one deal for Rocket, and they funnel their borrower to UWM and that is more unfavorable to them, don't you think they'd be doing a disservice to the borrower if they did that?

A I don't think brokers would do that.

Q Right. I'm saying under my questioning, though. Wouldn't they be -- would that be a disservice to the broker if they did do that?

A If they are consciously putting the broker -- or sorry -- if they are consciously putting the borrower into a loan that they don't believe is the best loan,

then, yes, I would agree with you, but I don't think brokers do that.

Q Do you think that if brokers have to pay liquidated damages for violating it -- for violating this provision that that could assist in putting brokers out of business?

MR. MURRAY: Object to foundation and form.

THE WITNESS: I -- I don't believe so. I think if they're making the conscious decision to not -- no longer send business to UWM and choose Rocket or Fairway, that's a business decision they can make.

BY MR. HIGH:

Q Right. But I guess my question is just about the liquidated damages. If they are trying to send a loan application for their client, and they're trying to find the best deal possible, but if it's in violation this agreement they have to pay liquidated damages, correct?

MR. MURRAY: Object to form. That was two questions.

But go ahead.

THE WITNESS: They are required to pay liquidated damages if they choose to continue to do business with UWM and Rocket or Fairway.

BY MR. HIGH:

Q And you --

A They make the decision to start working with Fairway, they just don't send business to UWM anymore.

Q Right, and I get that. But I guess my question is, if they have to pay liquidated damages for doing that, doesn't that hurt the broker?

MR. MURRAY: Object to foundation. Form.

You can answer.

THE WITNESS: It's a violation of a contract that was signed, and then if they make the business decision to violate that contract I would assume that they have the ability to pay the liquidated damages.

BY MR. HIGH:

Q Right. I guess my question is -- it is more of a yes or no question. Do you think that that hurts the broker if they have to pay liquidated damages for breaching this provision? Do you think that hurts the broker?

A No.

Q Okay. Do you think telling brokers that if you want to work with us you can't submit loans to Rocket or Fairway, do you think that that's steering brokers to UWM?

A No.

Q Are you aware of any agreements that Rocket or Fairway

has where brokers have to pay liquidated damages if they close loans with UWM?
A I've never reviewed either of their broker agreements.
Q So you're not aware of that?
A Uh-uh.
Q And I think you testified that you thought that the liquidated damages provision was reasonable, correct?
A Correct.
Q Okay. Let me humor you with an analogy. So if you had to sign an employment agreement --
A Uh-huh.
Q -- right -- and I'm sorry, strike that.
Do you have an employment agreement with UWM?
A I do.
Q Okay. And is it a yearly agreement? How's that -- the terms of agreement work? What's the terms?
MR. MURRAY: I'm going to object. This is all beyond the scope of the -- it's irrelevant and beyond the scope of the deposition notice but --
BY MR. HIGH:
Q And this could be in your personal capacity.
MR. MURRAY: -- well, she's not being deposed at a personal capacity.
MR. HIGH: Yeah.
MR. MURRAY: So, I mean, I guess I don't know

where this -- this line of questioning is going, Matt, because I just don't think it's relevant to the dep -- the dep notice.

BY MR. HIGH:

Q You can answer. It's not attorney-client privilege.

A If my agreement needs to be renewed annually?

Q Correct.

A No.

Q Okay. So it's like a five-year agreement?

A No.

Q Is it a one year? How many terms?

A It's not based on a term.

Q Okay. So could you tell me how it works, I guess?

MR. MURRAY: I'm going to renew my objection. I think is all well beyond the scope of the dep notice. I'm going to instruct her not to answer, Matt, unless you can say how this is going to be relevant to one of the dep -- one of the dep topics because I don't see how her personal employment agreement matters.

MR. HIGH: Yeah, I guess I'm not -- I'm not aware of any case law that says that if she is under oath that it's proper to instruct her not to testify if it's not about attorney-client privilege. I understand that it might not be covered under the dep notice. I don't disagree there, but I believe that that would

essentially be in her personal capacity which --

MR. MURRAY: But she's not being deposed in her personal capacity.

MR. HIGH: Right.

MR. MURRAY: She's only being deposed as a corporate representative of UWM, and her personal employment agreement is not one of the topics on which you identified for her to be testifying. So I think this whole line of questioning is inappropriate. I don't think it's relevant to anything. I mean --

MR. BYRD: Use another hypothetical.

MR. MURRAY: Yeah, I guess use a different hypothetical. If it's going to one of the topics, you can use a different hypothetical, but her personal agreement I don't think is relevant to any of this.

MR. HIGH: Yeah. And I guess my -- my thing is I don't think instructing her not to answer is -- that's not a proper basis. So if a topic isn't covered -- like, for example, her address isn't covered in the dep notice. You'd agree with me, right? No, no, no, just humor me, right? And her age isn't covered in a dep notice, correct?

MR. MURRAY: But there's --

MR. HIGH: I'm just saying --

MR. MURRAY: -- but there's reasonable

leeway, Matt, so I --

MR. HIGH: No, no --

MR. MURRAY: -- I'm not trying to be argumentative.

MR. HIGH: -- yeah, but I'm just saying --

MR. MURRAY: -- I'm saying there's reasonable leeway. I just don't see how her personal employment agreement is relevant. So, I mean, I think it'd be easier if you picked another hypothetical -- another hypothetical or something like that to get to whatever point it is you're -- you're trying to get to, but I don't see how the -- the -- the information about her personal employment agreement has any bearing on this case.

MR. HIGH: Yeah. But I guess I want to go back to what I was saying is that I asked her about her prior education. I asked her about where she lives. I asked her how old she was. None of that is in the dep notice, right? And I'm just saying -- and that's, to me, that is far more attenuated than the dep notice than asking her about her contract if she's testifying as corporate representative. I'm asking her her age and she's saying that, that's nowhere in the dep notice.

MR. MURRAY: Well, Matt, I disagree.

MR. HIGH: Yeah. Yeah.

MR. MURRAY: I mean, I think there's some general background questions that you would ask somebody, especially, you know, some of those baseline questions to establish the breadth of her knowledge about how things work at UWM, and her education and all that. I think this is all irrelevant.

I'm going to maintain my objection to all this line of questioning. You can go ahead, but I mean, I guess I'm going to reserve my right to move to have all this stricken, and I'm also going to still reserve my right to instruct her not to answer if I think it goes over the line.

But go ahead.

MR. HIGH: I understand.

MR. MURRAY: I'm just putting it on the record.

MR. HIGH: Understood.

BY MR. HIGH:

Q So I guess my question -- and you can see if your attorney is not going to instruct you to answer. I want to know, like, are you under a one-year term agreement with UWM? I'm just asking about yours. I'm not asking about your compensation, your bonus, anything like that. I'm just asking about the term --

MR. MURRAY: You can answer. I mean --

THE WITNESS: No, I'm not on a one-year term.

BY MR. HIGH:

Q Okay. So is it at will employment?

A Yes.

Q Okay. So now let's get to my hypothetical. So if in that agreement, part of it said you can only work for UWM, but if you work part time for Rocket you owe us $100 for every hour you work for Rocket. Do you think that that would be reasonable?

MR. MURRAY: Object to form and foundation. Incomplete hypothetical.

You can answer.

THE WITNESS: Yes.

BY MR. HIGH:

Q And you would sign an agreement like that?

A Yes, I would.

Q Okay. And why?

A Because I understand the basis of information that could be shared between the two.

Q Is there any information that can be shared between a broker and Rocket?

MR. MURRAY: Objection to form and foundation.

THE WITNESS: Are -- can you clarify --

BY MR. HIGH:
Q Yeah. I guess my question is, is there a risk? Like is -- is a broker learning whether it's proprietary information or information that UWM may not want a lender to know, does a broker learn anything like that during the contractual relationship?
A With UWM?
Q Yes.
A Absolutely.
Q Okay. And is that another reason the liquidated damages provision is there?
A Absolutely.
Q And why isn't that in the liquidated damages provision 7.3? Why is it, what I just said, in there?
MR. MURRAY: Object to form, and foundation, and to the extent it calls for legal conclusion.
You can answer.
THE WITNESS: I would say back to what I've stated earlier, that a lot of what we do from a technology standpoint, all of those components that we offer are included in that liquidated damages.
MR. HIGH: Okay. And I guess maybe I misunderstood you. When you said technology, I'm thinking more so the services that you allow the broker to use. I'm not thinking about, like, actual

information that UWM does not want other lenders to know.

A It would be -- so we subscribe, almost holistically across the board, to a build versus buy mentality. So what I mean by that is a training platform per se. We don't -- we don't go out and buy a training platform and bring it in. We build all that -- everything that we create, the curriculum, the trainers, they are all -- it is all proprietary to UWM. So if that helps to clarify.

Q No, that's perfect. Okay. Nope, so I get it.

So because I think initially you said one of the services that UWM provides to brokers is the training --

A Uh-huh.

Q -- correct?

So, obviously -- I mean, I don't know for a fact, but I'm assuming -- UWM provides different training than different lenders, correct?

A Yes, because it's all proprietary to us. Yes.

MR. HIGH: Got it. Okay. Yeah, I don't have nothing else for now.

MR. MURRAY: All right. I have a few questions for you, Ms. DeCiantis.

First off, I just want to clarify something.

Let's go to Exhibit 6, and 7 I guess too.

THE WITNESS: I think he wants that marked as 7.

Do you want 6 and 7?

MR. MURRAY: Yeah. That one 7 and that one 6.

(Exhibit 6 marked for identification)

(Exhibit 7 marked for identification)

MR. MURRAY: Matt, I'm just going to hand it so you have it.

MR. HIGH: Okay, sure.

MR. MURRAY: This is 6 and 7.

MR. HIGH: Oh, thank you so much. You're better than me. I'm sorry.

** ** ** ** **

E X A M I N A T I O N

BY MR. MURRAY:

Q All right. So, Ms. DeCiantis, earlier when Mr. High was asking you questions you testified, if I recall correctly, that you recall there being a version of the wholesale broker agreement with the all-in addendum included that was signed by or acknowledged by Kevron; is that correct?

A Correct.

Q All right. And when you were giving that testimony to

Mr. High was Exhibit 6 the document that you had in mind?
A Yes.
Q Okay. And what is Exhibit 6?
A It's the broker agreement.
Q Okay. And then when you said that you thought there was a signed version of the agreement, did you mean a physically signed agreement or did you mean an electronically signed agreement?
A Electronically.
Q Okay. And then if I show you Exhibit 7, can you tell me what Exhibit 7 is?
A Exhibit 7 is Kevron's acknowledgement of the broker agreement.
Q Okay. And is that the document you were referring to when you were talking with Mr. High earlier?
A Yes.
Q Okay. So when you testified earlier that -- I believe that he was asking you about Exhibit 3 at the time. Is it fair to say that what you were referencing in your mind was Exhibit -- what we now marked as Exhibit 6?
MR. HIGH: Objection to form.
BY MR. MURRAY:
Q Well, let me ask you -- let me rephrase the question.
At the time Mr. High asked you about whether there

was a signed version of Exhibit 3, what were you thinking of?
A I was thinking of this updated version of the broker agreement that includes the all-in addendum, which is -- mimics Exhibit 6.
Q Okay. And, again, is Exhibit 7 an acknowledgement of Exhibit 6?
A It is.
Q Okay. You talked earlier, Ms. DeCiantis, about various services and technologies that UWM provides to brokers, and I think you mentioned a couple of them. But can -- can you give us an idea, again, of what some of those services and technologies are?
A The -- we offer a variety of technology platforms, software. We have a marketing platform that we offer. We have training platforms that we offer, recruiting assistance, compliance assistance.
Q Okay. And does UWM break out the cost of those technologies and services per broker?
A No.
Q Does that make it difficult to calculate actual damages for UWM when a broker violates the wholesale broker agreement?
MR. HIGH: Objection to foundation. Form. Legal conclusion.

THE WITNESS: Yes.

BY MR. MURRAY:

Q If you do -- if UWM knew that a broker was going -- going to violate the wholesale broker agreement, would it provide those services and technologies to that broker?

A No.

Q And to make sure I understand, I think you testified earlier about a build versus buy concept?

A Yes.

Q Can you explain again what that means at UWM?

A That we do not go out and buy something off the shelf, whether it be a marketing platform, technology platform. We use our internal team members to build those platforms in that technology so that we are able to customize it in a way to best suit our client's business, their needs, the ability for them to grow in scale because we know how to do that best.

Q Does building those services and technologies consume a lot of resources at UWM?

A Yes.

Q And is that only in terms of dollars or are there other resources that it takes up at UWM?

A No, it is -- it is also team member or human capital as well.

Q Would UWM provide the resources and technologies and services to a broker if it knew that that broker would intentionally act in a way that would harm the wholesale channel?

A No.

Q Does UWM consider -- strike that.

When a broker submits a loan -- or excuse me -- submits a mortgage to Rocket or Fairway in violation of the wholesale broker agreement, is UWM -- does UWM consider itself damaged by that submission and violation of the agreement?

A Yes.

Q Are those damages difficult for UWM to calculate?

MR. HIGH: Objection to foundation and legal conclusion.

THE WITNESS: Yes.

BY MR. MURRAY:

Q With regard to the meeting that you mentioned earlier where it was discussed to implement the all-in addendum, were there -- was there a distinction in that meeting between the decision to implement the all-in addendum, and the decision to include a liquidated damages provision as part of the all-in addendum?

A As to who made the decisions?

Q Yes.

A Yes.
Q All right. Was it a group decision at that meeting to implement the all-in addendum?
A Yes.
Q In terms of the liquidated damages provision, did the group agree that a liquidated damages provision would be appropriate as part of the all-in addendum?
A Yes.
Q I believe earlier you testified that legal counsel made a decision with regard to that meeting. What decision in particular did legal counsel make? Without talking about any discussions with legal counsel, what -- what part, if any, of that decision did legal counsel make?
A That the actual liquidated damages portion would be included in the updated agreement.
Q Okay. So that was -- if I'm understanding correctly, was that the decision to actually put the language into the agreement --
A Correct.
Q -- itself? Okay.
If you could turn to Exhibit 6, specifically Section 7.08. Let me know when you're there.
A Yep.
Q All right. And do you see -- so that section talks about UWM amendments and website. Do you see that?

A Yes.
Q Okay. And take a moment to read this section to yourself if you need to, and let me know when you're -- when you're done.
A Okay.
Q Does Section 7.08 say that a broker can accept the terms of the wholesale broker agreement amendments other than by signing or submitting, rather, a acknowledgement similar to Exhibit 7?
A Yes.
Q And what does it say about that?
A That by submitting a loan they agree.
Q Okay. And then does 7.08 also have language saying that -- or excuse me. Does 7.08 have language advising a broker that the agreement can be amended from time to time?
A Yes.
Q All right. And does it say that UWM will provide notice to the broker by posting amendments on the UWM website?
A Yes.
Q Does 7.08 contain any obligation on the broker to check UWM's website to see if there are any amendments?
A Yes.
Q What does it say in that regard?

 A Do you want me to read it?
Q Yes, please.
A It says -- (witness mumbling) -- oh, that's a whole section.
This agreement and UWM's policies, procedures, requirements, and instructions concerning -- sorry, do you want me to start over? Sorry.
This agreement and UWM's policies, procedures, requirements, and instructions concerning mortgage loan applications, and mortgage loans, including, but not limited to those contained in the UWM guide may be amended by UWM from time to time. And UWM will endeavor to provide broker with prompt notice thereof, which may occur by posting any such amendments on UWM's website which broker is required to regularly check and monitor as a condition of this agreement.
Do you want me to keep going?
Q No, that's -- that's fine. That covers what I wanted to cover.
Exhibit 2.
A Oops, sorry. Two?
Q Yeah. And I'm going to hand -- ask you to look at Exhibit 2 and look at Section 7.08 of Exhibit 2, and can you tell me if that language in Section 7.08 of Exhibit 2 is the same as the language in Exhibit -- in

Section 7.08 of Exhibit 6?
A Yes, it does.
Q Under the all-in addendum, would a broker be free to cancel this wholesale broker agreement with UWM whenever it chose to do so?
A Yes.
Q Would a broker be free to cancel with UWM, and then do business with Rocket or Fairway if it wanted to?
A Yes.
MR. MURRAY: You want to just go off the record for a second --
MR. HIGH: Sure.
MR. MURRAY: -- I just want to confer with --
MR. HIGH: Yeah.
THE VIDEOGRAPHER: Okay. Going off the record at 4:43 p.m.
(Break from proceeding from 4:43 p.m. to 4:51 p.m.)
THE VIDEOGRAPHER: Okay, great. Now we're back on the record at 4:51 p.m.
MR. MURRAY: I don't have any more questions at this time, but I did just want to put one thing on the record as clarification, Matt. So -- because when we had the -- the discussion about Exhibit 3 and whether it was a signed version or not --

MR. HIGH: Oh --

MR. MURRAY: But I was talking about what you had was Exhibit 7 --

MR. HIGH: Uh-huh.

MR. MURRAY: -- so I just want to be clear, that's what we produced and that's what we have, and that's what there is. So I just -- can I -- later on if it comes out --

MR. HIGH: Okay.

MR. MURRAY: -- because I said I would look and get it to you if we have it --

MR. HIGH: Yeah.

MR. MURRAY: -- that's what it was. So there's nothing else for us to give.

MR. HIGH: No, that's what I figured. When -- when she said acknowledgement, I figured that might have been a reference.

MR. MURRAY: Right.

MR. HIGH: Yeah.

MR. MURRAY: I just want to be sure that there's not some other document out there that we --

MR. HIGH: That we -- yeah.

MR. MURRAY: -- that was Exhibit 7.

MR. HIGH: Nope, I figured.

MR. MURRAY: Okay. I'll pass the witness

right now.

MR. HIGH: Okay. I just have a few quick follow-ups.

** ** ** ** **

R E - E X A M I N A T I O N

BY MR. HIGH:

Q So one question I have is, I believe this is Exhibit 7 --

MR. MURRAY: 6.

BY MR. HIGH:

Q -- oh, sorry, 6 --

A 6. Okay.

Q -- and here's the amended agreement, and here's the acknowledgement form, and just some clarification from me. I guess, why isn't this all one document?

A Why isn't what all --

Q Yeah, I guess, how do I know that Kevron's approval is of this document because to me it seemed like it would be on one page, you know, showing the document, and then showing his approval right under it.

A I understand what you're saying. I would have to find out from our business development team --

Q Okay.

A -- how those are --

Q Okay.

A -- produced, but that is -- it is -- I understand what you're saying.
Q Yeah. No, I got it.
A But we'll have to figure out how that's produced in the system.
Q Okay. I think when your attorney asked you about how the damages -- the damages were difficult to calculate. You said that was the case, correct?
A Yes.
Q So how were you able to calculate $5,000?
A That was our best assessment based on what we've talked about during this testimony.
Q So that was not difficult to calculate, correct?
MR. MURRAY: Object to form.
BY MR. HIGH:
Q The $5,000 was not difficult to calculate, correct?
A It is difficult to calculate anything. That was our best -- $5,000 was our best assessment.
Q Right. So I guess my question is if it's -- if it's difficult to calculate, how were you able to calculate $5,000 then?
A We made our best and honest assessment of what the value was.
Q So you were able to calculate it, correct?
A Based on the $5,000, yes.

Q And you were able to calculate the $50,000, correct?
A Yes.
Q Now I know you've repeatedly testified that the $5,000 and the $50,000 was UW's [sic] best estimation, correct?
A Correct.
Q Do you have any supporting documentation of that?
A There is no documentation, no.
Q So the only evidence you have in support of it being UWM's best estimate is your testimony, correct?
A Yes.
Q And you said the decision to implement the liquidated damages, the all-in addendum, that was a group decision, correct?
A Yes.
Q And that was a group decision with the people that were a part of that meeting that you told me about?
A Yes.
Q Why wasn't the group a part of the Facebook Live announcement by Mat Ishbia?
A Why weren't we all --
Q Yeah, were you --
A -- speaking?
Q -- I'm sorry, strike that.
Were you a part of that? Not speaking, but were

you -- were any of the people that were in that meeting a part of that announcement?

MR. MURRAY: Object to form.

Usage of a part of, I don't --

BY MR. HIGH:

Q Yeah, present when he gave the announcement.

A I believe we all watched it if that is what you're referring to.

Q Right, no. I don't mean all watch it. I mean -- so I guess the difference would mean were they present. So I'm present in this deposition --

A Yep.

Q -- Kevin is watching --

A Uh-huh.

Q -- right? So I'm saying was there anybody in the room with Mat Ishbia like a forum like we are today when he announced it?

A I was.

Q Okay. You were there next to him or close to him when he announced it?

A Behind but, yes.

Q Okay. Now I think counsel was asking you about Exhibit 3. I think it was section 7.08?

A Yes.

MR. MURRAY: Not that I think this makes a

difference, Matt, but I think for the record when I asked about 7.8 it was out of Exhibit 6, but I think --

MR. HIGH: Oh, okay. Okay.

(Indiscernible crosstalk.)

MR. HIGH: That's what I thought. Yeah, okay. I kinda thought that.

BY MR. HIGH:

Q So my understanding of 7.08, and correct me if I'm wrong, is that UWM can change it from time to time. It can change policies, procedures, requirements, and instructions concerning loan applications and mortgage loans, but it's up to the broker to check UWM's website if those changes are made. Is that --

A Uh-huh. Yes.

Q -- a fair estimation?

A Yes.

Q So I take that to mean that UWM can unilaterally change the agreement itself, correct?

A Yes.

Q Okay. Can you look at 7.01, and could you read this provision out loud for me, please?

A Uh-huh.

Except as set forth in 7.08, this agreement may not be amended except in writing executed by authorized representative of both broker and UWM.

Q And now this section says the agreement may not be amended except in writing except by authorized representatives of both broker and UWM, correct?

MR. MURRAY: Object to form and foundation. That's not the whole sentence.

BY MR. HIGH:

Q But is what I just said in that sentence?

A Yes.

Q Okay. Does 7.01 and 7.08 conflict?

A I -- I interpret 0.71 [sic] as executed, meaning that there's -- there has been a signed agreement differently than I'm reading 7.08. I would need legal counsel to clarify the difference between those two, but that's how I am reading it.

Q So I guess do you think -- is your testimony that for there to be a change in an agreement that it would require a signature of UWM and the broker, or that UWM could change the agreement itself?

MR. MURRAY: Object to the extent it calls for a legal conclusion.

You can answer to the --

THE WITNESS: Yes, I would need legal to clarify specifically what they mean by that, but I understand it to mean executed.

BY MR. HIGH:

Q Okay. And I guess my question is, do you believe that UWM can change this agreement by itself?
A Yes.
Q Okay. If that is the case, then why did Mat Ishbia ask brokers to sign the addendum if UWM could change it by itself?
MR. MURRAY: Object to foundation.
THE WITNESS: I -- I'm not sure I understand your --
BY MR. HIGH:
Q Yeah. So could you go back to -- I believe it was Exhibit 4.
A Sure.
Q Yep. So Exhibit 4, page 14 --
A Uh-huh.
Q -- that bottom paragraph.
A Yes.
Q And this says: So you have until -- so, owners, you have until March 15 to sign an addendum saying you're not working with those two lenders, correct?
A Correct.
Q Okay. So if UWM could change the agreement by itself, why is the owner of UWM asking brokers to sign the agreement?
MR. MURRAY: Object to foundation.

THE WITNESS: I believe it is in 7.08 where -- I couldn't read the exact language -- I believe it's something that we will make best efforts to ensure that the brokers know. UWM will endeavor to provide broker with prompt notice thereof which may occur in posting any such addendums on UWM's website. Brokers are required to check regularly.

So we do make updates from time to time. We make our best efforts to make sure that those efforts -- or those changes are communicated. For this particular change, which was a larger change and maybe some other agreements or some other modifications to the agreement, this was one of the communication touch points.

BY MR. HIGH:

Q Okay. And I guess let me rephrase that. When Mat Ishbia announced this on Facebook Live, were there possibly 11- to 12,000 brokers present on this call?

A I -- I honestly would have to check the number. I don't know.

Q Okay. But if he's telling brokers that they have until March 15th to sign the addendum, does it -- wouldn't you take that to mean that the changes aren't official unless the broker signs an agreement?

MR. MURRAY: Object to form. Foundation.

THE WITNESS: The -- the agreement, the way that it is written, is that they -- if they send a loan, they're automatically signing it.

BY MR. HIGH:

Q Right. So I say if that is the case, why is he asking brokers to sign the agreement if what you said is true?

A We made a change, and that was part of our communication to -- or part of our efforts to communicate the change that was made, but that was not the only form of communication sent to brokers.

Q Yeah. No, I know it's not the only form. I'm just saying why -- if UWM can change the agreement itself, why is he asking brokers to change, to assent to the addendum?

MR. MURRAY: Object to form and foundation, and I think that mischaracterizes what the document says, but that's fine.

THE WITNESS: I'm trying to better answer your question. This was a form of communication to let them know there was an update to the broker agreement, and this was the change that was made, and this was -- there was now an addendum to -- to that agreement.

BY MR. HIGH:

Q Right. And I would -- I agree with that, but this is more than just saying, hey, here's the addendum. This

is saying, hey, you have until March 15th to sign the addendum. You see that, right?

A Yeah. Yeah.

Q So I'm saying if brokers are being told they have until a certain deadline to sign the agreement, why is he asking them that if UWM can just change the agreement by theirselves?

A Because this was a bit of a different change that was made, other than some other maybe smaller changes that we would make to the agreement. So we made best efforts to communicate that as broadly as we possibly could.

Q So I guess to put it another way, are you saying that, hey, we want to make sure that people agree to these terms so that's why we're asking them to sign the agreement?

MR. MURRAY: Object to form.

THE WITNESS: We want to make sure they were aware.

BY MR. HIGH:

Q So if you sign -- if you sign an agreement, do you think that -- do you think that means you're agreeing to the terms?

A Yes.

Q Okay. And that's why he's asking brokers to sign the

agreement to see if they agree with the terms, right?
A Yes.
Q Okay. So why is he doing that if UWM can change the agreement by itself?
MR. MURRAY: Object to form.
THE WITNESS: It was a form of communication. I'm -- I'm not sure how to better answer your question.
BY MR. HIGH:
Q Okay. So I guess the amended agreement -- it does have a signature block on it for brokers, correct? I believe it's 7.20 under -- isn't there a signature block for brokers to sign? I think it's the last page of the agreement.
A Yes.
Q And wouldn't that imply that if a broker is signing this agreement that they are agreeing to the changes?
A Yes.
Q So wouldn't that also imply that if they don't sign the agreement they don't agree to changes?
MR. MURRAY: Object to form and foundation.
THE WITNESS: As part of sending loans to UWM, they agree.
BY MR. HIGH:
Q Right, and I get that. But I guess I'm saying if you're saying, hey, this was a big move so we're making

sure brokers were okay with the changes. So that's why he asked them to sign, right?

A We wanted to make sure that the brokers understood that these changes were being -- being made.

Q Okay. So why -- why didn't he just say, hey, here are the changes as opposed to asking -- telling brokers to sign by a certain date?

A We wanted to make sure that they were aware that this was time sensitive.

Q And you don't think that could have been done without asking them to sign it?

MR. MURRAY: Object to form. Foundation.

THE WITNESS: A different form of communication, is that what you --

BY MR. HIGH:

Q Right. So I guess my question is, you're saying he asked them to sign to make brokers aware of the agreement, correct?

A Correct.

Q And I'm saying couldn't that have been done without asking brokers to sign the addendum?

A How would they acknowledge their agreement if they didn't sign?

Q Right. Right. That -- that -- I guess that's my -- that's what I wanted you to answer. So, right, if they

don't sign the agreement, how are they acknowledging the terms?

A Because their -- their acknowledgement of the terms is not necessarily them physically signing anything. Them sending us a loan is them signing.

Q So if that's not their acknowledgement of the terms why is he asking them to sign an agreement if that does not mean they acknowledged the terms?

MR. MURRAY: Object to foundation and form.

THE WITNESS: I'm not sure how to better answer your -- your -- the question that you're asking.

BY MR. HIGH:

Q Yeah. I guess -- and I'm not trying to trick you. I'm just trying to understand if you're testifying that, hey, 7.08 says UWM can change the agreement at any time, right?

A Yes.

Q But also when this announcement is made about the changes to the agreement, the CEO of UWM is saying, hey, if you -- you have until March 15th to sign the addendum --

A Uh-huh.

Q -- right? Why is that being done if the agreement has already been changed by UWM?

MR. MURRAY: Object to form and foundation.

THE WITNESS: We needed to communicate that this change was being made because there was a new portion of the agreement that had liquidated damages. Our clients needed to understand when those liquidated damages would go into effect. So I -- I --

BY MR. HIGH:

Q Could the communication have been made without asking brokers to sign the addendum?

A I don't believe so.

Q You think the only way that they can communicate this addendum to brokers is if they asked them to sign?

A We're -- the form of communication was more than just the Facebook Live. In every communication we had, that was the instruction that was provided.

Q I guess my question is a bit different.

MR. HIGH: Court Reporter, could you repeat my question, please?

(Indicated question played back by reporter.)

"Question: Could the communication have been made without asking brokers to sign the addendum?"

THE WITNESS: I don't believe so.

BY MR. HIGH:

Q But didn't you testify that the other way that that communication was made was by brokers submitting loans

to UWM? Wouldn't that also consider acceptance of the terms?

A That --

MR. MURRAY: Object to form.

THE WITNESS: -- that is considered acceptance, yes. That's -- that's not a form of communication, though.

BY MR. HIGH:

Q Right. So you're saying the only way that these terms were communicated to brokers was via this Facebook Live post?

A That is not what I'm saying.

Q So what are you saying?

A I'm saying this was one form of communication in which we had. That we had email communications that went out. We had communications from our sales team that went out. I mean, this was widely covered across the industry. So this was not the only form of communication. This was the -- this was the announcement communication. There were several touch points after that.

Q Right. Okay. So if there were all these mediums of communication, emails, whether it's renewal agreements, why in this specific communication were brokers asked to sign?

A I'm not -- I'm not sure how to better answer your question. I'm really not.
Q Okay. And I guess a better way to phrase it is you would agree that if a broker does sign that addendum, like CEO of UWM stated, that that would be them accepting the new terms, correct?
A That was one -- that is way to accept, yes.
Q Okay. In this Facebook Live video was there any discussion about other ways to accept the terms?
A Just based on the broker agreement of them sending loans, but, no, there wasn't discussion.
Q Okay. So there wasn't a discussion to say, hey, you can sign it, but also, if you do submit loans after this announcement that is also considered acceptance of the terms?
A That's part of the original broker agreement.
Q Right. Was that made known in his Facebook Live video?
A I don't believe that was stated in that.
Q Do you think that would have been important to make known?
A No, because that wasn't a change.
Q You said it wasn't a change?
A That was not a change.
Q Right. But I guess the change was the liquidated damages provision, right?

A Correct.
Q So don't you think would be important to let brokers know if they submit loans that they are accepting agreement to that provision?
A That is part of our original broker agreement.
Q The liquidated damages provision?
A No, the sending loans is acceptance.
Q Right. I guess my question is more so do -- during this communication do you think it would have been important to let brokers know that -- and I'm sorry, strike that.
Before this addendum was done, had UWM ever used liquidated damages provisions in wholesale broker agreements?
A Not that I'm aware of.
Q Are you aware of any other instance where UWM unilaterally changed the agreement, and then did an announcement just like this one?
A No.
Q So I don't know -- have you ever -- have you been able to read the deposition transcript of Kevron -- Kevin Rhatigan for Kevron?
A I don't believe I read that one, no.
Q Okay. Now he testified that he never received the all-in addendum agreement. Do you have a reason to

disbelieve that?
A I do because he's signed it.
Q Right. I'm talking about this agreement, the Exhibit 3.
A Exhibit 3 and Exhibit 6 are the same thing.
Q Right. But I guess my question is more so about Exhibit 3 because I think you were saying that there's a bit of a confusion about how, you know, that acknowledgement page is not on the same page as the actual agreement.
A That the printout is not, correct, but this is the digital version or the -- what is on our website as the broker agreement. So the -- the Exhibit 6 and Exhibit 3 are the same documents --
Q Uh-huh.
A -- in different form.
Q Okay. Do you know if UWM ever mailed this provision out to brokers?
A Like -- like physical snail mail?
Q Yes.
A I don't believe that.
Q Okay. And I guess the only reason I asked that is because I know Mat Ishbia said you have until this date to sign the addendum. Was he talking about like a physical copy, or do you think he was referring to the

acknowledgement?
A The acknowledgement.
Q Okay. Were you aware that Kevin Rhatigan had conversations with representatives of UWM about this addendum?
A No.
Q Okay. Well, I'm going to represent to you that he did, and that he was told the addendum does not apply to him. Does that ring a bell to you? Have you heard anything like that?
A No.
Q Is that something that UWM would do?
A No. It was -- nobody was -- it did not -- it did not "not" apply? It applied to everybody.
Q Okay. And so is it your testimony that as far as you know, all the brokers that do business with UWM currently do not do any business with Rocket or Fairway?
A That is my understanding, yes.
Q And then just follow-up. So I understand, you know, you told me the $5,000 was the best estimate. Why wasn't it $6,000?
A 5,000 was our best guess.
Q Right. But I guess why wasn't it $6,000?
A There's no reason it wasn't six. 5,000 was what we

landed on as our best assessment.
Q Okay. And -- and that was also, like -- so when that discussion was determined were different people offering different numbers of what that amount should be?
A No, that was proposed by legal counsel.
Q Okay. So you didn't have any input on that?
A Not the final number, no.
Q Okay. Did you propose any numbers?
A I did not.
MR. HIGH: I have no further questions.
THE WITNESS: Okay.
MR. MURRAY: Just a couple of quick follow-ups, Ms. DeCiantis.

** ** ** ** **

R E - E X A M I N A T I O N

BY MR. MURRAY:
Q With regard to Section 7.8, so I'm going to refer you to Exhibit 6. Well, excuse me. Let me back up.
With regard to Section 7.1 of Exhibit 6, can you read everything up to the first comma in that section?
A Amendment of agreement except as set forth on Section 7.08.
Q Okay. So does 7.01 indicate that whatever the amendment provisions are in 7.8 are an exception to

7.01?

MR. HIGH: Objection to foundation. She just testified she needed legal counsel to answer that.

MR. MURRAY: Well, I don't think that was the question you asked, but I'll ask it anyway.

BY MR. MURRAY:

Q So from what you read in Section 7.01, does that indicate that 7.08 is an exception to Section 7.01?

A Yes.

Q Then one final clarifying question. With regard to the liquidated damages numbers of 50,000 and 5,000, is that -- are those numbers comprised of the value of the technology and services provided to brokers only, or is goodwill also a part of that?

A Goodwill is also part of it.

MR. MURRAY: Okay. I don't have any other questions.

MR. HIGH: Just one follow-up.

** ** ** ** **

R E - E X A M I N A T I O N

BY MR. HIGH:

Q What part of that $5,000 is for goodwill?

A It was an all-in number. It was collective.

Q But do you know?

A No.

Q Okay. Do you know what part of that $5,000 is for technology?

A No.

Q Do you know what part of 5 -- of that $5,000 is for training?

A No.

Q Do you know what part of that $5,000 is for damages to the wholesale broker channel?

A No.

Q Do you have any knowledge of how that $5,000 is broken down? Like could you show me how it's -- how it's assigned to different services?

A No.

MR. HIGH: Okay. No further questions.

MR. MURRAY: Okay. I'm all set.

THE VIDEOGRAPHER: Okay. This concludes today's deposition. We are now off the record at 5:16 p.m.

(Deposition concluded at 5:16 p.m.)

** ** **

Transcript of SARAH DECIANTIS

Please do not share, forward, duplicate or copy to share with anyone outside of your offices. Please do not distribute a transcript to others for future sales, monetary gain, or any other purpose without paying the

UNITED WHOLESALE MORTGAGE v KEVRON INVESTMENT Job 29735
DECIANTIS , SARAH 05/01/2024 196

ordinary and customary charges for any and all additional transcripts.

** ** **

scheduling@fortzlegal.com fortzlegal.com Toll Free: 844.730.4066

STATE OF MICHIGAN )
)ss.
COUNTY OF OAKLAND )

I certify that this transcript is a complete, true and accurate record of the testimony of SARAH DECIANTIS to the best of my ability.

I also certify that prior to taking this deposition SARAH DECIANTIS was duly sworn by me to tell the truth.

I also certify that I am not a relative or employee of a party, or a relative or employee of an attorney for a party, have a contract with a party, or am financially interested in the aforementioned action.

Deborah Linehan

Deborah A. Linehan, CER 7251
Notary Public, Oakland County, Michigan
My commission expires 12-08-25

**Exhibits**

**Exhibit 1** 4:6 7:24,25

**Exhibit 2** 4:7 20:19,20,21 28:25 171:20,23,25

**Exhibit 3** 4:8 27:17,19 29:1 37:22 44:10 57:16,19,23 58:2,19 70:8 91:7 100:6 118:1 126:19,24 131:23 132:4 165:19 166:1 172:24 177:23 191:4,5,7,14

**Exhibit 4** 4:9 37:9,10 38:13 63:16 125:1 180:12,14

**Exhibit 5** 4:10 86:7,9

**Exhibit 6** 4:11 164:1,7 165:1,4,21 166:5,7 169:21 172:1 178:2 191:5,13 193:19,20

**Exhibit 7** 4:12 164:8 165:11,12,13 166:6 170:9 173:3,23 174:7,8

**$**

**$1,000** 79:10

**$100** 161:9

**$100,000** 95:25

**$2,000** 79:10

**$300,000** 26:16

**$5,000** 10:24 51:12,18 52:1,22 53:8 66:1 70:17 72:12,14,21 73:3 77:19,21 78:7,8,13,17 80:17 81:9,12,21 82:8 84:13 94:11,14,15 99:15 101:1,3 111:11 175:10,16,18,21,25 176:3 192:21 194:22 195:1,4,7,10

**$50,000** 53:8 70:20 72:17,19,21 82:12 92:11,22,23 93:13,17,23 94:14,25 95:2 96:3,10,24 99:15 101:5 132:6 176:1,4

**$6,000** 192:22,24

**0**

**0.71** 179:10

**0if** 24:6

**1**

**1** 5:2,6 7:24,25

**1/10** 27:3

**10** 27:2,15 135:23

**100** 27:13 128:9 151:25

**11-** 136:6,12,17 137:1 181:18

**12** 38:13 39:2

**12,000** 136:6,12,17 137:2 181:18

**14** 63:17 125:2,8 180:14

**15** 125:11 146:1 180:19

**15th** 125:14,19 181:22 183:1 186:20

**17** 127:25

**1:05** 5:3,6

**1:17** 16:5,7

**1:19** 16:7,9

**2**

**2** 5:10 20:20,21 28:25 43:25 149:24 150:4 151:10 171:20,23,25

**200** 52:15,20

**2019** 23:10

**2021** 54:10 57:9 59:7

**2024** 5:2,6

**21** 29:10 59:11

**22** 64:19 143:14,21 145:5

**22-cv-10395** 5:10

**2:12** 60:21,22

**2:27** 60:23,25

**3**

**3** 27:17,19 29:1 37:22 44:10 57:16,19,23 58:2,19 70:8 91:7 100:6 118:1 126:19,24 131:23 132:4 165:19 166:1 172:24 177:23 191:4,5,7,14

**3.03** 148:20

**3.03(x)** 44:17,22 70:14,16,19 71:4 147:15

**3.3** 53:13,17

**3.3(x)** 53:18,20 118:1

**300** 52:17

**3:41** 133:21,23

**3:55** 133:23,25

**4**

**4** 37:9,10 38:13 63:16 125:1 180:12,14

**41** 7:20

**45-** 135:15,23 136:2

**4:43** 172:16,18

**4:51** 172:18,20

**5**

**5** 27:2 43:24 86:7,9 149:25 150:4 195:4

**5,000** 72:25 73:16 75:4 78:24 80:10 91:9 94:8 98:18 99:11,22 100:4 102:3 134:19 149:13 192:23,25 194:11

**50** 41:11,13 52:13,14 65:20 135:23 146:1

**50,000** 73:20 75:4 80:23,24 84:14 91:10,13,16,18 98:18 99:11,21 100:4 102:4 134:19 135:15,24 136:2 194:11

**5:16** 195:18,19

**6**

**6** 164:1,4,6,7,12 165:1,4,21 166:5,7 169:21 172:1 174:9,11,12 178:2 191:5,13 193:19,20

**65** 19:2 34:16

**7**

**7** 164:1,3,4,5,8,12 165:11,12, 13 166:6 170:9 173:3,23 174:8

**7.01** 178:20 179:9 193:24 194:1,7,8

**7.08** 169:22 170:6,13,14,22 171:23,24 172:1 177:23 178:8, 23 179:9,12 181:1 186:15 193:23 194:8

**7.1** 193:20

**7.20** 184:11

**7.28** 81:17

**7.3** 38:7 44:10 45:11 48:15 49:12,18,21 50:4 162:14

**7.30** 37:24,25 45:7 49:21,22 70:9,11 81:20 107:25 148:15

**7.8** 178:2 193:18,25

**7/5/82** 7:22

**70** 34:16

**73** 128:13

**75** 125:16

**8**

**80** 128:10,12,17,24 129:10 130:7

**800** 40:7

**8500** 40:8

**9**

**90** 128:12

**A**

**abide** 149:18

**ability** 13:12 21:4,6 63:6 64:10,13 107:2 119:11 122:24 123:14 141:4 150:22 153:6 155:12 167:17

**able** 18:23 19:5,6 44:7 71:24 76:20,22 135:25 136:14 167:15 175:10,20,24 176:1 190:20

**about** 10:13 13:5 14:2,22,25 15:5,7,11,25 16:1,12,15,18 17:10 19:10,13,20 23:7 25:3 27:22 28:4 29:6 30:20 31:3,12 33:7,18,23,24 35:12 38:3 39:2, 10,15 40:4,14,25 41:2 44:10 45:20,21 51:3 54:12,18,21 55:5,7,16 56:2,13,19 57:2,5 61:18 62:9 66:3,5,10,14,18 73:12 77:4 80:2,7,9,12 81:17 83:7 85:13 87:2 88:6 90:12 91:17 95:8,9 103:4,5 104:19, 22,25 106:20 107:4,6,16,17,25 116:8 118:1 122:23 123:2,25 124:1,2,9,16 134:3,4,10 135:9, 15,23 136:6 138:5,22 139:7, 20,23 140:11,19 143:13 144:6 147:12,15 148:19,20 154:13 157:23 159:12,16,17,21 160:6, 23,24,25 162:25 165:19,25 166:9 167:9 169:12,25 170:11 172:24 173:2 175:6,12 176:17 177:22 178:2 186:18 189:9 191:3,6,8,24 192:4

**absolutely** 42:10 47:10 162:9,12

**accept** 57:8,10,14 127:21 170:6 189:7,9

**acceptable** 7:12

**acceptance** 59:8 127:5 188:1,6 189:14 190:7

**accepted** 22:11 26:17 57:8

**accepting** 189:6 190:3

**access** 25:20

**according** 66:2 77:6

**Accordingly** 70:15

**account** 97:1

**accumulate** 65:4,20

**accurate** 37:15

**acknowledge** 185:22

**acknowledged** 126:14,15 127:5 164:22 186:8

**acknowledgement** 126:12 127:11 165:13 166:6 170:9 173:16 174:14 186:3,6 191:9 192:1,2

**acknowledging** 186:1

**acknowledgment** 127:16

**acquired** 70:19

**across** 17:24 22:2 163:4 188:17

**act** 168:3

**action** 145:25

**active** 34:4

**actual** 12:6 22:15 55:1,5,8,13, 17 56:19 57:5 59:14 79:23 102:12,16,17,22,23 103:5,8, 11,16,19,22 104:3,11,19 105:4,14,18 106:10,18,21 107:4,6,8,11,17,21 108:3,5,10, 14,18,20 109:7,24 110:1,12, 16,21,25 111:12,16,18,21,23 112:6 126:13 127:14 162:25 166:21 169:14 191:10

**actually** 31:9 65:17,23 79:9 134:7 146:4 169:17

**ad** 62:11

**Adam** 16:25

**added** 21:7,8 148:16

**addendum** 10:11,15 11:2,15 12:10 16:1,12 17:10 23:8 27:18 28:5 30:8,13 38:4 44:12, 13 45:9,12 46:6 56:6 85:15,24 86:21 87:12,13 96:18 125:14, 20,21 126:3 129:3 130:16 131:1,3,12 132:11,14,17 134:4,11,15 137:17,22 164:21 166:4 168:20,22,23 169:3,7 172:3 176:13 180:5,19 181:22 182:14,22,25 183:2 185:21 186:21 187:8,11,21 189:4 190:12,25 191:24 192:5,8

**addendums** 181:6

**addition** 34:6 70:22

**additional** 67:13

**address** 63:15 158:19

**admit** 24:12 86:7,8,20 87:16 90:17

**admitted** 88:25 89:10,15,23 90:2,4

**advantageous** 43:5 65:19,21

**advertising** 9:15 62:4

**advising** 170:14

**affect** 42:19 136:17

**affixing** 127:9

**after** 5:16 7:3 30:3 31:8,18 39:9,10 40:16 41:9 56:5,7 64:23 68:24 125:18 128:6 142:16 145:9,13,15 188:21 189:13

**afternoon** 5:5

**again** 22:16 41:20 45:24 46:14 68:18 81:7 89:17 103:23 113:16 127:12 139:22 140:15 141:13,14 146:2,21,23 151:9 153:5 166:6,12 167:11

**age** 158:21 159:22

**agencies** 62:11

**agents** 31:21 41:9,10

**aggregate** 27:8

**aggressive** 36:5 40:17 61:20 141:2

**aggressively** 40:16

**agree** 47:1 70:11 71:1 125:17 150:3,25 151:16,19 152:7 154:1 158:20 169:6 170:12 182:24 183:14 184:1,19,22 189:4

**agreed** 46:6 54:7 88:7

**agreeing** 46:11 87:13 148:8 183:22 184:16

**agreement** 12:7,13 19:23,24 20:1,5,20 21:1,9,12,16 22:2,5, 6,9,11,14,15,17,21,24 23:4,7, 9,12 27:18 28:18 29:7,9,17,25 30:4 38:11 39:6 44:1,15 45:11 46:1,23 47:23,25 48:4,7,9,11, 18 49:9,14 50:2,21 51:21 55:2, 4,9,22 56:4,20 57:6,15,19 58:9,15,18,21 59:6,7,10,13,25 60:13 62:20 65:15 66:2 69:7, 20 70:1,24 73:24 75:2 76:21 77:5,6,10,12,19 81:5,9 82:5,7, 12,19 83:13,25 84:1,22,24 85:1,5,19,25 86:22 88:7 90:19 93:5,9 96:12,13,14,17 99:3 100:20 105:16 109:18,22 110:2,9 112:14,15,18 113:5,7,

8 114:8 117:6,12,15,22 119:18 121:19 122:11,18,21 123:15, 17,18,22 124:2,4,5,8 126:7,14, 20,21 127:3,4,6,9,10,18,20 138:20 139:7,21 143:13 144:12,15 145:11,22,24 147:2 149:18 150:10 154:17 156:10, 13,15,16 157:6,9,19 158:7,15 159:8,13 160:23 161:7,16 164:21 165:5,7,8,9,14 166:4, 23 167:4 168:9,11 169:15,18 170:7,15 171:5,8,16 172:4 174:13 178:18,23 179:1,11,16, 18 180:2,22,24 181:13,24 182:1,6,12,20,22 183:5,6,10, 16,21 184:1,4,9,13,16,19 185:18,22 186:1,7,15,19,23 187:3 189:10,16 190:4,5,17,25 191:3,10,13 193:22

**agreements** 20:7 126:15 142:18,21 155:25 156:3 181:12 188:23 190:14

**ahead** 29:21 103:25 154:21 160:9,14

**alert** 145:17

**all-in** 10:11,15 11:2,15 12:10 16:1,12 17:10 23:8 27:18 28:5, 6 29:1 30:8,13 38:3 44:12,13 45:9,12 46:12,23 55:23 56:6 85:15,24 86:21 87:11,12 96:18 131:1,3,12 132:10,14,17 134:4,11,15 137:17,22 153:7 164:21 166:4 168:19,21,23 169:3,7 172:3 176:13 190:25 194:23

**all-inclusive** 108:12 112:13

**alleged** 11:21

**allow** 162:24

**allowed** 144:16

**almost** 93:11 163:3

**already** 97:22 101:11 186:24

**also** 7:10 31:22 35:5 36:25 66:22 67:6,25 70:3 82:1 88:5 91:3 92:23 95:2 105:21 131:17,23 132:4 134:17,19 153:4 160:11 167:24 170:13 184:18 186:18 188:1 189:13, 14 193:2 194:14,15

**always** 151:19,23

**am** 9:9 23:19 33:13,15 65:6 68:18 90:1 99:7 139:13 147:10 179:14

**ambiguous** 87:11 88:5 89:6

**amended** 59:7 96:17 126:19 170:15 171:12 174:13 178:24 179:2 184:9

**amending** 85:19,25 86:21 90:19

**amendment** 193:22,25

**amendments** 169:25 170:7, 19,23 171:14

**among** 139:24

**amount** 45:20 47:7 50:18 66:23 72:16 73:3 74:18 78:11 101:1,3,5 102:3 103:12 109:16 112:20 116:15 143:19 193:4

**amounts** 76:8 84:5 101:21 102:4

**analogy** 156:9

**and/or** 70:24

**announced** 39:6 137:22 177:17,20 181:17

**announcement** 50:8 176:20 177:2,6 186:18 188:20 189:14 190:18

**announcing** 131:11,12

**annually** 157:6

**another** 27:21 35:6 67:3 96:22 108:16 128:9 143:6 158:11 159:9 162:10 183:13

**answer** 7:2,7,11 13:11 28:1 45:24 46:14 51:4 55:12 58:13, 23 75:22 76:5 79:17 82:3 84:9 88:9,10 89:7,22 91:5 97:15,19 100:24 102:25 104:7,10,16 105:3,8,12,25 106:4,15 107:1, 7 108:23,24 109:1 129:16,20 137:4 138:25 139:1,25 155:8 157:5,16 158:17 160:12,21 161:1,13 162:17 179:21 182:18 184:7 185:25 186:11 189:1 194:3

**answered** 33:12 45:23 46:21 49:3 52:23 83:4 85:9,21 87:16 97:18 105:6

**answering** 76:15 107:2

**answers** 6:15,18 13:17,20,24 14:20,21 76:3,6 86:7

**anticipate** 22:14,20 23:1,15

**anticipated** 23:2,25

**any** 9:16 11:13 14:11,19,22 15:11 19:8,13,20 21:15 22:13, 14,20 23:3,18,24 29:7 31:8 33:2,5,7 35:11,22 42:13 45:20 50:9 54:11 56:1 58:21 60:1 61:2,6,9 62:7 64:8 70:23 80:9, 12 82:11 92:15 96:9 98:6,20, 22 99:4,10,14,19,20,22 101:7, 13,15,21 102:9 103:8,20,22 104:3 106:10,18 107:11 108:10,14 110:11,14,16,20 121:13,17 124:13 126:2 134:25 137:15,25 138:12 139:6,23 141:18 142:17 143:24 144:16 151:15,18 155:25 157:21 158:15 159:13 161:21 169:12,13 170:22,23 171:14 172:21 176:7 177:1 181:6 186:15 189:8 190:16 192:17 193:7,9 194:16 195:10

**anybody** 14:23 15:16 20:4 114:4,11 177:15

**anymore** 125:19,24 155:3

**anyone** 13:4 14:8 19:10 115:17

**anything** 15:14 24:25 34:10 37:4,7 61:6 101:13,22 111:20 118:19 122:20,23 123:15,17 124:5,19,21 138:22 158:10 160:25 162:5 175:17 186:4 192:10

**anyway** 53:25 194:5

**anywhere** 23:24 48:9 121:19

**appear** 50:17

**applicable** 70:24

**application** 24:14,18,19 26:16 43:16 81:18 147:16 154:15

**applications** 25:14 171:10 178:11

**applied** 192:14

**apply** 192:8,14

**appropriate** 169:7

**approval** 174:17,20

**approximate** 12:6

**Approximately** 5:3

**arbitrarily** 97:5,9,16 98:5,10

**aren't** 69:20 70:1 123:1 181:23

**argumentative** 106:16 159:4

**around** 31:21 42:18 54:12 99:4 123:22 124:5,18

**arrive** 79:4 80:17 99:11

**arrived** 81:22 99:21,22

**arriving** 79:18

**articles** 33:7,9

**ascertain** 70:15 71:5,11,22 72:5 79:19 100:8

**ask** 7:5,7,10 19:15 22:16 48:20 53:19 54:14,18 60:7 77:25 81:7 84:21 85:10 107:16 109:5 118:10 122:14,17,22,25 123:7, 23 124:2,6,9,20 148:19 160:3 165:24 171:22 180:4 194:5

**asked** 12:9 33:11 42:4 44:10 45:23 46:20 52:23 85:9 97:18 105:6 147:22 150:14 159:16, 17,18 165:25 175:6 178:2 185:2,17 187:11 188:24 191:22 194:5

**asking** 15:18 45:20 55:5 56:13 76:17 83:14 84:2,18 87:2 102:1 103:4,5 107:6 116:8 123:25 124:1 135:19 137:14 139:8 140:5 143:12 159:21,22 160:23,24,25 164:19 165:19 177:22 180:23 182:5,13 183:6, 15,25 185:6,11,21 186:7,11 187:7,21

**assent** 182:13

**assessment** 45:18 59:15,20 66:7,25 71:25 72:6 73:4 74:7, 11 75:10,13 78:9,11,19,23 79:2,4,12,15,19,24 80:15 92:20,24 96:25 97:7 102:8,10 120:11,15,20,22 175:11,18,22 193:1

**assigned** 195:12

**assist** 148:4 154:5

**assistance** 166:17

**assume** 19:16 118:5 155:11

**assuming** 145:5 163:18

**attached** 57:19 58:10

**attempt** 12:6

**attention** 27:14

**attenuated** 159:20

**attorney** 6:25 7:1 109:3 160:21 175:6

**attorney-client** 157:5,23

**authority** 13:14

**authorized** 178:24 179:2

**automatically** 182:3

**available** 13:22 142:4,7,9 146:18 149:21

**avenue** 39:8

**aware** 13:24 22:13 23:18,19 29:8 32:17 33:2,5,10,15,18 35:11 39:12 54:11 61:2 65:6 68:10,11,18 69:2,4,5,7,9 98:20,22 99:4,7,10,12,14 103:8,20,22 108:10,14 126:2 127:9 137:25 139:6 140:4 142:17 143:7,10,24 144:15 147:10 155:25 156:4 157:21 183:19 185:8,17 190:15,16 192:3

**away** 31:22 34:5

### B

**bachelor's** 62:3

**back** 15:22 16:8 37:22 41:14 46:15 50:11 52:8,10,18 60:24 61:14,20 62:17 63:16 66:19,20 70:8 75:1 88:13 91:7 100:6 106:7 110:15 125:1 126:17 129:24 133:24 134:2 141:7,24 142:12,16 143:9 147:23 159:16 162:18 172:20 180:11 187:18 193:19

**background** 62:2 160:3

**bank** 143:3,4,5

**based** 17:13 21:16 25:19
26:10 27:11 59:16 65:16 71:25
72:8 73:7,16 74:2 78:9,11 79:5
81:2,10,14,21 82:4,8,12 83:9
89:1 97:12,22,25 99:25 112:17
113:5,7,8 115:23 121:5 142:4,
7 146:18,19 151:10 153:3
157:12 175:11,25 189:10

**baseline** 160:4

**basically** 53:20 118:1

**basing** 112:16

**basis** 11:21 26:7,10,20,25
27:3 41:11,13 73:3,5 80:9
82:16,23 83:18 84:4,13 85:2
123:19 128:9 145:21 146:24
158:18 161:19

**bathroom** 133:18

**bearing** 159:13

**because** 19:2 34:6 36:9,16
42:14 44:1,4 45:17,25 48:13
54:1 57:3 58:9 63:25 66:3,7
68:11 69:7,21 71:24 77:22
85:21 87:1,11,20 92:20,24
95:9 98:8 108:8 112:19 113:21
116:25 120:5 122:3 128:11
129:9 131:9 138:4 140:12,22
145:4 147:1 148:11,22 149:10,
17 151:16 157:2,18 161:19
163:12,20 167:18 172:23
173:10 174:18 183:8 186:3
187:2 189:21 191:2,7,23

**become** 34:4 77:20

**becomes** 63:9,10

**becoming** 36:21

**been** 10:8 13:8 21:20 31:3
56:25 61:22 66:23 83:4 110:22
135:7 138:4,16 145:7 173:17
179:11 185:10,20 186:24
187:7,20 189:19 190:9,20

**before** 6:10 8:4 19:16 30:8,15
31:9 54:10,14 59:12 62:9,11
85:13,19,21,24 86:11,21 87:13
88:7 90:18 129:3 134:7 137:11
138:5 139:18 147:12 190:12

**begins** 5:7

**behalf** 8:10 10:9 12:18 13:9,
14,18 64:14

**Behind** 177:21

**being** 18:17,23 24:23 30:25
33:25 42:1 44:7 63:14 65:7
67:21 88:18 90:12 93:8 120:15
131:21 132:8 145:24,25
147:10 156:22 158:2,5 164:20
176:9 183:4 185:4 186:23
187:2

**believe** 10:2 16:11 20:10,16
32:20 44:16 48:6,10,13 49:11
51:6 59:11 64:21 83:15 87:23
108:12 109:12 115:21 121:4,7,
18 131:7 143:20 144:23
146:24 147:1,19 148:16
152:10 153:25 154:8 157:25
165:18 169:9 174:7 177:7
180:1,11 181:1,3 184:11
187:9,22 189:18 190:23
191:21

**bell** 192:9

**benefit** 133:4

**benefits** 12:3 24:4

**besides** 69:12 139:25

**best** 13:12 45:17 59:15,20
66:7 70:7 71:24 72:6 73:4
74:7,11 75:9,13 78:9,11,19,23
79:2,4,12,19,24 80:14 89:7,13
90:1,8,9,13,24 92:20,24 94:8,
13 96:25 97:7 102:8 105:8
107:2 108:11 118:19 120:11,
15,20,22 137:23 149:21 150:6,
18 151:2,16,19,23 152:4,8,11,
14 153:7,25 154:16 167:16,18
175:11,18,22 176:4,10 181:3,9
183:10 192:21,23 193:1

**better** 36:10 43:1,16 55:19
75:22 76:18 105:24 108:25
109:3 119:1 164:14 182:18
184:7 186:10 189:1,3

**between** 10:20 18:18 19:14
30:5 33:2,5,10 34:16 66:8,24
73:25 74:6,20 76:1,7 84:12
93:5 108:18 126:13 151:18
161:20,21 168:21 179:13

**beyond** 36:20 51:2 82:1
100:22 118:22 129:14 152:25
156:18,19 157:15

**big** 184:25

**billion** 136:23,25 137:9,21

**binding** 13:24

**birth** 7:21

**bit** 82:21 153:13 183:8 187:15
191:8

**Blink** 81:17

**Blink+** 24:15

**block** 58:2 184:10,12

**board** 163:4

**bonus** 160:24

**borrower** 43:2,5,17 44:2,7
119:2,3 140:25 151:24 152:4,
5,11,23 153:8,16,18,24

**borrowers** 18:8 37:3 152:14

**both** 36:14 45:9 66:25 129:3
178:25 179:3

**bottom** 39:18 125:2,7 180:16

**breach** 47:25 50:2 69:5,10
70:12,21 71:2 73:24 74:12
76:2,5 77:10,11,18 93:5

**breached** 12:7 22:15,20 46:2
55:1,8,22 56:3,20 57:6 109:18,
22 110:2

**breaches** 75:2

**breaching** 22:24 155:17

**breadth** 160:5

**break** 16:6 50:15 60:8,19,22
107:8,10,19 110:3 111:5
133:16,22 166:18 172:17

**breakdown** 115:11,13,17,19,
20,22 116:1

**breakdowns** 116:2

**breaker** 43:15

**breakout** 111:23 115:6,8

**briefly** 28:4

**bring** 31:4 163:7

**broad** 22:8

**broadly** 183:11

**broken** 105:10 107:20,21
112:8 114:6 195:10

**broker** 12:13 18:22 19:5,17
20:13,14,15,20 21:17 22:10
23:3 24:11,16,21 25:11 26:5,

14 27:10,14 31:17,23 38:11 39:6 40:18 43:14,15,20,25 44:4 50:2 64:2,8,9,10,13 68:15 70:11,16 71:1 72:16 73:18 74:21 76:11,19 83:3 84:12,23 86:22 90:19 93:10 96:22 97:1, 3 98:17 121:23 122:4,10 124:9,19,20 125:18 126:15,20 135:16,22 136:6,12 140:10 141:3 142:18,21 143:6 146:3,9 147:6,15 149:14 150:6,9,14,18 151:9 153:5,14,22,23 155:6, 16,18 156:3 161:22 162:3,5,24 164:21 165:5,13 166:3,19,22 167:3,4,6 168:2,7,9 170:6,7, 15,19,22 171:13,15 172:3,4,7 178:12,25 179:3,17 181:5,24 182:20 184:15 189:4,10,16 190:5,13 191:13 195:8

**broker's** 24:17 70:13 71:3

**brokers** 12:4,9 17:24 18:9,10, 14 20:2 21:2,4,13 22:2 24:5 27:5,22 28:11 29:17,23 30:5 34:5 36:11,18 40:14,19 41:15 42:1 46:5,9 47:7,9 48:24 49:1, 8 51:11,17 52:5,7,20 53:7,13, 20,23 61:7 77:13 81:3,10,22 82:9,13,15,18,23,25 85:1 96:16 118:2 128:12 129:7,11 130:5 131:24 132:4 134:18 135:12,18 136:18 137:2 143:2, 24 144:9,16,19 145:22 147:1 148:4,12,23 149:12 152:13 153:19 154:2,3,5 155:20,22 156:1 163:13 166:10 180:5,23 181:4,7,18,21 182:6,10,13 183:4,25 184:10,12 185:1,3,6, 17,21 187:8,11,21,25 188:10, 24 190:2,10 191:18 192:16 194:13

**brought** 139:14

**build** 163:4,7 167:9,14

**building** 167:19

**built** 76:10

**bunch** 67:6

**Bush** 5:12

**business** 19:17 23:4 25:25 31:18 34:5,7,10 35:10,12,15, 19 36:5,16 41:21,25 42:2,3,6, 19 62:25 63:3 64:8,18,25 76:12 125:17 128:11,15,17,25 129:5,11 130:7,17 131:4,9,10, 19 132:18 133:5 135:12,18,25 136:12,15 140:22 143:24 144:10,17,19 153:9,10 154:6, 10,11,24 155:3,10 167:17 172:8 174:22 192:16,17

**buy** 26:16 163:4,6 167:9,12

**BYRD** 114:18 158:11

### C

**calculate** 59:14 100:19 108:20 166:21 168:13 175:7, 10,13,16,17,20,24 176:1

**calculated** 10:24 78:17,22 80:14 114:24 120:8

**calculation** 26:21 80:6 81:2 120:9,13

**call** 24:15 36:25 141:4 181:18

**called** 40:12 93:11 117:8 122:8 141:5 146:7

**calling** 40:14

**calls** 71:13 81:25 83:2,21 84:15 88:3 100:13,21 102:19 103:24 104:5,13 105:7,21 106:22 112:1,23 113:14 117:17 141:4 152:24,25 162:16 179:19

**came** 62:14 116:14

**can** 6:17 10:4 13:11 14:19 15:4,15 16:2 19:15 22:10,16 26:13,25 28:1 35:17 37:7,22 38:23 41:23 42:3 44:4 45:24 48:20 52:6 53:19 55:12 57:3 60:19 63:16 70:8 71:9,14 76:13,14 77:9,25 80:17,21,23 81:7 82:3,7,9,11 83:8 87:5 88:9 89:7 94:22 95:2 96:9 97:19 98:25 102:25 104:7 105:8,13,18 106:5,10,18,19 107:1 108:23,24 110:11,14,15, 16,20 111:18 115:4 116:19 121:13 122:20 124:6 126:17 129:16 132:13 135:22 137:4 138:25 139:25 145:2 147:4,20 150:10,18 151:11 152:5,6,8 154:11 155:8 157:5,17 158:14 160:9,20 161:1,7,13,21,25 162:17 165:11 166:11,12 167:11 170:6,15 171:24 173:7 178:9,10,17,20 179:21 180:2 182:12 183:6 184:3 186:15 187:10 189:13 193:20

**can't** 16:3 18:22 42:2 44:1 51:4 53:25 54:3 58:13,23 63:20,24,25 64:4 100:24 111:17 123:10 124:11,19 151:11 155:21

**cancel** 172:4,7

**cannot** 96:11 116:21,23

**capability** 77:2

**capacity** 156:21,23 158:1,3

**capital** 167:24

**careful** 146:16 151:7

**case** 5:10 12:7 20:4 21:15 55:14 63:7 87:9 100:11 152:1 157:21 159:14 175:8 180:4 182:5

**categories** 51:2

**category** 105:22

**caught** 98:9

**cause** 31:17 67:13 121:13 130:6,17 131:4,18 132:18

**causes** 61:4

**caution** 15:10 138:21 139:22

**center** 141:4

**CEO** 13:1 16:16 17:12 130:13, 19,25 131:6 132:8 186:19 189:5

**certain** 43:11 92:21 183:5 185:7

**chance** 40:7 141:12

**chances** 141:3,23 142:11

**change** 22:9,11,12 23:8 29:18,22 31:9,12 42:19 45:7 54:10,14,16 178:9,10,17 179:16,18 180:2,5,22 181:11 182:7,9,12,13,21 183:6,8 184:3 186:15 187:2 189:21,22, 23,24

**changed** 28:19 29:1,9,11,16, 18,25 30:1,3 59:6 186:24 190:17

**changes** 21:16,20,21,22 26:9,

12 29:6,7 38:6 39:6 45:4 54:12 57:9,14 59:8 178:13 181:10,23 183:9 184:16,19 185:1,4,6 186:19

**changing** 138:19 139:20

**channel** 23:6 24:11 31:17,23 40:6,10,18,23 42:7,24 45:19 46:1 48:3,5,8,25 49:15,25 50:4,7 54:1,21 59:16,18 61:8, 13,18 64:2 65:24 66:4,9,17,18, 20 67:8,13 69:18 72:1,10 73:9 74:9 75:10 76:11 79:7 94:1,10 102:14 116:14 119:24 120:4,5, 6,16 121:4 125:18 140:10,13, 18 141:6,23 149:15 168:4 195:8

**channels** 51:21

**charge** 25:11

**check** 53:15 59:2 145:23 146:5 170:22 171:15 178:12 181:7,19

**checkbox** 127:23

**chief** 9:13,23 13:2 16:18,20, 21,24 17:2 62:1

**choice** 43:20 60:13

**choose** 19:3,8 44:5 63:3 64:11 131:17 151:10 153:10 154:10,23

**chose** 129:4 172:5

**chosen** 32:13 33:21,24 34:1

**circulated** 29:18

**clarification** 25:8 123:4,22 124:21 147:13 172:23 174:14

**clarify** 28:13 75:12 94:22 95:4 126:10,23 127:19 138:6 145:2 161:25 163:10,25 179:13,23

**clarifying** 194:10

**clause** 110:15 148:3,4,11,15, 20,22 149:4

**clear** 7:8 10:7 25:3 28:22 30:20 49:20 51:5 56:5 58:2 59:5 173:5

**clearly** 49:12 113:4

**clicking** 127:21

**client** 16:3 19:22 63:15 149:22 150:6,19 151:3 154:15

**client's** 167:16

**clients** 22:8 25:18 41:20 56:11,24 57:3 73:8 74:8 80:14 97:13 116:13 187:4

**cloned** 117:13

**close** 18:19 36:19 47:7 75:21 132:5 156:2 177:19

**closed** 11:25 35:22 36:1,12 52:1 70:17 72:12,17,22 74:1,2, 4 75:5 77:20 78:3,14 113:9,10, 13,24 114:14,18 117:13,14 119:15,21 121:21 140:25 143:3 145:18 146:18,20 147:7

**closes** 37:6 77:18

**closing** 78:12 146:9 148:5,12

**collective** 194:23

**collectively** 66:24 98:2

**come** 27:12 40:21 61:14,20 66:20 141:7,21

**comes** 66:22 68:20 142:15 151:17 173:8

**coming** 141:24

**comma** 193:21

**comment** 140:11,19

**comments** 33:18

**common** 6:16

**communicate** 182:9 183:11 187:1,10

**communicated** 28:10 29:23 51:20 52:25 53:3,6 181:10 188:10

**communication** 56:10,16,24 181:13 182:8,10,19 184:6 185:14 187:7,12,13,20,25 188:7,14,19,20,23,24 190:9

**communications** 49:4 56:25 188:15,16

**companies** 40:5,10 41:5 52:21 136:2,7

**company** 13:9 18:7 40:12 41:8 125:23 136:5,23 137:1,9, 21

**compensation** 160:24

**competition** 36:24,25

**competitor** 61:16

**competitors** 11:4 32:11 132:10,18

**complaint** 57:20 58:10 64:22 143:14

**complete** 93:8

**completely** 93:16

**compliance** 166:17

**components** 162:20

**comprehended** 85:4

**comprehensiveness** 82:5 83:13

**comprised** 194:12

**con** 100:6

**concept** 167:9

**concerning** 8:24 171:6,9 178:11

**concluded** 195:19

**concludes** 195:16

**conclusion** 55:11 71:13 82:1 83:2,21 84:16 88:3 100:13,22 102:20 103:24 104:6,14 105:7, 21 106:23 112:2,24 113:15 117:17 141:22 152:17,25 162:16 166:25 168:15 179:20

**condition** 171:16

**conditions** 127:21

**confer** 172:13

**confirm** 118:19

**conflict** 179:9

**confuse** 103:11

**confusing** 57:4

**confusion** 191:8

**connection** 36:1 74:20 76:1, 4,7

**conscious** 154:9

**consciously** 153:23,24

**consequential** 11:7 113:12,

20,22,24 114:2,14,23 115:1,23 116:4,10,19 117:1,9,12,22

**consider** 25:24 52:12 168:6, 10 188:1

**consideration** 21:21 22:7

**considered** 188:5 189:14

**consistent** 126:5

**consult** 113:2

**consume** 167:19

**consumer** 18:5,16 24:16 143:5

**contact** 20:14

**contain** 170:22

**contained** 171:11

**contemporaneous** 98:23 99:4,9

**content** 140:5

**continue** 144:16 151:11 153:9 154:23

**continued** 67:7

**continuous** 30:14

**contract** 14:25 19:18,20,21 22:4 23:15 28:5 57:21 63:1,3, 5,6 64:11 65:1 67:20 68:25 69:5,10 76:2,5 81:15,16 83:7,8 84:11 94:3,5 97:1 98:22 100:7, 10,18 112:22 122:24 123:2,7 124:13,15,23 131:23 149:5 155:9,11 159:21

**contracts** 14:20,21 21:5

**contractual** 10:20 19:13 30:5 162:6

**control** 42:3

**controlled** 30:4

**conversation** 6:16 30:24 59:22,24 79:24 137:6,13,18,24 138:16 139:13,14,17 144:8

**conversations** 112:17 135:2 137:25 138:17 139:3,16 192:4

**copies** 38:16

**copy** 191:25

**Corelogic** 146:7

**corporate** 8:3 62:13 87:25 88:19 89:11,15,24 90:15 108:14 113:23 115:9 158:6 159:22

**corporation** 8:10

**correct** 16:13 17:21,22 21:13 28:20,21 30:1,2,6,7,11 31:13 36:23 38:8,9,11,12 45:5,6,7 47:4,5 50:23,24 53:5,14,21,22 62:16,21,22 64:5,6,20 65:12, 13 66:11 67:9,10 68:12 73:18, 19 74:14,15 75:4,7,12,13,14 76:20,23 77:7,8 80:4 81:3,4 85:17,20 88:17,20 90:7,23 91:6,10,11,13,14 92:12,13,14 93:2,13,14,17 94:3,6,9 96:14, 18 98:19 102:4 103:14 104:23, 24 105:1,2,19 107:11,22,25 108:1 109:8,19,22,24 112:7 114:3,8 129:6,18 130:2,4,7,20 131:1,2 132:1,6,7 133:9 134:11,15 136:18 139:10,12 140:11 141:15 144:13 145:7 147:17 148:24 149:2 150:6 151:24 152:1,2,5,9 154:18 156:7,8 157:7 158:22 163:16, 19 164:23,24 169:19 175:8,13, 16,24 176:1,5,6,10,14 178:8, 18 179:3 180:20,21 184:10 185:18,19 189:6 190:1 191:11

**correctly** 164:20 169:16

**correspondence** 11:13

**cost** 12:2 25:6,9 134:18 166:18

**could** 5:22 6:2 15:20 16:16 17:23 18:4 26:5 28:9,11,12 34:1 36:25 37:4,23 38:13 39:15,18,20 41:4 44:17 46:13 49:14,16,24 50:15 60:11 63:5, 10,17,19,20 67:24 70:8 85:22 88:12 94:19,24 99:19,20 101:15,22 107:22 111:20 116:3,8,17 118:8,11 119:6,9 120:1,2 121:19 122:14 124:18 125:2,3 126:9,10 127:25 128:23,25 129:20,22 130:6 131:18 132:9 135:21 138:16 139:15 140:14 141:19 142:2 145:25 146:1,8 147:21 154:5 156:21 157:13 161:20 169:21 178:20 179:18 180:5,11,22 183:12 185:10 187:7,16,20 195:11

**couldn't** 181:2 185:20

**counsel** 5:15 12:19 13:3 14:5, 8,23 15:8,12 16:24 17:19 20:10,16 21:10 29:12 30:1 85:11 90:16 91:4 100:1,2 104:16,25 113:2 138:15,17,23, 24 139:1,4,9,15,23,25 140:2 169:9,11,12,13 177:22 179:13 193:6 194:3

**counties** 65:17 146:22

**country** 17:25 22:3 67:17

**county** 146:18,19,21

**couple** 6:13 15:6 39:9 135:7 166:11 193:13

**course** 9:6 22:23

**court** 5:16,22 6:7,13 15:20 46:13 106:6 129:22 147:21 187:16

**cover** 171:19

**covered** 157:24 158:19,22 188:17

**covers** 48:15 171:18

**create** 163:8

**crosstalk** 43:8 58:7 147:18 178:4

**current** 9:8 127:18

**currently** 192:17

**curriculum** 163:8

**customize** 167:16

**cut** 41:9,13,15 65:16

D

**daily** 26:9 145:21 146:23

**damage** 36:21 37:1 56:3 59:18 61:4 66:7,9,11,16,21,22 67:8,13 83:18 94:24 103:11,16 106:12 109:25 110:1 112:19

**damaged** 11:17 18:23 19:5,9 34:17,19,23,25 35:1,2,5,16,20 37:6 48:9 49:15,25 50:5 54:21 67:4 93:2,4,21,23 96:23 133:7 168:10

**damages** 10:10,14,23 11:7,22

12:7 22:15,20,23 23:1,5,14,18,
19,24 36:12 38:7 44:11 45:8,
10,16,18,22,25 48:2,5,6 50:1,
9,23 51:7 53:12,24 54:5,8
55:1,3,5,8,14,18,21 56:2,19
57:5 59:12,14,15,20 60:1,17
61:8 62:18 66:3,5,6,14 67:1
70:11,12,20,21,22 71:2,10,20,
25 72:4 73:1 74:17 75:20 78:9,
12 81:11 82:24 84:5 85:2,8,14,
18 90:18 91:8 92:21,24 98:21
100:7,18 102:12,16,17,21,22,
23 103:2,5,6,8,9,12,19,21,22
104:3,4,8,11,12,19 105:4,5,9,
14,15,17,18 106:10,13,19,20,
21 107:4,6,8,9,11,16,17,18,21,
23,24 108:3,5,9,10,12,15,18,
19,20 109:7,8,16,17,21,23,24
110:1,4,12,15,17,18,21,25
111:6,9,12,16,17,18,19,21,25
112:3,4,6,10,13 113:6,13,16,
20,22,24 114:2,9,14,23 115:1,
4,23 116:4,10,15,19 117:2,5,9,
12,18,22 122:3 123:16,21,25
137:19 138:15,20 139:10,19
142:18 149:5,10 154:4,14,17,
23 155:5,12,16 156:1,7
162:11,13,21 166:21 168:13,
23 169:5,6,14 175:7 176:13
187:3,5 189:25 190:6,13
194:11 195:7

**damaging** 48:25

**Dan** 32:25 33:3,18

**Danny** 17:6

**data** 68:21 142:8 145:19
146:2,18 147:1

**database** 146:16,17

**databases** 142:5 145:20

**date** 7:21 126:25 185:7 191:23

**dated** 126:24

**day** 26:10,12

**days** 30:17 39:9,10 138:10

**deadline** 183:5

**deal** 119:2 149:21 151:19,21,
22 152:14 153:4,15 154:16

**Deciantis** 5:8,25 6:1,4,6,9 8:2
9:8 16:11 21:1 27:21 38:3 39:5
61:2 86:13 108:24 134:2
163:24 164:18 166:9 193:14

**decide** 76:13,14

**decided** 32:5 66:25 73:6
98:20 99:2

**decision** 10:10 11:14 17:12,
18 114:5,10 134:3 136:20
137:1 151:8,14,17 154:9,11
155:2,11 168:21,22 169:2,10,
13,17 176:12,14,16

**decisions** 12:22 31:18 168:24

**deem** 21:22

**deemed** 22:8

**defendant** 5:20

**Defendant's** 7:24

**definitely** 14:16 21:6 63:12
79:22 80:13 143:1

**degree** 62:3

**delays** 146:21

**denied** 86:23 87:2,3,16,19,24
90:12 91:3

**dep** 6:24 7:24 8:2 82:2 100:23
104:19 105:22,23 118:22
129:14 157:2,3,15,18,24
158:20,22 159:18,20,23

**depend** 21:10

**depends** 52:12 146:2

**depose** 84:21

**deposed** 156:22 158:2,5

**deposit** 142:13

**deposition** 5:7,11 6:6,10,25
8:3,13 9:25 14:4,9,12 23:21
153:1 156:19 177:11 190:21
195:17,19

**designated** 10:8,13 12:18
13:8 51:3

**Desmond** 9:21,22

**deter** 46:4,9,18

**determination** 94:16,17 96:4

**determinations** 138:17

**determine** 23:17 98:16
120:13 121:1 135:1 151:15
153:6

**determined** 80:18,24 96:5,6
98:6 100:3,14 103:12 105:25

109:17 117:1 120:19,21,24
131:1 134:13,17,19 137:8,11
139:9,12 193:3

**deterrence** 46:19

**develop** 12:2

**development** 174:22

**did** 9:2,24 10:1 14:4,6,8,11,14,
17,25 15:5 17:1 20:4 22:14,20
23:1,14,23 32:13 33:21 34:10
39:9 50:8 54:14,18,20,22,25
57:9,11,14,17 59:10,13,19
60:1,15 62:12 64:17 72:5,7
74:3 79:4,9,19 85:24 86:15,20
89:2 90:17 95:21 102:6 104:1
105:13,14,22 106:12 107:8
109:13 110:9 111:3,5 116:1,6
118:18,24 126:25 131:6
134:12 138:19 145:11,12,13,
14 153:18,22 165:7,8 169:5,
11,13 172:22 180:4 190:17
192:7,13 193:9,10

**didn't** 55:20 58:21 59:1 63:7
64:15,23 65:1 85:18 87:21
89:22 98:6 107:10 110:3
115:13 132:10,11,16 144:22,
24 145:9,15 185:5,23 187:24
193:7

**difference** 93:5 135:21
177:10 178:1 179:13

**different** 18:1 24:10 35:10
43:23 46:8 49:7 50:3 51:22
57:21 59:16,17 68:2 75:17,25
79:20 82:22 93:16 95:12,14
100:19 103:10 109:5,8 110:6
116:2 118:12 136:2,3 145:18
152:3 153:5,13 158:12,14
163:18,19 183:8 185:13
187:15 191:16 193:3,4 195:12

**differently** 48:21 179:12

**difficult** 70:14 71:4,10,22 72:4
74:10 100:7,19 141:7 166:21
168:13 175:7,13,16,17,20

**digital** 191:12

**digitally** 19:23

**direct** 9:16 18:5,16 35:25
59:22,24 61:17 63:16 64:11
82:14 86:19

**directed** 138:24

**direction** 24:6

**directly** 17:24 18:8 42:13

**director** 62:13

**disagree** 128:19,22 157:25 159:25

**disbelieve** 191:1

**discovery** 14:20,21 58:22 119:20

**discuss** 59:19 85:18,24 86:20 90:18 111:15,16,17 116:1 138:19

**discussed** 20:7 30:22,25 31:7 32:9 35:12 78:10 85:15 86:2 87:22 88:1,17,18,22,23,24 89:12,16,25 90:7,10,14,22 93:6 97:22 101:10 116:4,9,17, 20 134:22 138:18,22 139:14 140:1 149:11 168:19

**discussing** 137:19

**discussion** 14:22 17:9,15 30:12,17,20 31:6,8 32:6 39:10 54:20,25 55:6,20 56:2,18 57:5, 6,7 99:25 134:10 138:3 172:24 189:9,11,12 193:3

**discussions** 15:11,15 19:13, 20 30:9 54:11 94:16,18 96:6 115:25 116:1,9 135:4,6,9 138:24 139:1,7,20,23,24 140:4 169:12

**dispositive** 142:10,13

**dispute** 14:25 15:2

**disputing** 37:15

**disregard** 93:8

**disservice** 152:23 153:18,21

**distinction** 102:21 108:18 168:20

**document** 14:16 21:22 23:23 38:23 57:21 58:4 86:11,15 90:10,11,14 99:13,17 110:13 116:6,8 165:1,15 173:21 174:15,18,19 182:16

**documentation** 98:23 99:4,9, 10,14,20 101:15,21 102:9,11 110:11 147:5 176:7,8

**documented** 99:23 101:25 115:18

**documents** 14:11,17,19 23:20 37:5 99:22 191:14

**does** 18:19 20:1 23:7,11 24:4 25:11,21 26:4,18 27:4 31:24 32:2 34:9 35:22 36:15 41:1 42:5,13,14,19 48:4,7 50:4,7,17 64:10 67:21 68:3,4,9,25 69:3, 17 72:13,24 74:4,16 75:24 77:20 78:7 91:3 92:15,17 97:4 100:9 102:16,17,22 103:19 104:11 108:2 110:25 112:14, 15 117:4 118:5 119:14 120:17 124:8 133:4,10,11 135:12,18 136:5,12 141:3 142:24,25 144:10 146:5,9 148:3 152:21 162:5 163:1 166:18,21 167:19 168:6,9 170:6,11,13,14,18,22, 25 172:2 179:9 181:22 184:9 186:7 189:4 192:8,9 193:24 194:7

**doesn't** 6:17 32:4 43:17 50:21 61:14,20 65:10 66:20 67:13,19 68:5,24 77:12 81:9,20 84:21 97:1 100:10,18 108:19,21 126:16 130:16 151:19,23 155:6

**doing** 31:16 34:9 40:17 64:5 99:11 135:3 144:16,19 146:3 149:22 150:2,6,18 151:2 152:4,8,10 153:18 155:5 184:3

**dollar** 136:23,25 137:9,21

**dollars** 167:22

**don't** 7:12 20:24 21:19 25:25 28:2 34:23,24 38:16,18 40:20 41:12 46:14 48:10,23,25 49:8 51:10,13,17,23 52:3,19 53:10 57:7 59:24 64:25 65:3 66:19 76:3,5,15 77:23 81:1 82:15,22 83:17,22,24 84:3,10,12,20,22, 25 85:1 87:23 95:7 103:10 104:3,7,20 106:20 107:7,11, 15,16 109:9,12,25 111:14,15 113:19 114:25 115:3,5,7,8,14, 17,19,21 116:22 117:21 121:18 125:16,20,21 126:25 128:22 129:8 131:7 133:15 139:1 143:20 146:3,23,24 149:12,14,17 153:9,17,19,25 154:1,8 155:3 156:25 157:2, 18,25 158:10,15,17 159:7,12 163:6,17,21 172:21 177:4,9 181:20 184:18,19 185:10 186:1 187:9,22 189:18 190:2, 20,23 191:21 194:4,16

**done** 17:13 21:23 29:13 30:15 31:19 50:14 54:2 61:10 64:7 72:3 79:11,13 80:17 98:23 133:13,15 134:25 141:1,21 142:6 170:4 185:10,20 186:23 190:12

**double** 59:2 145:23

**down** 6:14 80:11 195:11

**drawing** 108:18

**dry** 65:16

**during** 8:13 26:12 53:4,6 131:14 138:19 162:6 175:12 190:8

**duty** 152:13,21

**E**

**each** 14:15 33:8 74:22

**earlier** 33:23 40:25 41:2 77:4 90:6 94:7 112:6 126:6 140:8 143:11 162:19 164:18 165:16, 18 166:9 167:9 168:18 169:9

**earn** 131:9

**easier** 113:21 159:9

**education** 62:7 159:17 160:6

**educational** 62:2

**effect** 137:1 187:5

**effective** 149:4

**efforts** 181:3,9,10 182:8 183:11

**egregious** 63:9,10 93:8 143:19

**Eight** 92:4

**either** 15:15 91:9 95:16 119:19 143:15 156:3

**electrically** 126:22

**electronic** 57:25 127:15 146:22

**electronically** 57:13,14 58:6 126:22 165:9,10

**eleven** 95:9

**eligible** 141:1

**else** 13:4 14:8,23 17:1,5 100:2 114:4,11 163:22 173:14

**email** 188:15

**emails** 31:8 188:23

**employed** 9:9

**employment** 9:8 62:9 156:10, 13 157:19 158:7 159:7,13 161:4

**encapsulate** 41:1

**encapsulated** 82:19 83:12 103:7,9

**encompasses** 117:19

**encompassing** 106:12,24

**end** 34:8 43:17 44:2 61:19 120:5 141:13 145:11

**endeavor** 171:13 181:4

**ends** 36:6,20 41:6

**engaged** 35:15

**engaging** 35:11 70:4

**enough** 25:24

**ensure** 181:4

**Entertainment** 62:10,12

**entire** 42:14

**entrust** 145:22 147:1

**erratic** 67:16

**especially** 160:4

**essentially** 61:14 129:10 158:1

**establish** 160:5

**established** 109:10

**estate** 31:21 41:9,10

**estimate** 45:17 94:8,14 102:6, 10,22,23 115:4 176:10 192:21

**estimation** 176:4 178:15

**even** 19:4 53:24 54:4 66:6 93:11

**event** 50:2 70:12,15 71:2

**ever** 6:9 22:4 54:23 59:21 85:15 126:25 138:19 139:20 142:23 147:9 190:12,20 191:17

**every** 23:16 161:9 187:13

**everybody** 22:4 84:20 100:2 192:14

**everything** 6:14 103:2 115:5 117:3 151:22 163:7 193:21

**evidence** 6:8 99:19 101:7,13 110:12,14,16,20 141:16,18,19 176:9

**exact** 73:13 93:4 181:2

**exactly** 68:19 76:16 93:21 142:6

**example** 22:3 24:14,20 26:14 27:9 43:24 47:1 77:17 116:19 119:1 149:24 152:3 158:19

**except** 178:23,24 179:2 193:22

**exception** 193:25 194:8

**exchanged** 31:9

**exclusively** 18:9,10

**excuse** 168:7 170:14 193:19

**executed** 22:18 23:15 56:1,8, 9 178:24 179:10,24

**exhibit** 7:24,25 20:19,21 27:17,19 28:25 29:1 37:9,10, 22 38:13 44:10,18 57:16,19,23 58:2,19 63:16 70:8 86:7,9 91:7 100:6 118:1 125:1 126:19,24 131:23 132:4 164:1,7,8 165:1, 4,11,12,13,19,21 166:1,5,6,7 169:21 170:9 171:20,23,25 172:1,24 173:3,23 174:7 177:23 178:2 180:12,14 191:4, 5,7,13,14 193:19,20

**exist** 55:20

**expect** 25:21

**expectation** 25:23

**experience** 119:14

**experienced** 121:2

**experiences** 124:7

**experiencing** 121:24

**explain** 17:23 26:5 28:9 63:11 83:8 94:24 95:3 100:10 120:1, 2 128:23,25 135:21 140:15 146:8 167:11

**explained** 109:6 131:16

**explaining** 131:14,17 140:10

**explanation** 94:19

**explicitly** 122:1

**extent** 55:11 71:13 81:25 83:2,21 84:15 88:3,6 100:13, 21 102:19,20 103:23 104:5,13 105:21 106:22 108:17,23 112:1,23 113:14 117:17 152:17,24 162:16 179:19

**extra** 38:16

**F**

**face** 18:16

**Facebook** 37:12 39:7 49:4 50:8 51:11,23 52:7 53:1,4,7 129:14 130:13 131:11,14 176:19 181:17 187:13 188:10 189:8,17

**fact** 70:6 105:14 163:17

**factor** 32:13 33:21

**factored** 33:25

**factual** 11:21

**fair** 102:6,21 104:3,11 107:10 165:20 178:15

**Fairway** 8:20 11:1,5,8,11,18, 20 23:5,11 28:12,13 31:15 32:18 33:24 34:18 35:3,7,13, 23 36:11,14 40:11,12,22 41:2, 21 44:16 45:5,14 46:5,7,10 47:8 48:8,25 49:16 50:5 51:12, 19,25 53:14,21,24 54:4 61:4 62:19 63:4,14 64:4,12,18,24 65:14,21 67:4,7 69:12 70:5,18 74:13,22 75:16 76:9,14,19 77:7 78:14 91:12 93:4,12,23 95:2,10,22,24 97:2 102:13,18 111:1,22 113:7,13,25 114:20 117:14 118:3,6,18 119:1,3,15, 22 120:18 121:9,21 128:7,18, 20 129:10 130:6,7,17 131:4, 15,18,19,25 132:5 133:4,8 134:14 135:1,3,10 138:5 143:15,25 146:10 147:7,17 148:5,13,24 149:24 150:3,5,11

151:10,18 152:3,22 153:11 154:11,24 155:2,22,25 168:8 172:8 192:18

**Fairway's** 42:6

**fall** 132:25

**fallout** 132:22

**family** 42:1

**far** 96:19 125:25 159:20 192:15

**favorable** 152:4,22

**Federal** 6:7,8

**fee** 26:10

**few** 39:10 133:14 163:23 174:2

**fiduciary** 152:13,20 153:3

**figure** 41:12 175:4

**figured** 173:15,16,24

**filed** 15:23 143:15

**final** 193:8 194:10

**financial** 37:5

**find** 24:17 145:24 152:14 154:16 174:21

**fine** 87:15 109:13 111:19 171:18 182:17

**finish** 7:7

**first** 8:8 14:25 15:5 23:8 30:21, 23 31:6 33:25 64:23 70:2 71:1 86:17 128:4 145:9 163:25 193:21

**five** 12:24 30:17 68:9,15,24 86:2 91:21 93:22 95:24 138:9

**five-year** 157:9

**flat** 26:10

**focus** 51:23 113:20 128:16 151:5,6

**focusing** 57:4 151:6

**follow-up** 192:20 194:18

**follow-ups** 174:3 193:14

**forever** 36:7 140:13

**form** 13:6 17:14 20:9 21:18 22:22 24:1 26:19 27:25 29:20 31:25 32:14,24 33:11 34:11 35:24 42:11,21 43:18 46:20 49:2,10 51:1 52:4 54:6 55:10 56:21 62:23 65:5,22 66:13 68:7 75:8,18 76:25 77:14,22 79:1,21 80:19 81:6 83:1,20 85:3,22 86:4 88:2 92:16 93:24 94:21 97:6,11,24 98:8,24 99:6 100:12 101:8,17,24 105:20 107:12 111:4 117:7 118:15,21 119:16 121:11 123:20 124:17 129:12 130:8,21 131:20 132:12,20 134:21 136:19 137:3 138:2 144:2 145:1 148:6,14,25 149:6 154:7,19 155:7 161:11,23 162:15 165:22 166:24 174:14 175:14 177:3 179:4 181:25 182:10,11, 15,19 183:17 184:5,6,20 185:12,13 186:9,25 187:12 188:4,6,14,18 191:16

**formalized** 31:10

**formula** 78:16,22 79:8,9,23 80:6,9,20,24 96:9,11 99:14 101:25 114:25 115:3 116:3,6, 9,18,21,23,25 121:1

**forth** 62:17 178:23 193:22

**Fortz** 5:14

**forum** 52:5 177:16

**Foster** 16:23

**found** 64:17

**foundation** 13:7 17:14 20:9 24:1 27:25 29:14 32:19,24 33:14 34:11 35:24 43:9,18 44:3 48:14,19 49:2,10 51:1,14 54:6 56:21 65:5,22 66:13 67:14,23 68:16 71:12 77:14 78:18 80:19 81:6,25 82:17 83:1,20 85:3 86:4 88:2 92:16 93:24 97:6 99:16 100:12 101:8 105:20 107:12 108:21 109:9 110:7 111:4 113:1 115:12 116:5,11 117:16 118:21 119:5, 10,16 122:6,13 123:3,9,20 124:10,17 129:12 130:8,21 131:20 132:2,12,20 134:21 136:19 138:2 142:19 148:6,14, 25 149:6,16 150:7,20 152:16 154:7 155:7 161:11,24 162:15 166:24 168:14 179:4 180:7,25 181:25 182:15 184:20 185:12 186:9,25 194:2

**four** 14:7 91:19

**frankly** 146:24

**free** 172:3,7

**from** 6:25 10:17 14:8,23 16:6 18:1 19:3 20:4 22:8 23:10 24:8 26:4,18 27:4,10,13 31:23 34:5 47:3 54:15 58:15 60:22 62:5,6 64:5 78:8 105:3 111:6,23 127:16 128:2 130:13 132:22 133:22 135:16 141:23 142:23 143:2 145:19 148:5,12,23 162:19 170:15 171:12 172:17 174:14,22 178:9 181:8 188:16 194:7

**front** 28:5 136:21

**full** 6:3 13:14 82:19 115:17 127:9

**fully** 14:2

**funnel** 153:16

**further** 25:8 87:9 104:16 193:11 195:14

G

**gap** 18:18,21

**gathers** 146:17

**gave** 177:6

**general** 160:3

**generally** 20:12 25:10 119:18

**generate** 26:4,18

**generates** 10:17 27:4

**gets** 124:13

**getting** 27:10 66:1 84:9 98:9 106:3,4

**Gilbert** 32:25 33:3,19

**give** 6:15,18 13:17,20 16:16 46:25 94:19 115:4 116:18,19, 21,23 166:12 173:14

**gives** 43:16

**giving** 95:12 164:25

**glasses** 20:24

**go** 6:12 10:6 16:2 18:5 23:4,16 24:16,22 29:21 31:18 34:7

37:22,23 40:6 43:2,5 44:5,17 50:11 52:8,10,18 61:13 65:14 66:19 67:4 69:17 70:8 79:22 89:3 91:7 103:25 119:3 120:4 121:8 124:12 125:25 126:17 129:4 133:17,20 141:17 143:8 146:4 150:13 154:21 159:15 160:9,14 163:6 164:1 167:12 172:10 180:11 187:5

**God** 5:24

**goes** 26:17 36:2 61:15 102:14 120:18 140:12 141:11,22 142:13,23 151:8 160:13

**going** 6:12 7:6,23 15:10 16:4 20:19 24:25 25:1 34:2 38:19 40:16 41:9 47:22 58:12 60:20 64:1 65:7 67:7 69:10 76:13 81:24 86:6 98:21 99:3 108:16 116:12 119:19 120:6,16 125:18 128:8,12 131:8 133:17, 20 134:2,14 138:21 142:12 151:25 156:17 157:1,14,16,17 158:13 160:8,10,11,21 164:9 167:3,4 171:17,22 172:15 192:7 193:18

**gone** 118:8,11 142:16

**good** 5:5 24:14 40:20 41:16 119:3

**goodwill** 11:10 72:1,9 73:9 74:8 75:10 79:6,11 94:10 97:13 98:1 116:14 119:14,21, 23 120:2,4,7,9,18,24 121:1,3, 9,14,20,22,24 122:11 123:7 124:1,3,8 194:14,15,22

**got** 25:21 27:13 36:9,21 40:7,8 46:14 81:12 88:9 95:18 136:8, 16 137:14 139:16,18 141:8,9 144:9 163:21 175:3

**governs** 84:11

**graduated** 62:6

**grand** 21:23

**great** 125:16 172:19

**greater** 70:17 72:17,21 73:22

**ground** 6:13 87:8,10

**group** 17:9 31:6 32:6 138:3 139:24 169:2,6 176:13,16,19

**grow** 40:6,7 42:1 76:11,13 128:14 167:17

**growth** 9:23 16:18 73:8,14,17 79:6

**guess** 18:20 20:12 22:1 23:11 25:10 27:9 35:5 37:5 42:5,16, 18 43:23 44:14 45:13 46:8,17, 25 47:11 48:17 49:7 50:3 51:22 54:3 58:25 60:11 65:9 67:3,19 68:2,11,23 69:8,22 72:3,23 74:12,25 75:24 76:18 78:21 79:8,13 82:21 83:6 84:3, 9 89:14,22,23 93:10 94:13,18 95:4 96:2 98:5,8 100:17 102:3 107:15 110:5 112:11 113:19 119:1,17 120:7,12,23 126:16 129:20 135:17 137:20 138:8 139:18 142:10 144:15,24 146:5,11 148:10 149:20 151:14 152:7 154:13 155:4,14 156:25 157:13,20 158:12,16 159:15 160:10,20 162:2,22 164:1 174:15,17 175:19 177:10 179:15 180:1 181:16 183:13 184:9,24 185:16,24 186:13 187:15 189:3,24 190:8 191:6,22 192:23,24

**guessed** 52:16

**guessing** 123:13

**guide** 171:11

**guys** 27:14 61:16 63:24 65:11 79:9,18 102:6 134:10 136:16

### H

**had** 6:9 15:11 22:7 30:16 31:21 34:2,3 54:7 56:14 57:6 59:21 60:13 62:17 79:23 83:3 87:12 89:4 112:17 118:13 134:10 135:2,6,7 136:16 137:6,15,17,21,24 138:4,15,17 139:15 145:6 147:6 156:9 165:1 172:24 173:3 187:3,13 188:15,16 190:12 192:3

**hairs** 95:5 111:15

**hand** 5:23 99:19 164:9 171:22

**happen** 39:9 65:1 69:11 77:9 132:9 142:24

**happened** 130:23 143:10 147:9

**happening** 143:7

**hard** 108:20

**harm** 31:17 54:1 168:3

**harmful** 65:24 66:1

**harms** 42:24

**has** 10:8 13:5 19:22 21:19 36:5,15 42:7,9 43:20 58:2 64:13 66:23 68:21 104:12 105:4 111:25 115:16,17,20 119:11 127:3 140:22 143:10 147:9 150:9 153:5 156:1 159:13 179:11 186:23

**hat** 78:25

**have** 6:9,21 7:2,8 8:3,6 9:16 13:14 21:4,6 23:7,11,16 24:7 25:8,20,25 31:24 32:2,4,21 33:9 34:10 36:14,15 38:16 39:12 40:11 42:6,13,14 44:21 47:7 51:18,25 52:8,10,16,18 54:20,25 55:3 56:14,24 57:20, 22,23 58:3,15,17 59:1,2 60:1, 17 61:6,9,10,15,19,22 62:3 63:6 64:10 69:21,23 70:2,4,24 73:11,13,15 74:4,16,22 75:15, 25 77:1 78:16,21 83:4,24 84:11,13,21,23 85:10 86:11 88:3,18 89:21 98:6 101:7,13 103:19 104:3,4,11 107:7,11 108:21 109:25 112:25 114:25 115:3,5,8,11,14,19 117:11,15, 21 118:6,8,11,13 119:7 122:23,24 123:14,18 125:3,9, 13,19,23 126:16 127:5 133:14 135:15,22,23 136:4,14 138:16 139:15 140:9,12,23,24 141:3, 16,18,21 142:1,8,20 143:11,18 145:6,19,23 146:4 149:12,17 150:22 151:19,23 152:11,13, 21 154:3,17 155:5,12,16 156:1,13 160:11 163:21,23 164:10 166:15,16 170:13,14 172:21 173:6,11,17 174:2,7,21 175:4 176:7,9 180:18,19 181:19,21 183:1,4 184:9 185:10,20 186:20 187:7,20 189:19 190:9,20,25 191:23 192:9 193:7,11 194:16 195:10

**having** 144:7

**he's** 131:8 181:21 183:25 191:2

**head** 73:11

**hear** 16:3 106:20

**heard** 6:2 192:9

**help** 5:24 14:8 64:1 76:11 128:14 148:23 152:14

**helping** 41:25 42:1 125:18

**helps** 151:15 163:9

**here** 8:10 10:6 23:18 38:7 40:8 49:12 64:14 72:12 74:9 84:11, 17 90:10 95:5 111:15 125:7 144:23 185:5

**here's** 59:20 81:22 99:21 100:18 128:3,6 174:13 182:25

**hey** 31:3 37:5,22 48:24 51:11 59:19 64:3 67:6 79:9 81:9 98:17 99:21 111:17 121:24 125:21 128:13 130:5 141:10 142:11 145:10 146:9 182:25 183:1,14 184:25 185:5 186:15, 20 189:12

**High** 5:20 6:1,2,5,12,20,24 7:5,10,16,23 8:1 9:4,6,7 13:13 15:20,24 16:2,10 17:17 20:11, 19,25 21:25 22:25 24:3 25:4,5 27:17,20 28:3,24 29:2,4,5,15, 24 32:1,16,22 33:1,17 34:13 36:8 37:9,11,17,20,21 38:1,2, 18,20 39:4,24 40:1 42:12,25 43:10,13,22 44:6,19,23 45:3 46:3,13,16,24 47:15 48:16,22 49:6,13,23 50:16,19 51:5,9,16 53:2 54:9 55:15 56:7,9,12 57:1 58:1,8,16 59:3,4 60:9,10,19 61:1 62:24 65:8,25 67:2,18 68:1,8,22 71:16 75:11,23 77:3, 16,24 78:2,20 79:3,25 80:22 81:8 82:6,20 83:5,16,23 84:8, 19 85:6,12,23 86:6,10 87:14 88:12,15 89:3,9,19 92:18 94:2, 23 95:6,12,15,17,19 96:1 97:8, 14,20 98:4,12,15 99:1,8,18 100:16,25 101:12,20 102:2 103:3 104:2,9,17 105:11 106:2,5,9,17,25 107:14 109:2, 11,15 110:10 111:7 112:5 113:3,18 114:20,22 115:14,15 116:7,16 117:10,20,25 118:17, 25 119:8,13,19,25 121:12 122:9,16 123:5,12,24 124:14, 22 127:2 129:19 130:1,11,24 131:22 132:3,15,24 133:12,17 134:1,24 136:22 137:7 138:7 139:5 140:3 142:22 144:3 145:3 147:3 148:1,9,18 149:3, 8,19 150:12,24 151:13 152:19 153:12 154:12,25 155:13 156:20,24 157:4,20 158:4,16, 24 159:2,5,15 160:1,15,18,19 161:3,15 162:1,22 163:21 164:11,13,18 165:1,16,22,25 166:24 168:14 172:12,14 173:1,4,9,12,15,19,22,24 174:2,6,10 175:15 177:5 178:3,5,7 179:6,25 180:10 181:15 182:4,23 183:20 184:8, 23 185:15 186:12 187:6,16,23 188:8 193:11 194:2,18,21 195:14

**highly** 142:15

**Hills** 7:18

**hold** 141:8

**holistically** 105:10 163:3

**honest** 45:17 66:25 79:15 175:22

**honestly** 181:19

**hope** 25:23

**hour** 134:5,10,13,17 137:1,9, 19 138:9,13 139:12 161:9

**hours** 14:6

**house** 26:16

**how** 7:19 9:18 10:14,17,23 12:23 14:6,17 16:18 17:13 21:10 22:3 26:4,5,8,18 29:13, 18 34:14 37:6 42:4,19 52:5,6 54:21 57:12,14 61:22 65:6,9 66:7,15 68:19 71:6,7,8,17,20, 23 72:7 73:6,10,12,23 74:17 75:21 77:19,20 78:7,8,16,22 79:4,11 80:18,24 81:12,22 83:8 91:15,17 92:19 93:7 99:21 102:16,17 103:1 105:24 108:25 110:9,25 111:1,20 114:4,10,17,23 115:1,4,22 116:18 120:7,10,12,17,18,21, 23 121:2 122:17,21 123:7,10 124:1,5,8,11,19 134:4 135:1, 12,17 136:5,14 139:16 140:10, 20 142:2,6 143:12 144:6 146:8,9 147:15,22 149:1 157:11,13,17,19 159:7,12,18 160:6 167:18 174:17,24 175:4, 6,10,20 179:14 184:7 185:22 186:1,10 189:1 191:8 195:10, 11

**how's** 66:1 156:15

**human** 167:24

**humor** 156:9 158:21

**hurt** 40:23 44:2,7,8 69:17 129:8 155:6

**hurting** 40:5,10 43:17 64:2

**hurts** 149:14 155:15,17

**hypothetical** 43:19 68:17 150:8,21 158:11,13,14 159:9, 10 161:6,12

**I**

**I'D** 51:5 58:25

**I'LL** 24:12 59:2 133:12,14 140:12 173:25 194:5

**I'M** 5:13 6:12 7:6,23 8:13,16, 19,20 11:20 15:4,10 19:10 20:19 22:13 23:7 24:12 25:1, 10 26:14,24 29:8 32:17 37:14, 15 38:18,19,20 40:2,24 43:2 44:16,21 45:20 50:21 51:22 54:19 55:5 56:13,23 58:10,12 60:4,6 63:25 64:1 69:8 71:14 74:19,24 75:21 76:15,16 77:24 81:24 83:4 84:9 86:6 87:2 89:1,13 90:8,12 95:5,12,23 98:9 101:2 103:4,5,22 105:24 106:3 107:2,6,8 108:16,25 110:3,19 111:10 113:10 114:20 116:8 117:13 119:19 121:7 123:14,25 125:20,22 126:12 128:3 129:6,9 132:16 133:17 137:14,15 138:21 140:5 142:15,25 143:10 145:4 147:21 153:20 156:12,17 157:14,16,20 158:24 159:3,5, 6,19,22 160:8,10,11,16,23,25 161:2 162:23,25 163:18 164:9, 14 169:16 171:22 176:24 177:11,15 178:8 179:12 180:8 182:11,18 183:4 184:7,24 185:20 186:10,13 188:12,14 189:1,2 190:10,15 191:3 192:7 193:18 195:15

**I'VE** 14:16 40:7 109:6 156:3 162:18

**idea** 166:12

**identification** 7:25 20:21
27:19 37:10 86:9 136:1 164:7,
8

**identified** 104:22,25 107:3
121:15,16 158:8

**immediately** 70:16

**impact** 42:13,14

**implement** 11:14 168:19,21
169:3 176:12

**implemented** 30:18 148:10,
22

**implementing** 30:8

**imply** 184:15,18

**important** 6:15 48:23 49:1,8
51:10,13,24 52:3,20,24,25
53:3,6,10 82:15,23,24 83:17,
24 84:4,10,13,20,23 117:11,
15,21 189:19 190:2,10

**impossible** 70:14 71:4,11,22
72:5 100:8

**in-house** 15:16

**inaccurate** 37:15

**inappropriate** 158:9

**Inc** 5:21

**include** 28:19 29:1 102:22
108:20 112:4 168:22

**included** 45:16 56:25 103:1,
21 123:16 151:22 162:21
164:22 169:15

**includes** 166:4

**including** 12:24 139:21
171:10

**inclusive** 18:7 105:17 106:1

**income** 10:17 26:4,18 27:4

**Incomplete** 43:19 68:17
150:8,21 161:12

**Incorporated** 5:9

**independent** 12:3 40:11,12,
22 41:21 70:19 128:8 135:17

**indicate** 193:24 194:8

**indicated** 15:22 46:15 88:13
106:7 129:24 147:23 187:18

**indicia** 151:15

**indirectly** 42:9

**indiscernible** 43:8 147:18
178:4

**individual** 8:11 16:19,22
135:22

**individually** 145:7,8

**individuals** 30:10 31:16
135:19 136:10

**industry** 12:16 18:20 19:5
24:13 34:15 36:13 37:1 42:17
141:5 188:18

**information** 13:21 24:18 52:8
88:6 106:19 146:6,17 147:4
159:12 161:19,21 162:4 163:1

**infrastructure** 141:4

**initial** 24:18 38:10 96:13 134:2

**initially** 73:18 138:9 144:24
145:4 163:12

**initiative** 28:7,10 31:21
138:10,14

**ink** 57:24

**input** 54:15 60:1,17 98:6,17
193:7

**insert** 10:10 21:4 24:18

**inserted** 22:4 45:11 59:13
85:14

**instance** 190:16

**instead** 130:5 131:18

**instruct** 157:16,22 160:12,21

**instructing** 158:17

**instruction** 187:14

**instructions** 171:6,9 178:11

**instructs** 7:2

**intentional** 38:21

**intentionally** 168:3

**interest** 43:24,25 150:5,16
151:2

**internal** 167:14

**interpret** 179:10

**interpretation** 129:18 130:2,

4

**interpreted** 143:13

**interpreting** 143:12

**interrupt** 89:2

**invested** 66:23

**Investment** 5:9

**Investments** 5:21 8:17

**involved** 30:23,25 35:18
100:3

**irrelevant** 87:1,8,20 90:11
156:18 160:7

**Ishbia** 16:17 33:2 39:5 50:8
63:17 176:20 177:16 180:4
181:17 191:23

**Ishbia's** 33:18 37:12

**isn't** 19:5 21:15 25:23 36:24
43:4 44:2 47:8 48:17 77:5
81:5,15,23 83:7,8,10 85:7
94:11,15 100:19 112:18,21
123:1 124:15 131:11,12,14,17,
23 132:18 150:18 158:18,19,
21 162:13 174:15,16 184:11

**it'd** 51:10 159:8

**it's** 6:14 7:11 20:10,23 21:21
24:22 25:1 26:8,17,22 36:21
37:12,14,15 38:15 41:12,24
42:20 43:1,5 47:19 49:11 51:6
61:17 63:8,13 65:16,19,20,23
66:3,5,10,15 68:19 72:21 74:1,
2,9,10 76:2,5 79:10 80:25
81:14 82:1,19 84:1 87:1,20
88:4 91:9 93:25 94:1,3,20
95:16,25 96:10 98:17,18
102:20 104:8 106:24 107:9,10,
13,21 108:21 110:18,22 111:6,
11 112:13 113:8,9,21 114:8,16
122:1,3,11,14,21 123:6,18
124:2,15,23 127:14 132:4
138:25 141:6 142:4,5,13,15,
16,25 143:4 149:1 152:25
154:16 155:9 156:18 157:2,5,
9,12,22,23 158:10,13 162:3
163:20 165:5 175:19 178:12
181:3 182:11 184:11,12
188:23 195:11

**iteration** 21:24

**itself** 45:21 61:18 98:17 148:3,
4 168:10 169:20 178:18

179:18 180:2,6,22 182:12 184:4

J

**Jacobson** 32:21

**Jacques** 5:13

**job** 41:12

**just** 6:2 7:7 8:13 9:1 10:6 13:4 15:10,15 17:15 18:8 19:10 24:11,24 25:2,12,22 26:13 28:18,19,22 29:6,16 30:19 31:12 32:2,6 33:24 34:24 35:19 36:9,24 37:13,15 39:2 41:14 44:25 45:20 49:20 50:20 51:5,22 55:5 56:5,13 57:2,4 58:2 59:5 61:12,19 62:25 63:1 64:7,9,15 65:15 66:10 67:20 68:25 72:8 75:1,12 77:4 78:7, 23 79:6,14 84:17 85:21 87:2, 21,24 89:4 93:25 94:11,15 95:4 97:15 98:9 100:3 101:1,3, 5,10,22 102:4 104:4 105:12 106:20 107:16 108:16 110:14, 24 111:16,18,19 112:6,21 113:4,19,20 117:1 119:6,19 120:22 121:5 122:23 123:13, 14 124:1 125:6 126:17,23 127:19 128:3,10,17,24 129:6 130:19,23 131:10 133:12 134:2,9 136:1 138:6,21 139:22 141:9,20 142:8,11 144:6 145:10 146:1,11 147:12,13 148:2,3,19 149:4 150:13 151:11 153:3,9 154:13 155:3 157:2 158:21,24 159:5,7,19 160:16,23,25 162:14 163:25 164:9 172:10,13,22 173:5,7,20 174:2,14 179:7 182:11,25 183:6 185:5 186:14 187:12 189:10 190:18 192:20 193:13 194:2,18

K

**Katie** 16:23

**keep** 171:17

**Kevin** 177:13 190:21 192:3

**Kevron** 5:9,21 8:16 10:20 11:18,25 12:7,13 19:14 20:4 22:6,15,20 23:2 31:24 32:3,4 34:10 42:4 54:12,15,18,21,25 55:1,7,8,21,22 56:2,3,13,19, 20,24 57:3,4,5,8,10 58:3,15 59:7,10,19 60:1 61:3,5 62:19 64:19,23 66:15 67:12 73:24 74:2 75:2 77:5,23,24 78:3 85:15,24 86:21 87:11,22 88:6, 17 90:18 91:12 96:16,22 98:6 109:17,22 110:2 111:1 114:15, 18 126:2,3,25 127:3,9,16 144:22 164:22 190:21,22

**Kevron's** 22:3 58:4 62:25 63:2 75:13 86:7 165:13 174:17

**key** 25:15

**Keyword** 123:17

**kind** 25:14 124:13

**kinda** 102:24 178:6

**knew** 136:16 167:3 168:2

**know** 7:6,11,12 13:11 15:25 16:1,15 18:17 19:13,16 20:12, 22,24 21:19 25:6 26:21 27:11 28:2 31:1 34:24 36:10 38:3 41:12,19 44:14 48:24 49:1,9 51:7,11,13,17 52:3,25 55:16 57:2,7,8 59:24 62:17 63:25 64:15 65:2,17 70:6 71:6,8,20, 23 74:9 77:23 79:8 80:7,9,16 81:13,20 82:3,16,23,25 85:2 86:25 87:3,19 93:7 107:17,18 111:8,10,11,19 114:4,11,17,23 115:1,7,17,22 116:22 118:23 120:10,13,17,18,21,23,25 121:2 122:4,10,17,22 123:7,11 124:2,9,12,20 126:17,20 128:8,17 129:16,17 133:15 138:12 139:18 140:12 146:9, 12,25 147:12,15 152:17 156:25 160:4,22 162:5 163:2, 17 167:18 169:22 170:3 174:17,19 176:3 181:4,20 182:11,20 190:3,10,20 191:8, 17,23 192:16,20 194:24 195:1, 4,7

**knowledge** 8:23 10:9,14,17, 20,23 11:1,4,7,10,13,17,21,24 12:2,6,9,12,15 13:5 15:9 61:6 70:7 88:18 89:8,13 90:1,8,9, 13,24 105:8 108:11 137:23 141:17 160:5 195:10

**knowledgeable** 80:1 90:25

**known** 189:17,20

L

**labeled** 24:16

**lag** 67:15 93:6

**landed** 193:1

**language** 21:5 82:10,11 84:2 169:17 170:13,14 171:24,25 181:2

**larger** 97:2 120:3 136:11 181:11

**largest** 18:11,17,19 19:4,6,11

**last** 8:7,8 15:6 27:14 37:23 41:5 86:16,17 125:8 184:12

**later** 30:14 138:10 173:7

**launched** 28:10

**law** 70:25 157:21

**lawsuit** 15:1,5,9,23,25 16:12

**lawyer** 109:14

**lead** 141:5

**lean** 38:19

**learn** 14:25 15:5 162:5

**learning** 162:3

**least** 116:18 132:11,19

**leave** 40:21 44:5 61:12 66:18 121:4

**leaving** 40:22 66:4 120:6

**leeway** 159:1,7

**legal** 5:14 12:19 13:3 14:5,8, 23 15:8,12,16 16:24 17:19 20:10,16 21:10 29:12 30:1 55:11 71:13 81:25 83:2,21 84:16 85:10 88:3,10 90:16 91:4 100:1,2,13,14,22 102:20, 24 103:24 104:6,14,16,25 105:7,21 106:23 112:2,24 113:2,15 117:17 138:15,17,23, 24 139:1,4,9,15,23,25 140:1 152:16,25 162:16 166:25 168:14 169:9,11,12,13 179:12, 20,22 193:6 194:3

**lender** 17:20 18:4,12,18 19:7, 8,11,17 26:4 35:6 43:16 66:8

70:20 75:25 84:12 93:16 118:9,12 141:13 142:12 145:19 146:20 149:21 150:15 151:1,16,18 152:3 162:5

**lenders** 18:2,6 19:2 27:23 32:5,8,9,11 34:14,18 35:11,15, 18,20 36:12 42:16,18 69:12, 17,20,23 70:1,3 121:13 125:15,16 128:13 142:17,21 149:14 163:1,19 180:20

**less** 27:10 134:8

**let** 6:5 7:7 36:9 39:15 40:4 44:25 46:25 53:15 67:3 75:1 109:3,4 128:16 156:9 165:24 169:22 170:3 181:16 182:19 190:2,10 193:19

**let's** 18:7 26:14 33:24 43:1 77:17 91:7 161:6 164:1

**letting** 65:3

**level** 27:6,8

**licensed** 41:11

**lieu** 70:23

**like** 18:7,19 19:16,17,24 24:25 25:14 26:5,21 27:2,3,7 31:3 43:23 51:6 57:24 61:6,9 67:15 72:3,24 73:2,5,24 74:5 75:16, 25 77:4 79:9,13,14 93:11 95:16 99:22 120:17 122:23 127:7,10,20,22 136:2 138:3 140:14 146:9 157:9 158:19 159:10 160:22,25 161:16 162:2,5,25 174:18 177:16 189:5 190:18 191:19,24 192:10 193:2 195:11

**likely** 21:8 142:15

**limited** 171:11

**line** 23:17 50:15 82:14 90:14 129:13 157:1 158:9 160:9,13

**liquidate** 70:22

**liquidated** 10:10,14,23 38:7 44:11 45:8,10,16,21 48:6 50:9, 23 51:7 53:12,24 54:5 55:3,14, 17 59:12 60:1,17 62:18 66:5 67:1 70:11,20 71:25 73:1 74:17 75:20 78:9,12 81:11 82:24 83:18 84:5 85:2,8,14,18 90:18 91:8 92:20 98:21 102:17,21 103:2,4,5,9,11,12, 21 104:4,8,12 105:5,9,15,17 106:1,12,13,20 107:9,13,16, 18,23,24 108:8,19 109:7,16,25 110:4,15,18,22 111:6,9,16,18, 24,25 112:3,10,19 113:6,17 114:9,16 116:15 117:5,18 122:3 123:15,21,25 137:19 138:15,20 139:10,19 142:17 149:5 154:3,14,17,23 155:5, 12,16 156:1,7 162:10,13,21 168:22 169:5,6,14 176:12 187:3,4 189:24 190:6,13 194:11

**listed** 8:24 13:4

**listing** 10:3

**little** 57:4 147:13

**live** 7:17 37:12 39:7 49:4 50:9 51:11,23,24 52:7 53:1,4,7 129:14 130:13 131:11,14 176:19 181:17 187:13 188:10 189:8,17

**lives** 159:17

**living** 21:21

**LLC** 5:9

**loan** 10:24 11:8,10,25 24:19, 20 25:14,19 26:18,19 34:17 35:2,6,20,22 36:1,6,19,22 37:6 40:13,15,20 41:10,15 43:14 44:1,8 48:24 52:1 53:8 61:3,15 62:19 65:14,18 66:2 67:12,21, 24 70:17 72:12,17,22 75:5,16, 24 76:19 77:18,20 78:3,7,12, 13 91:9,12 92:10,23 93:3,11, 12 94:11,15 95:2,24 111:11 119:3 120:18 135:15,23,24 140:12,24 141:6,7,10,11,22 142:23 143:5 145:9,13,14,16, 18 146:1,10,20 147:6,7,11,16 149:13 150:3,5,11,15 151:1 152:21 153:6,25 154:14 168:7 170:12 171:9 178:11 182:3 186:5

**loans** 10:18 11:18 27:10,12,13 31:18 34:7 36:12 40:19,20 42:23 44:15 45:5,14 46:5,7,10 47:7,9 48:8 49:15 50:5 51:12, 18,25 52:21 53:14,21,23,25 54:4,22 61:12,19 63:9,12,14 64:19,24 65:4,7,11,16,19,20 66:4,18 67:4,6,16 68:9,15,24 69:9,17,24 73:2 74:1,2,4,13,21 75:21 76:8 77:7 91:15,17,19, 21,23,25 92:2,4,6,8,10,21,23 93:3,7,15,22,23 94:25 95:8,9, 21,25 96:22,23 97:2 102:12,18 111:1,21 113:6,13,24 114:14 117:13,14 118:2,5,8,11,18,20 119:15,21 120:4,16 121:4,8,21 131:24 132:5 133:7 141:17 143:14,19,22,23 145:5 146:19 148:5,8,12,24 149:13,21 151:12 155:21 156:2 171:10 178:12 184:21 187:25 189:11, 13 190:3,7

**located** 141:25

**long** 7:1 41:23 47:2,4 61:22 134:4

**longer** 36:14 154:10

**look** 23:16 26:8 52:18 171:22, 23 173:10 178:20

**looked** 105:10

**looking** 55:13 145:21

**looks** 127:7

**LOS** 31:22 34:4

**lose** 35:22 61:16 121:13 129:10 130:7,17 131:19 132:18 133:4

**loses** 120:4 121:9 122:11

**loss** 11:10 41:14 73:2 79:10 103:16 119:14,20,23 120:1,7, 24 121:1,3,20,24 123:6 124:1, 7 131:4

**lost** 120:10,13,15,17,18 128:10,17,24 131:10 140:13 141:6

**lot** 7:5 52:9,11,12 124:12 143:22,23 162:19 167:20

**loud** 39:23 40:2 63:22 70:9 178:21

**low** 141:24

**lower** 150:15 151:1

M

**ma'am** 107:1

**made** 12:22 17:12,18 21:16, 20,23 22:9 29:7 31:13,18

54:10,14 57:9 68:10,11 69:9
72:6 114:5 134:3 137:1 168:24
169:9 175:22 178:13 182:7,9,
21 183:9,10 185:4 186:18
187:2,7,20,25 189:17

**mail** 191:19

**mailed** 191:17

**maintain** 12:2 160:8

**majority** 36:17

**make** 25:2 36:9,17 45:1 65:3,
10 67:11,20,21 68:3,4,5,9,14,
24 69:1,3 92:15 114:10 127:12
128:10,16,23 133:10 141:4
145:23 154:11 155:2,10
166:21 167:8 169:11,13 181:3,
8,9 183:10,14,18 185:3,8,17
189:19

**makes** 20:15 68:10 69:6
93:19,21 151:9 177:25

**making** 102:20 151:14 154:9
184:25

**manual** 146:22

**manually** 145:19

**many** 9:18 12:23 14:6,17
21:20 34:14 52:5,6 65:18 93:7
135:2,12,17 136:14 157:11

**March** 29:10 54:10 57:9 59:6
125:14,19 180:19 181:22
183:1 186:20

**margin** 26:7,19

**Margoy** 17:6

**mark** 7:23 20:19 27:17 86:6

**marked** 7:25 20:21 27:19
37:10 86:9 164:2,7,8 165:21

**market** 26:10

**marketing** 9:13,15 24:7 59:17
61:25 62:1,3,15 66:24 72:8
73:7 79:5 98:1 166:15 167:13

**marketplace** 135:3

**Mat** 16:17 33:2,18 37:12 39:5
50:8 63:17 176:20 177:16
180:4 181:16 191:23

**math** 80:17 99:11

**Matt** 5:20 9:2 24:24 37:25
38:17 50:14 58:25 98:14

157:1,16 159:1,25 164:9
172:23 178:1

**matter** 5:8 26:11 95:21

**matters** 157:19

**Matthew** 6:1

**may** 5:2,6 6:25 7:5,6,10 20:13
25:13,15 65:17 70:14,24 71:4,
10,22 100:7 143:18 162:4
171:11,14 178:23 179:1 181:5

**maybe** 10:2 95:5 128:7 143:3
162:22 181:11 183:9

**mean** 20:12 49:21 56:10 57:24
58:5,6,9 63:11 64:3 73:2 81:17
95:7 98:9 99:9 108:17 112:11
117:4 119:17,18 126:23,25
127:1 130:16 136:2 138:3,4,6
140:4 144:7 156:25 158:10
159:8 160:2,10 161:1 163:5,17
165:7,8 177:9,10 178:17
179:23,24 181:23 186:8
188:17

**meaning** 179:10

**means** 61:13,14 120:1 129:1
167:11 183:22

**meant** 77:23 128:23

**measure** 50:1 70:12 71:10

**measures** 71:2

**media** 33:15

**mediums** 188:22

**meeting** 16:14 134:3,4,6,20,
23,25 136:16,17 137:6,9,17,20
138:9,13,18,19,25 168:18,21
169:2,10 176:17 177:1

**meetings** 30:14 130:25
137:11,15 138:12

**Melinda** 17:4

**member** 167:24

**members** 167:14

**memory** 140:9

**memos** 31:9

**mentality** 163:4

**mention** 50:9,22 123:6

**mentioned** 25:22 30:10,21
32:2 105:15 140:11 143:14

166:11 168:18

**mentions** 72:12

**meter** 47:2

**Michigan** 5:1,12

**might** 7:11 24:17 36:4 124:20
133:13 143:11 157:24 173:17

**mimics** 166:5

**mind** 15:18 165:2,21

**minimum** 53:7 91:10 93:13
94:14 96:3 132:6

**mischaracterizes** 56:22
182:16

**misquote** 81:1

**miss** 129:9

**mistake** 67:25 93:12

**misunderstood** 162:23

**model** 34:7 36:16 41:25 42:3,
14 140:22

**models** 35:10,12 41:21 42:2

**modifications** 181:12

**modified** 29:22

**Moheem** 5:18

**moment** 50:13 133:12 170:2

**monetary** 70:23

**money** 35:22 61:16

**monitor** 171:16

**monitoring** 63:12

**month** 30:13

**monthly** 27:7 30:14 146:24

**months** 15:6 65:18

**more** 13:5 15:18 19:15 22:8
42:22 43:5 52:13,14,15,17
53:19 61:18 64:21 65:3,11,19,
21,24 66:1 67:11,20,21 68:3,
24 69:1,3,6 71:18 78:1 93:25
118:10 127:23 131:9 143:21
145:5 147:20 151:8 152:3
153:17 155:14 159:20 162:24
172:21 182:25 187:12 190:8
191:6

**mortgage** 5:9,19 8:14,19,21
9:11 10:17 12:3,9,15 17:20,24

18:1,4,6,11,14,18,22 20:2,13 21:2,4 22:10 23:3 24:5,12 26:4,14 32:18 34:5,14 36:11, 18 41:5,8,19,22 42:17 43:14, 15 46:4,9 54:21 67:8 77:18 128:7 135:17 143:24 146:19 147:16,17 151:23 152:13 168:8 171:9,10 178:11

**most** 8:23 27:23 80:1 90:25

**motion** 51:8

**move** 160:10 184:25

**moved** 61:25

**Mr** 5:18,20 6:1,5,12,20,24 7:5, 10,16,23 8:1 9:1,4,5,6,7,8,24 13:6,13 15:10,14,20,24 16:2, 10 17:14,17 20:9,11,19,22,25 21:18,25 22:22,25 24:1,3,24 25:4,5 27:17,20,25 28:3,22,24, 25 29:2,3,4,5,14,15,20,24 31:25 32:1,14,16,19,22,24 33:1,11,14,17 34:11,13 35:24 36:8 37:9,11,13,17,18,20,21, 25 38:1,2,16,18,19,20,22 39:1, 4,22,24,25 40:1 42:11,12,21, 25 43:7,9,10,13,18,22 44:3,6, 18,19,20,23,25 45:3,23 46:3, 13,16,20,24 47:13,15 48:14, 16,19,22 49:2,6,10,13,20,23 50:14,16,19 51:1,5,9,14,16 52:23 53:2 54:6,9 55:10,15 56:5,7,8,9,12,21 57:1,24 58:1, 5,8,12,16,25 59:3,4 60:7,9,10, 19 61:1 62:23,24 65:5,8,22,25 66:13 67:2,14,18,23 68:1,7,8, 16,22 71:12,16 75:8,11,18,23 76:25 77:3,14,16,22,24 78:2, 18,20 79:1,3,21,25 80:19,22 81:6,8,24 82:6,17,20 83:1,5, 11,16,20,23 84:6,8,15,19 85:3, 6,9,12,21,23 86:4,6,10 87:5,14 88:2,12,15 89:1,3,4,9,17,19 92:16,18 93:24 94:2,21,23 95:4,6,7,12,14,15,16,17,18,19 96:1 97:6,8,11,14,18,20,24 98:4,8,12,14,15,24 99:1,6,8, 16,18 100:12,16,21,25 101:8, 12,17,20,24 102:2,19 103:3,23 104:2,5,9,13,17 105:6,11,20 106:2,5,9,16,17,22,25 107:12, 14 108:16 109:2,9,11,12,15 110:7,10 111:4,7 112:1,5,23 113:1,3,14,18 114:18,19,20,22 115:12,14,15 116:5,7,11,16 117:7,10,16,20,24,25 118:15, 17,21,25 119:5,8,10,13,16,19, 25 121:11,12 122:6,9,13,16 123:3,5,9,12,20,24 124:10,14, 17,22 126:23 127:2 129:12,19 130:1,8,11,21,24 131:20,22 132:2,3,12,15,20,24 133:12, 14,17,19 134:1,21,24 136:19, 22 137:3,7 138:2,7,21 139:5, 22 140:3 142:19,22 144:2,3 145:1,3 146:11,14 147:3 148:1,6,9,14,18,25 149:3,6,8, 16,19 150:7,12,20,24 151:4,13 152:16,19,24 153:12 154:7,12, 19,25 155:7,13 156:17,20,22, 24,25 157:4,14,20 158:2,4,5, 11,12,16,23,24,25 159:2,3,5,6, 15,25 160:1,2,15,16,18,19 161:1,3,11,15,23 162:1,15,22 163:21,23 164:5,9,11,12,13, 17,18 165:1,16,22,23,25 166:24 167:2 168:14,17 172:10,12,13,14,21 173:1,2,4, 5,9,10,12,13,15,18,19,20,22, 23,24,25 174:2,6,9,10 175:14, 15 177:3,5,25 178:3,5,7 179:4, 6,19,25 180:7,10,25 181:15,25 182:4,15,23 183:17,20 184:5, 8,20,23 185:12,15 186:9,12,25 187:6,16,23 188:4,8 193:11, 13,17 194:2,4,6,16,18,21 195:14,15

**Ms** 5:25 6:1,9 8:2 16:11 21:1 27:21 38:3 39:5 61:2 86:13 108:23 134:2 163:24 164:18 166:9 193:14

**much** 66:16 73:10 91:15 109:4 110:25 111:2,21 115:1,4 126:1 130:10 164:13

**multiple** 136:10

**mumbling** 171:3

**Murray** 5:18 9:1,5 13:6 15:10, 14 17:14 20:9,22 21:18 22:22 24:1,24 27:25 28:22,25 29:3, 14,20 31:25 32:14,19,24 33:11,14 34:11 35:24 37:13, 18,25 38:16,19,22 39:1,22,25 42:11,21 43:7,9,18 44:3,18,20, 25 45:23 46:20 47:13 48:14,19 49:2,10,20 50:14 51:1,14 52:23 54:6 55:10 56:5,8,21 57:24 58:5,12,25 60:7 62:23 65:5,22 66:13 67:14,23 68:7, 16 71:12 75:8,18 76:25 77:14, 22 78:18 79:1,21 80:19 81:6, 24 82:17 83:1,11,20 84:6,15 85:3,9,21 86:4 87:5 88:2 89:1, 4,17 92:16 93:24 94:21 95:4,7, 14,16,18 97:6,11,18,24 98:8, 14,24 99:6,16 100:12,21 101:8,17,24 102:19 103:23 104:5,13 105:6,20 106:16,22 107:12 108:16 109:9,12 110:7 111:4 112:1,23 113:1,14 114:19 115:12 116:5,11 117:7, 16,24 118:15,21 119:5,10,16 121:11 122:6,13 123:3,9,20 124:10,17 126:23 129:12 130:8,21 131:20 132:2,12,20 133:14,19 134:21 136:19 137:3 138:2,21 139:22 142:19 144:2 145:1 146:11,14 148:6, 14,25 149:6,16 150:7,20 151:4 152:16,24 154:7,19 155:7 156:17,22,25 157:14 158:2,5, 12,23,25 159:3,6,25 160:2,16 161:1,11,23 162:15 163:23 164:5,9,12,17 165:23 167:2 168:17 172:10,13,21 173:2,5, 10,13,18,20,23,25 174:9 175:14 177:3,25 179:4,19 180:7,25 181:25 182:15 183:17 184:5,20 185:12 186:9, 25 188:4 193:13,17 194:4,6,16 195:15

**my** 5:12 6:1 7:2,7 13:12,17,20 15:15,21 16:3 22:1 35:5 41:12, 24,25 42:3,5 43:23 45:13 46:8, 14,17,25 47:11,16 48:17 49:7 50:3 51:10,22 54:3 58:14,20 59:9 65:9,10 67:19 68:2,23 69:22 72:3,11 73:11 76:4 78:21 79:13,17,18 82:21,22 83:6 84:3,9 88:12,16,24 89:10, 13,14,22,23 90:1,8,24 91:8 93:10 94:13,18 95:20 96:2 97:16 98:5 104:10 105:13 106:15,18 107:1,2 108:11,13 114:7 120:23 129:2,6,20 133:13 136:1 137:20,23 138:8 140:9,19 144:15 145:15 148:10,20 149:20 150:14 152:7 153:13,14,20 154:13 155:4,14 157:6,14 158:16 160:8,10,12,20 161:6 162:2 175:19 178:8 180:1 185:16,24 187:15,17 190:8 191:6 192:19

**myself** 12:24

N

**name** 5:12,15 6:1,3 16:22,24 17:3 32:20

**named** 96:22

**names** 14:15 16:16

**necessarily** 35:25 61:17 133:6 186:4

**need** 14:15 20:24 21:22 24:21 38:23,24 50:11 54:4 70:21 76:12 79:17,22 90:16 91:4 104:16 105:3 111:19 170:3 179:12,22

**needed** 37:2 53:25 62:18 123:22 187:1,4 194:3

**needs** 87:9 157:6 167:17

**negatively** 40:14

**negotiate** 20:5

**negotiations** 10:20

**never** 33:7 87:21 90:9 142:15 156:3 190:24

**new** 29:7,9,17 30:4 45:11 59:13 96:14 99:3 187:2 189:6

**next** 6:14 21:24 36:3 39:20 41:4,6 42:5 60:7 72:11 90:17 125:4,11 140:25 177:19

**Nine** 92:6

**no** 6:11 14:10,24 15:15 18:25 19:12 20:6 23:19 24:2 25:4,15 26:3,11,23 28:17 31:6,11 32:10,15 33:4,6,22 34:12,21 35:1,8,14 36:14 37:8,17 38:20 40:7 44:4,9 46:17 47:13,16,17, 18,20 48:11 50:18,22 51:15 52:2,4,19 53:9,11 54:13,17,24 55:5,25 60:3,19 62:8 64:24 65:23 68:4,6,23 71:19 77:15 79:13 80:16,25 81:19 82:14,21 85:16 86:1 88:18 89:3 90:2,3,5 97:25 99:13,17 101:21,25 102:11 105:18 106:14 107:21 108:6 110:13,18,19,23 111:10 115:22 116:8,21,23 117:23 118:7 120:13 121:22 122:1,8, 10 123:6,14,18 125:22 127:19 128:22 130:18 133:6 136:3 137:11 138:8 144:5,7,18 145:14 146:15 147:11 149:7, 17 154:10 155:15,19,24 157:8, 10 158:20,21 159:2 161:2 163:11 166:20 167:7,24 168:5 171:18 173:15 175:3 176:8 177:9 182:11 189:11,21 190:7, 19,23 192:6,11,13,25 193:6,8, 11 194:25 195:3,6,9,13,14

**nobody** 115:20 125:23 192:13

**non-excluded** 118:12

**none** 144:7 159:18

**nonexclusive** 118:8

**Nope** 78:24 148:19 163:11 173:24

**note** 9:1 51:24

**notes** 133:13

**nothing** 5:24 99:23 115:18 121:23 163:22 173:14

**notice** 6:6 7:24 8:2,24 10:3 27:9 82:2 100:23 104:19 105:22,23 118:22 129:15 153:1 156:19 157:3,15,24 158:20,22 159:19,20,24 170:19 171:13 181:5

**notification** 68:20 146:3

**notifies** 145:18

**novice** 24:12

**nowhere** 159:23

**number** 5:10 27:11 73:6 74:1, 2,4 80:18 92:21,25 93:1 94:12 95:22 97:5 98:6,16 181:19 193:8 194:23

**numbers** 52:10 73:13,23 75:6,15 82:16 83:9 193:4,9 194:11,12

O

**oath** 6:21 56:17 105:13 121:8 133:1 136:25 137:16 157:22

**object** 13:6 17:14 20:9 21:18 22:22 24:1 27:25 29:14,20 31:25 32:14,19,24 33:11 34:11 35:24 42:11,21 43:7,18 44:3 45:23 46:20 48:14,19 49:2,10 51:1,14 52:23 54:6 55:10 56:21 62:23 65:5,22 66:13 67:14,23 68:7,16 71:12 75:8, 18 76:25 77:14,22 78:18 79:1, 21 80:19 81:6,24 82:17 83:1, 20 84:15 85:3,9,22 86:4 88:2 89:1,4,17 92:16 93:24 94:21 97:6,11,18,24 98:8,24 99:6,16 100:12,21 101:8,17,24 102:19 104:5,13 105:6,20,22 106:16, 22 107:12 109:9 110:7 111:4 112:1,23 113:14 115:12 116:5, 11 117:7,16 118:15,21 119:5, 10,16 121:11 122:6,13 123:3, 9,20 124:10,17 129:12 130:8, 21 131:20 132:2,12,20 134:21 136:19 137:3 138:2 142:19 144:2 145:1 148:6,14,25 149:6,16 150:7,20 152:16,24 154:7,19 155:7 156:17 161:11 162:15 175:14 177:3 179:4,19 180:7,25 181:25 182:15 183:17 184:5,20 185:12 186:9, 25 188:4

**objection** 7:3 83:11 84:6 88:4 103:23 108:17 117:24 151:4 157:14 160:8 161:23 165:22 166:24 168:14 194:2

**objection's** 87:15

**objections** 6:25 9:2,5 13:10 88:10 89:5

**objects** 87:7,10

**obligation** 6:21 170:22

**obviously** 136:10 163:17

**occur** 54:23 171:14 181:6

**occurred** 140:6

**off** 16:2,4 60:20 73:11 83:9 112:16 115:23 119:19 133:21 151:14 163:25 167:12 172:10, 15 195:17

**offer** 24:22 59:17 66:8 72:1 73:8 76:12 97:13 98:3 151:24 153:7 162:21 166:14,15,16

**offered** 37:2 139:19

**offering** 118:19 193:4

**offerings** 116:13

**offers** 24:8 43:24,25 119:1 149:24,25 150:4,15 152:3

**office** 15:16

**officer** 9:13,23 13:2 16:18,20, 21 17:2 24:21 62:1

**officers** 16:20 40:13,15,20 41:10,15

**offices** 5:11

**official** 181:23

**often** 65:6,9 68:19

**oftentimes** 34:8 36:2,7 151:8

**oh** 26:24 27:14 40:8 50:16 77:24 89:1,3 114:20 164:13 171:3 173:1 174:11 178:3

**okay** 6:12 7:8,9,12,13 8:14,15, 18 16:4,8,14,18,20,22 17:3,9 18:1,6,11,22 20:12,17 23:14, 20 24:4,12 25:10,17 26:13,21 27:2,4,13 28:4,9,15 29:3,9 30:19 31:8 32:5 33:10 35:2 38:13,19,22,25 39:3,9,12 44:10 45:7,10 47:6,21 49:7,14, 19 50:8 52:5,13,17 53:3,12,16, 23 54:10 56:1,15 57:2,8,18 58:17,21,24 59:3 60:6,14,19, 20 61:11 63:16 64:22 65:9 67:6 68:2,14 69:3 71:19 72:11, 19 73:10 77:17,25 78:4,6,13, 16,24 80:9,12,23 81:1 82:7,11 83:6 84:3 85:13 86:6,15,19 90:17 91:3,7 94:7 95:18 96:16 99:9,19 101:1 102:6 103:19 106:3 108:2 109:3 110:11,24 111:14 113:12 114:13 115:1 116:1,3,17 117:6,11 119:14 120:1 125:12 126:5,9,16 127:17,24 128:16,23 129:20 130:4,13 131:23 132:8,25 133:14,19,20 134:2,9 135:9,17 136:1,4,12,23 137:25 139:6 140:8 141:9,18 143:22 145:15 146:8,14 148:2,21 149:12 152:20 155:20 156:9,15 157:9, 13 161:4,6,18 162:10,22 163:11,21 164:11 165:4,6,11, 15,18 166:6,9,18 169:16,20 170:2,5,13 172:15,19 173:9,25 174:2,12,23,25 175:6 177:19, 22 178:3,6,20 179:9 180:1,4, 22 181:16,21 183:25 184:3,9 185:1,5 188:22 189:3,8,12 190:24 191:17,22 192:3,7,15 193:2,7,9,12,24 194:16 195:1, 14,15,16

**old** 7:19 159:18

**once** 36:6 41:20 56:1 64:17 113:16 141:8,22 142:25

**one** 10:6 12:21 15:18 23:13, 14,20 24:11,20 27:3 34:3,17 38:6 39:8 44:2,22 45:2,4 53:19 64:23 65:14 67:12,21,24 71:18 75:21 77:19 78:1,7 91:12 92:10,22 93:3,11,12 94:11,15 95:2,10,24 103:7 110:8 111:6, 13,14 112:19 114:1,2 115:5,21 116:18 117:3 118:10 120:18 126:24 127:1 128:2 137:9,16, 19,20 138:9,13 143:5 145:13, 14,16 146:1 147:6,10,20 153:4,15 157:11,17,18 158:7, 13 163:12 164:5,6 172:22 174:7,15,19 181:13 188:14 189:7 190:18,23 194:10,18

**one-year** 160:22 161:2

**ones** 69:22

**online** 19:22 24:14,17 127:19

**only** 27:15 40:6 42:8,20 70:3 86:2 104:12 105:5,14 111:25 113:5 128:11 137:20 147:10 148:20 158:5 161:7 167:22 176:9 182:10,11 187:10 188:9, 18 191:22 194:13

**Oops** 171:21

**open** 124:21

**operating** 13:2 17:2

**opportunities** 143:1

**opportunity** 23:2 84:21 87:12 143:2 152:12 153:7

**opposed** 96:2 185:6

**option** 152:11

**order** 25:2

**original** 189:16 190:5

**originators** 135:15,23,24

**other** 14:19 16:20 22:8 23:3 29:7 32:8 33:8 34:18 35:11,15, 18 38:6 41:5,8 42:2 45:7 49:4 51:21 60:3,5 61:7 62:7 69:12, 23 70:23 74:23 88:6 96:16 121:13 125:15 128:13 137:11, 15,25 138:12,16 139:7,15 142:8,17,20,21 149:13 151:15, 18 163:1 167:22 170:8 173:21 181:12 183:9 187:24 189:9 190:16 194:16

**others** 121:17 139:24

**otherwise** 87:7 118:6

**outside** 14:8,23 15:14 29:6 96:16 107:24 110:14,19,22 114:4

**over** 6:12 31:20 32:6 38:19 47:2 52:20 160:13 171:7

**overall** 18:20 79:6 85:5

**oversee** 9:15

**owe** 51:12 52:22 53:7 75:4 91:13,15 93:13,17 132:6 161:8

**owed** 72:16

**owes** 92:11

**own** 21:5 136:5

**owner** 20:13 32:18,23 180:23

**owners** 125:13 180:18

## P

**p.m.** 5:3 16:5,7,9 60:21,23,25 133:21,23,25 172:16,18,20 195:18,19

**package** 153:7

**page** 10:3 37:23 38:13 39:2, 19,20 41:6 63:17 125:2,5,8,11 127:25 174:19 180:14 184:12 191:9

**Palace** 62:10,12

**paper** 126:13,17

**paragraph** 39:19 63:19 125:4, 6,7,8,11 128:1,4 180:16

**parking** 47:2,3

**part** 11:2 24:23 37:2 44:14 45:12 46:11,22 71:1 98:22 115:25 130:25 132:10,11,17, 19 134:14 135:4 137:13,14,18 138:24 139:1 161:7,8 168:23 169:7,13 176:17,19,25 177:2,4 182:7,8 184:21 189:16 190:5 194:14,15,22 195:1,4,7

**participants** 12:21

**particular** 20:4 31:21 118:20
127:1 169:11 181:11

**parties** 96:17

**partner** 24:7,23 25:20 98:2

**partnership** 41:14

**partnerships** 62:13

**pass** 173:25

**past** 41:19 61:10 141:21 142:7

**pay** 18:14 24:21 27:14 47:7
51:18,25 70:16 149:12,18
154:3,17,22 155:5,12,16 156:1

**paying** 41:10,11,13

**pen** 126:13,16

**penalize** 47:9

**penalty** 47:10

**people** 12:23,25 16:14,15
17:7 31:3 40:8 47:3 64:2 86:2
96:8 114:4 128:15 129:2
136:3,4 142:8 176:16 177:1
183:14 193:3

**people's** 42:2

**per** 10:24 26:11 53:8 66:1
70:17 72:12,17,22 75:5 91:9
111:11 142:5 149:13 163:5
166:19

**percent** 27:2,3 43:24,25
128:10,12,17,24 129:10 130:7
149:24,25 150:4 151:10,25

**percentage** 26:9,22 27:1

**perfect** 80:11 163:11

**perfectly** 7:11

**period** 54:12

**person** 8:23 10:8,13 17:3
20:14 80:1 90:25 104:18,22
107:3

**personal** 156:21,23 157:19
158:1,3,6,14 159:7,13

**phrase** 55:19 76:18 109:3
189:3

**physical** 191:19,25

**physically** 126:21 165:8
186:4

**pick** 32:5

**picked** 159:9

**piece** 124:3

**place** 45:1 108:16 138:1

**placed** 45:22 46:9,11,18,22

**placing** 136:20

**Plaintiff** 5:18

**plan** 137:12

**platform** 52:7 163:5,6 166:15
167:13,14

**platforms** 166:14,16 167:15

**play** 18:14 41:23 132:10,11,17

**played** 46:15 88:13 106:7
129:24 147:23 187:18

**please** 5:15,23 6:3 70:9 86:20
90:17 125:5 129:23 147:22
171:2 178:21 187:17

**PLLC** 5:12

**plus** 40:8 94:10

**point** 26:25 27:3 37:4,7 49:16
63:1 64:16 68:25 69:8,11
82:11 96:11 105:19 106:10,18,
19 107:22 110:11,14,20
121:19 141:19 142:1 159:11

**points** 26:8,20 41:11,13 128:9
181:14 188:21

**policies** 171:5,8 178:10

**portion** 45:16 120:3 129:4
169:14 187:3

**portray** 33:16

**position** 9:12

**possession** 11:14

**possible** 43:4 154:16

**possibly** 52:20 181:18 183:11

**post** 129:14 188:11

**posting** 170:19 171:14 181:6

**potential** 132:22,25 151:23,24

**potentially** 35:21 74:10
128:11,25 130:3,4,10,12,22
131:4,10 132:9

**PR** 9:15

**practice** 51:8

**practices** 35:16,19 36:6 42:6
70:5 125:17 138:5 141:2

**premise** 132:14

**prepare** 9:24 14:4,9,11 23:21

**prepared** 14:2

**present** 17:7 52:5,7 177:6,10,
11 181:18

**presented** 87:11 88:7 138:15
139:17

**prevent** 47:3 148:12,23

**preventing** 148:4

**previous** 28:18

**price** 128:9

**pricing** 131:9

**print** 20:23

**printout** 191:11

**prior** 19:18,20 30:25 32:8
55:23 62:9 85:16 134:25
138:18 159:17

**privilege** 157:5,23

**privileged** 15:12

**pro** 26:1

**probably** 14:18 24:14 30:17
133:14 134:7 140:9

**problem** 25:4 118:13 125:22

**problems** 131:15

**procedures** 171:5,8 178:10

**proceeding** 16:6 60:22
133:22 172:17

**process** 26:5

**produce** 59:1

**produced** 20:23 173:6 175:1,
4

**profit** 26:7 36:17

**program** 34:3

**programs** 34:2

**prompt** 171:13 181:5

**prompted** 28:6

**promulgated** 30:13

**proof** 70:21

**proper** 76:12 108:21 157:22 158:18

**properly** 95:24

**proportional** 87:9

**propose** 193:9

**proposed** 193:6

**proprietary** 24:25 63:13 146:12 162:3 163:9,20

**prospective** 43:2 119:2

**protective** 25:2

**provide** 24:4 25:13,18,24 27:23 74:8 76:10,20,22 77:13 81:19 101:22 116:13 167:5 168:1 170:18 171:13 181:5

**provided** 80:13 187:14 194:13

**provides** 12:3 27:22 73:18 74:16,20 75:7 76:8 79:20 81:3, 10,15,16,22 82:9,13 88:5 94:9 134:18 149:21 151:1 163:13, 18 166:10

**providing** 77:12

**provision** 10:11,15 38:7,10 44:11 45:8,10,21,22 46:9 50:10,23 53:13,24 54:5 55:6, 18,19 59:12 60:2 62:18 66:6 82:24 83:19 84:5 85:2,8,14,19 91:9 98:21 99:3 107:25 108:2, 5 109:20,25 138:20 139:10,19, 21 142:18 149:5 154:5 155:17 156:7 162:11,13 168:23 169:5, 6 178:21 189:25 190:4,6 191:17

**provisions** 190:13 193:25

**public** 63:13 141:17 142:4 146:16

**publicly** 142:4,7 146:17

**pull** 145:19 146:4,23,25

**pulled** 68:21 78:25 147:4,5,10

**pulling** 146:2 147:2

**purports** 37:18

**purpose** 47:2,8,16,19,21,22 49:12 130:16,18 131:3,5,7

**purposes** 6:7

**pursuant** 6:6

**put** 17:16 44:12,14 46:4 100:15 128:15 169:17 172:22 183:13

**putting** 153:23,24 154:5 160:16

**Q**

**qualify** 88:10

**question** 7:6,8 13:7,11 15:18, 21,22 22:1,16 24:6 27:21 34:24 35:5,17 39:1 42:5 43:23 45:13 46:8,14,15,17,25 47:11, 12,14,16,17 48:17,20 49:7 50:3 51:10,22 53:19 54:3 58:13 60:7 65:9,10 67:19 68:2, 3,23 69:22 71:15 72:3,11 76:4, 6,16 78:1,21 79:13,17,18 80:23 81:7 82:21,22 83:3,6 84:3,10 86:19 88:9,12,13,16 89:10,14,20,22,23 90:17 91:5 93:10 94:13,18 95:23 96:2 97:16 98:5,25 102:24 104:10 105:13,25 106:5,7,15,18 107:1,2 108:13,22 109:1 114:7 118:10 120:23 122:20 123:15, 19 124:16,21 129:21,22,24 137:20 138:8 144:15 145:15 147:20,23 148:10,20,22 149:20 150:13,14 152:7 153:13,14 154:13 155:4,14,15 160:20 162:2 165:24 174:7 175:19 180:1 182:19 184:7 185:16 186:11 187:15,17,18, 20 189:2 190:8 191:6 194:5,10

**questioning** 50:15 129:13 153:20 157:1 158:9 160:9

**questions** 7:3,10 13:18,21 19:22 84:22 122:23,25 123:1 124:4,6,9,12,18,20 133:15 154:20 160:3,5 163:24 164:19 172:21 193:11 194:17 195:14

**quick** 16:3 30:16 126:18 174:2 193:13

**quid** 26:1

**quo** 26:1

**R**

**raise** 5:22

**random** 146:25

**rate** 43:24,25 118:20 128:6 150:5,16 151:2,6,8,10,15,21 153:3,4

**rates** 43:16 152:22

**rather** 101:9 170:8

**reach** 71:24

**reached** 74:17 124:6

**read** 6:17 15:22 38:23,24 39:15,18,20,22 41:4 50:11 63:19,20 70:8 87:5 113:21 125:3 127:25 170:2 171:1 178:20 181:2 190:21,23 193:21 194:7

**reading** 82:18 179:12,14

**real** 31:21 41:9,10 126:18

**reality** 128:3,6

**really** 20:23 52:18 141:6 189:2

**realtor** 34:3

**realtors** 34:4

**reason** 45:13 58:21 132:14, 21,23 133:2,3 162:10 190:25 191:22 192:25

**reasonable** 21:11 156:7 158:25 159:6 161:10

**reasons** 33:23 89:18

**recall** 14:19 17:8 147:4 164:19,20

**receive** 58:21

**received** 27:13,15 190:24

**receives** 11:24

**record** 5:6 6:3,5 7:8 9:2 16:2, 5,9 24:25 28:23 37:13 51:5 57:18 59:5 60:21,25 63:13 109:13 133:21,24 160:17 172:11,16,20,23 178:1 195:17

**recorded** 65:17 67:16

**records** 145:20 146:18,19,21

**recruiting** 24:8 34:4 98:2
166:16

**redline** 22:6

**refer** 41:14 110:16 111:18
193:18

**reference** 23:24 173:17

**referenced** 112:4

**referencing** 165:20

**referring** 8:14,16,19,20 40:19
104:12 110:14 128:18,20
140:19 165:15 177:8 191:25

**refi** 141:1

**refinance** 36:3

**refinances** 141:13

**reflect** 6:5 90:10

**refresh** 140:9

**regard** 61:17 168:18 169:10
170:25 193:18,20 194:10

**regarding** 11:14 129:13 135:2

**regardless** 92:11

**regularly** 171:15 181:7

**reject** 62:25 64:8,10

**relate** 78:7

**related** 51:6 73:24 74:13
77:19

**relates** 42:4

**relationship** 11:4 30:5 64:8,
16 67:12 68:15 73:25 74:6
84:11 119:7 144:20,25 145:10,
11 162:6

**relevant** 157:2,17 158:10,15
159:8

**remedies** 70:23

**remember** 118:3 140:14
143:16

**remind** 6:20

**renew** 157:14

**renewal** 188:23

**renewed** 157:6

**repeat** 15:20 46:13 60:11
88:12 106:5 129:22 147:22

187:16

**repeatedly** 176:3

**rephrase** 67:3 71:9 165:24
181:16

**report** 9:20

**reporter** 5:16,22 6:13 15:20,
22 46:13,15 88:14 106:6,8
129:22,25 147:21,24 187:16,
19

**reports** 9:16

**represent** 5:16 6:2 13:21
57:18 72:13,24 75:6 192:7

**representation** 70:13 71:3
72:25 73:20

**representative** 8:3 13:8
54:11,15,18,20 55:7,21 56:18
87:25 88:20 89:11,15,24 90:15
108:14 113:23 115:9 126:2
158:6 159:22 178:25

**representatives** 179:3 192:4

**represented** 59:25

**representing** 5:14 17:6

**represents** 20:7 72:16,19

**request** 21:6 86:7,8 87:8,10,
15

**requests** 21:11 22:7

**require** 179:17

**required** 154:22 171:15 181:7

**requirement** 25:16

**requirements** 171:6,9 178:10

**resale** 142:14

**research** 11:17 61:3,9,10,11,
15 134:25 141:21,25 142:3,7,
11

**reserve** 160:10,12

**resources** 167:20,23 168:1

**respect** 10:9 13:15

**response** 84:7 86:23 87:6
88:4,11 89:5,18,21 105:23
106:3

**responsibility** 12:12 63:2
153:3

**restate** 35:17 98:25

**result** 11:7,10

**retail** 18:1,4 31:20 34:8 36:3,5,
6,17,20,22 43:5,10 61:13,19
69:12,23,24 70:3,4 102:15
120:6 140:24 141:1,2,6,14,23
142:14,16,24 143:8

**retail's** 141:8

**return** 25:13,21

**revenue** 11:24 27:11

**review** 14:11,14,17 87:12
133:12

**reviewed** 14:20 23:20,23
65:7,10 142:20 156:3

**revision** 126:25

**Rhatigan** 190:22 192:3

**right** 5:23 22:1 23:10 27:7
30:9 40:6,14,18 42:16 44:20,
21 45:1,2 54:3 55:16,20 58:19
61:2 62:19 64:19 65:12,21
67:4 69:6,24 70:22 72:23
73:21,23 74:4,19 75:13 76:3,
22 77:4,9,11,13 78:21 80:7
81:9,13 85:7 86:3 87:17,21,24
88:23 89:14 90:2,9,12,25 91:1
94:3,5,13,17,19 96:2 97:9,15,
23 98:5,7,13,18 100:8 102:7,9
103:5,8 104:18,20 105:12,18
107:7,10,15 108:13 110:5,6
112:6,21 113:19 114:7 115:9
117:6 119:9 120:23 121:16
122:4,10,11,21 123:1,6,17,19,
25 124:7,15,23 128:11 129:6
130:14,25 131:11 132:16,17
137:8,20 142:10 144:14,25
145:9 148:10,13,19 149:20,22
150:25 151:3,14,20,22 152:2,7
153:13,20 154:13 155:4,14
156:12 158:4,20,21 159:19
160:10,12 163:23 164:18,25
169:2,24 170:18 173:18 174:1,
20 175:19 177:9,15 182:5,24
183:2 184:1,24 185:2,16,24,25
186:16,23 188:9,22 189:17,24,
25 190:8 191:3,6 192:24

**ring** 192:9

**risk** 13:2 16:20,21 162:2

**rivalry** 33:5,10,16

**Rob** 5:13

**Rochester** 7:18

**rocket** 8:19 11:1,4,8,11,18 23:5,11 28:12,13 31:15,20 32:23 33:21,23,24,25 34:9,18 35:2,6,12,23 36:11,15 37:7 41:5,8,19,22 42:5 43:25 44:1,5,8,15 45:5,14 46:5,7,10 47:8 48:8,24 49:16 50:5 51:12,18,25 53:14,21,23 54:4 61:3 62:19 63:4,14 64:4,12,18,24 65:14,20 66:19 67:4,7 69:13 70:5,18 74:13,21 75:16 76:9,14,19 77:7,17,18,20 78:5 91:12 93:3,16,22 94:25 95:10,22,25 96:23 97:2 102:13,18 111:1,22 113:7,13,25 114:15,20 117:14 118:2,5,18 119:15,21 120:5 121:8,21 128:7,18,20 129:3,10 130:6,17 131:4,15,18,24 132:5 133:4,7 134:14 135:1,3,9 138:5 140:19,22 141:10,11 143:1,7,15,25 144:6,11,17,20 146:10 147:7,17 148:5,13,24 151:18 152:22 153:10,16 154:10,24 155:21,25 161:8,9,22 168:8 172:8 192:17

**Rocket's** 36:2 41:14 129:5

**role** 9:14,22 18:14,15

**roles** 12:25 61:24

**rolled** 108:8 110:4,8,22 111:9,13,14 112:10,11,19 113:17 114:1,2,8 115:5 117:3,5 122:3 134:7 137:12,17 138:10,14

**room** 12:21,23,25 13:1 16:19,21 17:1 30:10 86:3 96:8 99:25 100:2 114:5,10 177:15

**roughly** 19:2

**route** 43:6,10

**rules** 6:7,8,13 41:23,24

**S**

**said** 16:15 26:21 29:25 30:8 34:2 37:25 44:22 53:17 60:11,12 67:15 81:1 88:22 90:6 98:17 115:14 119:20 126:6 132:8 140:4 143:18,20 161:7 162:14,23 163:12 165:6 173:10,16 175:8 176:12 179:7 182:6 189:22 191:23

**sales** 13:1 17:6 188:16

**same** 20:1 27:24 37:1 41:18 70:4 72:20 73:20 78:13 80:23,25 83:11 84:6,7 89:17,20,21 91:20,22 92:25 93:1,2,4,22 94:12,19,20 99:5 117:24 118:11 134:13,17 144:1 145:6 148:16,22 151:4 171:25 191:5,9,14

**Sarah** 5:7 6:4,6 31:3

**say** 6:14,16 7:12 8:13,16,19,20 17:1 18:7,23 19:4 25:1 26:14 27:14 28:13 34:16 37:13 43:1 48:4,7 49:20 50:4 51:6 58:25 63:10 64:23 65:19,23 67:24 73:16 79:9 81:9,21 88:25 89:10,14,23 90:2,4 91:3 100:18 104:3,11 107:10 108:2 112:11,14 114:7 115:13 123:10 124:8,11,19 128:12 129:18 131:6 145:10 146:3,16 153:2,4 157:17 162:18 165:20 170:6,11,18,25 182:5 185:5 189:12

**saying** 16:3 28:25 36:10 37:16 41:1 55:23 56:23 58:10 59:19 60:16 69:6 72:19 74:19 79:11 87:1 89:11,16,24 90:11,13 95:10,11 101:16 102:3,6 103:22 105:4 107:9 110:3,19 111:10,12,17 115:20 123:14 125:14 127:19 128:23 130:20,22 131:8 132:16 133:1 137:15 139:9,13 140:17 141:10 142:13,15 151:21 153:20 158:24 159:5,6,16,19,23 170:13 174:21 175:2 177:15 180:19 182:12,25 183:1,4,13 184:24,25 185:16,20 186:19 188:9,12,13,14 191:7

**says** 37:14 48:6 49:15,24 50:1 53:13,20 62:20 63:19 71:1 82:8 86:20 87:16 90:17 99:20 100:7 118:2 125:3 131:7 132:8 142:6 147:19,25 157:21 171:3 179:1 180:18 182:17 186:15

**scale** 21:23 167:18

**scenario** 150:25

**scenarios** 95:13,14

**science** 80:11,12

**scope** 51:2 82:1 100:23 118:22 129:14 152:25 156:18,19 157:15

**script** 106:14

**se** 26:11 142:5 163:5

**second** 16:3 18:19 37:22,23 86:19 125:4,6,7 172:11

**section** 37:23 41:4 44:17 49:14,17,24 70:9,13,16,19 71:3 81:21 85:7 112:7 121:22 169:22,24 170:2,6 171:4,23,24 172:1 177:23 179:1 193:18,20,21,22 194:7,8

**see** 6:24 23:23 63:8 65:14 72:12 79:23 86:15,23 87:16 90:20 157:18 159:7,12 160:20 169:24,25 170:23 183:2 184:1

**seeks** 55:11

**seem** 75:16

**seemed** 174:18

**seen** 8:3,6 14:16 33:7,9 86:11

**sees** 153:15

**selected** 11:1 41:2 97:5,9,16

**selecting** 32:8

**selection** 146:25

**send** 25:13,19 26:11 43:14,16 44:1,8,15 45:5 46:7 47:22 48:8,24 51:12,18,25 52:21 53:14,25 54:3 75:20 77:7 93:12,15,22 94:11,15 95:24 118:2 131:24 132:4 141:10 149:13 150:3,10 151:10,11 152:21 153:6,10 154:10,14 155:3 182:2

**sending** 25:25 40:19 45:14 46:5,10 47:9 63:9 64:17,24 66:16 74:13,21 75:15,24 76:8 148:12,23 149:20 151:1 153:9 184:21 186:5 189:10 190:7

**sends** 61:3 62:19 76:19 91:12 92:10 93:11 96:22,23 97:2 111:1 141:11

**sense** 20:15 65:3,11 67:11,20,22 68:3,4,5,9,10,14,24 69:1,3,

6 92:15 93:19,21 133:10

**sensitive** 185:9

**sent** 29:17 34:17 35:2,6 49:16
50:5 56:24 63:12,14 64:19,23
65:12,18,20 67:12 91:15 92:21
93:3,4,7 102:18 111:21 113:6,
8 133:7 143:15 145:9 150:5
182:10

**sentence** 41:5 179:5,7

**separate** 104:1 111:23 135:16
148:17

**separately** 111:6 114:6

**September** 59:11

**series** 135:7

**serve** 9:2

**service** 27:21,24

**services** 12:3 24:4,8 25:7,12,
22 27:23 73:17 74:20 75:7,25
76:7,10,20,22 77:12 79:20
81:2,10,14,16,19,21 82:8,13
94:8 98:1,2 134:18 162:24
163:13 166:10,13,19 167:5,19
168:2 194:13 195:12

**set** 36:16 178:23 193:22
195:15

**setup** 24:9

**seven** 9:19 14:18 92:2

**several** 62:11 188:20

**Seyferth** 5:12

**shall** 70:16

**shared** 161:20,21

**sharpen** 128:9 131:9

**she** 85:21 88:9 109:11,12
115:13,14 138:4 157:21
159:17,18 173:16 194:2,3

**she's** 13:8 109:13 156:22
158:2,5 159:21,23

**sheet** 128:7

**shelf** 167:12

**shop** 135:22 141:3

**shops** 135:16,20 136:6,9,13

**should** 28:13 85:1 90:2,4
134:18 193:4

**shouldn't** 87:24 88:25 89:10,
14,23 90:10,14 115:11 119:2

**show** 49:14,24 80:17,21,23
82:7,9 96:9 99:20 101:15
110:16 111:20 142:11 165:11
195:11

**showed** 28:19 57:16 147:6

**showing** 99:14 101:18,19,21
174:19,20

**shows** 11:17 37:5 61:3,15
72:4 82:12 96:9 99:10 110:12,
20 111:20 121:20

**sic** 70:13 176:4 179:10

**side** 20:14 31:19,20 34:8
36:19 130:5 140:24 141:12,14
142:14,24 143:8,9

**sight** 67:21

**sign** 12:9 23:3 47:22 59:10
60:3,5,12,13 125:14,19,20,21
126:25 129:11 156:10 161:16
180:5,19,23 181:22 182:6
183:1,5,15,21,25 184:12,18
185:2,7,11,17,21,23 186:1,7,
20 187:8,11,21 188:25 189:4,
13 191:24

**signature** 57:24,25 58:2,4,5
126:14 127:10,14 179:17
184:10,11

**signed** 19:23 57:15,16,21,22,
23 58:3,6,11,15,18 59:7 93:9
124:13 126:6,21,22 127:3
135:24 136:9,14 145:23
155:10 164:22 165:7,8,9 166:1
172:25 179:11 191:2

**signing** 96:19 122:18,24
126:3 170:8 182:3 184:15
186:4,5

**signs** 181:24

**similar** 22:7 127:3,20 170:9

**similarly** 77:11

**single** 23:16 77:20

**sit** 23:18

**situation** 22:10 26:1 29:16
30:12 31:2,5 47:6 142:23
143:7 147:5,9 152:2

**situations** 43:4,12

**six** 12:24 14:18 16:15 86:2
91:23,25 192:25

**slim** 142:12

**small** 20:23

**smaller** 97:1 136:11 183:9

**smarter** 109:4

**Smith** 9:21,24

**Smith's** 9:22

**snail** 191:19

**so** 5:24 6:14,17,21 7:8,11 9:3
10:6 18:22 19:4,16 21:15,22
22:17 23:1,7,8,11,14 24:13,16
26:7,10,13,14,21 27:2,13 28:5,
18 29:16,19,25 30:13,19,20
31:2,12 32:5 33:10 34:24 35:2,
5,22 36:6,10,11,18 37:4 38:13
42:9,16 43:1,14,23 45:4,10,13
46:8,17,25 47:1,6,11,21 48:23
49:14 50:3,20,22 51:5,10
52:16,19 53:3,20,23 55:5,16,
17 56:17 57:4,16,20,23 58:2,
10,13 59:5,12 61:15,18 62:18
63:20,24 64:3,7,14,19,23
65:14 66:5,24 67:3,6,11,12
68:2,3,14 69:6,22 71:1 72:11,
21 74:25 75:24 76:7 77:11,17,
19 78:3,24 79:18 80:6,8 84:3,
9,22 85:1,13,18 87:16,24 88:9,
16,19,22,25 89:10,14,22,23
90:2,6,9,12 91:3,12 92:10
93:2,10,21 94:7,11 95:16,20,
23 96:16,22 97:1,23 99:2
101:21 102:3,16 103:8,10,19
104:3 105:3,18 106:3,10,15
107:3,10,15,21,24 109:4,6,14,
16,24 110:11,19,24 111:8,10,
19,25 112:6,11 113:4,22
115:7,16,19,22 117:1,5,21
118:8,11,12 119:1 120:3,7,10
121:7,18,23 122:10 123:6,18
124:1 125:1,3,8,13 126:1,17,
19 127:11,19 128:10,16,24
129:6 130:4 131:3 132:8
133:4,15 134:9,25 135:22,23
136:1,6,12,16,25 137:8,14
139:6,9,18 140:18,22 141:2,9
143:4 144:9,14,19 145:4,9,13,
15,17,21 147:15,21 148:2,10,
20,22 149:4,12,24 150:14,25
151:22 152:2,20 153:3 154:8
156:4,9,25 157:9,13 158:8,18

159:1,8 160:20 161:4,6 162:24
163:3,4,9,11,12,17 164:10,13,
18 165:18 167:15 169:16,24
172:5,23 173:5,7,13 174:7
175:10,13,19,24 176:9 177:9,
10,15 178:8,17 179:15 180:11,
14,18,22 181:8 182:5 183:4,
10,13,15,21 184:3,9,18,25
185:1,5,16,25 186:6 187:5,9,
22 188:9,13,18,22 189:12
190:2,8,20 191:6,13 192:15,20
193:2,7,18,24 194:7

**software** 166:15

**soliciting** 40:13,15

**solicits** 41:19,20

**some** 9:2 24:18 33:23 40:18
62:17 70:2 73:17 118:8
136:10,11 146:22 160:2,4
166:12 173:21 174:14 181:12
183:9

**somebody** 99:10 141:11,12
142:12 143:3,8 160:4

**something** 21:6 24:15,19,20,
22 39:16 40:4 42:9 51:20 63:8,
13 68:21 73:11 93:8 107:19
127:21 140:14 145:20 159:10
163:25 167:12 181:3 192:12

**sometimes** 6:16 26:12

**somewhere** 65:18

**soon** 67:12 68:10

**sorry** 11:20 15:4 26:24 32:17
38:18,20 40:2,8,24 43:2 44:16
49:22 50:21 52:6 54:19 60:4,6
70:18 71:14 72:18 77:24,25
89:2 101:2 113:10 114:20
117:13 121:7 125:6,12,21
128:3 147:20,21 153:24
156:12 164:14 171:6,7,21
174:11 176:24 190:10

**space** 19:3 36:18

**speak** 10:9,13 12:18 13:9,14
14:2 90:16 91:4

**speaking** 25:10 89:13 90:1,8
176:23,25

**specific** 23:13,19 24:11 27:10
48:10 50:18 61:5,7 66:15
80:20 81:13 82:10 116:25
126:21 188:24

**specifically** 19:15 31:15
33:25 40:11 42:18 50:7 55:17
56:13 57:3 81:17,20 83:14,17
84:1,4,18,24 112:15 117:9
122:7,15 124:3,19 138:23
139:8 140:19 169:21 179:23

**specifics** 143:10

**speed** 13:9

**spend** 14:6

**split** 111:15 126:13

**splitting** 95:5

**spoke** 14:5 28:4

**Sports** 62:10,12

**stand** 18:20

**standard** 21:1,12 22:5 96:12

**standardized** 19:24 20:5 22:2
96:13

**standing** 12:15

**standpoint** 24:9 162:20

**start** 155:2 171:7

**started** 24:19 61:25

**starting** 39:15 41:4

**starts** 10:3

**state** 5:15 6:2 25:1 50:7,21
62:6 71:14 83:18 84:4 112:15
147:20

**stated** 28:19 35:19 49:12
79:14 83:14 84:24 89:18
122:1,15 124:4 129:17 131:21
132:4 149:1 162:19 189:5,18

**states** 74:9 146:20

**staying** 42:23

**steal** 40:15

**steering** 155:22

**step** 75:1

**steps** 59:13

**Steve** 32:20

**stick** 129:7,11

**sticking** 128:13

**still** 19:4 35:16 36:15 40:19
76:20,22,24 77:1,9 87:16

93:16,23 96:23 109:21,23
146:22 160:11

**stop** 42:2 63:25 64:4 77:12

**stricken** 160:11

**strictly** 135:9

**strike** 32:17 43:3 44:16 50:21
54:19 156:12 168:6 176:24
190:11

**structure** 34:6

**structured** 140:23

**study** 142:5

**subject** 9:5 13:10 15:1 25:2
51:7 70:19

**submission** 168:10

**submissions** 11:8,11

**submit** 53:21,23 147:16 148:8
155:21 189:13 190:3

**submits** 11:18 168:7,8

**submitted** 26:17 54:22
102:13 145:6,7,8 147:6

**submitting** 150:15 170:8,12
187:25

**subscribe** 163:3

**such** 70:20 108:19 171:14
181:6

**suffer** 102:16,17 105:14 111:1

**suffered** 105:5 109:17 120:24

**suffers** 102:12 104:20 105:3
109:22 110:1 111:21 113:6,12,
24 114:13 115:2,23 116:18
117:1,12 121:20

**suggested** 22:11

**suggestion** 139:20

**suggestions** 21:8 22:3

**suit** 167:16

**summarized** 81:11

**support** 5:14 24:8,10 59:17
73:5 76:11 141:16 176:9

**supporting** 176:7

**supports** 101:16,23 141:19

**suppose** 21:10 43:11

**supposed** 62:20 77:6,7 118:2

**sure** 6:4 10:5 15:13 19:16 25:3 26:7 31:2 36:9 39:21 40:3 41:7 43:12 44:21 45:1 50:16 53:20 60:9,13 63:22 70:10 74:24 75:21 76:16 78:3 83:4 105:24 108:25 124:24 125:12 126:11, 12 127:12 128:5 135:22 142:25 143:10 145:23 147:14 164:11 167:8 172:12 173:20 180:8,13 181:9 183:14,18 184:7 185:1,3,8 186:10 189:1

**swear** 5:17,23

**system** 81:18 127:15 146:5,7, 12 175:5

**T**

**tactics** 61:20

**take** 21:20 22:6 38:23 50:13, 15 59:14 60:8,19 72:11 75:1 77:17 110:19 125:1 133:12,16 145:25 170:2 178:17 181:23

**taken** 5:8 6:6,10 16:6 133:22

**takes** 167:23

**taking** 5:11 6:14 31:22 34:5 47:6

**talk** 9:24 15:11 31:12 33:24 39:15 40:4 51:3 138:5,22 139:23

**talked** 29:6 33:23 38:3 66:18 77:4 85:13 116:2 118:1 143:13 147:12 166:9 175:11

**talking** 19:10 23:7 31:3 33:7 40:13 90:12 95:8,9 107:25 165:16 169:11 173:2 191:3,24

**talks** 81:17 147:15 169:24

**team** 24:8 41:15 141:2 167:14, 24 174:22 188:16

**technically** 77:5

**technologies** 166:10,13,19 167:5,19 168:1

**technology** 24:6,7,9,13 59:17 66:23 72:8 73:7,12,17 74:5 79:5,10 98:1 101:14,19 162:20,23 166:14 167:13,15 194:13 195:2

**tell** 5:23 18:4 22:10 34:1 52:20 87:21 105:13 132:13 142:2 157:13 165:11 171:24

**telling** 16:11 74:25 81:14 155:20 181:21 185:6

**tells** 121:23

**ten** 61:23 92:8,10,23 93:3,15, 23 94:25 95:8,10,16

**term** 157:12 160:22,25 161:2

**terminate** 63:1,3,5,6 64:7,15, 25 65:15 67:11,20 68:14,25 69:7 119:7,9,12 144:20,24 145:10 150:10

**termination** 69:11

**terms** 16:14 18:17 29:25 30:1, 3 34:9 40:24,25 44:10 53:12 62:17 76:21 77:5 87:13 118:20 127:21 152:4 156:16 157:11 167:22 169:5 170:7 183:15,23 184:1 186:2,3,6,8 188:2,9 189:6,9,15

**test** 40:24

**testified** 21:12 40:25 65:12 66:10 67:6 88:16 90:6,22 94:7 109:6,11 112:6,21 138:4,9 140:8 141:20 143:11 156:6 164:19 165:18 167:8 169:9 176:3 190:24 194:3

**testify** 6:22 15:15 64:14 80:1 104:22,25 107:4 157:22 187:24

**testifying** 6:21 56:17 87:25 101:23 121:7 133:1 136:25 137:16 158:8 159:21 186:14

**testimony** 14:22 50:20 56:22 59:6 90:15 112:16 113:5,23 114:13 126:5 129:9 134:9 143:16 144:9 164:25 175:12 176:10 179:15 192:15

**textual** 107:4

**than** 13:5 36:10 52:13,14,15, 17 60:3,5 64:21 65:3 93:25 109:4 119:2 127:23 134:8 143:21 151:8 153:14 159:20, 21 163:19 164:14 170:8 179:12 182:25 183:9 187:12

**thank** 28:17 124:25 126:1 164:13

**that** 6:15,17,20,22 7:1,7,8 8:2, 4,21,24 9:2,14 10:3,4 11:17 12:23 13:17,20,24 14:19 15:14 16:1,11,14,19,22 17:3,7,8,21, 22,23 18:23,24 19:4,18,21,23, 24 20:1,15,22 21:1,15,16,19, 22 22:1,4,7,8,12,14,17 23:2,3, 12,13,14,15,17,20,23,24 24:8, 19,21,22 25:1,3,4,14,22,23,24 26:5,11,18,19 27:2,12,21,22 28:2,9,10 29:6,8,17,18 30:4,9, 12,15,20,21,23 31:4,8,16,18, 19,24 32:2,13,17 33:21 34:2,3, 6,7,10 35:12,19 36:2,10,12,16, 20,21,24 37:4,5,15 38:7,9,10 39:5,8,9,10,12,18,20 40:5 41:13 42:19,23 43:3,4,17 44:11,13,14,16 45:6,12,17 46:4,8 47:1,6,7,8,13,16,22 48:4,9,15,17 49:1,3,4,9,16,24 50:1,6,17,21,22 51:4,11,17,20, 24 52:3,4,5,8,21,25 53:4,6,7, 10,13 54:1,7,12,14,15,19,22, 23 55:6,16,18,19 56:1,17,23 57:6,16,18,19,21 58:3,6,9,11, 14,17,18,20,21,23 59:6,7,8,9, 10,12,17,19,20 61:3,4,6,9,12, 13,15,17 62:11,20,25 63:2,7,8, 11,19,20 64:2,3,5,9,16,17,19, 21 65:1,3,12,16,18 66:2,7,10, 16,19,23,25 67:10,19,21,24 68:3,4,9,19,20,23,25 69:3,7,9, 10,17,22,23 70:3,5,6,12 71:1, 2,6,10,23 72:4,7,12,13,16,23, 24 73:2,3,6,8,11,16,17 74:2,6, 7,11,12,15,16 75:6,7,14,19 76:3,6,7,10,12,15 77:4,9,11, 12,13,19,20 78:7,8,10,11,13, 16,22,24 79:8,11,13,17,20 80:10,14,18,24 81:2,3,5,10,11, 13,14,15,16,20,21,23 82:7,8,9, 10,11,12,13,14,15,21,24 83:7, 10,12,14 84:2,11,18 86:3,11, 15,20,23,25 87:8,10,21,23,25 88:6,10,11,24,25 89:10,14,18, 23 90:2,7,10,11,17,20,22 91:11,14 92:12,14,15,20,21, 22,24 93:9,14,19,21 94:7,16 95:3,21 96:4,5,6,8,9,17,25 97:15 98:2,13,19,20,21 99:2,4, 10,12,19,20,22,25 100:2,3,7, 11,14,17,19,24 101:7,15,21,22 102:8,9,21,25 103:1,12,17,21 104:11,19,20,22 105:12,13,15, 18 106:5,10,19 107:3,7,22 108:2,4,5,13,19,20 109:7,10,

16,17,18,19,20,21,25 110:1,2,5,8,12,19,20 111:5,12,19,20 112:3,7,12,14,15,17,18,25 113:5,23 114:4,5,6,10,11,13,25 115:11,17,22,23 116:3,13,17 117:1,4,12,15 118:1,3,5,13,18,19 119:3,20 120:1,2,7,11,12,15,19,20,24,25 121:2,5,7,8,13,19,20,23 122:1,4,5,7,17,19,22,24 123:1,8,14 124:2,7,8,9,12,13,16 125:2,3,25 126:3,18,24 127:1,7,14,22,25 128:3,10,14,15,16,19,20,25 129:2,4,7,13 130:2,5,10,18,22,23,25 131:2,5,6,7,16,17,21,24 132:1,4,7,8,9,10,11,16,18,22,25 133:1,3,10 134:4,6,8,9,11,13,14,17,19,22,25 135:2,15,24 136:5,9,14,17,25 137:5,6,8,13,16,18,21,23 138:1,5,13,15,16,17,19,22,25 139:1,3,9,13,14,16,21,25 140:13,14,15,25 141:5,13,16,19,22,25 142:2,6,8,10,11,13,15,24 143:3,4,7,14,15,16,19,22,23,24 144:7,9,12,14,16,19,20,22 145:12,14,15,18,19,20,22,23,24 146:4,8,9,17,20,25 147:1,4,5,6,7,9,19,25 148:2,3,11,19 149:1,10,14,22 150:2,13,14,18,23,25 151:7,8,9,11,15,17 152:5,6,8,10,11,12,20,22 153:2,10,14,15,16,18,19,21,22,25 154:2,3,5,19 155:4,5,6,10,11,15,17,20,22,25 156:4,6,12,15 157:21,22,24,25 159:10,16,18,20,23 160:3,7,25 161:7,10,16,19,21 162:4,5,10,13,19,20,21,24 163:1,5,7,9,13 164:2,5,20,22,23,25 165:1,6,15,18,19,20 166:4,10,15,16,21 167:3,5,11,12,15,18,22,23 168:2,3,6,10,18,20 169:2,6,9,10,13,14,16,17,24,25 170:6,11,12,14,15,18,25 171:18,24 173:16,20,21,22,23 174:17 175:1,8,11,13,17 176:3,7,13,16,17,24,25 177:1,2,7,25 178:6,9,13,17 179:7,10,15,16,17,23 180:1,4,16 181:3,4,9,16,21,23 182:2,5,7,9,16,21,22,24 183:2,6,8,9,11,13,14,22 184:3,15,16,18,24 185:3,8,10,14,20,24 186:7,11,14,23 187:1,3,10,13,14,24 188:1,3,5,9,12,15,16,21 189:4,5,7,14,17,18,19,21,23 190:3,4,5,10,11,15,23,24 191:1,7,8,11,21,22 192:3,7,8,9,10,12,15,16,19 193:2,4,6,7,21,24 194:3,4,7,8,12,14,22 195:1,4,7,10

**that'd** 49:1 51:13 83:24

**that'll** 72:11

**that's** 7:9 15:1,12 18:1 21:15 24:6,15,19,25 28:5 30:11 36:21 40:20 41:16,24 44:2,16,24,25 45:2,4 47:11,16 51:7 57:21 58:11 59:25 60:16 63:13 64:7,22 65:9,21 66:20 67:7 68:3 71:19 74:17 75:12 81:12 83:6 87:15 88:16 97:23 100:22 102:1,24 103:9 107:8,18,20 109:24 111:12,19 114:7 117:6 123:15,17 125:22 126:5 130:19 136:14 144:23 151:22,25 152:1 154:11 155:22 158:18 159:19,23 163:11 171:3,18 173:6,7,13,15 175:4 178:5 179:5,14 182:17 183:15,25 185:1,24,25 186:6 188:6 189:16

**their** 18:15 21:4 34:7,8 36:2,16,17,18 41:21,24 54:15 56:2,4 75:2 76:11 102:14 119:7 125:17 127:10 128:11,17,24 129:11 130:7 131:9 136:4 140:22,24 141:1,12 142:18 149:22 150:6,19 151:2 152:11 153:7,16 154:15 156:3 167:17 185:22 186:3,6

**theirselves** 183:7

**them** 14:15 31:22 33:7 40:16,19,21 41:11,13,14 52:24 66:19 69:21 70:2 96:19 104:1 110:3,4 125:19,22 136:21 142:9 148:8 152:14 153:17 166:11 167:17 182:20 183:6,15 185:2,11,17 186:4,5,7 187:11 189:5,10

**themselves** 98:16

**then** 16:24 21:15,21 25:13 29:23 30:3 31:12 36:19 41:11 45:7 48:2 56:1 60:7 61:25 62:10,14 69:5 88:22 93:15 94:7 102:14 107:6 112:16 125:4,11,22 131:6 133:13 137:21 143:5,8 154:1 155:10 165:6,11 170:13 172:7 174:20 175:21 180:4 190:17 192:20 194:10

**there** 6:25 12:24 13:1,4 14:22 16:15 18:21 19:18,19,20 20:13 21:19,22 22:23 23:5,24 25:15,23 26:7,10 29:7 30:9,12,20 31:2,8,12 35:15,18 37:4,7 40:5,10,13,22 42:22 43:4,11 44:14 45:22,25 46:4,9,11,18,22 47:3 48:2,4 50:9,18,22 53:25 54:1 55:6,18,20 56:1,10,18,23 57:2,5,7 58:10,19 59:24 66:6,22 68:20 69:9,12,23 74:1 79:15 80:6,13,20 81:16,19,23 82:5,10,11,19 83:10,15 88:10 93:6 96:9,16 99:19,23 100:15 101:13,22,25 102:9 104:18 105:18 106:10 107:21 108:4 109:21,23 110:13 111:20,23 115:13,17,21 116:25 119:23 121:13,17,19,22,23 122:10 124:4,16,18 126:6 127:19 128:14 129:17 134:25 135:2 137:11,15,16,23 138:4,12,13,16,23 139:20,24 142:5,23 143:1 144:19 145:17 146:21 149:10 151:7 152:2 153:15 157:25 161:21 162:2,11,14 164:20 165:6,25 167:22 168:20 169:22 170:23 173:7,21 176:8 177:15,19 179:11,16 181:17 182:20,22 184:11 187:2 188:20,22 189:8,11,12

**there's** 19:2 24:9 26:19 37:1 40:4,9 47:6 50:1 58:18 69:5,10 93:2,5 102:11 115:19,22 119:20 120:9,13 121:1 123:6,21 124:12 125:15 136:6,10 141:12 147:10 151:7,17 158:23,25 159:6 160:2 173:14,21 179:11 191:7 192:25

**thereof** 171:13 181:5

**these** 14:2 20:7 25:12 32:5,8,11 36:12 41:20 42:18 52:21 54:22 72:4 74:25 75:6,21 76:8 80:2 83:9 84:22 101:21 119:21 125:17 129:7,11 130:5 132:9 136:4,17 149:13 183:14 185:4 188:9,22

**they** 18:5,16 19:8 21:6 23:4 24:21 25:19,24,25 28:11,12 29:16 30:3 31:18 32:13 34:2,3,4,6 36:14,17,18,19 40:11,17

41:22,23 42:19 43:21 44:8
46:6 47:7 51:17,18 53:25
56:14 57:11,14,15,16,17
60:13,15 61:12,19 63:3,7
64:17 75:4,19 76:12,13,14
77:10,13 81:19 88:7 93:12,15,
16,22 95:24 98:16 119:6,20
120:5 122:12,14,17,20,22,24
123:7,10,14,18,22,23 124:1,3,
6,11 127:5 128:10,17,24 129:4
131:8,10 132:5 135:7 136:4
137:21 139:16 140:5,23,24
143:8 144:12,24 145:5,8,23
148:8,11,16 149:13,17,18,20
150:3,10,18,22 151:9,11,14
152:5,6,8,10,11,15,18,20,21
153:6,9,10,16,18,21,22,23,24,
25 154:11,14,17,22,23 155:2,
3,5,10,12,16 156:2 163:8
170:12 177:10 179:23 181:21
182:2 183:4,18 184:1,16,18,
19,22 185:8,22,25 186:1,8
187:10,11 190:3

**they'd** 153:17

**they're** 18:23 19:5,6,8 40:13,
14,15,16,17 41:8,9,10,20,22
56:17 66:16 76:13,22 77:6
93:23 103:10 110:6 113:8,9,10
122:18 128:8 149:22 150:2,25
151:2 152:4,8,10 154:9,15
182:3

**thing** 38:24 41:18 72:20 73:20
74:10 80:25 128:12 153:4,5
158:16 172:22 191:5

**things** 31:16 74:22 75:17 76:1
103:10 110:6 116:17 160:6

**think** 28:4 37:9 39:1 42:4
44:25 45:2 46:14 47:13 48:23
49:1,3,8 51:10,13,17,23 52:3,
11,19 53:10 59:2 65:3 76:3,6,
15 77:4 80:8 82:1,15,18,22
83:12,17,24 84:3,10,12,20,22
85:1,13 88:4 100:22 101:1,3,5
102:12,24 106:3 107:7 108:17,
21 109:6,10 113:12 114:19
117:11,14,18,21 126:6 129:13
138:4,8 140:8,9,11,18 143:11,
12,18,20,22 148:2,3 149:12,14
151:5 152:13 153:13,17,19
154:1,3,9 155:15,17,20,22
156:6 157:2,15 158:8,10,15,17
159:8 160:2,7,13 161:9 163:12
164:2 166:11 167:8 175:6

177:22,23,25 178:1,2 179:15
182:16 183:22 184:12 185:10
187:10 189:19 190:2,9 191:7,
25 194:4

**thinking** 162:24,25 166:2,3

**third** 10:2

**this** 5:7,11 6:5,24 7:23 8:13
14:15 15:1,5 17:9,12,13 20:4,
19,22,23 21:12 23:2,8,10,13
26:11 27:15,17 28:6 29:13
30:8 31:4 34:9 36:10 37:6 38:6
39:9 40:25 41:1,12,18 42:4,17
44:1,18 45:11 46:1,6 47:6,23
48:4,25 50:1,14 53:20 55:14,
19 63:7 67:3 68:12 70:24
75:19 76:21 77:6 80:6 81:2,9,
21 82:4,12 83:18 84:5,11,22
85:1,7,13 86:6 87:7,9,10
90:10,11,14 91:3 96:12 97:5
98:6,21,23 99:2 105:22
108:11,18 112:22 113:5,7,8
114:8 121:25 126:19,20,21
127:3,7,10,18,20 128:18
129:13 130:13,16 131:7,8,14
132:9 134:15 136:16,17
137:11,17 139:12 140:12
142:6 145:10,11 146:4,6,12
147:12 148:10,11,15,20,22
149:4 154:4,17 155:17 156:17,
21 157:1,17 158:9,15 159:13
160:7,9,11 164:12 166:3 170:2
171:5,8,16 172:4,22 174:7,15,
18 175:12 177:11,25 178:20,
23 179:1 180:2,18 181:10,13,
17,18 182:19,21,24,25 183:8
184:16,25 185:8 186:18 187:2,
10 188:10,14,17,18,19,24
189:8,14 190:9,12,18 191:3,
11,17,23 192:4 195:16

**those** 8:24 9:5 13:4,5,10,15
21:5,8,23 25:7,11,21 27:23
29:6 30:3,9 31:16,20 34:17
35:15,18,20 45:9 48:10 52:10
56:25 57:8,9,10,14 59:8 63:24
69:17,20 70:1 73:13,15,23
74:22 75:15,16 76:1,15 82:16
99:25 102:4 104:23,25 118:8,
11,20 121:15,16 123:23 124:6
125:15,16 132:5 135:4,6,9
136:9 139:3 146:19 160:4
162:20 166:12,18 167:5,15,19
168:13 171:11 174:24 178:13
179:13 180:20 181:9,10 187:4
194:12

**though** 19:4 48:18 49:11 84:9
87:6 93:10 104:10 121:16
153:20 188:7

**thought** 89:6 148:11,23 156:6
165:6 178:5,6

**thoughts** 139:15

**three** 14:7 44:19,20 91:17

**through** 10:6 18:10 23:16
26:17 31:17 32:7 36:1 43:2
50:11 51:21 68:20 79:23 96:6
116:2,3,9,12 125:6 141:11

**throughout** 67:17 135:7

**ticket** 47:2,3

**tied** 26:19 45:9

**time** 5:6 8:8 15:19 22:14,17
30:21,23 37:1 38:23 53:19
54:12 67:16 71:18 78:1 86:17
93:6 98:20 99:2,5 118:10
127:1 140:25 144:1 145:6
147:20 148:16 151:25 161:8
165:19,25 170:15,16 171:12
172:22 178:9 181:8 185:9
186:16

**times** 7:5 143:2

**today** 5:13 7:24 8:10 9:25
14:22 23:18,21 113:5 128:6
135:13 144:10 177:16

**today's** 195:17

**together** 19:17 31:7 40:9

**told** 15:7 27:22 39:10 73:18
75:6 130:19 134:3 176:17
183:4 192:8,21

**tomorrow** 128:7

**took** 138:1

**tools** 73:8,14 74:16 79:6

**top** 38:15 39:19 73:11 128:2

**topic** 51:6 104:18 158:18

**topics** 8:24 9:3 10:3,6 13:4,5,
10,15 14:2 51:7 80:4 104:23
105:1 157:18 158:7,13

**total** 69:14 95:8,22 116:15

**touch** 181:13 188:20

**track** 27:4 68:13

**tracked** 68:19

**tracking** 65:11 68:11

**traditionally** 24:20

**trainers** 163:8

**training** 24:7 66:24 72:9 73:7, 10 76:12 79:5 163:5,6,14,18 166:16 195:5

**transaction** 36:3

**transcript** 6:17 37:12,14,19 38:14 50:22 63:17 113:21 190:21

**transcripts** 50:12

**transferring** 31:19

**translated** 26:9

**translates** 26:25

**trick** 186:13

**tries** 33:16

**trigger** 141:5 145:17

**trolling** 63:8

**Troy** 5:1,12

**true** 124:15 182:6

**truly** 79:15

**truth** 5:23,24

**truthfully** 6:22

**try** 109:3,4,5

**trying** 25:10 40:15,22 41:9 69:8 107:19 126:13 128:14,15 129:9 150:2 154:14,15 159:3, 11 182:18 186:13,14

**turn** 10:2 38:13 63:17 125:2 127:25 129:8 130:6 169:21

**turnaround** 30:16

**turned** 126:22

**turning** 31:22

**two** 30:17 31:16 32:5,8,11 33:5,10 34:2 36:12 40:4,9 42:16,18,20 52:21 73:25 75:16,21 91:15 95:12 96:23 103:10 110:6 121:15 125:15, 17 138:9 154:19 161:20 171:21 179:13 180:20

**type** 24:13 26:1 27:24 31:4 61:11

**typical** 11:24

**typically** 26:8 27:2

**U**

**uh-huh** 6:16 21:14 22:19 39:17 47:24 48:1 69:25 80:3 86:24 91:2,24 103:15,18 115:10 130:15 138:11 147:8 149:23 150:1,17 156:11 163:15 173:4 177:14 178:14, 22 180:15 186:22 191:15

**uh-uh** 6:16 156:5

**ultimately** 17:18 38:22 42:24 66:17 120:5

**unable** 43:14,15 91:5

**under** 6:7,21 12:12 56:17 70:13,24 71:3 76:21 105:13 106:1,13 107:9,13,18,23 108:8 121:8 133:1 136:25 137:16 150:13 152:7 153:20 157:21, 24 160:22 172:3 174:20 184:11

**understand** 7:1 13:17,20 17:20 25:11 26:13 28:6,18 30:19 34:23 36:9 37:17 38:6 39:5 45:4,13 50:20 52:19 53:13 55:16 64:3,13,19 67:19 68:23 69:8 72:23 74:12,24 76:16 78:24 80:16 81:19 82:21 92:22 94:17 96:12 97:15 100:6,17 103:4,16 104:20 105:12 106:14 108:13 109:7, 16,18,20 110:2,5,6,24 113:4 120:12 121:16 132:16 134:9 136:1 138:8 141:9 148:2 157:23 160:15 161:19 167:8 174:21 175:1 179:24 180:8 186:14 187:4 192:20

**understanding** 58:14,17,20 59:9 88:24 91:8 95:21,23 129:2,7 169:16 178:8 192:19

**understood** 6:22,23 8:21,22 15:17 28:17 37:20 160:18 185:3

**unfavorable** 153:17

**unheard** 143:4

**unilateral** 17:12

**unilaterally** 178:17 190:17

**unique** 27:23

**United** 5:8,19 8:14 9:11

**unless** 144:12 157:16 181:24

**unlikely** 21:15

**unrelated** 55:6,17 102:16

**unsigned** 57:20

**until** 63:9,10 125:3,9,13,14,19 180:18,19 181:21 183:1,4 186:20 191:23

**up** 13:9 17:16 34:8 36:6,16,20 43:17 61:19 90:14 98:9 108:8 110:4,8,22 111:9,13,14 112:10,11,19 113:17 114:1,8 115:5 116:14 117:3,5 120:5 122:3 135:24 136:9,14 139:14 141:13 167:23 178:12 193:19, 21

**update** 22:9 182:20

**updated** 166:3 169:15

**updates** 181:8

**upheld** 145:24,25

**upholding** 145:22

**upon** 13:25

**us** 25:13,19,25 40:9,21 41:16 51:12 52:22 128:14,15 135:25 142:8 155:21 161:8 163:20 166:12 173:14 186:5

**Usage** 177:4

**use** 20:1 36:11,18 129:8 143:9 146:5 158:11,12,14 162:25 167:14

**used** 22:2 190:12

**uses** 21:2 22:4 141:13 143:8

**using** 26:14

**usually** 123:1,2

**UW's** 176:4

**UWM** 8:13 10:8,13,17,21 11:17,24 12:9,18 13:14,18,22, 25 14:8 15:16 16:16 17:20 18:7,10,11,17,18,22 19:4,10, 14,17,24 20:1,5,8 21:2 22:11,

14,20 23:1,5,14,24 24:4 25:1, 11,20,21 26:17,18 27:4,9,13, 22 28:11,13 29:25 30:5 32:11 34:17,24 35:1,2,5,16,19,22 40:6 42:6,7,8,9,13,14,19,24 43:24 44:5 45:18 46:1,12 48:2, 5,7 54:25 59:13,15 61:4,16,22 62:9,14,25 63:5,20,24 64:10, 14,15,23 65:20,21,24 66:1,17, 23 67:3,11 68:14,20,24 69:7 70:11,16,21,24 71:1 72:2,5,9 73:18 74:16,20 75:7,25 76:8, 19 77:12,17,22 79:20 81:3,10, 14,16,22 82:8,13 85:18,24 86:20 87:7,9 89:11 90:17 93:21 94:1,3,8 96:23 97:5,9,16 98:5,16 102:12,16,17 103:12, 19 104:11,19 105:3,4,13 109:17,21 110:1,25 111:21,25 113:5,12,23 114:13 115:2,22 116:14,18 117:1,12 118:5,6, 12,18 119:2,7,9,11,14,24 120:3,17,24 121:2,9,13,20,24 122:10 124:7 125:23 128:13 129:3,4,7,11 130:5,14,19 131:17 133:4,7 134:18 135:12, 18,24 136:9,12,23 137:17 143:25 144:6,10,17,20 145:9, 15,18 146:5,9 148:3,10,22,23 149:12,24 150:4,10 151:11,18, 19,23 152:21 153:10,15,16 154:10,24 155:3,23 156:2,13 158:6 160:6,23 161:8 162:4,7 163:1,9,13,18 166:10,18,22 167:3,11,20,23 168:1,6,9,13 169:25 170:18,19 171:11,12 172:4,7 178:9,17,25 179:3,17 180:2,5,22,23 181:4 182:12 183:6 184:3,22 186:15,19,24 188:1 189:5 190:12,16 191:17 192:4,12,16

**UWM's** 8:2 10:10,23 11:2,4,7, 10,13,21 12:2,6,12,15 20:14 24:23 37:5 55:8 56:3,19 57:5, 20 70:22 74:5 75:13 86:7 90:15 94:3 100:18 108:3 110:12 170:23 171:5,8,14 176:10 178:12 181:6

**V**

**vague** 87:10 88:5 89:6

**value** 25:24 74:7 79:16,19 80:13,16 175:23 194:12

**variety** 24:9 166:14

**various** 31:17 116:13 166:9

**vendetta** 33:2

**vendor** 24:22

**verbal** 6:15,18

**verify** 32:21

**version** 57:22,23 58:3,6,9,11 164:20 165:7 166:1,3 172:25 191:12

**versus** 5:9 93:3,7 97:2 163:4 167:9

**very** 6:15 30:16 36:5 37:2 61:19 67:16 141:2,6,7,24 151:7

**via** 39:7 188:10

**video** 37:12 39:7,12 189:8,17

**videographer** 5:5,13 16:4,8 60:20,24 133:20,24 172:15,19 195:16

**videotaped** 5:7

**view** 26:2

**violate** 155:11 167:4

**violates** 166:22

**violating** 152:20 154:4

**violation** 70:15 119:17 144:12,14 154:16 155:9 168:8, 11

**volume** 25:19 61:12

**voluntarily** 87:13

**vote** 17:13,16

**VP** 13:1 61:25 62:14

**W**

**walk** 116:3,8

**want** 6:20 10:2,6 24:24 25:2 31:4 39:22 40:20,21 41:17,22 43:21 51:17 55:16 57:2,18 64:15,25 79:8 80:16 81:1,13, 20 86:19 87:6 97:15 103:10 104:10,16 105:12 106:14,20 107:15,16,17 111:15,16 113:19,20 125:1,25 126:17,20 127:12 128:16 129:8 133:16 138:6,12 139:18 146:11,16 147:12 148:19 150:13 151:7 155:20 159:15 160:22 162:4 163:1,25 164:4 171:1,7,17 172:10,13,22 173:5,20 183:14, 18

**wanted** 22:6 89:4 171:18 172:8 185:3,8,25

**wanting** 51:22

**wants** 21:17 164:2

**warrant** 70:13

**warranty** 71:3

**was** 8:8 12:21 13:1 14:22 15:23 16:19,21 17:1,6,9,11,12, 13,15 20:14 22:8,17 23:15 27:9 28:6,10,16,19,25 29:9,13, 16,17,18,22,23 30:4,12,13,14, 15,16,18,20,21,23,25 31:2,6,9, 12,13,22 32:6 33:21 34:3,5,24 38:6,10 39:8 41:2 44:11,14 45:10,16,17,21 46:1,4,8,11,17, 18,22 47:13 49:3 50:9,18,22 51:20 52:1,9,11,25 53:6 54:7, 10,14,22 55:6,20 56:1,6,7,10, 18,23 57:2,4,6,7,19 58:9 59:6, 8,11,12,15,20,24 61:25 62:13, 14,17 64:21 65:18 66:25 72:3 73:4,6,10 74:7,11 76:5 78:9, 17,19,22,23,24,25 79:2,11,12, 13,15,24 80:17,18,24 85:14,15 86:2,17 87:3,11,19,21,23 88:7, 24 89:6,25 90:7,9,11,13,22 92:20,24 93:9 94:8,14,16,17 95:22,23 96:4,12,25 97:5,7,9, 10,12,16,17,22,25 98:20,21,23 99:2,3,23,25 100:3 101:1,3,5 102:4,8 104:18,25 105:10,25 107:3 109:20 115:13,18,25 116:3,9,20,25 118:19 120:20, 21,22,24 121:2 124:4,6 126:6, 21,24 130:25 131:5 132:13,21, 22,25 133:1,3 134:3,4,6,19,22, 25 137:5,8,12,13,16,18,19,20, 21,23 138:10,13,22 139:12,13, 14,17,19 140:1,13,15 143:12, 15,19,20,22 146:20 147:5 154:19 155:10 156:7 159:16, 18 164:19,22 165:1,7,19,21 166:1,3 167:3 168:19,20 169:2,16,17 172:25 173:2,3, 13,23 175:8,11,13,16,17,18,23 176:4,13,16 177:15,18,22,23

178:2 180:11 181:11,13 182:7, 9,19,20,21,22 183:8 184:6,25 185:9 187:2,12,14,25 188:10, 14,17,18,19 189:7,8,17,18,23, 24 190:12 191:24,25 192:8,13, 21,23,25 193:2,3,6 194:4,23

**wasn't** 17:16 31:4 38:20 52:9 53:3 55:18 87:25 88:16,22 89:11,16 90:6 131:3 132:17 176:19 189:11,12,21,22 192:22,24,25

**watch** 177:9

**watched** 39:12 177:7

**watching** 177:13

**way** 20:22 36:16 39:18 55:19 67:3 71:24 76:18 83:14 84:18 93:2,4 109:5 119:19 122:10 125:16 126:15 127:14 140:23 148:7 167:16 168:3 182:1 183:13 187:10,24 188:9 189:3, 7

**Wayne** 62:6

**ways** 24:10 189:9

**we'd** 34:23 59:1

**we'll** 25:1 60:8 175:4

**we're** 10:7 16:3,4 25:3 30:20 37:6,9 55:13 58:2 59:5 60:20, 24 63:8 107:19 125:18 126:13 128:13 133:20 144:23 172:19 183:15 184:25 187:12

**we've** 31:3 66:17,25 78:10 88:9 93:6 97:22 101:10 109:10 111:13 121:15 142:6 149:10 175:11

**website** 24:17 169:25 170:20, 23 171:15 178:12 181:6 191:12

**Wednesday** 5:2

**week** 8:7,8 39:11 86:16,17 134:7

**weekly** 30:15 145:21 146:23

**welcome** 123:23

**well** 6:17 31:20 36:14 39:15 48:6 58:12 59:18 64:17,22 72:1,9 73:8 74:8 75:9,10 87:5 97:13 109:11 112:9 119:9 122:17 123:4 142:9 148:15

151:21 156:22 157:15 159:25 165:24 167:25 192:7 193:19 194:4

**went** 32:6 35:20 49:4 93:3 95:22 118:5,6,18 188:15,17

**were** 10:23 11:1 12:22,23,24, 25 16:11,14,15 17:7 21:11 23:3,4 24:22 29:7 30:3,9 31:3, 8,16,19 32:8,13 33:24 34:4 35:15,18 41:1 52:5,7 57:9 64:17 70:5 71:24 72:4 78:12 83:14 92:21 93:7,22 96:8 101:22 102:4 104:22 113:16 116:12 117:5 124:5 129:2 135:2,3,4,6,9 136:20 137:14, 15,18 138:12,23 139:4,20,24 140:10,17 143:14,15 148:16 164:25 165:15,16,20 166:1 168:20 175:7,10,20,24 176:1, 16,22,25 177:1,10,19 181:17 183:18 185:1,4,8 188:10,20, 22,24 191:7 192:3 193:3

**weren't** 114:10 145:5 176:21

**what** 9:8,14,22 12:25 14:4,14 15:25 16:3,20 17:23 18:4,14 19:13,16 20:12 21:16 23:1,11, 14 24:4,13 25:6,18,19,21,23 26:11,12 27:6 28:9,19 31:24 32:2,6 33:15,25 34:9 37:2 40:18,24,25 41:1,12,17 42:2,5 43:21 47:21 49:12,14 52:12 54:7,18,25 55:3,7,21 56:2,3,19 59:13 60:16,17 61:11,13,24 62:9,12 63:11,25 64:13 66:8, 15 71:25 72:3,5,12,23,24 73:2, 3 74:4,16,19,22,24,25 75:15, 20,24 76:16 78:10 80:12,13,17 81:11 82:16 83:9,18 94:22 97:12,22 98:9 100:14 101:10, 16,23 102:1,22,23 103:19 108:2,11 109:13,24 110:3,12, 16,20,24 112:11,16,21 115:23 116:9,20 117:4 120:1 124:20 126:20 128:8,25 129:17 130:19 132:13 135:3 138:6 139:8 140:15 141:5,16,18,19 145:12 146:5 147:19,25 153:2 159:16 162:14,18,19 163:5 165:4,12,20,21 166:1,12 167:11 169:10,12 170:11,25 171:18 173:2,6,7,13,15 174:16,21 175:1,11,22 177:7 178:5 179:7,23 182:6,16 185:14,25 188:12,13 191:12

192:25 193:4 194:7,22 195:1, 4,7

**what's** 9:12 15:9 16:22,24 17:3 18:14 25:6 59:25 62:2 64:22 73:5,25 74:5,19 76:1,4,7 123:2 125:7 128:23 150:6 151:2 156:16

**whatever** 36:3 143:4 159:10 193:24

**when** 7:21 8:6,16,19,20 11:17 12:21 14:25 15:5 20:7 23:15, 23 29:9 31:6 34:17 35:2 36:1, 11 37:6 40:8 49:15,20 50:5,8, 14 54:22 57:9 59:10 61:3 62:14 65:16 66:18,22 67:4,16 69:9,10,11 79:18 86:15 90:6 93:6,7 98:23 102:12,18 111:21 112:11 113:6,8,9,10,13,21,24 114:14 117:13 119:21 120:4 121:4,8,20,24 122:23 134:6 135:6 136:16 138:18 140:24 142:23 143:2,12 145:4 146:2, 25 147:4,10 151:17 153:4 162:23 164:18,25 165:6,16,18 166:22 168:7 169:22 170:3,4 172:23 173:16 175:6 177:6,16, 19 178:1 181:16 186:18 187:4 193:2

**whenever** 41:22 172:5

**where** 7:6,17 10:3 18:19 22:10 29:16 30:12 31:2 43:4 48:4,7 49:24 50:4,6 62:5 63:9,12,19 65:7,11 82:7,9 107:24 108:2 110:22 112:9,14 126:6 134:3 137:18 141:17,25 143:8 147:5 152:2 156:1 157:1 159:17 168:19 181:2 190:16

**wherever** 153:6

**whether** 27:7 30:14 95:21 105:3,4 126:21 162:3 165:25 167:13 172:25 188:23

**which** 5:16 24:10 31:22 34:3,5 37:2 42:7 61:14 62:19 65:7 76:13 93:6 104:12 128:2 139:16 141:3 146:2 158:1,7 166:4 171:14,15 181:5,11 188:14

**whichever** 72:17,21 73:22

**white** 24:15

**who** 6:2 9:9,20 10:8 12:18 13:5 15:7 17:1,5,8,18 20:7,14 29:11 32:5 43:16 96:5,7 115:16 129:2 146:20 149:21 150:4,15 151:1,16 152:21 168:24

**who's** 16:16 17:6 32:18,23 63:9

**whole** 5:24 24:10 36:13 38:23, 24 54:22 59:18 87:6 158:9 171:3 179:5

**wholesale** 5:8,19 8:14 9:11 12:12,15 17:20 18:6,11,18 19:2 20:20 23:6 27:18 31:19 34:7,8,14 36:2,7,14,15,19 37:1 38:10 39:6 40:5,10,12,23 42:7, 8,15,22,23,24 45:18 46:1 48:2, 5,8,25 49:15,25 50:4,7 54:1 59:16 61:8,13,14,18,21 65:24 66:4,8,9,17,18,20 67:8 69:18, 21 70:2,4 72:1 86:22 90:19 94:1,5 96:13 102:14 120:3,4,6 126:19 140:13,18,23,24 141:7, 12,14,23 142:12,16,18,24 143:9 164:21 166:22 167:4 168:4,9 170:7 172:4 190:13 195:8

**whom** 5:16

**why** 11:1 12:9,20 15:23 19:1 31:15 32:13 33:21 34:22,23 35:9 41:2 44:11,14 45:10,16, 21 48:12,17 50:25 53:24 54:4 58:21 62:17,18,25 63:7 64:7,9, 15,23 65:1,14 66:5 69:3,20 70:1 81:5,9,13,15,20,23 83:7, 8,9 85:7 86:25 87:3,19 88:4 89:5 91:3 92:22,25 93:1 94:11, 14,15,18,20,24 96:3,10 99:24 100:10,17,18,19 107:8 108:7 112:18,21 116:24 122:2 131:6 144:22,23,24 145:9,15 149:9 161:18 162:13,14 174:15,16 176:19,21 180:4,23 182:5,12, 13 183:5,15,25 184:3 185:1,5 186:6,23 188:24 192:21,24

**widely** 188:17

**Wilner** 17:4

**win** 40:8,9 41:25

**within** 15:6 30:17 39:11 42:23 134:7,10,13,17 136:9 137:1 139:12

**without** 70:21 98:17 138:20 149:4 169:11 185:10,20 187:7, 21

**witness** 5:17 6:4,11,19,23 7:4, 9,13 13:12 15:11,13,17,23 17:15 20:10 21:19 22:23 24:2 28:2 29:22 32:15,20,25 33:13, 15 34:12 35:25 38:25 39:3 42:22 43:11,20 44:4,21,24 45:25 46:22 48:15,20 49:3,11, 22 50:17 51:2,4,15 52:24 54:7 55:13 56:10,23 58:14 65:6,23 66:14 67:15,24 68:18 71:14 75:9,19 77:1,15,25 78:19 79:2, 22 80:20 81:7 82:4,18 83:3,12, 22 84:7,17 85:4,10 86:5 87:7 92:17 93:25 94:22 95:20 97:7, 12,25 98:11,25 99:7,17 100:14,24 101:10,18,25 103:1 104:1,8,15 105:9,24 106:24 107:13 108:25 110:8 111:5 112:3,25 113:2,16 114:21 116:6,12 117:8,18 118:16,24 119:6,11,23 122:7,14 123:4, 10,21 124:11,18 129:17 130:10,22 131:21 132:13,21 134:22 136:20 137:5 138:22 139:3 140:1 142:20 145:2 146:13,15 147:25 148:7,15 149:1,7,17 150:9,22 151:5 152:18 153:2 154:8,22 155:9 161:2,14,25 162:18 164:2 167:1 168:16 171:3 173:25 179:22 180:8 181:1 182:1,18 183:18 184:6,21 185:13 186:10 187:1,22 188:5 193:12

**Wolfe** 16:25

**word** 25:15 108:4

**words** 48:10

**work** 17:24 18:8,22 19:6,8 26:6 28:11,12 63:20,24 64:3,4, 11 72:3 76:14 125:23 136:5 143:5 155:21 156:16 160:6 161:7,8,9

**worked** 62:10

**working** 62:9 125:15,22 129:3 155:2 180:20

**works** 10:15 94:12 127:15 140:10 142:6 146:8 157:13

**world** 41:24

**would** 9:1 14:15 15:18 18:23 21:10,16,23 22:6,9 23:5,16 24:21 25:8,24 26:6 27:9,11 32:21 34:16 35:16,19 37:13 44:7,8 48:23 49:8 50:11 51:17, 24,25 52:3,8,10,16,18,19 53:7, 10,20 54:18 55:1,8,21 56:2,3, 14,19,24 60:18 63:2,6 65:3,10, 19,23 67:24 69:7,11 72:16 73:13,15 75:4 79:22 80:6,8 82:15,22,24 83:4,17 84:4,10, 12,20,23 85:10 90:16 91:4,13, 14,15 93:7,12,15,16 102:23 104:15,16 109:21,23,24 110:1 112:9,25 114:4,11,12 117:11, 15,21 118:6 119:6 122:10,17, 21 123:7,10,23 124:1,3,12,20 129:2,4,8,10,18 132:6 134:14 135:1 136:2,4,17 142:1 143:2, 5 144:7,14,20 145:6 148:4,11, 23 150:3,25 151:16,19 152:7 153:2,19,21 154:1 155:11 157:25 160:3 161:10,16,17 162:18 163:3 167:4 168:1,2,3 169:6,14 172:3,7 173:10 174:18,21 177:10 179:12,16, 22 181:19 182:24 183:10 185:22 187:5 189:4,5,19 190:2,9 192:12

**wouldn't** 62:25 67:11 68:14 118:13 122:4 124:16 149:4 152:20,22 153:21 181:22 184:15,18 188:1

**writing** 178:24 179:2

**written** 58:5 88:5 148:7 182:2

**wrong** 129:6 140:12 178:9

Y

**yeah** 15:3,5,25 20:18 22:17 28:24 35:18 44:14 45:2 48:7, 17,23 60:9 71:17,21 72:15 73:2,5 74:25 75:24 76:18 77:24 78:3 84:9 87:2 89:22 94:24 95:6,12 97:21 98:11 99:2 100:17 103:4,13 104:10 107:3 114:19 118:11 120:12 126:11,17 127:3,13,24 128:3, 21 130:12 133:17 139:9 143:17 144:24 145:4 147:21 152:18 156:24 157:20 158:12, 16 159:5,15 160:1 162:2 163:21 164:5 171:22 172:14

173:12,19,22 174:17 175:3 176:22 177:6 178:5 180:11 182:11 183:3 186:13

**year** 27:14,15 157:11

**yearly** 27:7 156:15

**years** 61:23 135:8

**yep** 18:10 26:15 29:4 53:16,18 56:7 75:3 77:24 80:5 86:14 92:5 95:1,15,17,19 107:5 125:8,10 130:12 140:18 169:23 177:12 180:14

**yes** 5:25 6:19 7:4 8:5,9,12,25 9:4,6,10,17 10:12,16,19,22,25 11:3,6,9,12,16,19,23 12:1,5,8, 11,14,17 13:16,19,23 14:1,3, 13,21 16:21 17:8 18:21 19:19, 22 23:22 27:8,16 28:8 29:2,23 30:24 31:14 32:12 33:9,20 34:2,20 35:4 36:25 38:1,5 39:8,11,14,24 40:2 41:3 44:23 45:9,15 46:17 47:17 55:4,24 56:14 57:17,22 58:15,20 59:9, 23 61:10 63:23 67:5 68:3,4,13 69:2,9,15,16,19 73:22 75:5 77:2,10 86:5,12,18 87:18 88:21 90:21,24 91:2 92:1,3,7,9 93:18,20,25 94:10 96:15,20, 21,25 97:23 100:5,9 101:4,6 102:5,8,15 104:21 108:1 109:23 110:3 113:11 114:9,16, 21 116:2 118:4,14,16 119:12, 24 121:6,10 126:1,4,8 127:5,8, 16,23 130:10,15 131:13,16,21 134:12,16,22,23 135:5,11,14 136:21,24 137:6,10,24 139:11 140:7,16,21,22 144:4,21 145:8 147:25 148:7,8 154:1 155:14 161:5,14,17 162:8 163:20 165:3,17 167:1,10,21 168:12, 16,25 169:1,4,8 170:1,10,17, 21,24 171:2 172:2,6,9 175:9, 25 176:2,11,15,18 177:21,24 178:14,16,19 179:8,22 180:3, 17 183:24 184:2,14,17 186:17 188:6 189:7 191:20 192:19 194:9

**you'd** 19:4 47:1 158:20

**you'll** 6:24 140:8

**you're** 14:2 28:25 31:2 33:5 45:1 50:14 55:23 56:17 60:16 62:20 64:14,24 68:11 69:6 72:19 74:25 76:17 79:11 80:1 81:14 84:2,18 87:24 88:19 89:15,16 90:13,25 91:5 93:4 95:9 101:16,23 102:1,3,6 104:12,18 107:3,19,25 108:17 111:12,17 115:9 121:7 122:24 123:13 125:14 126:12 127:9, 19 132:25 133:1,15 137:25 139:6,9 140:18 141:9 151:6 156:4 159:11 164:13 169:22 170:3,4 174:21 175:2 177:7 180:19 183:22 184:25 185:16 186:11,14 188:9

**you've** 15:11 33:7 109:6 176:3

**your** 5:13,15,22 6:3,9,25 7:1, 21 9:8,12,24 13:24 14:4,9,11, 22 15:9,18 23:21 24:6,19 26:1, 2 40:15 41:19 47:13 48:20 50:20 53:19 58:17 59:5 60:7 62:2 71:14 76:5,15 79:4,18 89:7 90:9,13 94:13 95:23 98:25 105:8,25 107:2 109:1,3 112:16 113:4,22 114:13 118:10 123:1 125:23 126:5 129:9 134:9 144:9 147:20 156:21 160:20,24 165:20 175:6 176:10 179:15 180:9 182:19 184:7 186:11 189:1 192:15

**yours** 160:23

**yourself** 8:11 39:25 170:3