UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE,
LLC,

       Plaintiff,

v.

KEVRON INVESTMENTS, INC.,

       Defendant.

Case No. 22-10395
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING UNITED WHOLESALE MORTGAGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT [40] AND DENYING KEVRON INVESTMENT'S MOTION FOR SUMMARY JUDGMENT [41]

---

In 2021, United Wholesale Mortgage, a wholesale mortgage lender, announced a new "initiative" to its mortgage broker partners, including Kevron Investments: to continue working with us, you must stop working with two of our competitors, Rocket Mortgage and Fairway Mortgage. At the time of the announcement, UWM and Kevron had been working together for almost two years, and they continued working together for another year after that. But Kevron continued sending loan applications to Rocket. So in 2022, UWM sued Kevron for breach of contract. Kevron, however, says it never agreed to the amended terms—in effect, that UWM tried but failed to modify the parties' original contract to add the Rocket/Fairway prohibition and a liquidated damages provision. Following discovery, both UWM and Kevron moved for summary judgment. (ECF Nos. 40, 41.) Most recently, UWM amended its motion to seek partial summary judgment. (ECF No. 51.)

Both motions are fully briefed (ECF Nos. 44, 46, 48, 49; *see also* ECF No. 53) and do not require further argument, *see* E.D. Mich. LR 7.1(f). Kevron's contract interpretation is unreasonable as a matter of law, and it fails to show that the liquidated damages clause is invalid as a matter of law. Thus, the Court will grant UWM's motion for partial summary judgment as to its breach of contract claim and deny Kevron's motion for summary judgment.

## I.

### A.

When shopping for a mortgage, homebuyers have two basic options: go directly to a retail mortgage lending institution (like a bank) and apply for a loan, or hire an intermediary (like a mortgage broker) to compare wholesale lender and loan options on the borrowers' behalf. (*See* ECF No. 40, PageID.397; ECF No. 41, PageID.959–960.) In other words, there are two main channels for residential mortgage loans—retail, where there is direct borrower and lender communication, and wholesale, where brokers match borrowers' needs with lenders' offerings. (*See* ECF No. 40, PageID.397; ECF No. 41, PageID.959–960.)

United Wholesale Mortgage, as its name suggests, is a wholesale mortgage lender. Kevron Investments is a mortgage broker. In July 2019, UWM and Kevron entered UWM's standard Wholesale Broker Agreement. (ECF No. 1-1; *see* ECF No. 40, PageID.398; ECF No. 41, PageID.980.) UWM agreed to underwrite mortgages for Kevron's qualifying clients, compensate Kevron for each loan closed, and provide "training, marketing and/or information services . . . in furtherance of [Kevron

Investments'] business." (ECF No. 1-1, PageID.11–13.) In return, Kevron agreed to advise its clients about UWM's loan products and to only submit mortgage loan applications to UWM that met UWM's conditions and requirements. (ECF No. 1-1, PageID.12; *see* ECF No. 40, PageID.397; ECF No. 41, PageID.962.)

Relevant here, the Wholesale Broker Agreement specified two ways the parties' contract could be modified. First, Section 7.01, "Amendment of Agreement," stated: "Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 1-1, PageID.16.) Second, Section 7.08 provided that "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, . . . may be amended by UWM from time to time" and that "Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind." (*Id.* at PageID.17.)

The Wholesale Broker Agreement governed the parties' relationship for about two years. Then, in March 2021, UWM announced what it calls its "All-In Initiative" (ECF No. 40, PageID.399), or, as Kevron refers to it, "an ultimatum" (ECF No. 41, PageID.961). If brokers wanted to continue working with UWM, they would have to stop working with two of its competitors, Rocket Mortgage and Fairway Independent Mortgage. (ECF No. 40, PageID.399; ECF No. 41, PageID.458.) Unlike UWM, which operates exclusively in the wholesale mortgage channel, Rocket and Fairway operate in both the retail and wholesale channels. (ECF No. 40, PageID.400; ECF No. 41,

3

PageID.959–960.) UWM asserts that their business model "negatively impacts consumers, brokers, and the wholesale mortgage channel in general and that the All-In Initiative was necessary to protect the long-term viability of the wholesale lending channel." (ECF No. 40, PageID.399.) So UWM "decided to end its business relationships with Broker Partners who chose to continue originating loans with [Rocket or Fairway]." (*Id.*) Kevron does not mention these adverse effects on the wholesale mortgage business, instead suggesting that the impetus for UWM's "ultimatum" was a "brewing rivalry" between UWM and Rocket. (ECF No. 41, PageID.960–961.)

UWM followed its announcement with an Amended Wholesale Broker Agreement. (ECF No. 1-2; *see* ECF No. 40, PageID.400–401; ECF No. 41, PageID.962.) It had two new provisions—a provision prohibiting brokers from submitting loans to Rocket and Fairway (Section 3.03(x)) and a liquidated damages clause for breaches of that prohibition (Section 7.30). Specifically, Section 3.03(x) stated that "Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding." (ECF No. 1-2, PageID.28.) And Section 7.30, "Liquidated Damages," directed that "in the event of a violation of Section 3.03(x), Broker shall immediately pay" UWM the greater of $5,000 per loan closed with Rocket or Fairway or $50,000. (*Id.* at PageID.38–39.) The rest of the amended agreement was identical to the prior Wholesale Broker Agreement. (*Compare* ECF No. 1-1, *with* ECF No. 1-2.)

After UWM's announcement and amendment, in November 2021, Kevron electronically signed a "renewal agreement" through UWM's online portal—which UWM says was the Amended Wholesale Broker Agreement (ECF No. 40, PageID.404) but which Kevron says did not contain the amended terms (ECF No. 44, PageID.1476, 1483). UWM and Kevron continued working together for a few more months. Kevron agrees that it continued sending loans to Rocket, but it says it was under no contractual obligation not to do so. (ECF No. 41, PageID.958.)

## B.

Because Kevron continued do business with Rocket while also submitting loans to UWM, in February 2022, UWM sued Kevron for breach of contract. Following discovery, the parties each moved for summary judgment in June 2024. (ECF Nos. 40, 41.)

UWM seeks summary judgment on its claim that Kevron breached the Amended Wholesale Broker Agreement. (ECF No. 40, PageID.406–413.) It further asserts it is entitled to liquidated damages as a matter of law per the amended agreement's terms. (*Id.* at PageID.414–420.) Kevron does not contest the alleged breach (that it submitted loans to Rocket while continuing to submit loans to UWM). (ECF No. 41, PageID.958.) Instead, it argues in its summary judgment motion that UWM did not validly amend the Wholesale Broker Agreement, so UWM's breach of contract claim must fail. (*Id.* at PageID.979–981.) Kevron also asserts, if it is wrong about its amendment argument, that the liquidated damages provision is an invalid penalty and thus unenforceable as a matter of law. (*Id.* at PageID.964–978.) It adds

5

that if the Court finds the liquidated damages provision unenforceable, it is entitled to summary judgment on UWM's breach of contract claim for the alternative reason that UWM suffered no actual damages. (*Id.* at PageID.978–979.)

Then, on March 20, 2025, UWM filed an amendment to its motion, stating that it recently realized the language of the liquidated damages provision "changed slightly at some point prior to Kevron's November 8, 2021 renewal acknowledgement." (ECF No. 51, PageID.1657.) While the provision in the Amended Wholesale Broker Agreement attached to UWM's complaint requires brokers to pay UWM $5,000 "per loan closed with Rocket Mortgage" (ECF No. 1-2, PageID.39), a "prior version" of the provision required payment of $5,000 per loan *submitted to UWM* at the same time as the broker was submitting loans to Rocket (ECF No. 51, PageID.1657). This prior version of the liquidated damages provision was in effect sometime between March 2021 (when the Amended Wholesale Broker Agreement was announced) and November 2021 (when Kevron allegedly signed the renewal). Under UWM's theory, Kevron still breached the contract before November because it had already accepted the amended agreement via its conduct under Section 7.08. But the way liquidated damages were calculated before November 2021 was different.

UWM's amendment of its motion in turn concedes, for purposes of summary judgment, a fact issue on both liability and damages as to the pre-renewal period. (*See id.* at PageID.1658.) UWM writes: "Given the slightly different calculation that would be required for the pre-November 8 period, as well as the factual dispute Kevron has raised as to whether it agreed via **conduct** to the All-In Addendum prior

to its November 8 express renewal, UWM amends its pending motion to withdraw, and leave for trial, the issues of liability and damages for the period prior to November 8." (*Id.* (emphasis in original).)

The Court held a status conference with the parties the day after UWM filed its summary judgment amendment and granted Kevron leave to file a response. It did so, and simply reiterated its position that regardless of the amount UWM seeks in liquidated damages, the provision itself is an unenforceable penalty. (ECF No. 53.)

The effect of UWM's March 20, 2025, filing is that it now moves for partial summary judgment. It asserts that there is no genuine issue of material fact that Kevron agreed to the Amended Wholesale Broker Agreement in November 2021, whether by conduct under Section 7.08 or via writing under Section 7.01, and breached those terms by continuing to send loan applications to Rocket. UWM further asserts that the liquidated damages provision in effect from November 2021 onward entitles it to $70,000, i.e., $5,000 per loan submitted to Rocket after November 2021. (ECF No. 51, PageID.1658.) It leaves for another day the liquidated damages amount it would be owed for Kevron's alleged breach before November 2021. (*See id.*)

## II.

Both parties have filed motions for summary judgment. So Federal Rule of Civil Procedure 56 governs, and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "This standard [of review] does not change 'simply because the parties present cross-motions' for summary judgment." *Nat'l Elec.*

*Annuity Plan v. Henkels & McCoy, Inc.*, 846 F. App'x 332, 336 (6th Cir. 2021) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Nor does the Court assume that either party is necessarily entitled to summary judgment. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021) ("[T]his Circuit does not assume that 'the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record.'" (quoting *Taft Broad. Co.*, 929 F.2d at 248)).

That said, UWM and Kevron must satisfy different burdens to succeed on their respective motions. Because UWM has the ultimate burden of persuasion on its breach of contract claim, it is only entitled to summary judgment if it shows that no reasonable jury could find in favor of Kevron. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012). In contrast, because Kevron lacks the burden of persuasion as to UWM's claim for relief, its initial summary judgment burden is lower: it need only "point[] out to the district court . . . that there is an absence of evidence to support [UWM's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Kevron does that, the burden shifts to UWM to "come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). With respect to the liquidated damages provision, though, the burden is on Kevron to show unconscionability and unenforceability. *See Hemlock Semiconductor Corp. v. Deutsche Solar GmbH* ("*Hemlock I*"), No. 13-11037, 2016 WL 3743130, at *19–20 (E.D. Mich. July 13, 2016) ("[W]hen contesting a liquidated damages provision, the burden of establishing the unconscionability of the

8

provision lies with the party challenging the provision."), *aff'd sub nom. Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH* ("*Hemlock II*"), 867 F.3d 692, 706–07 (6th Cir. 2017) (concluding that district court's assignment of initial summary judgment burden to non-movant opposing liquidated damages provision was "reasonable and consistent with" Sixth Circuit and Michigan law).

When considering the parties' competing motions for summary judgment, the Court considers each individually—viewing the evidence presented in each motion in the light most favorable to the nonmoving party, with the ultimate burden on the moving party to demonstrate that it is entitled to judgment as a matter of law. *See id.*; *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.").

## III.

By the terms of the parties' contract, the Court applies Michigan law. (*See* ECF No. 1-1, PageID.17 ("Governing Law"); ECF No. 1-2, PageID.35 (same).) Under Michigan law, a party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014); *see In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003). The first and third elements—the existence of a contract and damages—are the focus of the parties' motions for summary judgment.

9

## A.

The original agreement is not in dispute. Indeed, UWM and Kevron agree that they entered the Wholesale Broker Agreement, attached to UWM's complaint, in 2019; that the original agreement did not prohibit Kevron from submitting loans to Rocket and/or Fairway; that UWM introduced the prohibition via announcement and via an amended contract in 2021; and that Kevron continued sending mortgage loan applications to both UWM and Rocket after that. On the first element, the main question is whether there is a genuine dispute of material fact that Kevron agreed to the amended terms, or, put another way, whether UWM validly amended the parties' original contract.

Kevron concedes that it sent loans to UWM after the amendment was announced but insists that it did not accept the amended agreement. Section 7.01, says Kevron, creates a general rule that all contract modifications must be made in writing and signed by both parties. (ECF No. 41, PageID.979–981; ECF No. 44, PageID.1476–1478.) On the other hand, Section 7.08 creates a narrow exception to the general rule—a method of contract modification that allows UWM to make *certain types* of amendments without a signed writing, which Kevron may accept via conduct. (ECF No. 44, PageID.1478–1483.) But UWM's 2021 amendment was not the "type" of amendment covered by Section 7.08, according to Kevron, so it required a signed writing under Section 7.01 to be valid. (*Id.*) And while Kevron agrees it renewed the parties' agreement in November 2021 in a signed writing, it asserts that there is no genuine issue of material fact that the renewal did not contain the amended terms.

10

(*Id.* at PageID.1478, 1483–1485.) So Kevron says it is entitled to summary judgment on UWM's breach of contract claim because UWM has failed to establish it ever agreed to the Amended Wholesale Broker Agreement. (*Id.* at PageID.1476, 1484.)

UWM disagrees. In its motion for partial summary judgment, it focuses on only the period after Kevron signed the renewal agreement, and it argues there is no genuine issue of material fact that Kevron accepted the amended terms, whether by conduct or signed writing. (ECF No. 40, PageID.407–410.)

Because no reasonable jury could find in Kevron's favor that its continued loan submission was not acceptance of UWM's amendment, UWM is entitled to summary judgment on its breach of contract claim.

**B.**

Kevron attempts to avoid UWM's amendment by cabining the plain language of Section 7.08. According to the broker, Section 7.08 creates a narrow exception to Section 7.01 that allows UWM to make amendments that "involve (1) a policy, procedure, requirement, and instruction (2) involving Mortgage Loan Applications and Mortgage Loans." (ECF No. 44, PageID.1479.) It argues that the amendments at issue here, which would bar Kevron from sending loans to Rocket, "do[] not involve any policies and procedures 'concerning Mortgage Loan Applications and Mortgage Loans,'" so they are not "the types of modifications" UWM could make without a signed writing. (*Id.* at PageID.1479–1480.)

The clear and unambiguous contract language precludes Kevron's argument. "A fundamental tenet of [Michigan] jurisprudence is that unambiguous contracts are

not open to judicial construction and must be *enforced as written*." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494 (Mich. 2001); *see Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 373 (Mich. Ct. App. 2019) ("A court's primary obligation when interpreting a contract is to determine the intent of the parties. The parties' intent is discerned from the contractual language as a whole according to its plain and ordinary meaning." (citations omitted)). "If the contract language is clear and unambiguous, its meaning is a question of law." *Port Huron Educ. Ass'n, v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996). "Only when contractual language is ambiguous does its meaning become a question of fact." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010).

Recall that Section 7.08 provides, in relevant part: "This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, . . . may be amended by UWM from time to time . . . ." (ECF No. 1-1, PageID.17.) Kevron's interpretation requires ignoring the first three words of Section 7.08. It insists that Section 7.08 authorizes UWM to amend only "UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans." (ECF No. 44, PageID.1479.) But Section 7.08 expressly applies to "This Agreement" overall. And the Court must "give[] effect to every word, phrase, and clause' while avoiding 'interpretations that

would render any part of the document surplusage or nugatory.'" *Bayberry Grp., Inc. v. Crystal Beach Condo. Ass'n*, 964 N.W.2d 846, 852 (Mich. Ct. App. 2020) (quoting *Tuscany Grove Ass'n v. Peraino*, 875 N.W.2d 234, 237 (Mich. Ct. App. 2015)).

The text of Section 7.01 further underscores the broad application of Section 7.08. "[Michigan courts] read contracts as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003); *see Reardon v. Kelly Servs.*, 210 F. App'x 456, 459 (6th Cir. 2006) ("A court must consider the entirety of the contractual text whenever construing any portion of a contract."). Section 7.01 states: "Except as set forth [i]n Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both [Kevron] and UWM." (ECF No. 1-1, PageID.16.) So Section 7.01 describes how "this Agreement" may be modified and specifically cross-references Section 7.08, which in turn describes a second way "[t]his Agreement" may be modified. Indeed, Section 7.08 specifies that that UWM may "from time to time" amend "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans"; that UWM "will endeavor to provide broker with prompt notice" of any amendment and may do so by posting the amendment to its website (which Kevron must "regularly check and monitor"); that Kevron manifests acceptance of the amendment through "submission of any Mortgage Loan Applications or Mortgage Loans to UWM . . . without further signature or consent of any kind"; and that

UWM's amendment then applies to "pending[] and/or future Mortgage Loan Applications" submitted by Kevron to UWM. (ECF No. 1-1, PageID.17.)

The contract language is thus clear that UWM may amend the parties' entire agreement under Section 7.08, not only a narrow subcategory of terms. Kevron's interpretation to the contrary is an unreasonable reading of the text. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (applying Michigan law and explaining that a contract is unambiguous when there is only one reasonable interpretation); *see also ChiRhoClin, Inc. v. Grand River Aseptic Mfg., Inc.*, No. 17-993, 2019 WL 13100196, at *6 (W.D. Mich. June 20, 2019) ("Disagreement between the parties about the proper interpretation of a contract does not require the court to find the contract ambiguous; both interpretations must be reasonable.").

Further resisting this conclusion, Kevron argues that "[i]f UWM can change the entire agreement under section 7.08 unilaterally, then it would render Section 7.01, which requires Kevron and UWM's[,] signatures mere surplusage." (ECF No. 44, PageID.1482.) It contends it would not "make sense" for Section 7.08 to allow UWM "to unilaterally change the *entire* agreement" and says that "Section 7.08 is clearly meant to allow UWM to modify procedures for loan submissions." (*Id.* at PageID.1482–1483.) Not so.

Sections 7.01 and 7.08 present two different ways the parties can modify the contract—they are independent provisions such that neither makes the other superfluous, redundant, or meaningless. Section 7.01, titled "Amendment of Agreement," establishes that either party can modify the contract in a writing signed

by both parties, whereas Section 7.08, "*UWM* Amendments & Website," establishes that UWM, but not brokers, may make prospective unilateral amendments (applicable to "pending[] and/or future" loan applications), provided that UWM "endeavor[s] to provide broker with prompt notice" (e.g., "by posting any such amendments on UWM's website") and the broker accepts through "submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment." (ECF No. 1-1, PageID.16–17.); *see Bhasin v. United Shore Fin. Servs., LLC*, No. 20-13278, 2022 WL 662284, at *10 (E.D. Mich. Mar. 4, 2022) ("Reading [Sections 7.01 and 7.08 of UWM's Wholesale Broker Agreement] together, it appears that the contract can only be amended by either (1) a bilateral amendment in a writing per 7.01 or (2) a prospective amendment by UWM per 7.08."). Read together, Section 7.01 sets out that brokers may only make amendments in a signed writing, while Section 7.08 explains how UWM may propose amendments other than in a signed writing and how brokers may accept or reject UWM-proposed amendments.

Indeed, by providing that "Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind," Section 7.08 makes clear that (1) a broker's continued loan submission constitutes acceptance and (2) a broker may reject an amendment proposed by UWM by either not submitting loan applications to UWM or terminating the agreement. That, too, is consistent with the other contract terms, which specify that a broker is not required to submit any mortgage loan applications to UWM at all and that either

15

party may terminate the agreement at any time for any reason with seven days advance written notice. (*See* ECF No. 1-1, PageID.16 ("7.03. No Obligations To Make Loans. . . . Broker shall not be obligated to submit any particular mortgage loan applications or any minimum number of loan applications to UWM."); *id.* at PageID.17 ("7.06. Termination. This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice . . . .").)[1]

There is thus no genuine dispute of material fact that UWM validly modified the parties' original agreement under Section 7.08 to include the amended terms. It is undisputed that it publicly announced its "All-In Initiative" on March 4, 2021 (ECF No. 40, PageID.399; ECF No. 41, PageID.961), and "Kevron doesn't deny it closed loans with Rocket" after that date (ECF No. 41, PageID.958; *see also* ECF No. 40-12). UWM is entitled to summary judgment on its claim that Kevron agreed to the amended contract. Because the Court finds that Kevron agreed to the amended terms under Section 7.08, it need not reach the question of whether Kevron also agreed to the amended terms in a signed writing.[2]

---

[1] The Court notes that UWM also makes a persuasive argument that the "All-In Addendum" would indeed constitute an amendment to "UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans." (ECF No. 49, PageID.1646–1648.) But the Court need not address or adopt it after rejecting Kevron's interpretation of the contract.

[2] Unfortunately, neither party provides a fully executed amended agreement. But there is no dispute Kevron returned a signed "renewal agreement" on November 8, 2021. The timing of this signing vis-à-vis the announcement of the All-in Initiative and the fact that the parties' initial contract automatically renewed if neither party terminated it such that it did not need to be signed (ECF No. 1-1, PageID.16 (Section

**C.**

The final element of UWM's breach of contract claim is damages. In its motion for partial summary judgment, UWM seeks to enforce the contract's liquidated damages provision and recover $5,000 per loan submitted to Rocket from November 2021 onwards, i.e., $70,000 for 14 loans. (ECF No. 40, PageID.414–419; ECF No. 51.) In response, Kevron files its own motion for summary judgment, arguing that the liquidated damages provision is an unenforceable penalty provision rather than an enforceable agreement for contract damages. (ECF No. 41, PageID.967–978.) Because Kevron fails to carry its burden of showing the provision is unconscionable, UWM is entitled to partial summary judgment on its claim for liquidated damages.

"A liquidated damages provision is simply an agreement by the parties fixing the amount of damages in case of a breach." *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998) (citing *Papo v. Aglo Rests. of San Jose, Inc.,* 386 N.W.2d 177 (Mich. Ct. App. 1986)). "It is a well-settled rule in [Michigan] that the parties to a contract can agree and stipulate in advance as to the amount to be paid in compensation for loss or injury which may result in the event of a breach of the agreement." *Barclae v. Zarb*, 834 N.W.2d 100, 120 (Mich. Ct. App. 2013) (quoting *Moore v. St. Clair County,* 328 N.W.2d 47, 49–50 (Mich. Ct. App. 1982)).

---

7.05)), strongly suggests that no genuine issue of material fact exists as to what Kevron signed. (*See also* ECF No. 40-7 (form "Renewal – Broker application" with amended terms in online portal showing clickwrap); ECF No. 40-10, PageID.925–928 (Kevron's email confirmation of "Renewal Application"); 40-11 (Kevron's digital signature block on "Renewal – Broker").)

Thus, "courts are to sustain such provisions if the amount is 'reasonable with relation to the possible injury suffered' and not 'unconscionable or excessive.'" *UAW-GM*, 579 N.W.2d at 421 (quoting *Moore*, 328 N.W.2d at 50). A court will "disregard the express stipulation of parties" and not enforce a liquidated damages agreement "*only* in those cases where it is obvious from the contract . . . and the whole subject matter, that the principle of compensation has been disregarded." *Wilkinson v. Lanterman*, 22 N.W.2d 827, 829–30 (Mich. 1946) (quoting *Jaquith v. Hudson*, 5 Mich. 123, 134 (Mich. 1858)); *see Curran v. Williams*, 89 N.W.2d 602, 605 (Mich. 1958) (explaining that liquidated damages provisions, like all contract provisions, are subject to "the dictates of equity" and "the principle of just compensation" but that it must be "obvious" to the court that just compensation was disregarded for the provision to not be enforced). "[T]he burden of establishing the unconscionability of the [liquidated damages] provision lies with the party challenging the provision," just as the burden is on the party seeking to "avoid the operation of a contract provision it knowingly agreed to." *Hemlock I*, 2016 WL 3743130, at *19–20; *see Hemlock II*, 867 F.3d at706–07 (concluding that district court's assignment of initial summary judgment burden to non-movant opposing liquidated damages provision was "reasonable and consistent with" Sixth Circuit and Michigan law).

Whether a liquidated damages provision is reasonable and enforceable, or is instead unconscionable and void as a penalty, is a question of law. *Moore,* 328 N.W.2d at 49. Reasonableness is evaluated based on the circumstances at the time of contracting, not at the time of breach. *Hemlock II*, 867 F.3d at 706 (citing *Barclae*,

18

834 N.W.2d at 120). No single circumstance is dispositive, but liquidated damages are in general considered "especially appropriate 'where the damages which would result from a breach are uncertain and difficult to ascertain' when the contract is executed.'" *Id.* (quoting *Moore*, 328 N.W.2d at 50). "In general, Michigan courts will honor a liquidated damages provision" if it reflects the parties' "honest attempt" to compute "just compensation" for a breach. *Great Lakes Cyber Acad. v. Strongmind, Inc.*, No. 23-75, 2025 WL 881459, at *9 (W.D. Mich. Mar. 17, 2025).

In sum, the Court will give effect to the written language of the contract and enforce the liquidated damages provision unless Kevron shows the provision is obviously unreasonable or unconscionable. *See Hemlock II*, 867 F.3d at 706–08; *Hemlock I*, 2016 WL 3743130, at *20. Kevron fails to meet its burden.

Kevron's main argument is that (1) UWM "cannot meet its burden" (2) of showing "actual damages" that it suffers (3) when Kevron sends a loan to Rocket or Fairway. (ECF No. 41, PageID.967; *see id.* at PageID.967–972.) As part of that argument, Kevron asserts that the liquidated damages provision is inherently unreasonable because UWM fails to show either that actual damages were difficult to measure pre-breach or that it attempted to estimate its actual damages. (*Id.* at PageID.PageID.967–974.) Each of these arguments suffers from the same fatal flaws: Kevron fails to engage with the evidence presented by UWM and mischaracterizes the applicable law.

For starters, Kevron misstates the threshold inquiry. It asserts that UWM "must show" its "actual damages" were uncertain or difficult to measure at the time

of contracting for the liquidated damages provision to be enforceable. (ECF No. 41, PageID.967.) As already explained, though, the burden is on Kevron to show the unenforceability of the contract provision it agreed to. *Hemlock I*, 2016 WL 3743130, at *19–20; *Hemlock II*, 867 F.3d at 706–07. And it is not a requirement of enforceability that damages were hard to compute pre-breach. That difficulty of estimation is often instructive—but not dispositive. *See Hemlock II*, 867 F.3d at 706; *Jewett, Bigelow & Brooks v. Detroit Edison Co.*, 274 F. 30, 34–38 (6th Cir. 1921) (analyzing cases and explaining that the Michigan Supreme Court "ha[s] not limited the validity of contracts for liquidated damages" to only cases where "the loss cannot be measured by a pecuniary standard"); *cf. In re Constr. Diversification, Inc.*, 36 B.R. 434, 436 (Bankr. E.D. Mich. 1983) (explaining that a "per se rule" setting a maximum liquidated damages amount "would of course flatly contradict the established rule that liquidated damage provisions are to be evaluated according to their reasonableness, under the facts and circumstances of the case"). And, in any event, Kevron, as a contracting party, expressly agreed that an estimation of damages stemming from a breach of the Rocket/Fairway prohibition was difficult to measure. (ECF No. 1-2, PageID.38 (The first sentence of Section 7.30 states: "Broker and UWM agree that the measure of damages in the event of a breach of Broker's representation and warranty under Section 3.03(x) may be difficult, if not impossible, to ascertain.").)

Moreover, enforceability depends on the broader principle of whether the liquidated damages provision is "reasonable" in relation to the "possible" injury caused by the breach, i.e., based on the pre-breach context. *UAW-GM*, 579 N.W.2d at

421 (quoting *Moore*, 328 N.W.2d at 50); *Barclae*, 834 N.W.2d at 120. What the parties' actual damages are at the time of breach (or whether they are easily measured in hindsight) does not dictate reasonableness for purposes of enforceability. *UAW-GM*, 579 N.W.2d at 421 (quoting *Moore*, 328 N.W.2d at 50); *Cent. Tr. Co. v. Wolf*, 237 N.W. 29, 31 (Mich. 1931). So Kevron's formulation that "UWM's actual damages *were not* difficult to ascertain because it *does not* have any" confuses the issue. (ECF No. 41, PageID.967 (emphasis added).)

More fundamentally, Kevron talks past UWM when it asserts that UWM is not harmed by Kevron's submission of loans to Rocket or Fairway. The harm Kevron says is missing is a direct, one-to-one loss—like the profits UWM misses out on when a given loan goes to a different lender. (*Id.* at PageID.970–972.) But that is not the harm UWM identifies throughout the record. (*See* ECF No. 1, PageID.5–7; ECF No. 40-1, PageID.455–467 (deposition of UWM's chief marketing officer); ECF No. 41-10 (transcript of UWM's Facebook Live announcement of amendment).) As explained below, the damage from breach according to UWM is more systemic and intangible—damage stemming from the loss of a borrower's future business, "forfeited" and displaced investments, and the existential threat to wholesale mortgage lending overall. By failing to seriously engage with UWM's evidence, Kevron fails to carry its burden of showing how the purported harm is neither reasonably related to nor justly compensated by the stipulated damages amount.

Take as a representative example Kevron's assertion that it "makes no sense" that UWM seeks liquidated damages for loans closed with Rocket or Fairway but

simultaneously "acknowledges it has no damages" when Kevron closes loans with other lender competitors. (ECF No. 41, PageID.971.) Kevron says that this supposedly senseless distinction makes it "clear" that the liquidated damages provision was intended as a penalty. (*See id.* ("The fact that UWM singled out Rocket and Fairway, to the exclusion of all other competitors, shows that UWM was intending to penalize brokers who worked with Rocket and Fairway.").)

The trouble with Kevron's arguments is that the distinction does make sense based on what UWM cites as the damages associated with a breach. According to UWM, the main motivator behind the "All-In Initiative" is the uniquely harmful business model practiced by Rocket and Fairway and not by other competitors. (*See* ECF No. 40, PageID.399–401; ECF No. 40-1, PageID.459.) By simply ignoring or failing to contend with that assertion, Kevron cannot carry its burden of showing the lack of a reasonable relationship.

Specifically, as UWM puts it, Rocket and Fairway operate in both the retail and wholesale channels but use "very aggressive" strategies and initiatives designed to essentially convert borrowers to the retail channel (where Rocket and Fairway make more money) for good. (ECF No. 40-1, PageID.485; *see* ECF No. 40, PageID.400 (citing ECF No. 40-1, PageID.455, 457–458, 460, 565).) Per UWM's chief marketing officer, "once a loan ends up in retail, it oftentimes is out of wholesale forever." (*Id.* at PageID.460.) So despite what Kevron's singular focus might suggest, the measure of harm according to UWM is not the individual loan that a wholesale broker like Kevron sends to Rocket or Fairway—it is the loss of the borrower themselves. (*Id.* at

PageID.459–460.) That is, once a loan gets sent to Rocket or Fairway, the borrower gets pulled over to the retail channel for all their future loan needs. (*See id.* at PageID.564–565.) Further, UWM says it invests valuable resources and services in its brokers—for example, by building a borrower-facing online portal for brokers to import into their websites (*id.* at PageID.448)—and brokers use those resources to attract borrowers who they then send to Rocket and Fairway. And the harm according to UWM does not stop there—even more broadly, it says Rocket and Fairway threaten the "long-term viability" of the wholesale channel (ECF No. 40, PageID.399, 416–417), for example by actively recruiting realtors and wholesale brokers to become retail loan officers, thus thinning out the wholesale channel overall and making it less accessible and navigable for borrowers (*id.* at PageID.400; ECF No. 40-1, PageID.455–458).

Kevron at least acknowledges the deposition testimony of UWM's chief marketing officer that, in developing the liquidated damages figure, UWM's upper management sought to account for UWM's investment in brokers (e.g., "the technology, the marketing, the training, [and] the growth tools that [UWM] offer[s] [brokers]") and the intangible loss of "goodwill" when business in the channel decreases. (ECF No. 41, PageID.970 (quoting ECF No. 40-1, PageID.497).) But Kevron's response is lacking. It merely asserts that "[t]here's simply no causal link between the cost of UWM's technology and the number of loans Kevron closed with Rocket." (*Id.* at PageID.971.) Again, that misses the point. UWM's argument is that "seemingly intangible" harms, like "loss of goodwill" (ECF No. 40, PageID.418 (citing

*Hemlock I*, 2016 WL 3743130, at \*19)) and expansion costs and capital investments, *see Hemlock II*, 867 F.3d at 708, can be part of a liquidated damages figure. But Kevron does not engage with that argument *at all*, or indeed make any argument beyond its conclusory claim regarding causation. It stays at square one and disputes whether there is any harm to compensate, rather than attempting to explain why this harm is not reasonably related to this stipulated amount.

Kevron also contends that the liquidated damages provision is unenforceable because "[t]here simply isn't any evidence in the record UWM arrived at the $5,000 per loan figure by attempting to estimate the actual losses it would suffer if Kevron closed loans with Rocket or Fairway." (ECF No. 41, PageID.970; *see id.* at PageID.970–972.) And it faults UWM for "not provid[ing] any evidence showing the method or formula UWM used to determine its damages were $5,000 for each loan closed with Rocket or Fairway." (*Id.* at PageID.974; *see id.* at PageID.972–975; ECF No. 44, PageID.1485–1487, 1494.) But Kevron again ignores that it has the burden of showing the agreed-upon amount is unreasonable (and again fails to take that burden on). Not to mention, its demand is counterintuitive—liquidated damages are a stand-in or proxy for actual damages, often used to avoid such complex or impossible estimations. *See Hemlock II*, 867 F.3d at 708; (ECF No. 46, PageID.1525–1526 ("Such a requirement would defeat the whole point of liquidated damages clauses . . . [and] 'would be tantamount to barring the parties from stipulating to liquidated damages evidence in advance.'" (quoting *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 755–56 (6th Cir. 1999))).)

24

In a last-ditch effort to defeat enforcement, and perhaps to shift its burden to UWM, Kevron asserts that the liquidated damages provision "merit[s] intense scrutiny" as a provision in "UWM's standard adhesion contract." (ECF No. 41, PageID.973 (citing out-of-circuit cases).) The Court need not say much about this argument. Michigan courts are clear that "[a]n 'adhesion contract' is simply that: a *contract*. It must be enforced according to its plain terms unless one of the traditional contract defenses applies." *Rory*, 703 N.W.2d at 35. And Kevron does not seek to avoid enforcement of the entire contract under "one of the traditional contract defenses, such as fraud, duress, unconscionability." *Id.* at 41–42. It appears, instead, that Kevron argues that the Wholesale Broker Agreement was an adhesion contract to skew the balance in its favor, but in Michigan, unlike in other jurisdictions Kevron may cite to, "[t]he term 'adhesion contract' . . . may not be used as a justification for creating any adverse presumptions or for failing to enforce a contract as written." *Id.* at 52; *see Pichey v. Ameritech Interactive Media Servs.*, 421 F. Supp. 2d 1038, 1047 (W.D. Mich. 2006).

In sum, rather than carry its burden of showing that the liquidated damages provision is an unenforceable penalty, Kevron repeatedly evades it. Instead of showing how UWM's damages were, in fact, readily measurable at the time of contracting, Kevron says only that there was nothing to measure. Instead of showing why the liquidated damages amount is disproportionate to the alleged harm wrought when Rocket and Fairway divert borrowers and brokers to the retail channel to stay or indirectly benefit from UWM's investments in brokers, Kevron insists that the

harm is distinct and, again, ultimately nonexistent. The main theme is that Kevron ultimately takes issue with the premise that compensation is due for a breach of the Rocket/Fairway prohibition. But having concluded that UWM is entitled to summary judgment as to the issue of whether Kevron agreed to the prohibition and liquidated damages provision, the only question for the Court is whether it is "obvious from the contract . . . that the principle of just compensation has been disregarded." *Hemlock II*, 867 F.3d at 706. It is not. And Kevron has failed to present any evidence to that effect or even address UWM's arguments on the issue. So the liquidated damages provision will be enforced, and the Court will award UWM $70,000 in liquidated damages for the 14 loans that Kevron submitted to Rocket after November 8, 2021. (*See* ECF No. 40; ECF No. 51, PageID.1658 (citing ECF No. 40-11, PageID.932).)

## IV.

Finally, Kevron and UWM argue about the enforceability of the contract's attorney's fees provision. UWM seeks to enforce the provision (ECF No. 1-2, PageID.36; *see* ECF No. 1-1, PageID.17 (same)), though it asks the Court to determine the amount owed based on a hearing or supplemental briefing (ECF No. 1, PageID.8–9; ECF No. 40, PageID.411–413, 413 n.4; ECF No. 51, PageID.1658). Kevron contends that UWM's request for attorney's fees is premature because the Court should first determine whether they are reasonable. (ECF No. 44, PageID.1497–1498.)

It is well established under Michigan law that a contractual provision for reasonable attorney's fees is judicially enforceable. *See, e.g., Zeeland Farm Servs., Inc. v. JBL Enters., Inc.*, 555 N.W.2d 733, 736 (Mich. Ct. App. 1996). Whether the

amount sought is reasonable is a distinct question. *See id.*; *Papo*, 386 N.W.2d at 183; cf. *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 762 (6th Cir. 2004). Here, pursuant to Section 7.16 of the parties' agreement, UWM is contractually entitled to recover its reasonable attorney's fees and costs. As for the amount to which UWM is entitled, i.e., what constitutes a reasonable amount here, the parties agree that supplemental information is necessary. (ECF No. 40, PageID.413 n.4; ECF No. 51, PageID.1658; ECF No. 44, PageID.1497–1498.) The Court also notes that, per UWM's amendment to its motion for summary judgment, "the issues of liability and damages for the period prior to November 8" remain. (ECF No. 51, PageID.1658.)

So the Court will determine the reasonableness of the amount owed to UWM in attorney's fees and costs after the parties have submitted supplemental briefing and supporting documentation on the issue.

## V.

For the reasons above, the Court GRANTS United Wholesale Mortgage's motion for partial summary judgment (ECF No. 40) and DENIES Kevron Investment's motion for summary judgment (ECF No. 41).

SO ORDERED.

Dated: March 31, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE